**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————————x
                                              :
In re                                         :          Chapter 11
                                              :
                                              :          Case No. 16-10073 (MG)
PRIMORSK INTERNATIONAL SHIPPING               :
LIMITED, *et al.*,[1]                         :           Joint Administration Pending
                                              :
                          Debtors.            :
———————————————————————x

### DECLARATION OF HOLLY FELDER ETLIN
### PURSUANT TO RULE 1007-2 OF THE LOCAL BANKRUPTCY RULES
### FOR THE SOUTHERN DISTRICT OF NEW YORK IN
### SUPPORT OF FIRST DAY MOTIONS AND APPLICATIONS

I, Holly Felder Etlin, hereby declare as follows:

1.      I am a Managing Director at AlixPartners operating in the firm's

Turnaround and Restructuring practice.  I am based in the New York office of AlixPartners and I

have over 30 years of experience in providing restructuring and reorganization services for

companies.

2.      I currently serve as the chief restructuring officer of Primorsk

International Shipping Limited, a corporation organized under the laws of Cyprus ("Primorsk"),

and each of the debtors and debtors-in-possession in these chapter 11 cases (each a "Debtor

Subsidiary" and, together with Primorsk, the "Debtors").

---

[1]     The Debtors in these Chapter 11 Cases and, if applicable, the last four digits of their U.S. taxpayer
        identification numbers are:  Primorsk International Shipping Limited (Cyprus), Boussol Shipping Limited
        (Cyprus) (6402) – m/t "Zaliv Amerika", Malthus Navigation Limited (Cyprus) (6401) – m/t "Zaliv Amurskiy",
        Jixandra Shipping Limited (Cyprus) (6168) – m/t "Prisco Alexandra",  Levaser Navigation Limited (Cyprus)
        (0605) – m/t "Prisco Ekaterina", Hermine Shipping Limited (Cyprus) (0596) – m/t "Prisco Irina", Laperouse
        Shipping Limited (Cyprus) (0603) – m/t "Prisco Elizaveta", Prylotina Shipping Limited (Cyprus) (6085) – m/t
        "Prisco Elena", Baikal Shipping Ltd (Liberia) (6592) – m/t "Zaliv Baikal" and Vostok Navigation Ltd (Liberia)
        (1745) – m/t "Zaliv Vostok".

3.      I have served in the capacity of the chief restructuring officer of the Debtors since January 14, 2016.  Although the Debtors are each independent legal entities, given the worldwide coordination of their business as a vertically integrated group of companies, in connection with my recent appointment, I have become familiar with the day-to-day operations and business and financial affairs of the Debtors as a group.  AlixPartners has been engaged by the Debtors to assist in various restructuring negotiations since 2012.

4.      I submit this declaration pursuant to rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules") in support of the Debtors' petitions (the "Petitions") for relief under title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code"), filed on January 15, 2016 (the "Petition Date") and the Debtors' related requests for initial relief in the form of motions and applications (the "First Day Motions").  I have reviewed the Debtors' Petitions and First Day Motions, or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to ensure the uninterrupted operation of the Debtors' business and the success of the Debtors' reorganization.

5.      Except as otherwise indicated, the facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees working under my supervision, or my opinion based upon experience with the operation of the Debtors and their industry as a whole.  I am authorized to submit this declaration on behalf of each Debtor, and if called upon to testify, I would testify competently to the facts set forth herein.  Unless otherwise indicated, the financial information contained in this declaration is unaudited.  Such financial information is also presented on a consolidated basis for the affiliated Debtors where applicable, whether located in the United States or elsewhere.

SC1:4025921.1

6.      On the Petition Date, the Debtors commenced reorganization cases in this Court pursuant to chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").  As well as seeking the relief requested in the First Day Motions, this declaration is intended to provide a summary overview of the Debtors and their business.  The Debtors conduct their business directly and through three wholly-owned non-Debtor subsidiaries, Isardia Holdings Limited, Walmer Shipping Co. Limited and Shipworth Shipping Company Limited (the "Non-Debtors Subsidiaries" and, together with the Debtors, the "Company").  Specifically, Part I provides an overview of the Company's business.  Part II provides a description of the Company's organizational structure, financial position and performance and prepetition indebtedness.  Part III addresses the circumstances leading to the filing of the Chapter 11 Cases.  Part IV describes the Debtors' expected restructuring plan.  Part V describes the relief sought by the Debtors in each of the First Day Motions.  Part VI contains information required by Local Rule 1007-2 to the extent not otherwise provided herein.

## I.      The Company's Business

### A.      Background

7.      The Company is an international specialty shipping company and one of the world's leading operators of modern ice-classed, double-hulled tankers.  Founded in 2004, the Company is renowned for its ice navigation expertise and has extensive experience operating in the Artic under extreme conditions.  The Company has a highly-experienced management team and broad expertise across international shipping sectors and market cycles.

8.      The Company's business and the market for the Company's services are international.  The Company conducts and finances its business in United States Dollars.  It is organized in Cyprus and managed from Singapore.  It is currently engaged in the transport of crude oil and other oil products in Russian, Canadian, United States and European waters,

SC1:4025921.1

among other localities.  In calendar years 2014 and 2015, the Company's vessels made 113 stops in the United States.

9.       The Company provides these global shipping transportation services to customers through the operation of a fleet of nine wholly-owned specialty vessels, each of which is owned by a separate Debtor Subsidiary.  The Company enters into long-term contractual arrangements, or time-charters, with its customers.  Under the time-charters, the Company is obligated to provide the vessel and crew, and otherwise perform transportation shipping services, in return for charter fees.  Charter fees are calculated on a daily basis and generally are paid to the Company monthly in advance.

10.       The amount currently paid to the Company for vessel charters is approximately $16 million per quarter, substantially in excess of the Company's operating costs. In recent years, the Company has consistently generated positive operating income.  The Company's fleet is currently at or near full utilization.

11.       Revenues through charter fees paid can be volatile and vary with market trends and conditions, including world trade volumes, the supply and age of vessels in the market, global oil price and other factors.  For the past few years, the Company has operated under a series of below-market long-term time-charters.  Charter rates for the specialty services provided by the Company have increased in recent months and the Company entered into new long-term time-charters, generally effective January 1, 2016, that have further improved its operating financial performance.

B.       The Company's Customers

12.       The Company is committed to providing its clients with first-class quality transportation services and has developed a strong reputation with a number of leading

-4-

charterers including oil majors, traders and international shipping companies.  The Company

charters its vessels to a broad range of established leading companies and seeks to develop and

maintain long-term relationships through the provision of safe, reliable and quality

transportation services.  The high-quality vessels in the Company's tanker fleet currently have

vetting approvals from a number of global leading oil majors and refiners including BP, CEPSA,

Chevron Corporation, ENI, Lukoil, Phillips 66, Repsol, Shell, Statoil, Sunoco, Tesoro and Total.

C.    The Company's Suppliers

13.    The Company's main suppliers provide (a) management services, (b) the

crew required to operate its vessels, and (c) the lube oils, chemicals, engine spares, maintenance

and repairs and insurance necessary to ensure the vessels' continued operations.

14.    Management services are provided by Prisco (Singapore) Pte Ltd ("Prisco

Singapore" or the "Managing Agent"), which acts as the managing agent on behalf of the

Debtors for their principal ship management and procurement activities.  The Managing Agent

employs approximately thirty (30) employees in Singapore.

15.    Crews for the vessels are sourced by Primorsk Shipping Corporation

("PSC") and trained at the Prisco Training Centre ("PTC") in Nakhodka, Russia on the coast of

the Sea of Japan.  The PTC is one of the few maritime educational establishments in Russia and

is officially registered with the International Maritime Organization ("IMO"), which is the

United Nations' specialized agency responsible for improving maritime safety and preventing

pollution from ships.  In 2011, PTC also became the first maritime training center in Russia

certified by Det Norske Veritas ("DNV").  DNV is an Oslo-based free-standing, autonomous

and independent foundation whose purpose is to safeguard life, property and the environment.

PSC provides qualified crew as and when required.

16.     The Managing Agent and PSC are independent companies and are not

Debtors.  However, they are sister companies with Primorsk in that they are owned and

controlled by Apington Investments Limited ("Apington"), a British Virgin Islands holding

company that also is the parent company of Primorsk.  The Managing Agent and PSC have

contractual arrangements with the Debtors that I understand to be on arm's-length terms as

contemplated by the Debtors' financing arrangements.

17.     The Company is provided with spares and stores for the Company's fleet

through a network of dedicated third-party logistics partners with whom the Company works to

coordinate shipments and final delivery to the vessels.  Due to the global scope of the

Company's operations and ports of call, its suppliers and service providers also are spread

throughout the world.  The purchasing department of the Managing Agent is responsible for

procuring and supplying the Debtors with all goods and services necessary to support their

operations, providing the Debtors with significant logistical efficiencies.  In order to ensure cost

competitiveness, where supply agreements are not in place, orders are sourced through

recognized suppliers with three quotations obtained to benchmark the costs.

## II.     The Company's Organizational Structure, Financial Performance and Prepetition Indebtedness

### A.     Organizational Structure

18.     The corporate structure chart, attached hereto as Exhibit A, provides a

general overview of the relationship of the Debtors and their affiliates.  Primorsk is organized

under the laws of Cyprus and its 12 subsidiaries are organized under the laws of either Cyprus or

Liberia.  The Company has structured its operations in this manner for various reasons,

including considerations unique to the shipping industry and geopolitical considerations.

Various circumstances in the global shipping industry confer material advantages to registering a

vessel, or a special purpose corporation holding a vessel, in specific countries.  These are known in the industry as "registration countries" and the use of such jurisdictions is entirely conventional in the international shipping market.

      B.    <u>Financial Performance and Cash Position</u>

      19.    In the fiscal year 2015 ending on December 31, 2015, the Company, on a consolidated basis, will report revenues of approximately $51 million and operating income of approximately $21 million.  In 2014, the Company reported revenue of $47 million derived from ship ownership and chartering and operating income of $19 million.  As of December 31, 2015, the Company, on a consolidated basis, reported approximately $364 million in total assets and $357 million in total liabilities as compared to $334 million in assets and $375 million in liabilities in the previous year.

      20.    The Company's fleet of nine vessels has an average age of 7-8 years, and useful lives of approximately 25 years.  The value of the vessels to the Company is not closely tied to their book value (generally, acquisition cost minus depreciation), but instead is primarily determined by expected market charter rates over the vessels' remaining useful life.  The Company does not anticipate any decline in the value of its vessels during 2016 because the modest depreciation of the vessels' book value is expected to be more than offset by increases in charter rates from 2015.

      21.    As of the Petition Date, the Debtors have approximately $3,780,000 of cash on hand, including $350,000 on account with Sullivan & Cromwell LLP in New York (held as a security retainer for the ratable account of all Debtors), approximately $530,000 on account with AlixPartners in New York (held as a security retainer for the ratable account of all Debtors) and approximately $2,700,000 on account (the "<u>Nordea Account</u>") with Nordea Bank Norge

SC1:4025921.1

ASA ("Nordea") in London, England.  The Debtors conduct their business worldwide in United States Dollars.

C.      The Debtors' Prepetition Indebtedness

22.      The Debtors' principal liabilities consist of (i) two tranches of senior unsecured bonds governed by Norwegian law, in an aggregate amount of approximately US $80.9 million equivalent (the "Norwegian Bonds"), and (ii) three tranches of secured financing governed by English law, in an aggregate amount of approximately US $262.2 million (the "Secured Debt").  Primorsk's obligations under the Norwegian Bonds and the Secured Debt are guaranteed by each Debtor Subsidiary.  Other than a portion of the Norwegian Bonds, which are denominated in NOK, all of the funded debt of the Debtors is denominated in United States Dollars.

a.   The Norwegian Bonds

23.      The Norwegian Bonds were issued pursuant to an agreement, dated February 23, 2007 and amended as of February 28, 2011, May 27, 2011, July 29, 2011 and October 1, 2015 (as amended, the "Bond Agreement"), between Primorsk and Norsk Tillitsmann ASA (now Nordic Trustee ASA) in its capacity as trustee ("Bond Trustee").  The total outstanding principal amount of such Norwegian Bonds is approximately US $80.9 million equivalent, consisting of an approximately $21.7 million tranche denominated in United States Dollars and an approximately $59.2 million tranche denominated in Norwegian Kroner. Pursuant to the October 1, 2015 amendment, all accrued and unpaid interest as of October 1, 2015 was capitalized and added to the then outstanding principle amount.  No interest has accrued since.  Primorsk is the issuer of the Norwegian Bonds, which are guaranteed by each of the Debtor Subsidiaries pursuant to a guarantee dated August 5, 2011 granted by each Debtor

-8-

Subsidiary in favor of the Bond Trustee.  The Norwegian Bonds and related guarantees are unsecured.

24.     The Company is engaged in restructuring discussions with a majority in outstanding principal amount of the Norwegian Bonds and believes it has reached an agreement in principle concerning a plan of reorganization that would garner significant bondholder support.  The restructuring would involve the conversion of all of the outstanding Norwegian Bonds into approximately 75% of the equity of the reorganized Debtors pursuant to a chapter 11 plan of reorganization, with the remaining equity of the reorganized Debtors to be retained by current owners and management.

### b.  The Secured Debt

25.     As of the Petition Date, the Debtors' Secured Debt consists of approximately $262.2 million in aggregate principal and accrued interest through the Petition Date with respect to three tranches of secured financing: (i) approximately $194.3 million owed to a syndicate of banks and financial institutions pursuant to a senior secured term loan facility taken mainly to finance the purchase of vessels (the "Senior Secured Facility"); (ii) approximately $51.6 million in aggregate to a syndicate of banks and financial institutions with respect to a junior secured facility taken mainly to finance the purchase of vessels and for other general corporate purposes (the "Junior Secured Facility") and (iii) approximately $16.3 million in aggregate to a syndicate of banks and financial institutions with respect to a third ranking term loan facility taken to finance certain swap liabilities (the "Third Ranking Swap Facility").  Primorsk and each Debtor Subsidiary guarantee the Secured Debt.  Each Secured Debt facility purports to be secured, in first, second and third priority, respectively, by: (i) mortgages over a number of vessels; (ii) general assignments of certain earnings, insurance

and requisition compensation with respect to such vessels; (iii) charges over certain bank accounts; (iv) charterparty assignments in respect of certain existing and future time charters relating to the relevant vessels and (v) shareholdings of Primorsk in the Debtor Subsidiaries.

26.     All of the Secured Debt matured in June 2015.  The Company paid interest on the Secured Debt through its maturity and also has been paying interest on the Secured Debt after its maturity.  The Company also has made various principal payments on its Secured Debt, before and after its maturity, to reduce the outstanding balance to current levels, as described in more detail below.

### c.  Other Liabilities

27.     The Debtors currently have unsecured obligations to crew, suppliers of lube oils, chemicals, engine spares and other goods and port and transportation services, maintenance and repair providers, insurance providers and other vendors or business counterparties  (collectively the  "Operating and Tax Expenses").  The Company will be able to satisfy ongoing Operating and Tax Expenses from continuing operating revenues for the foreseeable future, and subject to Court approval where required, intends to pay Operating and Tax Expenses in the ordinary course of business when due.

## III.    Events Leading to the Commencement of the Debtors' Chapter 11 Cases

28.     Since its formation in 2004, the Company pursued a strategy of steady growth, increasing and diversifying its fleet of vessels to a maximum of 25 in 2010 to achieve a competitive operational size.

29.     Unfortunately, the Company undertook its strategic plan shortly before the global economic crisis began in late 2007.  The economic crisis led to a substantial decrease in world trade with a corresponding reduction in the demand for marine transportation.  Such

decrease in demand led to a decrease in transportation tariffs, depressing the profitability of shipping companies, including the Company.  In addition, several of the Company's diversification strategies ultimately did not produce levels of operating income which justified the investment, and were subsequently disposed of.

30.    Since 2008, the Company's operations have been affected by the global economic downturn and a slow-down in its current activities.  Although the Company has consistently generated positive operating income, the pricing of time-charters has impaired the Company's profitability and limited its ability to repay debt, refinance existing debt and obtain financing to purchase new vessels.

31.    Since 2010, the Company has entered into various restructuring agreements and facility amendments with its creditors, pursuant to which it has sold various vessels, facilities and non-core assets, and reduced its total debt from a maximum amount of approximately US $550 million to the amounts outstanding as of the Petition Date.

32.    In November 2014, the Company and holders of approximately 48% in principal amount of its Norwegian Bonds agreed on the terms of a consensual restructuring in which the Norwegian Bonds would be converted into equity and also receive a cash payment (the "Proposed Bond Restructuring").  However, the Proposed Bond Restructuring was conditional, among other things, upon a negotiated extension of the term of the Secured Debt to June 30, 2020.  The Debtors engaged in protracted negotiations to implement the Proposed Bond Restructuring outside of a judicial process, but this proved unsuccessful because of the unwillingness of the Secured Debt lenders to extend their maturity on terms mutually agreeable to the parties.

-11-

33.    The Secured Debt matured in June 2015.  Since then, the Debtors have worked diligently and in good faith to reach a compromise to extend or refinance the Secured Debt.  The Secured Debt lenders instead insisted that the Company pursue a liquidating sale of its entire fleet of vessels, and refused to provide a standstill against enforcement action unless a sale process was conducted to test the waters.  Faced with the lenders' demands, the Debtors cooperated, and undertook to explore the lender-sponsored liquidation of their assets, even though the Debtors believed that a forced sale would not achieve or reflect the true long-term value of the business.  The Debtors believe that their business is worth significantly more than the liquidation value of their vessels, especially if the business is able to reset interest rates and charter rates to current market conditions.

34.    The sale process requested by the Secured Debt lenders was conducted over a four-month period.  Not surprisingly, given the large difference between the liquidation value of the vessels and the going concern value of the Company with its worldwide relationships and operating expertise, the sale process failed to provide a solution to the impasse.  As a consequence, the Debtors have been operating without a standstill or other protection from their Secured Debt lenders since the conclusion of the active sale process in October 2015.

35.    In response to this unsatisfactory state of affairs, Primorsk sought to engage the Secured Debt lenders in an extension of the facilities based on the improved economics for lenders as the global charter market continues to recover.  The Company continues to believe strongly that reorganization—not a sale of vessels—is the best path to maximize the total value of the enterprise distributable to all creditors, including the holders of the Norwegian Bonds as well as the Secured Debt lenders.  The Company is profitable, successful, a market leader and charter rates are rising.

SC1:4025921.1

36.    However, the Secured Debt lenders, acting through their agent Nordea, have continued to insist that the Debtors immediately relaunch the sale process to liquidate the fleet, and have threatened further enforcement action if the Debtors do not do so.  On January 12, 2016, Nordea, acting as agent under the Senior Secured Facility, sent the Debtors a principal payment notice.  Simultaneously, Nordea took possession of approximately $7.3 million from the Nordea Account in London (the Company's primary banking account at the time) and applied such amounts to the outstanding balance of the Secured Debt.  The seizure of this cash reduced the Company's cash available to only slightly more than one month's operating expenses.  On the next day, Nordea, acting as agent under the Senior Secured Facility, sent an acceleration notice demanding immediate payment of all amounts owing under the Senior Secured Facility.  As a result, Primorsk, after careful consideration of all alternatives, determined that the filing of the Chapter 11 Cases was in the best interests of the Company and all of its stakeholders.

37.    With respect to the choice of the United States Bankruptcy Code and a filing in the Southern District of New York, I have discussed with the Company and its legal advisors the various options available to the Company for financial reorganization under the laws of the many jurisdictions in which the Company operates or has property.  The Company has property in New York City, conducts its business in United States Dollars, calls at United States ports and does business in the United States when in such ports or United States coastal waters, is part of a global market in the transport of crude oil in which the United States has an interest, has debt denominated in United States Dollars held by international lenders that operate in New York and are subject to United States jurisdiction, intends to issue New York law-governed bonds to refinance the Secured Debt pursuant to a chapter 11 plan of reorganization (as

SC1:4025921.1

discussed below), and has primary stakeholders (including Nordea and majority holders of

Norwegian Bonds) who as of the Petition Date already have engaged restructuring advisors

based in New York City who are familiar with chapter 11 and are ready to appear without undue

expense to represent the various interests fairly.  Weighing the available options, the Company

has determined in good faith that the United States is the jurisdiction in which the reorganization

of the Company is most feasible and appropriate in order to maximize the value of the

Company's operating business and to protect the interests of its creditors, employees, current

customers and other stakeholders.

IV.    **The Debtors' Chapter 11 Cases**

38.    The Debtors intend to operate their business in the ordinary course during

the Chapter 11 Cases.  I have reviewed the Debtors' business plan and projected financial

information, and the Debtors forecast that postpetition revenue from charter arrangements will

exceed $5 million per month during financial year 2016.  The Debtors also forecast that

operating expenses, including the cost of these Chapter 11 Cases, will not exceed $4 million per

month during financial year 2016.

39.    The strong forecasted financial performance is in part a result of new

long-term charter prices negotiated by the Company in December 2015, which charter pricing

contemplates the operation and reorganization of the Company as a going concern.  Based upon

improved charter rates, the Debtors forecast that 2016 EBITDA will be approximately $34

million, as compared to $22 million in 2015.  I believe that all of the foregoing forecasts are

reasonable based on information available at this time.

40.    Prior to the Chapter 11 Cases, the Debtors were in discussions with

holders of a majority in principal amount of the Norwegian Bonds regarding a consensual

SC1:4025921.1

restructuring.  Shortly before the Petition Date, the Debtors reached an agreement in principle

with majority holders that the Debtors believe will garner significant other bondholder support

as part of a chapter 11 plan of reorganization.  The agreement contemplates the conversion of the

Norwegian Bonds into equity of the reorganized Debtors.  The agreement in principle currently

contemplates the following key terms:

a. **Charter Arrangements**.  The Debtors would assume new and existing long-term charter arrangements as negotiated by the Debtors in their best interests, with charter rates at least as favorable as the recently-improved charter arrangements in place on the Petition Date and discussed above.

b. **Case Financing**.  The proposed plan and the prosecution of the Chapter 11 Cases would be funded from existing cash and cash generated from operations during the Chapter 11 Cases.  There would be no debtor-in-possession financing.

c. **Norwegian Bonds**.  Holders of the Norwegian Bonds will be provided a disclosure statement and solicited to approve a plan of reorganization in accordance with the Bankruptcy Code.  The proposed plan would discharge all claims against the Debtors arising under the Norwegian Bonds in exchange for equity in the reorganized Debtors.

d. **Reorganized Equity**.  Holders of Norwegian Bonds would receive up to 75% of the fully diluted issued share capital of the reorganized Primorsk. The remaining share capital of reorganized Primorsk would be allocated to the existing shareholders of Primorsk and the executive directors of Primorsk.

e. **Senior Secured Debt**.  Holders of Secured Debt also will be provided a disclosure statement and solicited to approve the proposed plan of reorganization in accordance with the Bankruptcy Code.  The proposed plan would leave any liens securing the Secured Debt in place and discharge Secured Debt claims against the Debtors in exchange for replacement instruments in the form of United States Dollar-denominated senior secured bonds governed by New York law.  The Debtors and the large holders of Norwegian Bonds would work in good faith to achieve consensus with holders of Secured Debt on the appropriate tenor and interest rates for the replacement instruments prior to soliciting approval, or seeking confirmation, of the plan of reorganization.

f. **Management Agreements**.  The proposed plan would provide for the assumption of management arrangements with Prisco (Singapore) Pte Ltd, which arrangements would be equally or more favorable to the Debtors than the existing arrangements (except as holders of two-thirds of the Norwegian Bonds by principal amount may otherwise agree).

-15-

41.     The Debtors are in discussions with representatives of holders of the Norwegian Bonds to finalize and document this agreement in a restructuring support agreement or other written understanding.  The terms described above may change as such discussions continue.

## V.     The Debtors Require Relief to Avoid Immediate and Irreparable Harm

42.     To enable the Debtors to continue business operations without disruption and promote a smooth transition to chapter 11, the Debtors have requested various forms of relief in their First Day Motions.  The First Day Motions seek authority to, among other things, obtain the use of cash collateral on an interim basis, preserve customer relationships, maintain employee morale and ensure the continuation of the Company's cash management systems and other business operations without interruption.  Receiving court approval of the relief sought in the First Day Motions is essential to giving the Debtors an opportunity to work towards a successful restructuring that will benefit all of the Debtors' constituents.

43.     Several of the First Day Motions request authority to pay certain prepetition claims which have not yet been invoiced.  It is my understanding that Bankruptcy Rule 6003 provides that to the extent "relief is necessary to avoid immediate and irreparable harm," a Bankruptcy Court may approve a motion to pay all or part of a claim that arose prior to the filing of the Chapter 11 Cases within 21 days after the petition date.  Given the very narrow universe of trade creditors and their *de minimis* nature, the Debtors' request for authority to pay prepetition claims has been tailored.  Nevertheless, a failure to pay such a narrow universe of *de minimis* claims would cause immediate and irreparable harm to the Debtors.

-16-

A.     Administrative Motions

i.     **Motion for an Order Authorizing Joint Administration of the Debtors' Chapter 11 Cases**

44.     The Debtors are "affiliates" as defined in section 101(2) of the Bankruptcy Code.  The Debtors therefore request that the Court jointly administer the Chapter 11 Cases.  Joint administration will obviate the need for duplicative notices, motions, applications and orders, thereby saving considerable time for the Court and time and expense for the Debtors and their estates.  I believe that joint administration will promote the fair and efficient administration of the Chapter 11 Cases, and accordingly, respectfully submit that this motion should be approved.

ii.     **Motion for an Order Extending the Time to File Schedules and Statements**

45.     The Debtors have requested that the Court extend the fourteen-day period to file their schedules of assets and liabilities, schedules of current income and expenditures and schedules of executory contracts and unexpired leases (collectively, the "Schedules") and statements of financial affairs (the "Statements") for an additional thirty (30) days, for a total of forty-four (44) days.

46.     I believe that the size and complexity of the Debtors' business and the volume of material that must be compiled and reviewed by the Debtors' staff to complete the Schedules and Statements for each Debtor during the initial days of the Chapter 11 Cases provide ample "cause" for justifying the requested extension.

47.     An extension will permit the Debtors and their advisors to gather the necessary information in a manner that maximizes accuracy and avoids the necessity of subsequent corrections and amendments.  All parties will benefit from the enhanced accuracy of the information-gathering process.  Additionally, the Debtors do not intend to sell their assets

-17-

during this 44-day period, so no party-in-interest will suffer any adverse consequences as a result

of the Debtors' requested extension.  Accordingly, I respectfully submit that this motion is in the

best interest of the Debtors and their estates and should be approved.

### iii. Motion for an Order (A) Authorizing the Debtors to Prepare a List of Creditors in Electronic Format in Lieu of Mailing Matrix, (B) Authorizing the Debtors to File a Consolidated List of Their 30 Largest Unsecured Creditors and (C) Authorizing the Debtors to Mail Notices Through Their Claims Agent

48.     The Debtors have requested that the Court authorize the Debtors to

(a) prepare a list of creditors in electronic format, in lieu of submitting any required mailing

matrix; (b) file a consolidated list of their 30 largest unsecured creditors, and (c) mail notices

through their Claims Agent (as defined below).

49.     The Debtors request authority to maintain a consolidated list of creditors

in electronic format, in lieu of any required mailing matrix.  This information exists in a reliable

computerized form and I believe that converting the Debtors' computerized information into the

required matrix format would be unduly burdensome and would increase the risk of error with

respect to the transfer of this information from the computer systems maintained by the Debtors

or their agents.  The Debtors anticipate that, with the assistance of their Claims Agent, an

electronic consolidated list of their creditors will be completed within only twenty-one (21) days

of the Petition Date.  The Debtors are prepared to make such list available in electronic form to

any party-in-interest who so requests (or in non-electronic form at such requesting party's sole

cost and expense) in lieu of submitting a mailing matrix.

50.     Similarly, because many of the creditors are shared amongst certain of the

Debtors and the Debtors operate as a single business enterprise, I believe that granting the

Debtors authority to file a single, consolidated list of their 30 largest general unsecured creditors is appropriate under the circumstances.

51.    The Debtors further request the authority to mail notices through their claims and noticing agent, Kurtzman Carson Consultants LLC (the "Claims Agent"), whose services will streamline the notice process for all parties.

> ### iv.    Motion for an Order Enforcing Sections 362, 365(e)(1) and 525 of Bankruptcy Code

52.    The Debtors have requested that the Court enter a declaratory order enforcing and restating the automatic stay, *ipso facto* and anti-discrimination provisions under sections 362, 365(e)(1) and 525 of the Bankruptcy Code.  The Debtors are a leading international shipping company and serve customers worldwide.  As a result, the Debtors have many foreign creditors, charter counterparties and other parties-in-interest in various countries who may not be well versed in the protections and restrictions of the Bankruptcy Code.  Some of these creditors do not transact business on a regular basis with companies that have filed for chapter 11, or are unfamiliar with the scope of a debtor-in-possession's authority to conduct its business.  Such circumstances warrant an order apprising parties—especially non-U.S. customers, creditors and vendors—of sections 362, 365(e)(1) and 525 and the protections provided thereby.  Accordingly, I respectfully submit that this motion should be approved.

> ### v.    Application for an Order Appointing Kurtzman Carson Consultants LLC as Claims and Noticing Agent for the Debtors *Nunc Pro Tunc* to the Petition Date

53.    The Debtors have numerous creditors and other parties-in-interest, many of whom are expected to file proofs of claim.  As such, the Debtors respectfully submit that noticing parties and receiving, docketing and maintaining proofs of claim would impose heavy administrative and other burdens upon the Court and the Office of the Clerk of the United States

-19-

Bankruptcy Court for the Southern District of New York.  The Debtors propose to retain

Kurtzman Carson Consultants LLC as their claims and noticing agent, to relieve the Court and

the clerk's office of these burdens.

      B.    <u>Financing Motions</u>

           **i.**    **Motion for Interim and Final Orders (A) Authorizing the Use of Cash Collateral, (B) Granting Adequate Protection, (C) Modifying the Automatic Stay, (D) Authorizing Debtors to Utilize Operating Revenues as Unencumbered Property Under Section 552 of the Bankruptcy Code and (E) Authorizing Debtors to Direct Payments by Charter Counterparties**

      54.    The Debtors require the immediate use of cash collateral to continue

operations and preserve the value of the Debtors' assets.  Specifically, the Debtors seek to use

cash collateral to (a) continue their operations consistent with their prepetition cash management

practices, (b) pay certain prepetition obligations as described in the First Day Motions and

(c) pay the costs of administering these chapter 11 cases.  As of the Petition Date, the Debtors

estimate that the total amount of cash collateral the Debtors propose to use is approximately $2.7

million, consisting primarily of funds held in the Nordea Account.

      55.    The Debtors propose to provide secured creditors with adequate

protection in the form of replacement liens on the Debtors' Postpetition Charter Revenues (as

defined below), bank accounts and other security or deposit accounts of the Debtors, subject to

certain standard exceptions.  The Debtors forecast that their cash position will increase

substantially from its current low level, and that these adequate protection liens will secure

property with a value well in excess of the value of the cash collateral the Debtors propose to

use.

      56.    By March 2016, the Debtors expect that accounts receivable and receipts

from their shipping transportation service operations earned by the Debtors for the performance

of transportation services after the Petition Date ("Postpetition Charter Revenues") will be sufficient to fund both the Debtors' ongoing business operations and the Debtors' expenses relating to the administration of the Chapter 11 Cases.  The Debtors request that the Court find that these Postpetition Charter Revenues are not subject to any lien arising under the Secured Debt and accordingly, as such revenues are earned, can be directed to bank accounts designated by the Debtors and used by the Debtors as unencumbered property of their estates.

57.     In the meantime, however, the Debtors currently lack sufficient unencumbered funds to pay operating expenses and maintain an adequate and prudent cash position.  The Debtors' ability to continue to operate their business is dependent on their ability to maintain long-term business relationships with suppliers, customers and employees— requiring both payment of amounts due and assurances as to the capacity to pay amounts that may become due in the future.  The operation of the Debtors' vessels is capital intensive, and any lapse in operation, no matter how transitory, could have a devastating economic impact on the going concern value of the Debtors' business.

58.     I believe that the Debtors do not have sufficient available sources of working capital and financing to operate their business with sufficient liquidity in the ordinary course without the use of cash collateral.  Without the use of cash collateral, the continued operation of the Debtors' business in a prudent manner would not be possible and immediate and irreparable harm could result to the Debtors and their estates and creditors.  The relief requested in this motion is, therefore, necessary, essential, and appropriate for the continued operation of the Debtors' business, and the management and preservation of their estates.

SC1:4025921.1

ii.     **Motion for Interim and Final Orders (A) Authorizing the Continued Use of Debtors' Cash Management System, Bank Accounts and Business Forms, (B) Granting a Waiver of the Deposit Guidelines Set Forth in Section 345 of the Bankruptcy Code and (C) Granting Related Relief**

59.     In furtherance of the Debtors' integrated global business operations the Debtors use a cash management system (the "Cash Management System") to collect, transfer and distribute funds generated by the Debtors' operations and to accurately record such collections, transfers and disbursements as they are made.  Primorsk is the only Debtor that maintains bank accounts (the "Bank Accounts"); none of the Debtor Subsidiaries maintains any bank accounts.  Most of the Primorsk bank accounts are at Nordea Bank Norge ASA, the agent and security trustee of the Debtors' Senior Secured Facility.

60.     The Cash Management System has been continuously utilized by the Debtors.  I believe that the Debtors' corporate and financial structure make it difficult, if not impossible, and in any event, unduly burdensome, for the Debtors to establish an entirely new system of accounts and a new cash management system for Debtors and the non-Debtor affiliates.  Thus, under the circumstances, maintenance of the Cash Management System is not only essential, but also in the best interests of the Debtors' estates and creditors.  Furthermore, preserving "business as usual" conditions and avoiding the enormous difficulties inevitably triggered by any substantial disruption of the Cash Management System will facilitate the Debtors' stabilization of their postpetition business operations and assist the Debtors in their reorganization efforts.  The Debtors will continue to maintain accurate and current records with respect to all transactions, whether transfers of cash, setoffs or otherwise, so that all transactions can be readily ascertained, traced and properly recorded.

SC1:4025921.1

61.    The Debtors also seek a waiver of the requirement of the Office of the United States Trustee for the Southern District of New York that existing bank accounts be closed and new postpetition accounts be opened.  I believe that if enforced in the Chapter 11 Cases, these requirements would cause enormous disruption in the Debtors' business and would impair the Debtors' efforts to successfully reorganize.  Accordingly, the Debtors request that their Bank Accounts be deemed to be debtor-in-possession accounts, and that their maintenance and continued use, in the same manner and with the same account numbers, styles and document forms as those employed during the prepetition period, be authorized.

62.    In addition, the Debtors request authority to preserve various reporting and accounting mechanisms, such as signatory authorizations and accounting systems central to the maintenance of the Bank Accounts.  The interruption or termination of such reporting and accounting mechanisms would undermine the utility of the Bank Accounts.  In accordance with existing practices, the Debtors will maintain strict records of all receipts and disbursements from the Bank Accounts during the pendency of the Chapter 11 Cases and will ensure that their records properly distinguish between pre- and postpetition transactions.

63.    The Debtors also request authorization to use their existing business forms.  To minimize expenses to their estates, the Debtors request authority to continue to use all correspondence and business forms (including letterhead, purchase orders, invoices, etc.) as such forms were in existence immediately before the Petition Date, without reference to the Debtors' status as debtors-in-possession.  Upon depletion of the Debtors' business forms stock, the Debtors will obtain new business forms stock reflecting their status as debtors-in-possession.

64.    Finally, the Debtors also request that the Court waive the requirements of section 345(b) of the Bankruptcy Code and permit them to maintain their deposits in the Bank

-23-

Accounts in accordance with their existing deposit practices.  I believe that strict adherence to the requirements of section 345(b) of the Bankruptcy Code is not required.  Requiring the Debtors to change their deposits and other procedures abruptly could result in harm to the Debtors, their estates and their creditors due to the disruption of their Cash Management System. If granted a waiver, the Debtors will not be burdened with the significant administrative difficulties and expenses relating to opening new accounts in a manner that ensures all of their funds are insured or invested strictly in accordance with the restrictions established by section 345 of the Bankruptcy Code. Accordingly, I respectfully submit that this motion should be approved.

### C.    Operational Motions

### i.    Motion for an Order (A) Authorizing, But Not Directing, the Debtors to Pay Certain Prepetition Claims of Critical Vendors and (B) Authorizing, But Not Directing, All Financial Institutions to Honor All Related Payment Requests

65.    In connection with their provision of global shipping transportation services and chartering-out of their vessels, the Debtors purchase specialized equipment, fuel and services from certain international vendors  (collectively, the "Critical Vendors").  These Critical Vendors provide the Debtors with the following categories of goods and services: (a) stores/lube oils, (b) maintenance and repair (including spares), (c) insurance coverage and (d) other vessel-related expenses.

66.    Notwithstanding the payments that have been made to Critical Vendors, the Debtors seek authority to pay, in their discretion, the prepetition claims of Critical Vendors that delivered goods or provided services to the Debtors prior to the Petition Date (the "Critical Vendor Payments").  The Debtors estimate that the Critical Vendor Payments will not be substantial and will not exceed approximately $1.5 million in the aggregate.

-24-

67.     An overwhelming majority of the Critical Vendors are foreign vendors who may not be well versed with a U.S. chapter 11 proceeding.  Many of these vendors do not transact business on a regular basis with companies that have filed for chapter 11, or are unfamiliar with the scope of a debtor-in-possession's authority to conduct its business. Additionally, some of the Critical Vendors are the sole source, or are among a handful of such suppliers in the world or in those geographic regions in which the Debtors operate, and are likely to refrain from supplying goods and services essential for the day-to-day operations of the Debtors if they are not paid.  Such an outcome would force the Debtors to obtain such goods and services elsewhere at a higher price or in a quantity or quality that is insufficient to satisfy the Debtors' requirements, or, in some instances where such Critical Vendors are irreplaceable, to cease operations.

68.     Furthermore, some of the Critical Vendors may attempt to enforce maritime liens against the Debtors' vessels due to payments being overdue.  Because such Critical Vendors may attempt to seize vessels, I believe that it is imperative that the Debtors be authorized to make the Critical Vendor Payments.  Accordingly, I respectfully submit that this motion should be approved.

> **ii.      Motion for an Order Authorizing, But Not Directing, the Debtors to (A) Pay Certain Prepetition Wages, (B) Pay and Honor Crew Benefits and Other Programs and (C) Continue Crew Obligations**

69.     The Debtors and their non-Debtor affiliates employ approximately 190 crew members (collectively, the "Crew"), although the number of Crew members employed at any time may fluctuate somewhat as the Crew for a vessel departs and a new Crew begins service.  Through this motion, the Debtors seek the authority, but not the direction, to pay and honor Crew wages, benefits, union memberships and other programs in the ordinary course of

SC1:4025921.1

business.  The Debtors estimate that as of the Petition Date, the Crew is owed approximately

$435,000 in unpaid wages, and seek the authority, but not the direction, to pay this amount and

any other Crew obligations in arrears as of the Petition Date.  The Debtors also provide their

Crew with certain general welfare benefits, including, but not limited to, medical and dental

benefits, food, accommodation, sick pay, disability pay, maternity leave, holidays, travel,

training, a savings program and supplemental payments to Crew members who do not qualify

for the savings program and union-related benefits, which the Debtors also seek the authority,

but not the direction, to continue as they see fit in their business judgment.

70.      I believe that the commencement of the Chapter 11 Cases will likely cause

uncertainty and concern among the Debtors' Crew.  Nonpayment of wages and benefits, in

addition to imposing hardship on the Crew, would likely also generate doubts regarding the

stability of the Debtors and their prospects for emerging from chapter 11.  Failure to pay the

Crew obligations would undermine morale and create significant risk of attrition.  The relief

requested in this motion will greatly assist the Debtors in alleviating these concerns and

retaining their Crew.

### iii.      Motion for an Order (A) Authorizing, But Not Directing, the Debtors to Pay Prepetition Taxes and (B) Authorizing, But Not Directing, All Financial Institutions to Honor All Related Payment Requests

71.      In the ordinary course of business, the Debtors incur certain taxes and fees

relating to the operations of their vessels, including:  (a) tonnage taxes and related fees,

(b) registry maintenance fees, (c) classification society fees and (d) other similar charges and

assessments (collectively (a) through (d), the "Taxes") that are payable directly to taxing,

registration and classification authorities (collectively, the "Taxing Authorities") as such

payments become due.  The Debtors' operations require them to pay Taxes with respect to each

of their vessels to Taxing Authorities in Cyprus and Liberia.

72.        Although the Debtors believe that they are current on all of their Taxes

that have become due as of the Petition Date, a lag between the time when the Debtors incur an

obligation to pay the Taxes and the date such Taxes become due and payable may exist.  As a

result, some Taxing Authorities may have claims against the Debtors for Taxes that have

accrued but remain unpaid as of the Petition Date.

73.        Failure to pay prepetition taxes will significantly harm the Debtors,

potentially resulting in the imposition of maritime liens on the Debtors' property, the

invalidation of a vessel's certificate of registry and other penalties by the Taxing Authorities

against the Debtors.  Accordingly, I believe that the Debtors should be authorized to make

payments to the relevant Taxing Authorities for any accrued and unpaid prepetition Taxes, as

and when they become due, in the ordinary course of business and the financial institutions

should be authorized to honor all related payment requests.

## VI.        Information Required by Local Bankruptcy Rule 1007-2

74.        Local Rule 1007-2 requires certain information related to the Debtors,

which I have provided in the exhibits attached hereto as Exhibits B, C, D, E, F, G, H, I, J, K, L

and M.  Specifically, these exhibits contain the following information with respect to the

Debtors:[2]

---

[2]     The information contained in the Exhibits attached to this declaration shall not constitute an admission of
liability by, nor is it binding on, the Debtors.  The Debtors reserve all rights to assert that any debt or claim
listed herein is a disputed claim or debt, and to challenge the priority, nature, amount or status of any such
claim or debt.  The descriptions of the collateral securing the underlying obligations are intended only as brief
summaries.  In the event of any inconsistencies between the summaries set forth below and the respective
corporate and legal documents relating to such obligations, the descriptions in the corporate and legal
documents shall control.

SC1:4025921.1

- <u>Exhibit A</u> provides an up-to-date corporate structure chart showing Primorsk and its 100% direct ownership of the Debtor Subsidiaries.

- Pursuant to Local Rule 1007-2(a)(3), <u>Exhibit B</u> attached hereto provides the following information: the names and addresses of the members of, and attorneys of, any committee organized prior to the Petition Date.

- Pursuant to Local Rule 1007-2(a)(4), <u>Exhibit C</u> attached hereto provides the following information with respect to each of the holders of the Debtors' 30 largest unsecured claims on a consolidated basis, excluding claims of insiders: the creditor's name, address (including the number, street, apartment, or suite number, and zip code, if not included in the post office address) and telephone number; the name(s) of person(s) familiar with the Debtors' account; the nature and approximate amount of the claim; and an indication of whether the claim is contingent, unliquidated, disputed or partially secured.

- Pursuant to Local Rule 1007-2(a)(5), <u>Exhibit D</u> attached hereto provides the following information with respect to each of the holders of the five largest secured claims against the Debtors: the creditor's name, address (including the number, street, apartment, or suite number and zip code, if not included in the post office address); the amount of the claim; a brief description of the claim; an estimate of the value of the collateral securing the claim; and whether the claim or lien is disputed.

- Pursuant to Local Rule 1007-2(a)(6), <u>Exhibit E</u> attached hereto provides a summary of the Debtors' assets and liabilities.

- Pursuant to Local Rule 1007-2(a)(7), <u>Exhibit F</u> attached hereto provides information on the Debtors' outstanding publicly held securities.

- Pursuant to Local Rule 1007-2(a)(8), <u>Exhibit G</u> attached hereto provides the following information with respect to any property in possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, or secured creditors, or agent for such entity: the name, address, and telephone number of such entity and the court in which any proceeding relating thereto is pending.

- Pursuant to Local Rule 1007-2(a)(9), <u>Exhibit H</u> attached hereto provides a list of the premises owned, leased or held under other arrangement from which the Debtors operate their business.

- Pursuant to Local Rule 1007-2(a)(10), <u>Exhibit I</u> attached hereto sets forth the location of the Debtors' substantial assets, the location of their books and records, and the nature, location and value of any assets held by the Debtors outside the territorial limits of the United States.

- Pursuant to Local Rule 1007-2(a)(11), <u>Exhibit J</u> attached hereto provides a list of the nature and present status of each action or proceeding, pending or threatened, against

SC1:4025921.1

the Debtors or their property where a judgment or seizure of their property may be imminent.

- Pursuant to Local Rule 1007-2(a)(12), <u>Exhibit K</u> attached hereto sets forth a list of the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

- Pursuant to Local Rule 1007-2(b)(1)-(2)(A), <u>Exhibit L</u> attached hereto provides the estimated amount of payroll to the Debtors' employees (not including officers, directors and stockholders) and the estimated amounts to be paid to officers, stockholders, directors, and financial and business consultants retained by the Debtors, for the 30-day period following the filing of the Debtors' Chapter 11 Cases.

- Pursuant to Local Rule 1007-2(b)(3), <u>Exhibit M</u> attached hereto provides a schedule for the 30-day period following the filing of the Chapter 11 Cases, of estimated cash receipts and disbursements, net cash gain or loss, obligations and receivables expected to accrue but remain unpaid, other than professional fees, and any other information relevant to an understanding of the foregoing.


I declare under penalty of perjury that the foregoing is true and correct.


Date: January 17, 2016                          */s/ Holly Felder Etlin*
                                                Name:  Holly Felder Etlin
                                                Title:    Chief Restructuring Officer of the Debtors

SC1:4025921.1

**<u>Exhibit A</u>**

**Corporate Structure Chart**

SC1:4025921.1



**PRIMORSK INTERNATIONAL SHIPPING LIMITED**
**Structure Chart**
**(as of 1/14/2016)**

\*Held directly or controlled via special purpose subsidiaries.  Remainder of interest held by Isardia Holdings Limited and public shareholders.

SC1:4025921.1

## **Exhibit B**

**Committees**


        Pursuant to Local Rule 1007-2(a)(3), to the best of my knowledge, information and belief, no committees were organized prior to the Petition Date.

SC1:4025921.1

## Exhibit C

**Consolidated List of the Holders of the 30 Largest Unsecured Claims of the Debtors**

Pursuant to Local Rule 1007-2(a)(4), the following provides information with respect to the holders of the 30 largest unsecured claims against the Debtors on a consolidated basis.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors.  The Debtors reserve all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount or status of any such claim or debt.  In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.  The schedule estimates outstanding claim amounts (including principal and interest) as of the Petition Date.

| NAME OF CREDITOR and NAME, TELEPHONE NUMBER AND COMPLETE MAILING ADDRESS, INCLUDING ZIP CODE, OF EMPLOYEE, AGENT OR DEPARTMENT OF CREDITOR FAMILIAR WITH CLAIM | NATURE OF CLAIM (trade debt, bank loan, government contract, *etc.*) | INDICATE IF CLAIM IS CONTINGENT, UNLIQUIDATED, DISPUTED OR SUBJECT TO SETOFF | DOLLAR AMOUNT OF CLAIM (if secured also state value of security) |
|---|---|---|---|
| Nordic Trustee ASA<br>Postboks 1470 Vika<br>0116 Oslo<br>Norway<br>Att: Mr. Jo Forfang<br>Telefax No: +47 22 87 94 I 0 | Bond Debt | | $80,866,877.50 |
| BNP PARIBAS FORTIS<br>Montagne du Parc 3, B-1000<br>Bruxelles Warandeberg 3, B-1000 Brussel<br>+ 32 2 433 40 34<br>+ 32 2 565 42 22 | Legal Fees | | $91,632.27 |
| Nordea Bank Oslo<br>Middelthunsgate 17<br>PO Box 1166<br>Sentrum Oslo NO-0107 Norway<br>+47 2248 5000<br>+47 2248 6668 | Legal Fees | | $82,154.99 |

C-1

| NAME OF CREDITOR and NAME, TELEPHONE NUMBER AND COMPLETE MAILING ADDRESS, INCLUDING ZIP CODE, OF EMPLOYEE, AGENT OR DEPARTMENT OF CREDITOR FAMILIAR WITH CLAIM | NATURE OF CLAIM (trade debt, bank loan, government contract, *etc.*) | INDICATE IF CLAIM IS CONTINGENT, UNLIQUIDATED, DISPUTED OR SUBJECT TO SETOFF | DOLLAR AMOUNT OF CLAIM (if secured also state value of security) |
|---|---|---|---|
| Wrist Ship Supply - World Ship Texas<br>World Ship Building<br>P.O. Box 231 192<br>Houston, TX<br>+1 713 222 6005<br>+1 713 222 1121<br>texas@worldship.com | Trade | | $37,691.47 |
| Inmarsat – ex Stratos<br>99 City Road, London, United Kingdom<br>+44 (0)20 7728 1000<br>information@inmarsat.com | Trade | | $33,054.34 |
| Prisco (Singapore) Pte. Ltd<br>8 Temasek Boulevard # 24-02 Suntec Tower Three,<br>038988, Singapore<br>(fax no: +65 62 351 102) | Management Fee | | $32,540.00 |
| Kuwait Oil Tanker CO SAK<br>Shuwaikh administrative Sector ( P )<br>Jamal Abdel Nasser Street<br>P.O.Box 810 Safat, ZIP CODE 13009 – Kuwait<br>Tel.: +965 2462 5050<br>Fax: +965 2491 3597<br>Email: ho-email@kotc.com.kw | Agent | | $31,688.53 |
| MAN Diesel & TURBO<br>Stadtbachstr. 1<br>86153 Augsburg Germany<br>Phone: +49 821 322-0<br>Fax: +49 821 322-3382<br>info-de@mandieselturbo.com | Trade | | $18,303.42 |
| MEDPOOL<br>FAMELINE BUILDING<br>1-3 SPATHARIKOU STREET<br>4004 MESA YEITONIA<br>CYPRUS<br>357 25823248<br>357 25823686 | Trade | | $12,854.32 |

C-2

| NAME OF CREDITOR and NAME, TELEPHONE NUMBER AND COMPLETE MAILING ADDRESS, INCLUDING ZIP CODE, OF EMPLOYEE, AGENT OR DEPARTMENT OF CREDITOR FAMILIAR WITH CLAIM | NATURE OF CLAIM (trade debt, bank loan, government contract, *etc.*) | INDICATE IF CLAIM IS CONTINGENT, UNLIQUIDATED, DISPUTED OR SUBJECT TO SETOFF | DOLLAR AMOUNT OF CLAIM (if secured also state value of security) |
|---|---|---|---|
| ALCAP SHIP SUPPLIES<br>80 GENTING LANE #11-05<br>RUBY INDUSTRIAL COMPLEX<br>Singapore 349565 | Trade | | $12,390.39 |
| Gulf Marine & Industrial Supplies, Inc.<br>401 ST JOSEPH ST<br>New Orleans, LA 70130 | Trade | | $11,372.14 |
| Dae Hwa<br>206-8 SAMSAN-DONG<br>NAM-GU<br> 680-813 Ulsan, Korea<br>+82 52 258 62302<br>+82 52 258 6233<br>contact@daehwaeng.com | Trade | | $11,125.90 |
| Wilhelmsen Ships Service (ex Barwil Un)<br>186 Pandan Loop<br>128376 SINGAPORE<br>+65 6395 4545<br>+6568731487<br>wss.singapore.csc@wilhelmsen.com | Trade | | $9,893.25 |
| Legero Holland<br>Kotterstraat 2, 3133 KW Vlaardingen<br>Rotterdam, NETHERLANDS<br>+31 10 2322032<br>operations.rotterdam@legerogroup.com | Trade | | $9,410.96 |
| DH MARINE TECH<br>RM 101, SUNKYUNG B/O, #213-5, CJORANG<br>Busan (ex Pusan), KOREA, REPUBLIC OF<br>+82 51 417-9788<br>+82 51 417-9789<br>dhmarine@korea.com | Trade | | $9,253.50 |

C-3

| NAME OF CREDITOR and NAME, TELEPHONE NUMBER AND COMPLETE MAILING ADDRESS, INCLUDING ZIP CODE, OF EMPLOYEE, AGENT OR DEPARTMENT OF CREDITOR FAMILIAR WITH CLAIM | NATURE OF CLAIM (trade debt, bank loan, government contract, *etc.*) | INDICATE IF CLAIM IS CONTINGENT, UNLIQUIDATED, DISPUTED OR SUBJECT TO SETOFF | DOLLAR AMOUNT OF CLAIM (if secured also state value of security) |
|---|---|---|---|
| Dintec (Singapore) Pte Ltd Office : 3 International Business Part, #05-13 Nordic European Centre, Singapore 609927                 Warehouse : 7 Soon Lee Street, #-2-43/44 Ispace, Singapore 627608 TEL : (+65) 6896 4434 FAX : (+65) 6896 4244 E-MAIL : service@dintec.com.sg | Trade | | $8,215.88 |
| CONSILIUM MARINE&SAFETY AB (SWEDEN) Box 5021, SE-131 05 NACKA, SWEDEN | Trade | | $8,039.65 |
| Lankhorst Touwfabrieken Bv Marconiweg 24, 3316 AM Dordrecht, Netherlands Phone: +31 78 611 7700 | Trade | | $6,494.54 |
| Neko Ship Supply BV P.O. Box 32 3190 AA Hoogvliet Columbussraat 22-26, Port Number 2768 Rotterdam, Netherlands +310108005555 SUPPLY@NEKOSHIP.NL | Trade | | $5,799.13 |
| Jinsan Marine Management co ltd 140-2 MAEAM-DONG, NAM-GU Ulsan, Korea +82 52 268-8073 +82 52 265-8297 jinsan@jinsankorea.co.kr | Trade | | $5,702.11 |
| MARFLEX BV - THE NETHERLANDS Louis Pasteurstraat 8, 3261 LZ Oud-Beijerland, Netherlands Phone: :+31 186 890 200 | Trade | | $5,535.74 |
| KET MARINE INTERNATIONAL BV KOPERSLAGERIJ 23 Zevenbergen, 4762 AR NETHERLANDS 31 0 168 328 550 31 0 168 326 350 info@ketmarine.nl | Trade | | $5,387.62 |

C-4

| NAME OF CREDITOR and NAME, TELEPHONE NUMBER AND COMPLETE MAILING ADDRESS, INCLUDING ZIP CODE, OF EMPLOYEE, AGENT OR DEPARTMENT OF CREDITOR FAMILIAR WITH CLAIM | NATURE OF CLAIM (trade debt, bank loan, government contract, *etc.*) | INDICATE IF CLAIM IS CONTINGENT, UNLIQUIDATED, DISPUTED OR SUBJECT TO SETOFF | DOLLAR AMOUNT OF CLAIM (if secured also state value of security) |
|---|---|---|---|
| Berg & Larsen<br>Baldersbuen 29 B, 2640 Hedehusene, Denmark<br>Phone:+45 46 56 55 22 | Trade | | $5,005.37 |
| OCEAN MV<br>6600, Saint-Urbain,<br>Suite 305,<br>Montréal, (Québec)<br>H2S 3G8, Canada<br>CONTACT:<br>service@oceanmv.com<br>TEL. 1.514.965.6089<br>FAX. 1.514.375.1304<br>24/7. 1.514.812.6089 | Trade | | $4,808.91 |
| UMC INTERNATIONAL (SE ASIA)<br>1 Soon Lee Street, #03-10/11 Pioneer Centre, Singapore 627605<br>+65 6795 7546 | Trade | | $4,745.46 |
| Exway GLS Co., Ltd<br>(Pantos Pusan Agency), Byuksan Digital Velley III,    132-7 Gamjeon-Dong, Sasang-ku<br>Busan (ex Pusan) | Trade | | $4,481.45 |
| Seven Seas Shipchandlers<br>5 Tuas Loop, Singapore 637338<br>65 31 52 2188<br>65 31 52 2189<br>supply.singapore@sevenseasgroup.com | Trade | | $4,479.35 |
| KYONG-IN-SAFETY SERVICES CO., LTD<br>58-30, 7KA, HANG-DONG CHOONG-KU<br>Incheon, KOREA (SOUTH)<br>82 032 885 1551<br>82 032 885 4236<br>kissco@liferaft.co.kr | Trade | | $4,460.00 |

C-5

| NAME OF CREDITOR and NAME, TELEPHONE NUMBER AND COMPLETE MAILING ADDRESS, INCLUDING ZIP CODE, OF EMPLOYEE, AGENT OR DEPARTMENT OF CREDITOR FAMILIAR WITH CLAIM | NATURE OF CLAIM (trade debt, bank loan, government contract, *etc.*) | INDICATE IF CLAIM IS CONTINGENT, UNLIQUIDATED, DISPUTED OR SUBJECT TO SETOFF | DOLLAR AMOUNT OF CLAIM (if secured also state value of security) |
|---|---|---|---|
| Wartila<br>8th Floor Saesam Building<br>1485-1 Jwa-dong, Haeundae-gu<br>Busan 612030 Korea | Trade | | $4,037.41 |
| ELCOME INT<br>DUBAI INVESTMENT PARK, 598-1121<br>Dubai, UNITED ARAB EMIRATES<br>971 4 8121333<br>971 4 8121300<br>info@elcome.ae | Trade | | $3,651.00 |

C-6

## Exhibit D

### Consolidated List of the Holders of the Five Largest Secured Claims

Pursuant to Local Rule 1007-2(a)(5), the following lists the Debtors' five largest secured claims on a consolidated basis.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors.  The Debtors reserve all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount or status of any such claim or debt.  The descriptions of the collateral securing the underlying obligations are intended only as brief summaries.  In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.  The schedule estimates outstanding claim amounts (including principal and interest) as of January 15, 2016.

| No. | Creditor | Contact Mailing Address & Telephone Number, Fax Number and Email Address | Amount of Claim (as of December 31, 2015) | Type of Collateral |
|---|---|---|---|---|
| 1. | Nordea Bank Norge ASA[1] | Name: Shipping Department Address: P.O. Box 1166, Sentrum, 01707, Oslo, Norway. Tel: +47 2248 5000 Fax +47 2248 6668 | Approximately $194.3 million | *See* ¶ 25. |
| 2. | Nordea Bank Norge ASA[2] | Name: Shipping Department Address: P.O. Box 1166, Sentrum, 01707, Oslo, Norway. Tel: +47 2248 5000 Fax +47 2248 6668 | Approximately $51.6 million | *See* ¶ 25. |
| 3. | BNP Paribas[3] | Name: Transaction Group Middle Office,  Shipping and Offshore Address: 16, rue de Nanovre, 75002, Paris France Phone: +33 1 4298 1234 | Approximately $16.3 million | *See* ¶ 25. |
| 4. | n/a | | | |
| 5. | n/a | | | |

---

[1]   As agent under the Senior Secured Facility.

[2]   As agent under the Junior Secured Facility.

[3]   As agent under the Third Ranking Swap Loan.

D-1

## <u>Exhibit E</u>

### Summary of the Debtors' Assets and Liabilities

   The following financial data is the latest available information and reflects the Debtors' financial condition, as consolidated with its domestic affiliated debtors and non-debtors as of December 31, 2015.  The following financial data shall not constitute an admission of liability by the Debtors.  The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt or challenge the priority, nature, amount or status of any claim or debt.

Total Assets (Book Value):   $364 million
Total Liabilities:     $357 million

E-1

**<u>Exhibit F</u>**

**Publicly Held Securities**


       Pursuant to Local Rule 1007-2(a)(7), the Debtors do not have any shares of stock, debentures, or other securities that are publicly held as of the Petition Date.

SC1:4025921.1

## Exhibit G

### Debtors' Property Not in Debtors' Possession

Pursuant to Local Rule 1007-2(a)(8), the following lists the Debtors' property, as of the Petition Date, in the possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, secured creditor, or agent for any such entity. The Debtors are working to confirm that no other such party is in possession of any of the Debtors' property and reserves the right to supplement this schedule if additional property is identified.  The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors.  The Debtors reserve all rights to challenge the priority, nature, amount or status of any claim or debt.

To the best of the Debtors' knowledge, it does not have any property that is in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee or rents or secured creditor, or any agent for any such entity, other than, if any:

- bank accounts that may be subject to control agreements or claims of setoff by certain of the Debtors' lenders under the Secured Debt facilities;

- stock and membership interests of certain of Primorsk's direct and/or indirect subsidiaries pledged for the benefit of the holders of the Secured Debt;

- various other security deposits held by certain lessors, utility companies, regulatory agencies and others; or

- property that may be owned by the Debtors that may be in possession of third parties for purposes of storage, repair, and/or delivery in the ordinary course of business.[1]

---

[1]   The arrangements described herein do not affect the Debtors' ownership interest in such property. Further, in light of the movement of this property and size of the Debtors' business operations, including their vessels that are subject to time-charters, providing a comprehensive list of the persons or entities in possession of the property, their addresses and telephone numbers, and the location of any court proceeding affecting such property, would be impractical if not impossible.

SC1:4025921.1

## Exhibit H

**Debtors' Property**

Pursuant to Local Rule 1007-2(a)(9), the Debtors do not own, lease or hold under other arrangements any premises from which they operate their business.

H-1

## Exhibit I

## Location of Debtors' Assets, Books and Records

Pursuant to Local Rule 1007-2(a)(10), the following lists the locations of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

### Location of Debtors' Substantial Assets

As stated in above, the Debtors' substantial assets consist of vessels.  Due to the nature of the Debtors' business, at any time, these assets are located in international waters around the world.

### Book and Records

The Debtors' books and records are located at Prisco Singapore's headquarters at No.8 Temasek Boulevard, #24-02 Suntec Tower Three, Singapore 038988.

### Debtors' Assets Outside the United States

Please see the Location of Debtors' Substantial Assets above.  The estimated value of the Debtors' vessels as of June 22, 2015 are as follows:

| Vessel | Charterfree Value |
|---|---|
| Zaliv Baikal | $44.5 million |
| Zaliv Vostok | $44.5 million |
| Zaliv Amurskiy | $41.5 million |
| Prisco Alexandra | $23.25 million |
| Prisco Ekaterina | $23.25 million |
| Prisco Irina | $25 million |
| Prisco Elizaveta | $25 million |
| Prisco Elena | $25 million |
| Zaliv Amerika | $39.5 million |

I-1

## <u>Exhibit J</u>

**Litigation**


   Pursuant to Local Rule 1007-2(a)(11), the following is a list of the nature and present status of each action or proceeding, pending or threatened against the Debtors or their properties where a judgment against the Debtors or a seizure of their property may be imminent.

   To the best of the Debtors' knowledge, information and belief, there is no action or proceeding, pending or threatened against the Debtors or their properties where a judgment against the Debtors or a seizure of their property may be imminent.

**Exhibit K**

**Senior Management**


Pursuant to Local Rule 1007-2(a)(12), the following provides the names of the individuals who comprise the Debtors' existing senior management and a brief summary of their relevant responsibilities and experience.

| Name | Title | Tenure and Experience |
|---|---|---|
| Captain Alexander Migunov | Managing Director, Prisco (Singapore) Pte Ltd | Has served Primorsk and affiliated companies in management and operating roles for over 20 years. |
| Dmitry Golomovzy | Chief Financial Officer, Prisco (Singapore) Pte Ltd | Has served Primorsk and affiliated companies in various financial roles since 2004. |
| Dmitry Kirilichev | Executive Director, Prisco (Singapore) Pte Ltd | Has served Primorsk and affiliated companies in management and engineering roles for over 20 years. |
| Holly Felder Etlin | Chief Restructuring Officer, Primorsk | Joined the debtors in 2016. She has 30 years of experience in providing restructuring and reorganization services for her clients and is a Managing Director of AlixPartners LLP. |

K-1

## Exhibit L

### Payroll

       Pursuant to Local Rules 1007-2(b)(1)-(2)(A) and (C), the following provides the estimated amount of weekly payroll to the Debtors' employees (not including officers, directors and stockholders) and the estimated amount to be paid to officers, stockholders, directors and financial and business consultants retained by Debtors for the 30-day period following the Petition Date.

| | |
|---|---|
| **Payments to Employees (Not Including Officers, Directors and Stockholders)** | Approximately $1,032,000 for next 30 days |
| **Payments to Officers, Directors and Stockholders** | No payments for next 30 days |
| **Payments to Financial and Business Consultants Retained by the Debtors** | Approximately $750,000 will be accrued (do not expect any amounts to be paid in the next 30 days) |

L-1

## Exhibit M

**Cash Receipts and Disbursements,**
**Net Cash Gain or Loss, Unpaid Obligations and Receivables**

Pursuant to Local Rule 1007-2(b)(3), the following provides for the 30-day period following the commencement of the Chapter 11 Cases, the Debtors' estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| | |
|---|---|
| **Cash Receipts** | $5.5 million |
| **Cash Disbursements** | $2.3 million |
| **Net Cash Gain/Loss** | $3.2 million |
| **Unpaid Obligations** | $0 |
| **Unpaid Receivables** | $0 |

M-1