WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Glenn M. Kurtz
Scott Greissman
Douglas P. Baumstein
Charles R. Koster

*Attorneys for Nordea Bank Norge ASA,
as Facility Agent*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

─────────────────────────────────────x
: 
In re                                : Chapter 11
:
PRIMORSK INTERNATIONAL SHIPPING      : Case No. 16-10073 (MG)
LIMITED, *et al.*,¹                  :
:   Jointly Administered
Debtors.                         :
:
─────────────────────────────────────x

**REQUEST BY NORDEA BANK NORGE ASA,
AS FACILITY AGENT, FOR STATUS CONFERENCE**

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

Nordea Bank Norge ASA, in its capacity as agent and security trustee (the "Facility

Agent") under that certain secured loan facility agreement dated January 2, 2008 (as amended

and restated as of December 21, 2012 and as further amended from time to time, the "Facility

Agreement") relating to a $530 million secured loan facility (the "Nordea Facility"), for itself

---

[1] The Debtors in these Chapter 11 Cases and, if applicable, the last four digits of their U.S. taxpayer identification numbers are: Primorsk International Shipping Limited (Cyprus), Boussol Shipping Limited (Cyprus) (6402) – m/t "Zaliv Amerika", Malthus Navigation Limited (Cyprus) (6401) – m/t "Zaliv Amurskiy", Jixandra Shipping Limited (Cyprus) (6168) – m/t "Prisco Alexandra", Levaser Navigation Limited (Cyprus) (0605) – m/t "Prisco Ekaterina", Hermine Shipping Limited (Cyprus) (0596) – m/t "Prisco Irina", Laperouse Shipping Limited (Cyprus) (0603) – m/t "Prisco Elizaveta", Prylotina Shipping Limited (Cyprus) (6085) – m/t "Prisco Elena", Baikal Shipping Ltd (Liberia) (6592) – m/t "Zaliv Baikal" and Vostok Navigation Ltd (Liberia) (1745) – m/t "Zaliv Vostok".

Americas 91126866

and the other lender parties thereto (the "Senior Lenders"), files this request for an immediate in person status conference and respectfully states as follows:

## REQUEST

1.      Following final hearing on cash collateral these cases have gone off track. The Debtors have signaled that they are pursuing a no-new-money cram down plan that is the product of hopeless conflicts and is patently unconfirmable. Thus, the cases unfortunately appear to be headed to a contested confirmation process. The Facility Agent therefore requests a status conference now to address scheduling and next steps.

## BACKGROUND

2.      The Senior Lenders are the principal stakeholders in these chapter 11 cases, holding claims totaling approximately $263 million under the Facility Agreement secured by virtually all of the Debtors' assets.[2] The Facility Agent does not believe that there is meaningful value in the Debtors in excess of the secured debt.

3.      The Facility Agent devoted the first five weeks of the chapter 11 cases to negotiating with the Debtors regarding the consensual use of cash collateral, sharing with the Debtors information to facilitate a consensual deal, and preparing for a settlement conference with the Debtors on February 23, 2016 in London. At the conference, held shortly after the Debtors had obtained an agreement on final use of cash collateral, the Debtors advised the Senior Lenders that they intend to pursue a no-new-money cram down plan of reorganization that had been constructed by conflicted insiders to benefit insiders.

---

[2]     This figure includes approximately $16 million of principal debt owed to BNP Paribas, as swap agent and lender (the "Swap Bank"), which is outstanding under the swap facility (the "Swap Facility") relating to that certain 7.5 million swap loan facility agreement dated June 7, 2011 (as amended and restated on December 21, 2012). The Swap Bank is separately represented in these proceedings by Luskin Stern & Eisler LLP. The Swap Bank joins in this request.

2

4. Dmitry Golomovzy and Alexander Kirilichev (the "Controllers") are the Debtors' controlling shareholders and senior management. The Controllers are also the majority owners and managers of Prisco (Singapore) Pte Ltd ("Prisco"), the non-Debtor affiliate ship management company. The Controllers appear intent on prosecuting a plan that diverts value from the Senior Lenders to themselves and Prisco. Consequently, any proposed plan will be subject to the very daunting "entire fairness" standard as part of this Court's good faith inquiry.

5. The Controllers' proposed plan is not confirmable. First, there is no reasonable dispute that the Controllers' current equity is out of the money. Yet the Controllers' intend to retain 25% of the new equity on account of their existing out-of-the-money equity, without contributing any new money. Moreover, while the Senior Lenders need disclosure on the issue, it appears that the Controllers also own a significant portion of bonds issued by Primorsk and guaranteed by the Debtor subsidiaries (the "Norwegian Bonds") and, therefore, could own nearly half of reorganized Primorsk under their no-new-money cram down plan if the remaining equity is distributed to the bondholders as the Controllers intend.

6. Second, the Controllers' intend to preserve multiple lucrative and inappropriate income streams for themselves through their non-Debtor affiliate insider, Prisco. They plan to assume management contracts with Prisco that pay themselves lucrative fees for little work. They intend to maintain for themselves substantially inflated and unnecessary SG&A relative to what other unaffiliated managers would require on an arms' length basis. The Controllers also intend to receive commissions for the long-term charters and charter extensions with Novatek Gas & Power GmbH ("Novatek") relating to virtually the Debtors' entire fleet executed in violation of the Facility Agreement shortly before the commencement of these chapter 11 cases.[3]

---

[3] Moreover, Novatek is subject to U.S. sanctions under the Office of Foreign Assets Control "Directive 2," which prohibits "all transactions in, provision of financing for, and other dealings in new debt of longer than 90 days

3

7. No disinterested debtor trying to reorganize its business would in good faith divert such amounts to insider non-debtors and away from secured lenders or any other legitimate stakeholder. To the contrary, a truly disinterested debtor would seek to shed any unnecessary costs and expedite repayments to creditors. But the Controllers here appear committed to using these chapter 11 cases to enrich themselves. In fact, the Controllers have refused to consider any vessel sales to de-lever their balance sheet and get to a consensual resolution and quick exit because they want to preserve for themselves the inflated and unnecessary income streams for all nine vessels.

8. Even ignoring these obvious impediments to confirmation, any plan to cram down the Senior Lenders would be patently unconfirmable. First, the Controllers cannot cram down essentially their entire capital structure. Cram down cases are rare, cram down cases against senior secured creditors are even rarer, and the Facility Agent is not aware of any case that has confirmed a plan over the objection of senior secured lenders, with liens on depreciating collateral, that allows old equity and out-of-the-money bondholders to retain their interests without providing new money and without requiring substantial up-front cash paydowns to the senior lenders. Indeed, we are aware of no shipping chapter 11 case with a similar size and capital structure that has confirmed a plan without secured lender support.

9. Second, the Controllers cannot rely on the class of holders of Norwegian Bonds as the impaired accepting class, and without this there is no impaired accepting class at the vessel-owning entities. Initially, the Facility Agent believes that vessel values do not justify any distributions to holders of the Norwegian Bonds, who therefore should be deemed to reject a plan. Even if such class is not deemed to reject, a significant portion of the Norwegian Bonds

---

maturity of persons determined to be subject to this Directive, their property, or their interests in property." Exec. Order No. 13662, 31 CFR 589 (2014). So, those charters present additional risk.

are held by insiders whose votes cannot be counted for purposes of establishing an impaired accepting class. The remaining holders, as well as their relationship to the Debtors or their affiliates, have not been identified, notwithstanding that the Debtors purport to have an agreement with the bondholders and the Senior Lenders' multiple requests for the information and the Debtors' repeated promises to provide it.[4]

10. Regardless, none of the holders of Norwegian Bonds can vote for any plan that the Senior Lenders do not support. Nordic Trustee ASA ("Nordic Trustee"), on behalf of the bondholders, is party to an Intercreditor Deed dated August 2, 2011 (the "Intercreditor Deed"). The Intercreditor Deed, which is governed by English law and subject to the exclusive jurisdiction of the courts of England, prohibits the bondholders from taking certain actions in connection with a restructuring prior to payment in full of the Senior Lenders. Specifically, among other things, the bondholders cannot take any step to exercise or enforce any right without the Senior Lenders' prior written consent (Intercreditor Deed § 6.2), enter into any arrangement with the Debtors that is not approved by the Senior Lenders (id. § 6.6), or vote or otherwise act in an actual or proposed arrangement with creditors contrary to the Senior Lenders' direction. (Id. § 6.12) Nordic Trustee, in the Intercreditor Deed, irrevocably appointed the Facility Agent as its attorney to do any act or thing Nordic Trustee is required to take under the Intercreditor Deed. (Id. § 9.1) The Intercreditor Deed thus precludes the holders of the Norwegian Bonds from converting their debt to equity or voting for, or otherwise supporting, the Controllers' plan.

---

[4] The Debtors purport to have an agreement in principle with holders of the Norwegian Bonds, but have not shared any restructuring support agreement with the Senior Lenders. The Debtors provided some information about the bondholders, but (<u>after</u> approval of final cash collateral) when pressed for actual identities and other confirming information, the Debtors refused to respond.

5

11. And, even if the bondholders could convert their debt to equity under a cram down plan, the Intercreditor Deed precludes a distribution of equity to them until the Senior Lenders are paid in full, and any distribution before such time must be held on trust for the Senior Lenders. (Id. §§ 4.3(a), 4.6) Thus, the holders of the Norwegian Bonds do not have a protectable economic interest, because confirmation would simply result in immediate turnover litigation in England between the Facility Agent and the bondholders in respect of the reorganized equity.

12. Third, the Controllers' plan is not feasible. The Debtors do not have sufficient cash flows to service and ultimately pay-off the Senior Lenders. If they did, the sale of the nine vessels for $290 million in December likely would have closed, and the secured debt would otherwise be refinanceable without the risk, cost and expense of a non-consensual chapter 11 cram down plan.

13. Fourth. The Senior Lenders entered into the Nordea Facility with the Debtors in January 2008. The Nordea Facility was a traditional secured ship financing facility with a six year term. Repayment was originally scheduled for May 2014. This six year loan has now been outstanding for over eight years, as the Senior Lenders agreed to extend the maturity date to June 30, 2015, and then entered into a forbearance agreement through mid-December 2015. In exchange for the Senior Lenders' forbearance, the Debtors agreed to sell the vessels (as a fleet or, failing that, on a vessel by vessel basis) in an orderly sale process that the Debtors insisted they design and fully control (without reduction of SG&A and without Senior Lender input or influence) to maximize proceeds and repay their secured debt. The Debtors failed. Their efforts to consummate a fleet sale for $290 million fell through in December, and they refused to attempt to sell the vessels individually as they had repeatedly agreed to do. Instead, the Debtors

6

commenced the chapter 11 cases. Any interest rate that adequately addresses the risk Senior Lenders are forced to bear by extending the term of the Nordea Facility <u>another five years</u>, for a total loan term in excess of 13 years, secured only by the same vessels which, on day one of the extended term, would not cover the debt, will necessarily render the plan infeasible. Thus, without a substantial up-front paydown a cram down plan cannot be fair and equitable.

14.    The Senior Lenders and the Debtors met on February 23, 2016 in London to discuss potential plan settlements. The meeting terminated almost immediately after the Debtors received the Senior Lenders' good faith counterproposal (to sell some vessels in exchange for runway). Before leaving, the Debtors announced their intention to pursue a cram down plan of reorganization.

## **CONCLUSION**

15.    The Senior Lenders remain willing to negotiate a consensual restructuring. But the Senior Lenders cannot blindly agree to a plan that places all the risk on them while preserving lucrative income streams and granting free options for insiders and non-Debtors. The estates should not spend limited resources and time pursuing an unconfirmable reorganization, particularly in a case that has virtually no connection with the United States, no support from its principal economic stakeholders and which could directly lead to litigation in England.[5] Absent resolution in the very near term, the Senior Lenders unfortunately appear to have no choice but to take all steps necessary to protect their interests. The Senior Lenders must therefore ascertain the extent of all conflicts, including by identifying the real beneficiaries of the proposed plan, the

---

[5]    The Chapter 11 Cases have no meaningful connection to the United States. The Debtors are incorporated and the vessels flagged in Cyprus or Liberia; their non-Debtor affiliates, including the non-Debtor affiliate management company Prisco, are incorporated in Russia or Singapore; their shares are owned by a British Virgin Island corporation; the Norwegian Bonds are issued under Norwegian law and Nordic Trustee is a Norwegian entity; and the Senior Lenders are European institutions whose loan and security documents are governed by English and other non-U.S. laws. The Debtors have no U.S. operations or assets (other than eve-of-filing retainers paid to the Debtors' counsel and financial advisor). Confirmation cannot be resolved without adjudicating intercreditor issues which are governed by English law in the courts of England.

7

Debtors "reorganization" prospects and the extent to which insiders, existing management and others stand to benefit from it.[6]  The Facility Agent is prepared to move quickly for such discovery from the Debtors, Prisco, Nordic Trustee, certain bondholders, Apington Investments Limited (the corporate parent) and Novatek and to seek dispositive or other relief as it deems necessary or appropriate.  The Facility Agent believes that a status conference at this critical juncture is therefore warranted.  All such rights are hereby reserved.

## NOTICE

16. No creditors' committee, trustee, or examiner has been appointed in these chapter 11 cases.  Notice of this Motion has been provided to: (a) the Debtors; (b) the U.S. Trustee; (c) counsel to Nordic Trustee; (e) counsel to Novatek; (f) counsel to the Swap Bank; and (g) all parties requesting notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002.

[*Remainder of page intentionally left blank.*]

---

[6] Additionally, the Senior Lenders are subject to strict "Know Your Customer" regulations and would need to know who will own reorganized Primorsk in any case.

Dated: March 9, 2016
    New York, New York

                                                                 Respectfully submitted,

By:    */s/ Scott Greissman*
        WHITE & CASE LLP
        Glenn M. Kurtz
        Scott Greissman
        Douglas P. Baumstein
        Charles R. Koster
        1155 Avenue of the Americas
        New York, NY 10036
        Telephone: (212) 819-8200
        Facsimile: (212) 354-8113
        gkurtz@whitecase.com
        sgreissman@whitecase.com
        dbaumstein@whitecase.com
        ckoster@whitecase.com

        Attorneys for Nordea Bank Norge ASA, as Facility Agent

Americas 91126866

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

―――――――――――――――――――――――――――――――x
:
In re                                                                           :      Chapter 11
:
:      Case No. 16-10073 (MG)
PRIMORSK INTERNATIONAL SHIPPING            :
LIMITED, *et al.*,[1]                                                   :       Jointly Administered
:
:
                                                      Debtors.     :
―――――――――――――――――――――――――――――――x

## ORDER SCHEDULING STATUS CONFERENCE

Upon the request[2] of the Nordea Bank Norge ASA, in its capacity as agent and security trustee (the "<u>Facility Agent</u>"), dated March 9, 2016, for entry of an order scheduling a status conference, it is hereby

**ORDERED** that a status conference will be held in these chapter 11 cases on March ___, 2016, at __:__ _m. (Eastern Time), in the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York, Courtroom 523 (Hon. Martin Glenn, BJ).

Dated:  March __, 2016
            New York, NY

                                                                        _____
                                                                                         MARTIN GLENN
                                                                              United States Bankruptcy Judge

---

[1]    The Debtors in these Chapter 11 Cases and, if applicable, the last four digits of their U.S. taxpayer identification numbers are: Primorsk International Shipping Limited (Cyprus), Boussol Shipping Limited (Cyprus) (6402) – m/t "Zaliv Amerika", Malthus Navigation Limited (Cyprus) (6401) – m/t "Zaliv Amurskiy", Jixandra Shipping Limited (Cyprus) (6168) – m/t "Prisco Alexandra", Levaser Navigation Limited (Cyprus) (0605) – m/t "Prisco Ekaterina", Hermine Shipping Limited (Cyprus) (0596) – m/t "Prisco Irina", Laperouse Shipping Limited (Cyprus) (0603) – m/t "Prisco Elizaveta", Prylotina Shipping Limited (Cyprus) (6085) – m/t "Prisco Elena", Baikal Shipping Ltd (Liberia) (6592) – m/t "Zaliv Baikal" and Vostok Navigation Ltd (Liberia) (1745) – m/t "Zaliv Vostok".

[2]    Capitalized terms not otherwise defined herein have the meaning ascribed to such terms in the request.