**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————————— x
In re                                                  :         Chapter 11
                                                       :
                                                       :         Case No. 16-10073 (MG)
PRIMORSK INTERNATIONAL SHIPPING         :
LIMITED, *et al.*, [1]                                 :          Jointly Administered
                                                       :
                              Debtors.                 :
———————————————————————— x

## DISCLOSURE STATEMENT FOR DEBTORS' JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

Andrew G. Dietderich
Brian D. Glueckstein
Alexa J. Kranzley
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone:   (212) 558-4000

Counsel to the Debtors and Debtors-in-Possession

Dated: March 15, 2016

---

[1]    The Debtors in these Chapter 11 Cases and, if applicable, the last four digits of their U.S. taxpayer identification numbers are: Primorsk International Shipping Limited (Cyprus), Boussol Shipping Limited (Cyprus) (6402) – m/t "Zaliv Amerika", Malthus Navigation Limited (Cyprus) (6401) – m/t "Zaliv Amurskiy", Jixandra Shipping Limited (Cyprus) (6168) – m/t "Prisco Alexandra", Levaser Navigation Limited (Cyprus) (0605) – m/t "Prisco Ekaterina", Hermine Shipping Limited (Cyprus) (0596) – m/t "Prisco Irina", Laperouse Shipping Limited (Cyprus) (0603) – m/t "Prisco Elizaveta", Prylotina Shipping Limited (Cyprus) (6085) – m/t "Prisco Elena", Baikal Shipping Ltd (Liberia) (6592) – m/t "Zaliv Baikal" and Vostok Navigation Ltd (Liberia) (1745) – m/t "Zaliv Vostok".

THE BOARD OF DIRECTORS (OR THE EQUIVALENT AUTHORIZED BODY) OF EACH OF THE DEBTORS HAS APPROVED THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN AND THE TRANSACTIONS CONTEMPLATED AND DESCRIBED HEREIN.  IN ADDITION, THE NORWEGIAN BOND TRUSTEE AND A MAJORITY OF THE HOLDERS OF THE NORWEGIAN BONDS AND THEIR LEGAL AND FINANCIAL ADVISORS PLAYED AN ACTIVE ROLE IN THE NEGOTIATION OF THE TERMS OF THE PLAN, AND THE TRANSACTIONS CONTEMPLATED THEREIN AND DESCRIBED HEREIN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED FOR THE PURPOSE OF SOLICITING VOTES TO ACCEPT OR REJECT THE CHAPTER 11 PLAN IT DESCRIBES HEREIN.  NO PERSON SHOULD USE OR RELY ON THIS DISCLOSURE STATEMENT FOR ANY OTHER PURPOSE.

IMPORTANT FEDERAL, STATE AND LOCAL LAWS FOR THE PROTECTION OF INVESTORS DO NOT APPLY TO THIS DISCLOSURE STATEMENT. THE SECURITIES DESCRIBED HEREIN WILL BE ISSUED TO CREDITORS WITHOUT REGISTRATION UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "*SECURITIES ACT*"), OR ANY SIMILAR FEDERAL, STATE OR LOCAL LAW, IN RELIANCE UPON THE EXEMPTIONS SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE TO THE MAXIMUM EXTENT PERMITTED AND APPLICABLE. IN ACCORDANCE WITH SECTION 1125(E) OF THE BANKRUPTCY CODE, A DEBTOR OR ANY OF ITS AGENTS THAT PARTICIPATES, IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, IN THE OFFER, ISSUANCE, SALE, OR PURCHASE OF A SECURITY, OFFERED OR SOLD UNDER THE PLAN, OF THE DEBTOR, OF AN AFFILIATE PARTICIPATING IN A JOINT PLAN WITH THE DEBTOR, OR OF A NEWLY ORGANIZED SUCCESSOR TO THE DEBTOR UNDER THE PLAN, IS NOT LIABLE, ON ACCOUNT OF SUCH PARTICIPATION, FOR VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE OFFER, ISSUANCE, SALE, OR PURCHASE OF SECURITIES.

THIS DISCLOSURE STATEMENT IS BEING DISTRIBUTED TO PARTIES-IN-INTEREST AS A SETTLEMENT PROPOSAL AND IS THEREFORE SUBJECT TO FEDERAL RULE OF EVIDENCE 408 AND OTHER APPLICABLE RULES, AND DOES NOT CONSTITUTE AND MAY NOT BE CONSTRUED AS AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER IN CONNECTION WITH ANY PENDING, THREATENED AND POTENTIAL LITIGATION, ARBITRATIONS OR DISPUTES.

THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PLAN AND DOCUMENTS RELATED THERETO; STATUTORY PROVISIONS RELEVANT TO CONFIRMATION OF THE PLAN; EVENTS IN THESE CHAPTER 11 CASES; AND FINANCIAL INFORMATION.  ALTHOUGH THE DEBTORS BELIEVE SUCH SUMMARIES ARE FAIR AND ACCURATE, THEY ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRETY OF SUCH DOCUMENTS OR STATUTORY PROVISIONS.

SC1:4030163.4

FACTUAL INFORMATION INCLUDED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' ADVISORS, MANAGEMENT AND EMPLOYEES OF PRISCO (SINGAPORE) PTE LTD, THE DEBTORS' MANAGEMENT SERVICES PROVIDER, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO. HOLDERS OF CLAIMS AND EQUITY INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED.

NO PERSON SHOULD RELY ON ANY OTHER INFORMATION THAN THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED BY REFERENCE HEREIN.  THE DEBTORS HAVE NOT AUTHORIZED ANYONE TO PROVIDE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.

SC1:4030163.4

# TABLE OF CONTENTS

1. Executive Summary ................................................................................................1
    A.    Purpose of this Disclosure Statement ........................................................1
    B.    Recovery Analysis and Treatment of Claims and Equity Interests ..........2
    C.    Deemed Substantive Consolidation of the Debtors ..................................5
    D.    Voting on the Plan ....................................................................................5
    E.    Confirmation of the Plan ..........................................................................7

2. Background to These Chapter 11 Cases ................................................................8
    A.    The Debtors...............................................................................................8
    B.    Prepetition Capital Structure....................................................................8
    C.    Events Leading Up to These Chapter 11 Cases .....................................12

3. Significant Events and Initiatives in These Chapter 11 Cases...........................15
    A.    Overview of Chapter 11 .........................................................................15
    B.    The Chapter 11 Cases ............................................................................16
    C.    Summary of the Claims Process .............................................................17

4. The Reorganized Debtors ....................................................................................18
    A.    Ownership and Corporate Structure.......................................................18
    B.    Board of Directors...................................................................................18
    C.    Business Plan ..........................................................................................18
    D.    Management Services with Prisco Singapore – an Affiliated Company...............19
    E.    Corporate Matters and Capitalization ....................................................20

5. Summary of the Plan............................................................................................22
    A.    Classification, Treatment and Voting of Claims and Equity Interests....................22
    B.    Settlement, Release, Injunction and Related Provisions........................27

6. Statutory Requirements for Confirmation of the Plan ........................................31
    A.    The Confirmation Hearing .....................................................................32
    B.    Confirmation Standards ..........................................................................32
    C.    Best Interests Test ..................................................................................34
    D.    Financial Feasibility...............................................................................36
    E.    Acceptance by Impaired Classes ...........................................................37
    F.    Confirmation Without Acceptance by All Impaired Classes................37

7. Voting Procedures................................................................................................39
    A.    Parties-in-Interest Entitled to Vote ........................................................40
    B.    Voluntary Releases under the Plan .........................................................41
    C.    Classes under the Plan ............................................................................42
    D.    Solicitation Packages for Voting Classes ..............................................42
    E.    Solicitation Packages for Non-Voting Classes ......................................42
    F.    Voting Procedures...................................................................................43

8. Additional Factors to Be Considered Prior to Voting........................................44

|     | A. | Plan Risks | 44 |
|     | B. | Risks Relating to the Debt and Securities to Be Issued under the Plan | 46 |
|     | C. | Certain Risks Related to the Debtors' Business and Operations | 50 |
|     | D. | Additional Factors to Be Considered | 56 |
| 9.  | U.S. Securities Law Considerations | | 58 |
|     | A. | Issuance of New Common Stock | 58 |
|     | B. | Subsequent Transfers | 58 |
| 10. | Material United States Federal Income Tax Consequences of the Plan | | 59 |
| 11. | Alternatives to Confirmation of the Plan | | 60 |
|     | A. | Continuation of these Chapter 11 Cases | 61 |
|     | B. | Alternative Plans of Reorganization | 61 |
|     | C. | Liquidation | 61 |
| 12. | Debtors' Recommendation | | 62 |

# **<u>Appendices</u>**

Appendix A: Debtors' Plan of Reorganization

Appendix B: Solicitation Procedures Order

Appendix C: Debtors' Corporate Structure Chart

Appendix D: Business Plan

Appendix E: Liquidation Analysis

SC1:4030163.4

# 1.    EXECUTIVE SUMMARY

On January 15, 2016 (the "*Petition Date*"), Primorsk International Shipping Limited ("*Primorsk*") and the other Debtors in these Chapter 11 Cases (collectively, the "*Debtors*") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "*Bankruptcy Code*"). The Debtors have continued to operate in the ordinary course of business since the Petition Date and certain of Primorsk's other subsidiaries are not subject to these Chapter 11 Cases.

Simultaneous with the filing of this Disclosure Statement, the Debtors are filing the *Joint Chapter 11 Plan of Reorganization of Primorsk International Shipping Limited and its Debtor Affiliates* (as may be further amended, supplemented or modified from time to time, including the Plan Supplement and all other exhibits and schedules thereto, in each case, as they may be further amended, modified or supplemented from time to time, the "*Plan*"),[2] attached hereto as <u>Appendix A</u>.

## A.    Purpose of this Disclosure Statement

Chapter 11 is the chapter of the Bankruptcy Code primarily used for business reorganization. Chapter 11 helps a company to restructure its operations and finances to maximize recovery to all stakeholders. The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case. A plan of reorganization sets forth the means for satisfying claims against, and interests in, the debtor. Confirmation of a plan of reorganization by a bankruptcy court binds the debtors, any issuer of securities under the plan, any person acquiring property under the plan, and any creditor or interest holder of the debtors. Subject to certain limited exceptions, the order approving confirmation of a plan discharges the debtors from any debt that arose prior to the date of confirmation of the plan and enjoins all parties from bringing any causes of action in connection with such debts.

In general, a plan of reorganization (i) divides claims and interests into separate classes, (ii) specifies the property that each class is to receive under the plan, and (iii) contains provisions necessary to implement the plan. Under the Bankruptcy Code, "claims" and "interests," rather than "creditors" and "shareholders," are classified because creditors and shareholders may hold claims and interests in more than one class.

The Debtors submit this *Disclosure Statement for Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* (this "*Disclosure Statement*") pursuant to section 1125 of the Bankruptcy Code for the purpose of soliciting votes on the proposed Plan. The purpose of this Disclosure Statement is to provide the Holders of Claims and Equity Interests who are entitled or solicited to vote on the Plan with adequate information to make an informed judgment about the Plan. According to section 1125 of the Bankruptcy Code, acceptances of a chapter 11 plan may be solicited only after a Bankruptcy Court-approved written disclosure statement has been provided to each creditor or interest holder who is entitled to vote on the plan.

---

[2]    Capitalized terms not defined herein shall have the meanings given to them in the Plan.

**B.    Recovery Analysis and Treatment of Claims and Equity Interests**

The Plan organizes the Debtors' creditor and equity constituencies into groups called Classes.  For each Class, the Plan describes (a) the underlying Claim or Equity Interest, (b) the recovery available to the Holders of Claims or Equity Interests in that Class under the Plan, (c) whether the Class is Impaired under the Plan, meaning that each Holder will receive less than full value on account of its Claim or Equity Interest or that the rights of Holders under law will be altered in some way (such as receiving stock instead of holding a Claim), and (d) the form of any consideration (*e.g.*, Cash, stock or a combination thereof) that Holders will receive on account of their respective Claims or Equity Interests.

In accordance with section 1123(a)(1) of the Bankruptcy Code, the Plan does not classify General Administrative Claims or Professional Claims, which will generally be paid in Cash when approved by the Bankruptcy Court or in the ordinary course on or after the Effective Date.

The classification of Claims and Equity Interests pursuant to the Plan is as follows:

| CLASS | CLAIMS AND EQUITY INTERESTS | STATUS | VOTING RIGHTS |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3A | Senior Secured Claims | Impaired | Entitled to Vote |
| 3B | Junior Secured Claims | Impaired | Entitled to Vote |
| 3C | Swap Secured Claims | Impaired | Entitled to Vote |
| 4 | Norwegian Bond Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Equity Interests in Primorsk | Impaired | Entitled to Vote |

The table below provides a summary of the classification, treatment and estimated recoveries of Claims and Equity Interests under the Plan.  This information is provided in summary form for illustrative purposes only, is subject to material change based on contingencies related to the claims reconciliation process, and is qualified in its entirety by reference to the provisions of the Plan.  For a more detailed description of the treatment of Claims and Equity Interests under the Plan, see <u>Section 5</u> below—Summary of the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ARE THEREFORE SUBJECT TO CHANGE.**

**<u>SUMMARY OF TREATMENT OF CLAIMS AND EQUITY INTERESTS AND ESTIMATED RECOVERIES</u>**[3]

---

[3]    Figures are as of January 14, 2016, and are subject to material change.

SC1:4030163.4

| CLASS | TREATMENT | ESTIMATED ALLOWED CLAIMS[4] | ESTIMATED PERCENT RECOVERY | |
|---|---|---|---|---|
| | | | Plan | Liquidation |
| **Class 1**<br><br>**Other Priority Claims** | Each Holder of an Allowed Other Priority Claim shall be paid in full in Cash on or as soon as reasonably practicable after the latest of (i) the Effective Date, (ii) the date on which such Other Priority Claim becomes Allowed, and (iii) such other date as may be ordered by the Bankruptcy Court. | $0 | 100% | 100% |
| **Class 2**<br><br>**Other Secured Claims** | Each Holder of an Allowed Other Secured Claim shall receive one of the following treatments, in the sole discretion of the applicable Debtor: (i) payment in full in Cash including the payment of any interest payable under section 506(b) of the Bankruptcy Code; (ii) delivery of the collateral securing such Allowed Other Secured Claim; or (iii) treatment of such Allowed Other Secured Claim in any other manner that renders the Claim Unimpaired. | $0 | 100% | 100% |
| **Class 3A**<br><br>**Senior Secured Claims** | Each Holder of an Allowed Senior Secured Claim shall receive its Pro Rata share of the Tranche A Replacement Loans; provided, however, if Classes 3A, 3B and 3C all vote to accept the Plan, each Holder of an Allowed Senior Secured Claim shall receive its Pro Rata share of the Amortizing Tranche A Replacement Loans in addition to other Amortizing payments; with such modifications, if any, as the Debtors may determine to be appropriate in light of the requirements of section 1129(b) of the Bankruptcy Code. | $194,269,474 | 100% | 100% |

---

[4]  Estimated aggregate amount of claims currently asserted against or scheduled by the Debtors, incorporating provisions of the Plan and excluding duplicative claims.

3

| CLASS | TREATMENT | ESTIMATED ALLOWED CLAIMS[4] | ESTIMATED PERCENT RECOVERY | |
|---|---|---|---|---|
| | | | Plan | Liquidation |
| **Class 3B** **Junior Secured Claims** | Each Holder of an Allowed Junior Secured Claim shall receive its Pro Rata share of the Tranche B Replacement Loans; provided, however, if Classes 3A, 3B and 3C all vote to accept the Plan, the Tranche A Replacement Loans shall be Amortizing and the Applicable Margin of the Tranche B Replacement Loans shall be 1.75% and if any of Class 3A, 3B or 3C votes to reject the Plan, the Tranche A Replacement Loans shall not be Amortizing and the Applicable Margin of the Tranche B Replacement Loans shall be 2.00%; in each case with such modifications, if any, as the Debtors may determine to be appropriate in light of the requirements of section 1129(b) of the Bankruptcy Code. | $51,625,000 | 100% | 99-100% |
| **Class 3C** **Swap Secured Claims** | Each Holder of an Allowed Swap Secured Claim shall receive its Pro Rata share of the Tranche C Replacement Loans; provided, however, if Classes 3A, 3B and 3C all vote to accept the Plan, the Tranche A Replacement Loans shall be Amortizing and the Applicable Margin of the Tranche C Replacement Loans shall be 2.00% and if any of Class 3A, 3B or 3C votes to reject the Plan, the Tranche A Replacement Loans shall not be Amortizing and the Applicable Margin of the Tranche C Replacement Loans shall be 2.25%; in each case with such modifications, if any, as the Debtors may determine to be appropriate in light of the requirements of section 1129(b) of the Bankruptcy Code. | $16,400,988 | 100% | 0-100% |
| **Class 4** **Norwegian Bond Claims** | Each Holder of an Allowed Norwegian Bond Claim shall receive its Pro Rata share of the New Class B Common Stock. | $80,868,077 | N/A | 0-28% |
| **Class 5** **General Unsecured Claims** | On the later of the Effective Date or as soon as practicable after a General Unsecured Claim becomes Allowed, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed General Unsecured Claims, each Holder of an Allowed General Unsecured Claim shall receive payment in Cash in an amount equal to 75 percent of the amount of such Allowed General Unsecured Claim. | $217,789 | 75% | 0% |

SC1:4030163.4

| CLASS | TREATMENT | ESTIMATED ALLOWED CLAIMS[4] | ESTIMATED PERCENT RECOVERY | |
|---|---|---|---|---|
| | | | Plan | Liquidation |
| **Class 6** **Equity Interests in Primorsk** | Each Holder of the Equity Interests in Primorsk shall receive its Pro Rata share of the New Class A Common Stock. | 1,000 shares | N/A | 0% |

### C.    Deemed Substantive Consolidation of the Debtors

The Plan shall serve as a motion by the Debtors seeking entry of a Bankruptcy Court order deeming the substantive consolidation of the Debtors' Estates into a single Estate for certain limited purposes related to the Plan, including Voting, Confirmation and Distribution.

As explained in <u>Section 2.A</u> below, the Debtors consist of Primorsk and its nine wholly-owned subsidiaries.  The Debtors are an integrated enterprise, managed across geographic boundaries and legal entities.  Given the number of overlapping creditors, the Debtors believe that it would be inefficient to propose, vote on and make distributions in respect of entity-specific claims. Accordingly, Holders of Allowed Claims against or Equity Interests in each of the Debtors will receive the same recovery provided to other Holders of Allowed Claims or Equity Interests in the applicable Class. The Debtors believe that no creditor will receive a recovery inferior to that which it would receive if each Debtor proposed a plan of reorganization that was completely separate from that proposed by each other entity and, therefore, the Debtors do not believe that any creditor will be materially adversely affected by not voting and receiving distributions on an entity-by-entity basis.

### D.    Voting on the Plan

#### 1.    *Parties-in-Interest Entitled to Vote*

Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan of reorganization unless:  (a) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof; or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

In general, under section 1126(a) of the Bankruptcy Code, the holder of a claim or interest that is allowed under a plan of reorganization is entitled to vote to accept or reject the plan if such claim or interest is impaired under the plan.  Under section 1126(f) of the Bankruptcy Code, the holder of a claim that is not impaired under a plan of reorganization is deemed to have accepted the plan, and the plan proponent need not solicit such holder's vote. Under section 1126(g) of the Bankruptcy Code, the holder of an impaired claim or impaired interest that will not receive any distribution under the plan in respect of such claim or interest is

SC1:4030163.4

deemed to have rejected the plan and is not entitled to vote on the plan.  For a detailed description of the treatment of Claims and Equity Interests under the Plan, refer to <u>Section 5</u> below—Summary of the Plan.

Classes 1 and 2 are Unimpaired under, and deemed under section 1126(f) of the Bankruptcy Code to have accepted, the Plan.

Classes 3 – 6 are Impaired under, and entitled to vote to accept or reject, the Plan.

Except as described in <u>Section 6</u> below, the Bankruptcy Code requires, as a condition to confirmation of the Plan, that each Impaired Class accept the Plan.  Section 1126(c) of the Bankruptcy Code defines acceptance of a plan of reorganization by an impaired class of claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in such class that have voted to accept or reject the plan.  Under section 1126(d) of the Bankruptcy Code, an impaired class of equity interests has accepted a plan of reorganization if the plan has been accepted by holders of at least two-thirds in amount of the allowed interests of such class that have voted to accept or reject the plan.  Holders of claims and equity interests who fail to vote are deemed neither to accept nor to reject the plan.  For a more detailed description of the requirements for confirmation of the Plan, refer to <u>Section 6</u> below—Statutory Requirements for Confirmation of the Plan.

Even if the Plan has not been accepted by all Impaired Classes entitled to vote, section 1129(b) of the Bankruptcy Code allows the Bankruptcy Court to confirm the Plan, provided that the Plan has been accepted by at least one Impaired Class of creditors. Notwithstanding the failure of an Impaired Class to accept the Plan, the Plan can be confirmed in a procedure commonly known as cram-down, so long as the Plan does not "discriminate unfairly" and is "fair and equitable," for the purposes of the Bankruptcy Code, with respect to each Class of Claims or Equity Interests that is Impaired under, and has not accepted, the Plan. For a more detailed description of the requirements for confirmation of a nonconsensual plan, refer to <u>Section 6</u> below—Statutory Requirements for Confirmation of the Plan.

<div align="center">

2.     *<u>Submitting a Ballot</u>*

</div>

Classes 3 – 6 are entitled to or are being solicited to vote to accept or reject the Plan.  If you are entitled or are being solicited to vote, you should carefully review this Disclosure Statement, including the attached appendices and the instructions accompanying your Ballot or Ballots.  Then, indicate your acceptance or rejection of the Plan by voting for or against the Plan on the enclosed Ballot or Ballots and return the Ballot or Ballots to Kurtzman Carson Consultants LLC (the "*Notice and Claims Agent*") or, if you are a beneficial Holder of Norwegian Bond Claims, to your voting nominee as indicated on your Ballot. For further information, refer to <u>Section 7</u> below—Voting Procedures, and the Solicitation Procedures Order attached hereto as <u>Appendix B</u>.

Ballots cast by Holders in Classes entitled to vote must be received by the Notice and Claims Agent by 8:00 p.m. (Eastern Time) on June 15, 2016. For further information, refer to <u>Section 7</u> below—Voting Procedures.

SC1:4030163.4

Ballots received after the Voting Deadline will not be counted.

The method of delivery of Ballots to be sent to the Notice and Claims Agent (or to a voting nominee, as the case may be) is at the election and risk of each Holder of a Claim or Equity Interest. Except as otherwise provided in the Plan or Solicitation Procedures Order, delivery of a Ballot will be deemed made only when the original executed Ballot is actually received by the Notice and Claims Agent. In all cases, sufficient time should be allowed to ensure timely delivery. Original executed Ballots are required.

Delivery of a Ballot to the Notice and Claims Agent by facsimile, e-mail or any other electronic means will not be accepted. No Ballot should be sent to the Debtors or the Debtors' financial or legal advisors, agents or representatives (other than the Notice and Claims Agent), and if so sent, will not be counted.

*3.*        *Recommendation*

**The Debtors recommend that Holders of Claims and Equity Interests entitled to vote on the Plan vote to accept it.**

**E.        Confirmation of the Plan**

*1.*        *Plan Objection Deadline*

Objections to Confirmation of the Plan must be filed with the Court and served so as to be actually received on or before 4:00 p.m. (Eastern Time) on July 1, 2016.

Unless objections to Confirmation are timely served and filed in compliance with the Solicitation Procedures Order, they will not be considered by the Bankruptcy Court. For further information, refer to <u>Section 6</u> below—Statutory Requirements for Confirmation of the Plan.

*2.*        *Confirmation Hearing*

The Bankruptcy Court has scheduled the Confirmation Hearing for [_____] **(Eastern Time)**. The Confirmation Hearing may be adjourned by the Bankruptcy Court or the Debtors without further notice other than by announcement in open court and/or notice(s) of adjournment filed on the docket with the Bankruptcy Court's permission.

SC1:4030163.4

## 2.    BACKGROUND TO THESE CHAPTER 11 CASES

### A.    The Debtors

The Debtors conduct their business directly and through three wholly-owned non-Debtor subsidiaries, Isardia Holdings Limited, Walmer Shipping Co. Limited and Shipworth Shipping Company Limited (collectively with the Debtors, the "*Company*").  A corporate structure chart of the Company is attached hereto as <u>Appendix C</u>.

The Company is one of the world's leading operators of modern ice-classed double-hulled product tankers and crude oil tankers.  Primorsk's current fleet is comprised of nine wholly-owned product and crude oil tankers and two joint venture vessels.  The core fleet is comprised of ice class vessels with hull reinforcement, steel propellers and other winterization features that enable transportation in harsh environments such as the Arctic, Russia Far East (Sakhalin) and Baltic areas.

The Company is a profitable going concern business with robust operating margins and long-term relationships with leading charter parties.  The Company's vessels and services have been in consistent demand.  Since 2008, no vessel of the Company has averaged more than one day off hire per year.

### B.    Prepetition Capital Structure

#### 1.    *Secured Debt*

As of the Petition Date, the Debtors had outstanding funded secured debt (the "*Secured Debt*") in an aggregate amount of principal and accrued interest of $262,295,462.  It consisted of (a) approximately $194.3 million pursuant to a senior secured term loan facility and approximately $51.6 million pursuant to a junior revolving credit facility (collectively the "*Secured Facility*") and (b) approximately $16.4 million pursuant to a third ranking term loan facility taken to refinance certain swap liabilities (the "*Swap Facility*").

The outstanding amounts of the Secured Debt were held by the following:

SC1:4030163.4

| NAME OF CREDITOR | TOTAL AMOUNT OF SECURED DEBT HELD | TOTAL AMOUNT OF SENIOR SECURED DEBT HELD | TOTAL AMOUNT OF JUNIOR SECURED DEBT HELD | TOTAL AMOUNT OF SWAP SECURED DEBT HELD |
|---|---|---|---|---|
| BNP Paribas S.A. | $54,046,095 | $37,645,107 | $0 | $16,400,988 |
| Oaktree/ OCM Starfish Debtco S.a.r.l | $53,239,220 | $18,822,553 | $34,416,667 | $0 |
| Nordea Bank Norge ASA | $36,030,887 | $18,822,553 | $17,208,333 | $0 |
| DnB Bank ASA | $25,039,177 | $25,039,177 | $0 | $0 |
| Credit Agricole Corporate and Investment Bank | $25,039,177 | $25,039,177 | $0 | $0 |
| DVB Bank SE | $25,039,177 | $25,039,177 | $0 | $0 |
| Credit Suisse AG | $25,039,177 | $25,039,177 | $0 | $0 |
| ING Bank N.V. | $18,822,554 | $18,822,554 | $0 | $0 |
| **TOTAL** | **$262,295,462** | **$194,269,474** | **$51,625,000** | **$16,400,988** |

a.      Secured Facility

The Secured Facility was entered into on January 2, 2008 and initially consisted of a $450 million senior secured term loan bearing interest at LIBOR plus a margin of 1.05% (the "*Senior Secured Facility*") and a $80 million junior revolving credit facility bearing interest at LIBOR plus a margin of 2% (the "*Junior Secured Facility*"). The blended margin over LIBOR of the Secured Facility was initially 1.19%. The Secured Facility had a term ranging from five to slightly over six years depending on the dates of disbursement.

The Secured Facility has been repaid substantially as a result of vessel dispositions and other accommodations made in discussions with the Secured Lenders beginning in December 2010. Currently, approximately $194.3 million of the Senior Secured Facility and approximately $51.6 million of the Junior Secured Facility are outstanding.

The Secured Facility was evidenced by a loan agreement (as amended from time to time, the "*Secured Loan Agreement*") with Nordea Bank Norge ASA, as agent and security trustee (the "*Secured Agent*") and the banks, financial institutions and other lenders party thereto (the "*Secured Lenders*"). The Secured Facility is secured by mortgages over the Debtors' vessels, and charges over certain bank accounts and shareholdings of Primorsk in the Debtor Subsidiaries. In addition, general assignments were created in favor of the Secured Facility, in

SC1:4030163.4

respect of, amongst other things, the earnings, insurances and requisition compensation insurances related to the Debtors' vessels.  As between the Senior Secured and Junior Secured Lenders, the Secured Loan Agreement provide that the security interest of the Senior Secured Lenders takes priority.  Primorsk and each other Debtor Subsidiary also guarantee the Secured Facility.

        As part of its discussions with the Secured Lenders while the Secured Facility was in default, on December 21, 2012, Primorsk, the Secured Agent and the Secured Lenders amended the Secured Loan Agreement and the interest on the Senior Secured Facility was increased to LIBOR plus a margin of 3% and the interest on the Junior Secured Facility was increased  to LIBOR plus 4.5%.  The Company has continued to pay interest at these default interest rates during these Chapter 11 Cases.  The Company has timely made interest payments on the Secured Facility at all times prior to and during these Chapter 11 Cases.

<div align="center">

b.    <u>Swap Facility</u>

</div>

        On June 7, 2011, while in discussions with its Secured Lenders, Primorsk entered into a secured loan agreement (as may be amended from time to time, the "*Swap  Loan Agreement*") with BNP Paribas, as agent (the "*Swap Agent*") and the banks, financial institutions and other lenders party thereto (the "*Swap Lenders*").  The Swap Loan Agreement refinanced interest rate swap exposure created to comply with certain covenants in the Secured Facility.  As of the Petition Date, approximately $16.4 million remain outstanding.  The Company has continued to pay interest at LIBOR plus a margin of 4.5% during these Chapter 11 Cases.

        The Swap Facility is secured by a number of second ranking priority mortgages over the Debtors' vessels and second ranking priority charges over certain bank accounts and shareholdings of Primorsk in the Debtor Subsidiaries.  In addition a second priority general assignment was created in respect of, amongst other things, the earnings, insurances and requisition compensation insurances related to the Debtors' vessels.  Primorsk and each other Debtor Subsidiary also guarantee the Swap Facility.

<div align="center">

2.    *Norwegian Bonds*

a.    <u>General</u>

</div>

        Primorsk's primary unsecured creditors are the holders of two tranches of unsecured, publicly-traded bonds governed by Norwegian law (the "*Norwegian Bonds*").  The Norwegian Bonds—$15.2 million denominated in United States Dollars and $350 million denominated in Norwegian Kroner—were issued pursuant to an agreement, dated as of February 23, 2007 (as may be amended from time to time, the "*Norwegian Bond Indenture*"), between Primorsk and Nordic Trustee ASA (f/k/a Norsk Tillitsmann ASA), as trustee (the "*Norwegian Bond Trustee*").  The Norwegian Bonds bore an interest rate of LIBOR plus 3.6% for the United States Dollar tranche and NIBOR plus 3.6% for the Norwegian Kroner tranche.

        In 2011, a number of amendments were made to the Norwegian Bonds.  First, in February 2011, the margins on all the Norwegian Bonds were increased to 6% over LIBOR or NIBOR, as applicable.  In August 2011, the Norwegian Bonds were given the benefit of

<div align="center">10</div>

upstream guarantees by the Debtor Subsidiaries, as well as junior mortgages (fourth-ranking) in the Debtor Subsidiaries' vessels and other collateral.

In 2015, further amendments were made to the Norwegian Bonds to release the junior mortgages and other security. These amendments left in place the unsecured guarantees by the Debtor Subsidiaries, but as general unsecured claims. In addition, on October 1, 2015, all accrued and unpaid interest due on the Norwegian Bonds was capitalized.

Currently, the Norwegian Bonds consist of an approximately $21.7 million tranche denominated in United States Dollars and an approximately $59.2 million tranche denominated in Norwegian Kroner. The Norwegian Bonds continue to trade publicly.

### b.    Affiliated Holders

An affiliate of the Company, Lenarda Services Inc. ("*Lenarda*") repurchased Norwegian Bonds in secondary trading transactions. Lenarda is a wholly-owned subsidiary of Apington (defined below), the Company's immediate parent. As of the Petition Date, Lenarda holds 32% of the aggregate principal amount of the Norwegian Bonds. Lenarda has informed the Company that it currently intends to vote to approve the Plan, in which Lenarda will receive the same pro rata consideration as other Holders of Norwegian Bond Claims.

The Company is not aware of any other Holder of Norwegian Bond Claims that is affiliated with the Company.

### c.    Other Substantial Holders

The Company has also been informed that an investment vehicle controlled by members of the Peraticos family, Wealth Holdings, Inc., or its affiliated funds (the "*Peraticos Holders*"), have purchased approximately 60% of the Norwegian Bonds in secondary trading transactions. The Peraticos Holders have experience in shipping and other industries and are not affiliated with the Company or Apington. Counsel to Wealth Holdings, Inc. has reviewed preliminary drafts of the Plan and informed the Company that they believe that Wealth Holdings, Inc. has no objection to the Plan as a general matter, including the allocation of 75% of the equity of the Reorganized Debtors to the Holders of Allowed Norwegian Bond Claims as contemplated by the Plan. Wealth Holdings, Inc., however, continues to review the Plan, including without limitation with respect to corporate governance matters, and has made no decision to support or approve the Plan, or to continue to hold the Norwegian Bonds they currently hold.

The Company is not aware of any other Holder of a substantial amount of the Norwegian Bonds.

### 3.    *Equity Ownership*

As of the Petition Date, Primorsk had 1,000 authorized and outstanding shares of ordinary stock, €1.71 par value, all of which were held by Apington Investments Limited ("*Apington*"), a British Virgin Islands holding company. Apington is not a Debtor. As noted in the corporate structure chart, attached hereto as <u>Appendix C</u>, Alexander Kirilichev holds 55%

equity ownership of Apington, Dmitry Golomovzy holds 25% equity ownership of Apington and the remaining 20% equity ownership of Apington is held by other management and non-management employees, with no individual holding more than 10%.

Each other Debtor is wholly-owned by Primorsk directly.

Apington has informed the Company that it currently intends to vote to approve the Plan, in which Apington will receive New Class A Common Stock representing 25% of the share capital of the Company.

## C.      Events Leading Up to These Chapter 11 Cases

### 1.      *Historical Overview*

Founded in 2004, the Company is an international specialty shipping company and one of the world's leading operators of modern ice-classed, double-hulled tankers. The Company is renowned for its ice navigation expertise and has extensive experience operating in the Artic under extreme conditions. The Company has a highly-experienced management team across international shipping sectors and market cycles.

After its formation in 2004, Primorsk grew steadily in response to customer demand, increasing and diversifying its fleet of vessels. In 2007, Primorsk issued the Norwegian Bonds to raise additional funding to build or otherwise acquire additional vessels.

Shortly after issuing the Norwegian Bonds, Primorsk's operations were affected by the global economic downturn at the end of 2007. Although Primorsk has consistently generated positive operating income, falling pricing for time-charters impaired Primorsk's profitability and limited its ability to repay debt, refinance existing debt and obtain new financing to purchase additional vessels.

### 2.      *Prepetition Restructuring Initiatives*

On October 1, 2009, the Debtors undertook an extensive review of all non-essential expenditures. All cost budgets were reviewed to reduce expenses and headcount in line with recent ship dispositions. The Debtors implemented tight budget control over operating and technical costs.

Additionally, Primorsk initiated discussions with the Secured Agent, the Secured Lenders, the Swap Agent, the Swap Lenders, the Norwegian Bond Trustee and the Norwegian Bondholders in the second half of 2009. In connection with these discussions, the Debtors, the Secured Agent, the Secured Lenders, the Swap Agent, the Swap Lenders and the Norwegian Bond Trustee, on behalf of the Norwegian Bondholders, entered into waivers of certain financial covenants.

In December 2010, Primorsk reached an agreement with the Secured Agent and the Secured Lenders whereby it sold six shuttle tankers to OAO Sovcomflot for $281.5 million, yielding net sale proceeds of $277.3 million. Approximately $230 million of the sale proceeds were used to repay outstanding amounts under the Secured and Swap Facilities, with the balance

12

being maintained by Primorsk as a liquidity buffer. This restructuring and amendment stabilized cash flows and deleveraged Primorsk.

However, the shipping business benefits from economies of scale in terms of the necessary corporate overhead as well as relationships with customers and vendors. After the reduction in size agreed to with its creditors, Primorsk's financial issues continued. As a result of continued challenging market conditions, Primorsk tightened its liquidity position and agreed to service interest-bearing debt with significant regular debt repayments. In 2012, Primorsk entered into an amendment with the Secured Agent and Secured Lenders pursuant to which, Primorsk agreed to (i) cease paying interest to the Norwegian Bondholders, and (ii) increase the margin on the Senior Secured Facility to 3.0% per annum and the margin on the Junior Secured Facility to 4.5% per annum. Primorsk also entered into an amendment with the Swap Agent and Swap Lenders pursuant to which the Swap Facility was restructured to ensure that 75% of the quarter balance would be capitalized as a new swap loan, with the remaining 25% of the amounts due to be paid each quarter.

With fewer vessels and larger debt service payments, Primorsk was left with little liquidity buffer as global financial conditions continued to worsen. The Secured Lenders demanded more vessel sales to facilitate repayment of the Secured Debt, including two drybulk vessels in 2012, a crude tanker in 2013, two Suezmax tankers, and other unencumbered assets, including a 25% interest in the ice class LNG carrier in 2014 and a 50% interest in the ice class ice-breaking tug "Polar Pevek". Those vessel sales further decreased the size of the Company, putting pressure on its per vessel operating costs as well as market position.

### 3.    *Recent Developments*

In November 2014, the Debtors and holders of approximately 48% in principal amount of Norwegian Bonds agreed on the terms of a consensual restructuring in which the Norwegian Bonds would be partly converted into equity and the Debtors would make a cash payment to the holders. This restructuring was conditional on, among other things, an extension of the Secured and Swap Facilities to June 30, 2020. The Debtors engaged in protracted negotiations with the Secured Agent, the Secured Lenders, the Swap Agent and the Swap Lenders to implement the proposed bond restructuring outside of a judicial process, but were unsuccessful because of the unwillingness of the Secured and Swap Lenders to extend their maturity on terms mutually agreeable to the parties.

As a result, the Secured and Swap Facilities matured in June 2015. Since then, the Debtors have worked diligently and in good faith to reach a global compromise in which the Company converts the Norwegian Bonds to equity and extends or refinances the Secured and Swap Facilities to allow the Company to continue operations as a viable going concern. The Secured and Swap Lenders instead have insisted that the Debtors pursue a liquidating sale of their vessels, and refused to provide a standstill against enforcement action unless a sale process was conducted.

In an effort to reach a consensual resolution, the Debtors cooperated and undertook to explore the lender-sponsored liquidation of all their vessels, even though the Debtors believed that a forced sale would not achieve or reflect the true long-term going concern

13

value of the business.  The Debtors believed, and continue to believe, that their business is worth significantly more than liquidation value.

The sale process was conducted over a four-month period.  Because of the significant difference between the liquidation value of the vessels and the going concern value of the entire enterprise, which include the Debtors' worldwide relationships and special operating expertise, the sale process failed to provide a viable solution.

*4.*    *Amended Charters*

Charter rates have now recovered and are improving.  In December 2015, the charters for five of the Debtors' nine vessels came up for regular renewal.

On December 25, 2015, Primorsk amended and extended these five existing charters.  Additionally, at the same time, Primorsk entered into new charters with respect to three other vessels.  The charter durations of these amended and new charters were extended to January 1, 2019 (subject to minor adjustments) and the per diem charter rates were increased. With respect to the five vessels that were amended and extended, the rate increases took effect immediately and applied for the remainder of the existing charter period.

The Company's remaining vessel is currently scheduled to expire on June 1, 2016.  The Debtors have reached an agreement with the existing charter counterparty to extend the charter for 10 to 12 months at an increased rate of $25,000 per day.

The terms of these charter amendments and new charters are as follows:

| VESSEL | PREVIOUS CHARTER RATE | NEW CHARTER RATE | CHARTER DURATION |
|---|---|---|---|
| Zaliv Vostok | $16,500/day | $22,000/day | 36 months from January 1, 2016 |
| Zaliv Amurskiy | $17,250/day | $22,000/day | 36 months from January 1, 2016 |
| Prisco Ekaterina | $15,800/day | $17,100/day | 36 months from January 1, 2016 |
| Prisco Elena | $16,000/day | $17,100/day | 36 months from January 1, 2016 |
| Prisco Alexandra | $14,000/day | $17,100/day | 36 months from January 25, 2016 |
| Prisco Elizaveta | $15,700/day | $17,100/day | 36 months from redelivery from the current charterer whose charter is scheduled to terminate on March 24, 2016 |
| Prisco Irina | $15,300/day | $17,100/day | 36 months from redelivery from the current charterer whose charter is scheduled to terminate on March 20, 2016 |
| Zaliv Baikal | $14,500/day | $22,000/day | 36 months from January 1, 2016 |

SC1:4030163.4

| Vessel | Previous Charter Rate | New Charter Rate | Charter Duration |
|---|---|---|---|
| Zaliv Amerika | $23,000/day | $25,000/day | 10 to 12 months from June 1, 2016 |

5.    *Cash Sweep and Threat of Vessel Arrests*

When the sale process failed to produce a suitable purchaser, the Debtors reengaged with the Secured Agent, the Secured Lenders, the Swap Agent and the Swap Lenders to further restructure the Secured and Swap Facilities based on the improved economics as the global charter market and shipping industry generally continue to recover.  The Secured and Swap Lenders, however, informed the Debtors that they would not discuss a restructuring that did not involve a liquidation of the Debtors' vessels.

In response, on January 12, 2016, the Secured Agent sent the Debtors a principal payment notice and simultaneously took possession of approximately $7.3 million from the Nordea account in London (Primorsk's primary banking account at the time) and applied the funds to the outstanding balance of the Secured Facility.  This unanticipated seizure reduced Primorsk's cash available to only slightly more than one month's operating expenses.  Additionally, on the next day, the Secured Agent sent an acceleration notice demanding immediate payment of all amounts owing under the Secured Facility.

As a result, and to prevent any further unanticipated enforcement actions, the Debtors, after careful consideration of all alternatives, determined that the filing of these Chapter 11 Cases was in the best interests of the Company and all of its stakeholders.

## 3.    SIGNIFICANT EVENTS AND INITIATIVES IN THESE CHAPTER 11 CASES

The following is a general summary of significant events in these Chapter 11 Cases, including a discussion of the Debtors' restructuring and business initiatives since the commencement of these Chapter 11 Cases.

### A.    Overview of Chapter 11

Chapter 11 is the chapter of the Bankruptcy Code primarily used for business reorganization.  Chapter 11 helps a company to restructure its operations and finances to maximize recovery to all stakeholders.  Chapter 11 promotes equality of treatment for similarly situated creditors and interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate comprising all property and all other legal and equitable interests of the debtor as of the date of the debtor's petition for chapter 11 protection.  The Bankruptcy Code allows the debtor to continue all business operations and remain in possession of all property of the estate as a "debtor-in-possession."

The United States Trustee for the Southern District of New York (the "*U.S. Trustee*") monitors the progress of a chapter 11 case and supervises its administration.  In

SC1:4030163.4

particular, the U.S. Trustee is responsible for monitoring the debtor in possession's operation of the business and the submission of operating reports and fees.

A chapter 11 case culminates in the consummation of a plan of reorganization. The plan of reorganization includes a classification of claims against and interests in the debtor and specifies how each class will be treated. Among other things, the plan of reorganization must be confirmed by the bankruptcy court before it is implemented.

**B.      The Chapter 11 Cases**

On January 15, 2016, the Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code in the Bankruptcy Court. These Chapter 11 Cases are being jointly administered for procedural purposes under case number 16-10073 (MG). The Debtors have continued to operate as debtors-in-possession.

*1.      First Day Relief*

On the Petition Date, the Debtors filed numerous motions seeking relief intended to ensure a seamless transition between the Debtors' prepetition and postpetition business operations, and to facilitate the administration of these Chapter 11 Cases (the "*First Day Motions*"). Among other things, the orders entered by the Bankruptcy Court granting the First Day Motions (the "*First Day Orders*") allowed the Debtors to continue certain normal business activities not specifically authorized under the Bankruptcy Code or as to which the Bankruptcy Code requires prior court approval. The First Day Motions and the First Day Orders are available at the Debtors' case information website, http://www.kccllc.net/primorsk.

In particular, the First Day Orders authorized the Debtors to:

- pay prepetition claims of critical vendors;

- pay prepetition wages, pay and honor crew benefits and other programs, and continue crew obligations;

- continue to use their prepetition cash management system, bank accounts and business forms;

- pay prepetition taxes; and

- use cash collateral.

In addition, the commencement of the Debtors' Chapter 11 Cases triggered the automatic stay under section 362 of the Bankruptcy Code, which, with limited exceptions, enjoined all collection efforts and actions by creditors, the enforcement of all liens against property of the Debtors and the commencement or continuation of prepetition litigation against the Debtors. Subject to limited exceptions, the automatic stay will remain in effect until the Effective Date of the Plan.

SC1:4030163.4

2.      *Retention of Professionals*

In addition to the First Day Motions, shortly after the Petition Date, the Debtors filed applications to retain their professionals.  These included:  (i) an application to retain Sullivan & Cromwell LLP as counsel to the Debtors, (ii) an application to retain APS to provide interim management and restructuring services and designating Holly Felder Etlin as chief restructuring officer, (iii) an application to retain Kurtzman Carson Consultants LLC as the Debtors' administrative agent, and (iv) a motion to retain, compensate and reimburse professionals utilized in the ordinary course of business (collectively, the "*Retention Applications*").  Each of the Retention Applications was approved on February 18, 2016.

3.      *Continuation of the Debtors' Operations*

Since the Petition Date, the Debtors have continued business operations in the ordinary course.  In accordance with the First Day Orders, the Debtors paid certain prepetition claims of critical vendors and employees, and the Debtors continue to pay their vendors and employees in the ordinary course of business postpetition as amounts become due and payable.

C.      **Summary of the Claims Process**

On February 29, 2016, the Debtors filed their schedules of assets and liabilities and statements of financial affairs (the "*Schedules*") with the Bankruptcy Court.  The Schedules are available for review at the Debtors' case information website, http://www.kccllc.net/primorsk.

[On [_____], 2016, the Bankruptcy Court entered an order [Docket No. __] (the "*Claims Bar Date Order*") establishing [_____], 2016 as the general bar date for the filing of proofs of claim in these Chapter 11 Cases (the "*Claims Bar Date*") and approving the form and manner of notice of the Claims Bar Date.  Subject to certain exceptions, the Claims Bar Date Order requires all persons and entities holding prepetition claims to file a proof of claim on or before the Claims Bar Date.

Notice of the Claims Bar Date was published in *Tradewinds*, an industry journal selected because of its international distribution, at least 28 days prior to the Claims Bar Date and the Debtors served notice of the Claims Bar Date on all known creditors and potential Holders of Claims, including all entities listed in the Schedules as potential Holders of Claims.

The Claims Bar Date does not apply to General Administrative Claims, Claims relating to the rejection of any Executory Contract or Unexpired Lease during these Chapter 11 Cases, or the other Claims excepted by the Claims Bar Date Order.  The Plan establishes an Administrative Claim Bar Date, which governs all requests for payment of General Administrative Claims, and a separate deadline for the filing of proofs of claim relating to the rejection of executory contracts and unexpired leases.][5]

---

[5]     On March 4, 2016, the Debtors filed the *Debtors' Motion for an Order Establishing Bar Dates for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof* [Docket No. 92] (the "*Bar Date Motion*").  The

## 4.    THE REORGANIZED DEBTORS

### A.    Ownership and Corporate Structure

Pursuant to the Plan, the new owners of the Reorganized Debtors will be the Holders of the Norwegian Bonds, as holders of the New Class B Common Stock, and the Holders of the existing Equity Interests, as holders of the New Class A Common Stock.  New Class A Common Stock represents 25% of the equity of the Reorganized Debtors, and New Class B Common Stock represents 75% of the equity of the Reorganized Debtors.  Based on the Holders of the Norwegian Bonds and the existing Equity Interests as discussed above, the pro forma equity holders of the Reorganized Debtors will be as follows:

| ENTITY/ INDIVIDUAL | CURRENT HOLDINGS | NEW CLASS A COMMON STOCK | NEW CLASS B COMMON STOCK | TOTAL COMMON STOCK |
|---|---|---|---|---|
| Apington (including in its capacity as parent of Lenarda) | 100% of prepetition shares and 32% of Norwegian Bonds | 100% | 32% | 49% |
| Peraticos Holders | 60% of Norwegian Bonds | | 60% | 45% |
| Other holders | 8% of Norwegian Bonds | | 8% | 6% |

The percentages above may change with trading activity in the Norwegian Bonds prior to the Effective Date of the Plan.

### B.    Board of Directors

The identity and affiliation of each individual proposed to serve as a director, officer or voting trustee of any Reorganized Debtor after the Effective Date, as well as the nature of any compensation of such individual who is an insider of a Debtor, will be disclosed in the Plan Supplement.

### C.    Business Plan

The Debtors, with the assistance of their management and advisors, prepared a business plan (attached hereto as Appendix D, the "*Business Plan*") covering the Reorganized Debtors' operations through 2021.  The Business Plan assumes, among other things, that the Plan will be implemented in accordance with its stated terms on or around June 30, 2016.

The Business Plan is based upon the current and projected market conditions in the Debtors' product tanker shipping market and that the Debtors and Reorganized Debtors do

---

Bar Date Motion is scheduled to be heard before the Bankruptcy Court at the omnibus hearing on March 22, 2016, and the Debtors will revise this Section 3.C as appropriate after the hearing on the Motion.

not engage in any material acquisitions or divestitures. Accordingly, the estimates and assumptions underlying the Business Plan are inherently uncertain and are subject to significant business, economic and competitive uncertainties. The Business Plan, estimates and assumptions are not necessarily indicative of current values or future performance, which may be significantly less or more favorable than set forth herein. The Business Plan should be read in conjunction with the additional assumptions, qualifications and notes set forth in Appendix D.

### D.    Management Services with Prisco Singapore – an Affiliated Company

Management services have been provided to the Company by Prisco (Singapore) Pte Ltd ("*Prisco*") pursuant to a separate contract with each Debtor Subsidiary. Prisco is an affiliate of the Company and wholly-owned by Apington. The historical rates by vessel per day are as follows:

| VESSEL | DAILY FEE (HISTORICAL) |
|---|---|
| Zaliv Vostok | $2,440/day |
| Zaliv Amurskiy | $2,440/day |
| Prisco Ekaterina | $2,190/day |
| Prisco Elena | $2,190/day |
| Prisco Alexandra | $2,190/day |
| Prisco Elizaveta | $2,190/day |
| Prisco Irina | $2,190/day |
| Zaliv Baikal | $2,440/day |
| Zaliv Amerika | $2,440/day |

Services provided by Prisco include access to specially trained management and crew with ice navigation experience and unique ice-class expertise. Additionally, Prisco also arranges insurance coverage for the vessels and with the exception of Boussol Shipping Limited, and acts as a broker to negotiate charters on behalf of each of the Debtor Subsidiaries. For example, in December 2015, Prisco negotiated the amended charters on behalf of the Debtor Subsidiaries. In exchange, Prisco receives a 1.25% commission fee, a fee comparable to those of other third-party brokers.

The pricing for Prisco's management services was approved by the Secured Lenders as part of the budgeting process in accordance with the Secured Loan Agreement since 2008.

If the Plan is confirmed, the historical management services agreements will be rejected and terminated upon consummation of the Plan and the Reorganized Debtors will enter

SC1:4030163.4

into new management services agreements effective upon emergence from these Chapter 11 Cases, subject to review by the two new directors appointed to the Board by the holders of the New Class B Common Stock (the "*Class B Directors*"). The Class B Directors will not be affiliated with Prisco or Apington.

In order to provide the reorganized Debtors with assured access to management services pending review by the Class B Directors, Prisco has agreed to make a binding commitment to the Reorganized Debtors on the Effective Date to provide management services for five years on terms that the Company believes are consistent with arm's-length terms under the Company's circumstances (the "*New Management Services Agreements*"). The terms of the New Management Services Agreements are substantially similar to the old agreement and are set forth on Exhibit 3 of the Plan, as amended and modified by the Plan Supplement. Annual management fees will vary by Debtor Subsidiary. The New Management Services Agreements provide for average fees per vessel per day equal to $2,000 per vessel per day from the Effective Date until June 30, 2017, after which the average fees per vessel per day shall be equal to $1,800. The reduced management services fees result in substantial savings to the Company as compared to those applicable prior to these Chapter 11 Cases.

The Class B Directors shall have the period prior to the Effective Date and the 90 days immediately after the Effective Date to review the New Management Services Agreements. If the Class B Directors determine in good faith that the New Management Services Agreements are not as favorable to the Company as another available alternative, the Class B Directors may terminate the New Management Services Agreements without liability of the Reorganized Company for periods after the effectiveness of termination. Termination would be effective 90 days after notice from the Class B Directors to Prisco.

### E.   Corporate Matters and Capitalization

#### 1.   *Equity*

The Reorganized Primorsk Certificate of Incorporation, the form of which may be included in the Plan Supplement, will be filed with the Registrar of Companies and Official Receiver (D.R.C.O.R.) of the Republic of Cyprus on or prior to the Effective Date.

On the Effective Date, the Reorganized Primorsk Certificate of Incorporation shall have provided for the authorization of the New Common Stock. The shares of New Common Stock issued in connection with the Plan shall be authorized without the need for further corporate action or without any further action by any Person, and once issued, shall be duly authorized, validly issued, fully paid and non-assessable.

Any share of New Common Stock issued to a creditor of any Debtor that is not Primorsk shall be treated as (a) a contribution of cash by Reorganized Primorsk to the applicable Debtor in the amount equal to the fair market value of such New Common Stock, followed by (b) the issuance of New Common Stock by Reorganized Primorsk to the applicable Debtor in return for such cash, followed by (c) the transfer of the New Common Stock by the applicable Debtor to the applicable creditor.

2.    *Replacement Loans*

Confirmation of the Plan shall be deemed (a) approval of the Replacement Loans and all transactions contemplated hereby and thereof, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, and (b) authorization for the Reorganized Debtors to enter into and perform under the Replacement Loan Documents. The Replacement Loan Documents shall constitute legal, valid, binding and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms.

On the Effective Date, all of the liens and security interests to be granted in accordance with the Replacement Loan Documents (a) shall be deemed to be approved; (b) shall be legal, binding and enforceable liens on, and security interests in, the collateral granted under the respective Replacement Loan Documents in accordance with the terms of the Replacement Loan Documents; (c) shall be deemed perfected on the Effective Date, subject only to such liens and security interests as may be permitted under the Replacement Loan Documents, and the priorities of such liens and security interests shall be as set forth in the respective Replacement Loan Documents; and (d) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors and the parties under such Replacement Loan Documents are hereby authorized to make all filings and recordings, and to obtain all governmental approvals and consents to establish and perfect such liens and security interests under the provisions of the applicable federal or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection of such liens and security interests granted under the Replacement Loan Documents shall occur automatically by virtue of the entry of the Confirmation Order and funding on or after the Effective Date, and any such filings, recordings, approvals and consents shall not be necessary or required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such liens and security interests to third parties. To the extent that any Holder of a Secured Claim that has been satisfied or discharged pursuant to the Plan, or any agent or such Holder, has filed or recorded any liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent of such Holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors or any administrative agent under the Replacement Loan Documents that are necessary to cancel and/or extinguish such liens and/or security interests (it being understood that such liens and security interests shall be automatically canceled and/or extinguished automatically on the Effective Date by virtue of the entry of the Confirmation Order).

3.    *Restructuring Transactions*

As described in Section 5.2 of the Plan, following the Confirmation Date, the Debtors may reorganize their corporate structure by eliminating certain entities (including non-Debtor entities) that are deemed no longer helpful, and may take all actions as may be necessary or appropriate to effect such transactions, including any transaction described in, approved by, contemplated by or necessary to effectuate the Plan.

SC1:4030163.4

## 5.    SUMMARY OF THE PLAN

The classification, treatment and voting of Claims and Equity Interests and settlement, release, injunction and related provisions are summarized below.  For all other provisions relating to the Plan, including implementation of the Plan; corporate governance and management; compensation and benefits programs; treatment of Executory Contracts and Unexpired Leases; provisions governing distributions; procedures for resolving contingent, unliquidated and disputed claims; conditions precedent to effectiveness of the Plan; modification, revocation or withdrawal of the Plan and retention of jurisdiction, please refer to the Plan attached hereto as Appendix A.

### A.    Classification, Treatment and Voting of Claims and Equity Interests

#### 1.    *Classification of Claims and Equity Interests*

All Claims and Equity Interests, except for Administrative Claims and Professional Claims, are classified in the Classes set forth in Article 4 of the Plan.  A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Equity Interest qualifies within the description of such other Classes.  A Claim or Equity Interest also is classified in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim or Equity Interest is Allowed as a Claim or Equity Interest in that Class and has not been paid, released or otherwise satisfied prior to the Effective Date.

##### a.    Deemed Substantive Consolidation

The Plan shall serve as a motion by the Debtors seeking entry of a Bankruptcy Court order deeming the substantive consolidation of the Debtors' Estates into a single Estate for certain limited purposes related to the Plan, including Voting, Confirmation and Distribution. As a result of the deemed substantive consolidation of the Estates, each Class of Claims and Equity Interests will be treated as against a single consolidated Estate without regard to the separate legal existence of the Debtors.  The Plan will not result in the merger or otherwise affect the separate legal existence of each Debtor, other than with respect to voting and distribution rights under the Plan.

##### b.    Summary of Classification and Treatment

The classification of Claims and Equity Interests pursuant to the Plan is as follows:

| CLASS | CLAIMS AND EQUITY INTERESTS | STATUS | VOTING RIGHTS |
|-------|------------------------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3A | Senior Secured Claims | Impaired | Entitled to Vote |
| 3B | Junior Secured Claims | Impaired | Entitled to Vote |
| 3C | Swap Secured Claims | Impaired | Entitled to Vote |
| 4 | Norwegian Bond Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Equity Interests in Primorsk | Impaired | Entitled to Vote |

2.    *Treatment of Claims and Equity Interests*

a.    Class 1 – Other Priority Claims

"*Other Priority Claim*" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than an Administrative Claim.

Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed Other Priority Claim, each Holder of such Allowed Other Priority Claim shall be paid in full in Cash on or as soon as reasonably practicable after the latest of (i) the Effective Date, (ii) the date on which such Other Priority Claim becomes Allowed, and (iii) such other date as may be ordered by the Bankruptcy Court.

Class 1 is Unimpaired.  Each Holder of an Other Priority Claim is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of Other Priority Claims is entitled to vote to accept or reject the Plan.

b.    Class 2 – Other Secured Claims

"*Other Secured Claim*" means any Secured Claim other than a Senior Secured Claim, a Junior Secured Claim or a Swap Secured Claim.

Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive one of the following treatments, in the sole discretion of the applicable Debtor: (i) payment in full in Cash including the payment of any interest payable under section 506(b) of the Bankruptcy Code; (ii) delivery of the collateral securing such Allowed Other Secured Claim; or (iii) treatment of such Allowed Other Secured Claim in any other manner that renders the Claim Unimpaired.

Class 2 is Unimpaired.  Each Holder of an Other Secured Claim is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of an Other Secured Claim is entitled to vote to accept or reject the Plan.

SC1:4030163.4

c.      Class 3A – Senior Secured Claims

"*Senior Secured Claims*" means all Claims arising under or in connection with the Senior Secured Facility.

The Senior Secured Claims shall be Allowed in an aggregate amount equal to $194,269,474, representing principal and accrued and unpaid interest at the non-default contractual rate up to and including the Petition Date.

Except to the extent that a Holder of an Allowed Senior Secured Claim agrees to a less favorable treatment, and in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed Senior Secured Claim, each Holder of an Allowed Senior Secured Claim shall receive its Pro Rata share of the Tranche A Replacement Loans; provided, however, if Classes 3A, 3B and 3C all vote to accept the Plan, each Holder of an Allowed Senior Secured Claim shall receive its Pro Rata share of the Amortizing Tranche A Replacement Loans in addition to the other Amortizing payments as set forth in Exhibit 2 of the Plan as amended and modified by the Plan Supplement; in each case with such modifications, if any, as the Debtors may determine to be appropriate in light of the requirements of section 1129(b) of the Bankruptcy Code.

Class 3A is Impaired and each Holder of a Senior Secured Claim is entitled to vote to accept or reject the Plan.

d.      Class 3B – Junior Secured Claims

"*Junior Secured Claims*" means all Claims arising under or in connection with the Junior Secured Facility.

The Junior Secured Claims shall be Allowed in an aggregate amount equal to $51,625,000, representing principal and accrued and unpaid interest at the non-default contractual rate up to and including the Petition Date.

Except to the extent that a Holder of an Allowed Junior Secured Claim agrees to a less favorable treatment, and in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed Junior Secured Claim, each Holder of an Allowed Junior Secured Claim shall receive its Pro Rata share of the Tranche B Replacement Loans; provided, however, if Classes 3A, 3B and 3C all vote to accept the Plan, the Tranche B Replacement Loans shall be Amortizing and the Applicable Margin of the Tranche B Replacement Loans shall be 1.75%, and if any of Class 3A, 3B or 3C votes to reject the Plan, the Tranche A Replacement Loans shall not be Amortizing and the Applicable Margin of the Tranche B Replacement Loans shall be 2.00%; in each case with such modifications, if any, as the Debtors may determine to be appropriate in light of the requirements of section 1129(b) of the Bankruptcy Code.

Class 3B is Impaired and each Holder of a Junior Secured Claim is entitled to vote to accept or reject the Plan.

24

e.    Class 3C – Swap Secured Claims

"*Swap Secured Claims*" means all Claims arising under or in connection with the Swap Loan Agreement.

The Swap Secured Claims shall be Allowed in an aggregate amount equal to $16,400,988, representing principal and accrued and unpaid interest at the non-default contractual rate up to and including the Petition Date.

Except to the extent that a Holder of an Allowed Swap Secured Claim agrees to a less favorable treatment, and in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed Swap Secured Claim, each Holder of an Allowed Swap Secured Claim shall receive its Pro Rata share of the Tranche C Replacement Loans; provided, however, if Classes 3A, 3B and 3C vote to accept the Plan, the Tranche A Replacement Loans shall be Amortizing and the Applicable Margin of the Tranche C Replacement Loans shall be 2.00%, and if any of Class 3A, 3B or 3C votes to reject the Plan, the Tranche A Replacement Loans shall not be Amortizing and the Applicable Margin of the Tranche C Replacement Loans shall be 2.25%; in each case with such modifications, if any, as the Debtors may determine to be appropriate in light of the requirements of section 1129(b) of the Bankruptcy Code.

Class 3C is Impaired and each Holder of a Swap Secured Claim is entitled to vote to accept or reject the Plan.

f.    Class 4 – Norwegian Bond Claims

"*Norwegian Bond Claims*" means all Claims arising under or in connection with the Norwegian Bond Indenture, excluding any Claim of the Norwegian Bond Trustee for fees, costs, and expenses under or in connection with the Norwegian Bond Indenture or any related documents.

The Norwegian Bond Claims shall be Allowed in an aggregate amount equal to $80,868,077.

Except to the extent that a Holder of an Allowed Norwegian Bond Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Norwegian Bond Claim, each Holder of an Allowed Norwegian Bond Claim shall receive its Pro Rata share of the New Class B Common Stock.

Class 4 is Impaired and each Holder of a Norwegian Bond Claim is entitled to vote to accept or reject the Plan.

g.    Class 5 – General Unsecured Claims

"*General Unsecured Claims*" means any Claim that is not an (a) Administrative Claim, (b) Other Priority Claim, (c) Other Secured Claim, (d) Senior Secured Claim, (e) Junior Secured Claim, (f) Swap Secured Claim, (g) Norwegian Bond Claim, (h) Equity Interest or (i) Intercompany Claim.

Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, on the later of the Effective Date or as soon as practicable after a General Unsecured Claim becomes Allowed, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive payment in Cash in an amount equal to 75 percent of such Allowed General Unsecured Claim.

Class 5 is Impaired and each Holder of a General Unsecured Claim is entitled to vote to accept or reject the Plan.

h.    Class 6 – Equity Interests in Primorsk

Except to the extent that a Holder of an Equity Interest in Primorsk agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for its portion of the Equity Interests in Primorsk, each Holder of an Equity Interest in Primorsk shall receive its Pro Rata share of the New Class A Common Stock.

Class 6 is Impaired and each Holder of an Equity Interest in Primorsk is entitled to vote to accept or reject the Plan.

3.    *Intercompany Claims and Interests*

Notwithstanding anything herein to the contrary, on the Effective Date or as soon thereafter as is reasonably practicable, at the option of the Reorganized Debtors, all Intercompany Claims and Intercompany Interests will be:  (a) preserved and reinstated, in full or in part; (b) canceled and discharged, in full or in part, in which case such discharged and satisfied portion shall be eliminated and the Holders thereof shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such portion under the Plan; (c) eliminated or waived based on accounting entries in the Debtors' or the Reorganized Debtors' books and records and other corporate activities by the Debtors or the Reorganized Debtors; (d) contributed to the capital of the obligor entity; or (e) otherwise compromised.  In no event shall Intercompany Claims be allowed as General Unsecured Claims or entitled to any Distribution under the Plan.

4.    *Special Provision Governing Unimpaired Claims*

Except as otherwise provided herein, the Plan shall not affect the Debtors' or the Reorganized Debtors' rights in respect of any Unimpaired Claims, including legal and equitable defenses or setoff or recoupment rights with respect thereto.

5.    *Confirmation Pursuant to Sections 1129(a) and 1129(b) of the Bankruptcy Code*

For purposes of Confirmation, section 1129(a)(10) of the Bankruptcy Code shall be satisfied if any one of Classes 3 – 5 accepts the Plan.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class or Classes of Claims.

SC1:4030163.4

### B.    Settlement, Release, Injunction and Related Provisions

#### 1.    *Compromise and Settlement*

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the Distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Equity Interests and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim, or any Distribution to be made on account of such Allowed Claim.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors and their Estates and is fair, equitable and reasonable.

#### 2.    *Subordinated Claims*

The allowance, classification and treatment of all Allowed Claims and Equity Interests and the respective Distributions and treatments under the Plan take into account, conform to and satisfy the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto; however, the Debtors reserve the right to reclassify or modify the treatment of any Allowed Claim or Equity Interest in accordance with any contractual, legal or equitable subordination relating thereto, unless otherwise provided in a settlement agreement concerning such Allowed Claim or Equity Interest.

#### 3.    *Discharge of Claims and Termination of Equity Interests*

Pursuant to and to the fullest extent permitted by the Bankruptcy Code, except as otherwise specifically provided in the Plan or the Confirmation Order, the treatment of Claims and Equity Interests under the Plan shall be in full and final satisfaction, settlement, release, discharge, and termination, as of the Effective Date, of all Claims of any nature whatsoever, whether known or unknown, against, and Equity Interests in, the Debtors, any property of the Estates, the Reorganized Debtors or any property of the Reorganized Debtors, including all Claims of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a Proof of Claim or Equity Interest based upon such Claim, debt, right, or Equity Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Equity Interest based upon such Claim, liability, obligation or Equity Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim, liability, obligation or Equity Interest has accepted the Plan.  Except as otherwise provided in the Plan, any default by the Debtors or their Affiliates with respect to any Claim that existed immediately prior to or on account of the filing of these Chapter 11 Cases shall be deemed cured on the Effective Date.

#### 4.    *Release of Liens*

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against

any property of the Estates shall be fully released and discharged, and all of the rights, title and interest of any Holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Reorganized Debtors and their successors and assigns.

## 5.    DEBTOR RELEASE

**Except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, on and after the Effective Date, the Released Parties are hereby released and discharged by the Debtors, the Reorganized Debtors and the Estates, including any successor to the Debtors or any Estate representative, from all claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereafter arising, in law, at equity or otherwise, whether for indemnification, tort, contract, violations of federal or state securities laws or otherwise, including, those that any of the Debtors, the Reorganized Debtors or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or any other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors and their non-Debtor Subsidiaries, the Estates, the conduct of the businesses of the Debtors and their non-Debtor Subsidiaries, these Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the restructuring of Claims and Equity Interests prior to or during these Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Disclosure Statement, the Replacement Loans or, in each case, related agreements, instruments or other documents, any action or omission with respect to Intercompany Claims, any action or omission as an officer, director, agent, representative, fiduciary, controlling person, affiliate or responsible party, or any transaction entered into or affecting, a Non-Debtor Subsidiary, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan, other than claims or liabilities arising out of or relating to any act or omission of a Released Party to the extent such act or omission is determined by a Final Order to have constituted willful misconduct, gross negligence, fraud, or a criminal act.**

SC1:4030163.4

## 6.    VOLUNTARY RELEASE BY HOLDERS OF CLAIMS AND EQUITY INTERESTS[6]

**HOLDERS OF CLAIMS AND EQUITY INTERESTS THAT VOTE IN FAVOR OF THE PLAN ARE DEEMED TO AGREE TO THE RELEASES CONTAINED IN SECTION 12.6 OF THE PLAN.  Holders of Claims and Equity Interests that (a) vote to reject the Plan or (b) abstain from voting may, in each case, opt out of the releases contained in Section 12.6 of the Plan by clearly marking the "opt-out" box on the Ballot provided to such Holder.  Assuming such Ballot is timely received and in proper form, Holders of Claims and Equity Interests who check the "opt-out" box on the Ballot will not be Releasing Parties for purposes of Section 12.6 of the Plan.  All other Holders of Claims and Equity Interests that are entitled to vote on the Plan are deemed to agree to the releases contained in Section 12.6 of the Plan with respect to all Claims and Equity Holders.**

**Except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, on and after the Effective Date, to the fullest extent permitted by applicable law, the Releasing Parties (regardless of whether a Releasing Party is a Released Party) shall be deemed to conclusively, absolutely, unconditionally, irrevocably and forever release, waive and discharge the Released Parties of any and all claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereafter arising, in law, at equity or otherwise, whether for indemnification, tort, contract, violations of federal or state securities laws or otherwise, including, those that any of the Debtors, the Reorganized Debtors or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or any other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors and their non-Debtor Subsidiaries, the Estates, the conduct of the businesses of the Debtors and their non-Debtor Subsidiaries, these Chapter**

---

[6]    This and the following Sections should be read in conjunction with the following definitions:

"*Holder*" means an Entity holding a Claim (as defined in section 101(5) of the Bankruptcy Code) against or an Equity Interest (as defined in section 101(16) of the Bankruptcy Code) in any of the Debtors.

"*Releasing Parties*" means (a) the Agents; (b) the Norwegian Bond Trustee; and (c) each Holder of a Claim or an Equity Interest that was provided a Ballot and (i) affirmatively votes to accept the Plan; or (ii) either (A) abstains from voting; or (B) votes to reject the Plan; and, in case of either (A) or (B), does not opt out of the Voluntary Release by Holders of Claims and Equity Interests in compliance with the instructions set forth in the Solicitation Materials.  For the avoidance of doubt, Holders who (i) were not provided a Ballot; and (ii) are not listed in clauses (a) – (c) above are not Releasing Parties.

"*Released Parties*" means (a) the Exculpated Parties (as defined below); (b) the Agents, in their capacity as such; (c) the Norwegian Bond Trustee, in its capacity as such; and (d) with respect to each Entity named in (b) and (c), such Entity's directors, officers, employees, agents, Affiliates, parents, subsidiaries, predecessors, successors, heirs, executors and assigns, attorneys, financial advisors, restructuring advisors, investment bankers, accountants and other professionals or representatives when acting in any such capacities.

SC1:4030163.4

11 Cases, the purchase, sale or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the restructuring of Claims and Equity Interests prior to or during these Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Disclosure Statement, the Replacement Loans or, in each case, related agreements, instruments or other documents, any action or omission with respect to Intercompany Claims, any action or omission as an officer, director, agent, representative, fiduciary, controlling person, affiliate or responsible party, or any transaction entered into or affecting, a Non-Debtor Subsidiary, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan, other than claims or liabilities arising out of or relating to any act or omission of a Released Party to the extent such act or omission is determined by a Final Order to have constituted willful misconduct, gross negligence, fraud, or a criminal act.

## 7. *Scope of Releases*

Each Person providing releases under the Plan, including the Debtors, the Reorganized Debtors, the Estates and the Releasing Parties, shall be deemed to have granted the releases set forth in those sections notwithstanding that such Person may hereafter discover facts in addition to, or different from, those which it now knows or believes to be true, and without regard to the subsequent discovery or existence of such different or additional facts, and such Person expressly waives any and all rights that it may have under any statute or common law principle which would limit the effect of such releases to those claims or causes of action actually known or suspected to exist at the time of execution of such release.

## 8. *Exculpation*[7]

Notwithstanding anything in the Plan to the contrary, as of the Effective Date, the Debtors and their directors, officers (including the chief restructuring officer and interim management), employees, attorneys, investment bankers, financial advisors, restructuring advisors and other professional advisors, representatives and agents will be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including section 1125(e) of the Bankruptcy Code and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with the solicitation.

---

[7] This Section should be read in conjunction with the following definition: "*Exculpated Parties*" means (a) the Debtors and the Reorganized Debtors; and (b) the current and former directors, officers (including the chief restructuring officer and interim management), employees, agents, attorneys, financial advisors, restructuring advisors, investment bankers, accountants, and other professionals or representatives of the Debtors and the Reorganized Debtors, in their capacities as such; and (c) with respect to each Entity named in (a) and (b), such Entity's directors, officers, employees, agents, Affiliates, parents, subsidiaries, predecessors, successors, heirs, executors and assigns, attorneys, financial advisors, restructuring advisors, investment bankers, accountants and other Professionals or representatives when acting in any such capacities.

SC1:4030163.4

**Except with respect to any acts or omissions expressly set forth in and preserved by the Plan, the Plan Supplement or related documents, the Exculpated Parties shall neither have nor incur any liability to any Entity for any Prepetition or postpetition act taken or omitted to be taken in connection with, or arising from or relating in any way to, these Chapter 11 Cases, including (a) the operation of the Debtors' businesses during the pendency of these Chapter 11 Cases; (b) formulating, negotiating, preparing, disseminating, implementing, administering, confirming and/or effecting the issuance of any shares of New Common Stock in connection with the Plan, the Disclosure Statement and the Plan, the Plan Supplement, the Replacement Loans and any related contract, instrument, release or other agreement or document created or entered into in connection therewith (including the solicitation of votes for the Plan and other actions taken in furtherance of Confirmation and Consummation of the Plan); (c) the offer and issuance of any securities under or in connection with the Plan; or (d) any other Prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, other than liability resulting from any act or omission that is determined by Final Order to have constituted willful misconduct, gross negligence, fraud, or a criminal act.**

9.    *Injunction*

**Except as otherwise expressly provided in the Plan or Confirmation Order, the satisfaction, release and discharge pursuant to Article 12 of the Plan shall also act as a permanent injunction against any Person who has held, holds or may hold Claims or Equity Interests against commencing or continuing any action, employment of process or act to collect, enforce, offset, recoup or recover any Claim or Cause of Action satisfied, released, or discharged under the Plan or the Confirmation Order to the fullest extent authorized or provided by the Bankruptcy Code, including to the extent provided for or authorized by sections 524 and 1141 thereof.**

10.    *Limitations on Exculpations and Releases*

Notwithstanding anything to the contrary herein, none of the releases or exculpations set forth herein shall operate to waive or release any obligation or Causes of Action of any Person or Entity:  (a) arising under any contract, instrument, agreement, release or document delivered pursuant to the Plan or documents, agreements or instruments executed in connection therewith, including all post Effective Date obligations, or (b) expressly set forth in and preserved by the Plan, the Plan Supplement or related documents.

# 6.    STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

The following is a brief summary of the process of confirmation of the Plan. Holders of Claims and Equity Interests are encouraged to review the relevant provisions of the Bankruptcy Code and/or consult their own attorneys.

SC1:4030163.4

A.        **The Confirmation Hearing**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing at which the Debtors will seek confirmation of the Plan.  Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to confirmation of the Plan.

**THE CONFIRMATION HEARING IS SCHEDULED TO BE HELD ON [_____], 2016 AT [_____] (EASTERN TIME), BEFORE THE HONORABLE MARTIN GLENN, UNITED STATES BANKRUPTCY JUDGE, IN THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, ONE BOWLING GREEN, NEW YORK, NEW YORK 10004.  THE CONFIRMATION HEARING MAY BE ADJOURNED FROM TIME TO TIME BY THE BANKRUPTCY COURT OR THE DEBTORS WITHOUT FURTHER NOTICE OTHER THAN BY ANNOUNCEMENT IN OPEN COURT AND/OR NOTICE(S) OF ADJOURNMENT FILED ON THE DOCKET WITH THE BANKRUPTCY COURT'S PERMISSION.**

**OBJECTIONS TO CONFIRMATION OF THE PLAN MUST BE FILED WITH THE COURT AND SERVED SO AS TO BE ACTUALLY RECEIVED ON OR BEFORE [_____] (EASTERN TIME) ON [_____], 2016, IN ACCORDANCE WITH THE SOLICITATION PROCEDURES ORDER.  UNLESS OBJECTIONS TO CONFIRMATION ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE SOLICITATION PROCEDURES ORDER, THEY WILL NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

B.        **Confirmation Standards**

To confirm the Plan, the Bankruptcy Court must find that the requirements of section 1129 of the Bankruptcy Code have been satisfied.  The Debtors believe that section 1129 has been satisfied because, among other things:

(i)      the Plan complies with the applicable provisions of the Bankruptcy Code;

(ii)     the Debtors, as plan proponents, have complied with the applicable provisions of the Bankruptcy Code;

(iii)    the Plan has been proposed in good faith and not by any means forbidden by law;

(iv)     any payment made or promised under the Plan for services or for costs and expenses in or in connection with these Chapter 11 Cases, or in connection with the Plan and incident to these Chapter 11 Cases, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable;

(v)     the Debtors will disclose the identity and affiliations of any individual proposed to serve, after Confirmation of the Plan, as a director, officer or voting trustee of the Debtors, an affiliate of the Debtors participating in the Plan with the Debtor or a successor to the Debtors under the Plan.  The appointment to, or continuance in, such office of such individuals, will be consistent with the interests of Holders of Claims and Equity Interests and with public policy, and the Debtors will have disclosed the identity of any insider that the Reorganized Debtors will employ or retain and the nature of any compensation for such insider;

(vi)    with respect to each Class of Impaired Claims or Equity Interests, either each Holder of a Claim or Equity Interest in such Class has accepted the Plan or will receive or retain under the Plan on account of such Claim or Equity Interest property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on such date under chapter 7 of the Bankruptcy Code (see Section 6.C below – Best Interests Test);

(vii)   each Class of Claims or Equity Interests has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such class pursuant to section 1129(b) of the Bankruptcy Code;

(viii)  except to the extent that the Holder of a particular General Administrative Claim has agreed or will agree to a different treatment of such Claim, the Plan provides that Allowed General Administrative Claims will be paid in full in Cash on the Effective Date;

(ix)    except to the extent that a holder of an Allowed Other Priority Claim has agreed to a different treatment of such Claim, each such Holder shall receive Cash in an amount equal to the Allowed amount of such Claim, or treatment in any other manner so that such Claim shall otherwise be rendered Unimpaired, (i) on the Effective Date or as soon as reasonably practicable thereafter; (ii) if an Other Priority Claim is Allowed after the Effective Date, on the date such Other Priority Claim is Allowed or as soon as reasonably practicable thereafter; (iii) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as the case may be; or (iv) at such time and upon such terms as set forth in an order of the Bankruptcy Court;

(x)     Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, unless such

33

liquidation or reorganization is proposed in the Plan (see <u>Section 6.D</u> below – Financial Feasibility); and

(xi) all fees payable under section 1930 of title 28 of the United States Code will be paid as of the Effective Date of the Plan.

### C. Best Interests Test

*1.* <u>*Explanation of the Best Interests Test*</u>

Pursuant to section 1129(a)(7) of the Bankruptcy Code, Confirmation of the Plan requires that, with respect to each Class of Impaired Claims or Equity Interests, each Holder of a Claim or Equity Interest in such Class either (i) accepts the Plan or (ii) receives or retains under the Plan on account of such Claim or Equity Interest, property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on such date under chapter 7 of the Bankruptcy Code (this latter clause is known as the "*Best Interests Test*").

To determine the probable distribution to Holders of Claims and Equity Interests in each Impaired Class, if the Debtors were liquidated under chapter 7 of the Bankruptcy Code, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation.

The Debtors' liquidation value would consist primarily of the unencumbered and unrestricted cash held by the Debtors at the time of the conversion to a chapter 7 liquidation and the proceeds resulting from the sale of the Debtors' remaining unencumbered assets and properties by a chapter 7 trustee. The gross cash available for distribution would be reduced by the costs and expenses of the chapter 7 liquidation and any additional Administrative Claims that might arise as a result of the chapter 7 cases. Costs and expenses incurred as a result of the chapter 7 liquidation would include, among other things, the fees payable to a trustee in bankruptcy and the fees payable to attorneys and other professionals engaged by such trustee. Additional Administrative Claims could arise by reason of, among other things, the breach or rejection of obligations incurred and leases and executory contracts assumed or entered into by the Debtors during the pendency of these Chapter 11 Cases. Such Administrative Claims and any other Administrative Claims that might arise in a liquidation case or result from these Chapter 11 Cases, such as compensation for attorneys, financial advisors and accountants, would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay prepetition Claims.

To determine if the Plan is in the best interests of each Impaired Class, the present value of the distributions from the proceeds of a liquidation of the Debtors' unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses and Administrative Claims associated with a chapter 7 liquidation, must be compared with the value offered to such Impaired Classes under the Plan. If the hypothetical liquidation distribution to Holders of Claims or Equity Interests in any Impaired Class is greater than the distributions to be received by such parties under the Plan, then the Plan is not in the best interests of the Holders of Claims or Equity Interests in such Impaired Class.

SC1:4030163.4

2.      *Estimated Valuation and Business Plan*

The value offered to Holders of Claims in Impaired Classes under the Plan is discussed in the Business Plan. The Business Plan is based, in part, on the financial projections provided in Appendix D. The Business Plan does not reflect an adoption of "fresh start" reporting, which is required by Topic 852, Reorganizations, of the FASB Accounting Standards Codification. Fresh start adjustments in the Emergence Balance Sheet are not expected to have a material impact on the projected recoveries for creditors described therein.

3.      *Liquidation Analysis of the Debtors*

Amounts that a Holder of Claims and Equity Interests in Impaired Classes would receive in a hypothetical chapter 7 liquidation are discussed in the liquidation analysis of the Debtors prepared by the Debtors' management with the assistance of its advisors, attached to this Disclosure Statement as Appendix E (the "*Liquidation Analysis*").

As described in the Liquidation Analysis, underlying this analysis is the extensive use of estimates and assumptions that, although considered reasonable by the Debtors' management and their financial advisors, are inherently subject to significant business, economic and competitive uncertainties and contingencies beyond the control of the Debtors. The Liquidation Analysis is based on assumptions with regard to liquidation decisions that are subject to change. Actual results may vary materially from the estimates and projections set forth in the Liquidation Analysis if the Debtors were, in fact, to undergo a liquidation.

The Liquidation Analysis was developed solely for purposes of the formulation and negotiation of the Plan and to enable Holders of Claims entitled to vote under the Plan to make an informed judgment about the Plan, and should not be used or relied upon for any other purpose, including the purchase or sale of securities of, or Claims or Equity Interests in, the Debtors or any of their affiliates.

Events and circumstances subsequent to the date on which the Liquidation Analysis was prepared may be different from those assumed, or alternatively, may have been unanticipated, and thus the occurrence of these events may affect financial results in a materially adverse or materially beneficial manner. The Debtors and the Reorganized Debtors do not intend and do not undertake any obligation to update or otherwise revise the Liquidation Analysis to reflect events or circumstances existing or arising after the date the Liquidation Analysis is initially filed or to reflect the occurrence of unanticipated events. Therefore, the Liquidation Analysis may not be relied upon as a guarantee or other assurance of actual future results.

In deciding whether to vote to accept or reject the Plan, Holders of Claims must make their own determinations as to the reasonableness of any assumptions underlying the Liquidation Analysis and the reliability of the Liquidation Analysis.

SC1:4030163.4

4.    *Application of the Best Interests Test to the Liquidation Analysis of the Debtors and the Valuation Analysis of the Reorganized Debtors*

Notwithstanding the difficulties in quantifying with precision the recoveries to Holders of Claims and Equity Interests, the Debtors believe that, based on a comparison between the recoveries under the Plan and the Liquidation Analysis, the Debtors' proposed Plan satisfies the requirements of the Best Interests Test.  As the following table indicates, members of each Impaired Class will receive more (or no less) under the Plan than they would through a liquidation of the Debtors in a hypothetical chapter 7 case.

| CLASS | DESCRIPTION | ESTIMATED RECOVERY | |
| --- | --- | --- | --- |
| | | PLAN | LIQUIDATION |
| 1 | Other Priority Claims | 100% | 100% |
| 2 | Other Secured Claims | 100% | 100% |
| 3A | Senior Secured Claims | 100% | 100% |
| 3B | Junior Secured Claims | 100% | 99-100% |
| 3C | Swap Secured Claims | 100% | 0-100% |
| 4 | Norwegian Bond Claims | N/A | 0-28% |
| 5 | General Unsecured Claims | 75% | 0% |
| 6 | Equity Interests in Primorsk | N/A | 0% |

Accordingly, the Debtors believe that their continued operation as a going concern will allow the realization of greater value for their respective Impaired Classes than their liquidation.

**D.    Financial Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires, as a condition to confirmation of the Plan, that the Bankruptcy Court find that confirmation is not likely to be followed by the liquidation of the Debtors or the need for further financial reorganization, unless such liquidation is contemplated by the Plan.  For purposes of demonstrating that the Plan meets this feasibility standard, the Debtors have analyzed the ability of the Reorganized Debtors to meet their obligations under the Plan and to retain sufficient liquidity and capital resources to conduct their business, taking into account the Financial Projections for the Reorganized Debtors.

In addition to the cautionary notes contained elsewhere in this Disclosure Statement and in the Business Plan, the Debtors reiterate that they make no representation as to the accuracy of the Business Plan or their ability to achieve the projected results.  The Business Plan, while presented with numerical specificity, is necessarily based on a variety of estimates and assumptions which, though considered reasonable by the Debtors, may not be realized and are inherently subject to significant business, economic, competitive, industry, regulatory, market and financial uncertainties and contingencies, many of which are beyond the control of the Debtors and the Reorganized Debtors.  The Debtors caution that no representations can be made or are made as to the accuracy of the Business Plan or to the Reorganized Debtors' ability to achieve the projected results.  Some assumptions inevitably will have been incorrect. Moreover, events and circumstances occurring subsequent to the date on which the Business Plan were prepared may be different from those assumed, or, alternatively, may have been

36

unanticipated, and thus the occurrence of these events may affect financial results in a materially adverse or materially beneficial manner. The Debtors and the Reorganized Debtors do not intend and do not undertake any obligation to update or otherwise revise the Business Plan to reflect events or circumstances existing or arising after the date the Business Plan is initially filed or to reflect the occurrence of unanticipated events. Therefore, the Business Plan may not be relied upon as a guarantee or other assurance of actual future results.

In deciding whether to vote to accept or reject the Plan, Holders of Claims and Equity Interests must make their own determinations as to the reasonableness of any assumptions underlying the Business Plan and the reliability of the Business Plan.

Based upon the Business Plan , the Debtors believe they will be able to make all distributions and payments under the Plan (including payment of all cure costs) and that Confirmation of the Plan is not likely to be followed by liquidation of the Reorganized Debtors or the need for further financial reorganization of the Reorganized Debtors.

### E. Acceptance by Impaired Classes

Except as described in <u>Section 6.F</u> below, the Bankruptcy Code requires, as a condition to confirmation of the Plan, that each Impaired Class accept the Plan. A class of claims or equity interests that is unimpaired under the plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. Under section 1124 of the Bankruptcy Code, a class is impaired under a plan of reorganization unless (a) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof; or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan of reorganization by an impaired class of claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class; only those holders that actually vote to accept or reject the plan are counted for purposes of determining whether these dollar and number thresholds are met. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number that actually vote cast their ballots in favor of acceptance. Under section 1126(d) of the Bankruptcy Code, a class of equity interests has accepted a plan of reorganization if holders of such equity interests holding at least two-thirds in amount have actually voted to accept the plan. Holders of claims who fail to vote are deemed neither to accept nor to reject the plan.

### F. Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows the Bankruptcy Court to confirm the Plan, provided that the Plan has been accepted by at least one Impaired Class of creditors. Notwithstanding the failure of an Impaired Class to accept the Plan, the Plan will be confirmed in a procedure commonly known as cram-down, so long as the Plan does not "discriminate unfairly" and is "fair and equitable," for the purposes of the Bankruptcy Code, with respect to

SC1:4030163.4

each Class of Claims or Equity Interests that is Impaired under, and has not accepted, the Plan. Pursuant to Section 4.5 of the Plan, the Debtors reserve the right to seek confirmation under section 1129(b) of the Bankruptcy Code if necessary.

### 1.   *Unfair Discrimination*

The Plan does not "discriminate unfairly" for the purposes of section 1129 of the Bankruptcy Code if the Plan gives substantially equivalent treatment to each Class of equal rank; in determining whether a plan discriminates unfairly, courts take into account a number of factors, including the effect of applicable subordination agreements between parties. Accordingly, the Plan may treat two Classes of Holders of Unsecured Claims differently without unfairly discriminating against either Class.

### 2.   *Fair and Equitable*

The condition that the Plan be fair and equitable includes the following requirement as applicable:

(i)   with respect to a non-accepting Class of Secured Claims, that:  (a) the Holders of such Secured Claims retain the Liens securing such Claims to the extent of the Allowed amount of the Secured Claims, whether the property subject to the liens is retained by the Debtors or transferred to another entity under the Plan; and (b) each Holder of a Secured Claim in the Class receive deferred cash payments totaling at least the Allowed amount of such Claim with a present value, as of the Effective Date, at least equivalent to the value of such Secured Claim Holder's interest in the Debtors' property subject to the Liens.

(ii)   with respect to a non-accepting Class of Unsecured Claims, that either: (a) the Plan provide that each Claim Holder in such Class receive or retain, on account of such Claim, property of a value, as of the Effective Date, equal to the Allowed amount of such Claim; or (b) no Holder of any Claim or Equity Interest that is junior to the Claims or Equity Interests of such Class receive or retain any property under the Plan on account of such junior Claim or Equity Interest.

(iii)   with respect to a non-accepting Class of Equity Interests, that either: (a) the Plan provide that each Holder of an Equity Interest in such Class receive or retain under the Plan, on account of such Equity Interest, property of a value, as of the Effective Date, equal to the greater of:  (i) the Allowed amount of any fixed liquidation preference to which such Holder is entitled; (ii) any fixed redemption price to which such Holder is entitled; or (iii) the value of such Equity Interest; or (b) if the Class does not receive property in the amount required under (a), no Class of Equity Interests junior to the non-accepting Class receive a distribution under the Plan.

SC1:4030163.4

3.      *Confirmation of the Plan Pursuant to Section 1129(b)*

The Debtors may seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any Impaired Class presumed to reject the Plan, and reserve the right to do so with respect to any other rejecting Class of Claims, and/or to modify the Plan. Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of confirmation of the Plan by the acceptance of the Plan by at least one Class that is Impaired under the Plan.

The Debtors submit that the Plan does not "discriminate unfairly" for the purposes of section 1129(b) of the Bankruptcy Code because all Classes of equal rank receive substantially equivalent treatment under the Plan.

The Debtors submit that the Plan is "fair and equitable" for the purposes of section 1129(b) of the Bankruptcy Code because, as set forth above and in the Plan, the Holders of Claims in Classes 1 and 2 are Unimpaired and therefore deemed to have accepted the Plan. The Holders of Claims in Class 3 may not receive, and the Holders of Claims in Classes 4 and 5 and Holders of Equity Interests in Class 6 will not receive, a distribution equal to the Allowed amount of their Claims, but no Holders of Claims or Equity Interests junior to these Classes will receive a distribution under the Plan on account of such junior Claims or Equity Interests.

Therefore, the requirements of section 1129(b) of the Bankruptcy Code would be satisfied in the event that the Debtors are required to cram down.

## 7.    VOTING PROCEDURES

On [_____], 2016, the Bankruptcy Court entered an order, among other things, approving this Disclosure Statement, approving procedures for soliciting votes on the Plan, approving the form of the solicitation documents and various other notices, setting the Voting Record Date, the Voting Deadline and the date of the Confirmation Hearing and establishing the relevant objection deadlines and procedures associated with Confirmation of the Plan [Docket No. __] (the "*Solicitation Procedures Order*").[8]

The Solicitation Procedures Order, a copy of which is attached hereto as Appendix B, is hereby incorporated by reference as though fully set forth herein. The Solicitation Procedures Order should be read in conjunction with this Section 7 of this Disclosure Statement.

If you have any questions about: (a) the procedures for voting your Claim or Equity Interest or with respect to materials that you have received or (b) the amount of your Claim or Equity Interest, or wish to obtain (at no charge) an additional copy of the Plan, this Disclosure Statement or other solicitation documents, please contact:

---

[8]    Capitalized terms in this Section 7 not otherwise defined in this Disclosure Statement or the Plan shall have the meanings ascribed to them in the Solicitation Procedures Order.

Primorsk Balloting Center
c/o Kurtzman Carson Consultants LLC
2335 Alaska Avenue
El Segundo, CA 90245
T: 888-249-2721
http://www.kccllc.net/primorsk

The Bankruptcy Court may confirm the Plan only if it determines that the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code and that the disclosure by the Debtors concerning the Plan has been adequate and includes information concerning all payments made or promised by the Debtors in connection with the Plan and these Chapter 11 Cases. In addition, the Bankruptcy Court must determine that the Plan has been proposed in good faith and not by any means forbidden by law and, under Bankruptcy Rule 3020(b)(2), it may make such a determination without receiving evidence if no objection is timely filed.

In particular, and as described in more detail below, the Bankruptcy Code requires the Bankruptcy Court to find, among other things, that: (a) the Plan has been accepted by the requisite votes of all Classes of Impaired Claims and Equity Interests unless approval will be sought under section 1129(b) of the Bankruptcy Code in spite of the nonacceptance by one or more such Classes; (b) the Plan is "feasible," meaning there is a reasonable probability that the Debtors will be able to perform their obligations under the Plan and continue to operate their businesses without further financial reorganization or liquidation; and (c) the Plan is in the "best interests" of all Holders of Claims and Equity Interests, meaning that all such Holders will receive at least as much under the Plan as they would receive in a liquidation under chapter 7 of the Bankruptcy Code.

The Bankruptcy Court must find that all conditions mentioned above are met before it can confirm the Plan. Thus, even if all classes of Impaired Claims and Equity Interests accept the Plan by the requisite votes, the Bankruptcy Court must still make an independent finding that the Plan satisfies these requirements of the Bankruptcy Code, that the Plan is feasible, and that the Plan is in the best interests of the Holders of Claims against and Equity Interests in the Debtors.

UNLESS THE BALLOT BEING FURNISHED IS TIMELY RECEIVED BY THE NOTICE AND CLAIMS AGENT ON OR PRIOR TO JUNE 15, 2016 AT 8:00 P.M. (EASTERN TIME) TOGETHER WITH ANY OTHER DOCUMENTS REQUIRED TO BE SUBMITTED WITH SUCH BALLOT, THE DEBTORS MAY, IN THEIR SOLE DISCRETION, REJECT SUCH BALLOT AS INVALID AND, ACCORDINGLY, DECLINE TO COUNT IT AS AN ACCEPTANCE OR REJECTION OF THE PLAN. IN NO CASE SHOULD A BALLOT OR ANY OF THE CERTIFICATES BE DELIVERED TO THE DEBTORS OR ANY OF THEIR ADVISORS.

A.    **Parties-in-Interest Entitled to Vote**

Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan of reorganization unless: (a) the plan leaves unaltered the

legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof; or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

In general, under section 1126(a) of the Bankruptcy Code, the holder of a claim or interest that is allowed under a plan of reorganization is entitled to vote to accept or reject the plan if such claim or interest is impaired under the plan.  Under section 1126(f) of the Bankruptcy Code, the holder of a claim that is not impaired under a plan of reorganization is deemed to have accepted the plan, and the plan proponent need not solicit such holder's vote. Under section 1126(g) of the Bankruptcy Code, the holder of an impaired claim or impaired interest that will not receive any distribution under the plan in respect of such claim or interest is deemed to have rejected the plan and is not entitled to vote on the plan.  For a detailed description of the treatment of Claims and Equity Interests under the Plan, refer to <u>Section 5</u> above—Summary of the Plan.

The Holder of a Claim that is Impaired under the Plan is entitled to vote to accept or reject the Plan if the Plan provides a distribution in respect of such Claim and (i) the Holder has timely filed a Proof of Claim and such Proof of Claim is not in an amount of $0.00, unless such Claim is subject to an objection filed by the Debtors on or before May 11, 2016, in which case such Claim will be expunged, reclassified or reduced for voting purposes as requested by the Debtors , unless otherwise ordered by the Bankruptcy Court; (ii) the Claim has been scheduled by the respective Debtor in the Schedules in an amount that is not listed in its entirety as contingent, unliquidated or disputed (a claim that is listed as partially liquidated and partially unliquidated shall vote only in the liquidated amount); (iii) the Holder of a Claim has timely filed a motion pursuant to Bankruptcy Rule 3018(a) seeking temporary allowance of such Claim for voting purposes, in which case such Holder's vote will be counted as ordered by the Bankruptcy Court at the Confirmation Hearing; or (iv) such Claim is otherwise entitled to vote by order of the Bankruptcy Court.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that such vote was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.  The Solicitation Procedures Order also sets forth assumptions and procedures for tabulating Ballots, including Ballots that are not completed fully or correctly.

### B.      Voluntary Releases under the Plan

The third-party release and injunction language in Article 12 of the Plan is described above in <u>Section 5</u> of this Disclosure Statement.

**HOLDERS OF CLAIMS AND EQUITY INTERESTS THAT VOTE IN FAVOR OF THE PLAN ARE DEEMED TO AGREE TO THE RELEASES CONTAINED IN SECTION 12.6 OF THE PLAN.  HOLDERS OF CLAIMS AND EQUITY INTERESTS THAT (A) VOTE TO REJECT THE PLAN OR (B) ABSTAIN FROM VOTING MAY, IN EACH CASE, OPT OUT OF THE RELEASES CONTAINED IN SECTION 12.6 OF THE PLAN BY CLEARLY MARKING THE "OPT-OUT" BOX ON THE BALLOT**

**PROVIDED TO SUCH HOLDER.  ASSUMING SUCH BALLOT IS TIMELY
RECEIVED AND IN PROPER FORM, HOLDERS OF CLAIMS AND EQUITY
INTERESTS WHO CHECK THE "OPT-OUT" BOX ON THE BALLOT WILL NOT BE
RELEASING PARTIES FOR PURPOSES OF SECTION 12.6 OF THE PLAN.  ALL
OTHER HOLDERS OF CLAIMS AND EQUITY INTERESTS THAT ARE ENTITLED
TO VOTE ON THE PLAN ARE DEEMED TO AGREE TO THE RELEASES
CONTAINED IN SECTION 12.6 OF THE PLAN WITH RESPECT TO ALL CLAIMS
AND EQUITY INTERESTS.**

### C.    Classes under the Plan

#### 1.    *Voting Impaired Classes*

Classes 3 – 6 are Impaired under, and entitled to vote to accept or reject, the Plan.

#### 2.    *Unimpaired Classes of Claims*

Classes 1 and 2 are Unimpaired under the Plan and deemed under section 1126(f)
of the Bankruptcy Code to have accepted the Plan.

### D.    Solicitation Packages for Voting Classes

As set forth in the Solicitation Procedures Order, the Debtors will distribute
Solicitation Packages, or cause Solicitation Packages to be distributed, to the Classes entitled to
vote on the Plan.  The Solicitation Packages will contain:

(i)    a cover letter (a) describing the contents of the Solicitation Package, the contents
of the enclosed CD-ROM and instructions for obtaining hard copies of materials
provided on CD-ROM and (b) informing the Holders of the Debtors'
recommendation to accept the Plan;

(ii)    the Confirmation Hearing Notice;

(iii)    an appropriate Ballot, together with a pre-addressed, postage prepaid return
envelope;

(iv)    this Disclosure Statement (with the Plan annexed thereto and other exhibits) in
electronic format on a CD-ROM; and

(v)    the Solicitation Procedures Order (without exhibits) in electronic format on a CD-
ROM.

### E.    Solicitation Packages for Non-Voting Classes

#### 1.    *Unimpaired Classes of Claims Not Eligible to Vote*

Under section 1126(f) of the Bankruptcy Code, classes that are not impaired
under a plan of reorganization are deemed to accept the plan.  The following Classes are

Unimpaired under the Plan and deemed under section 1126(f) of the Bankruptcy Code to accept the Plan: Classes 1 and 2. Their votes to accept or reject the Plan will not be solicited. Pursuant to the Solicitation Procedures Order, these parties should only receive a notice of the Confirmation Hearing and a notice of non-voting status with respect to Unimpaired Classes deemed to accept the Plan.

### F. Voting Procedures

Ballots cast by Holders in Classes entitled to vote (other than beneficial Holders of Norwegian Bond Claims) must be received by the Notice and Claims Agent by the Voting Deadline at the following address:

**<u>For Ballots, if by First-Class Mail, Courier or Hand Delivery</u>:**

Primorsk Ballot Processing
c/o Kurtzman Carson Consultants LLC
2335 Alaska Avenue
El Segundo, CA 90245

Beneficial Holders of Norwegian Bond Claims must submit their Ballots to their respective voting nominees, and all votes cast by such Holders must be submitted to the Notice and Claims Agent so as to be actually received by the Voting Deadline.

IF YOU HAVE ANY QUESTIONS ON THE VOTING PROCEDURES, PLEASE CALL THE NOTICE AND CLAIMS AGENT AT (888) 733-1521.

Ballots received after the Voting Deadline will not be counted or considered for any purpose in determining whether the Plan has been accepted or rejected. The method of delivery of Ballots to be sent to the Notice and Claims Agent is at the election and risk of each Holder of a Claim. Except as otherwise provided in the Plan, such delivery will be deemed made only when the original executed Ballot is actually received by the Notice and Claims Agent. In all cases, sufficient time should be allowed to ensure timely delivery. Ballots must be signed and legible, and must be clearly marked to either accept or reject the Plan (but not both). If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, or other person acting in a fiduciary or representative capacity, such person must indicate such capacity when signing the Ballot. Original executed Ballots are required. Delivery of a Ballot to the Notice and Claims Agent by facsimile, e-mail or any other electronic means will not be accepted. No Ballot should be sent to the Debtors or the Debtors' financial or legal advisors, agents or representatives (other than the Notice and Claims Agent), and if so sent, will not be counted.

Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and those restrictions on modifications set forth in the Plan, the Debtors may alter, amend or modify the Plan, without additional disclosure pursuant to section 1125 of the Bankruptcy Code. If the Debtors make changes in the terms of the Plan materially adverse to any Holder of Claims or Equity Interests or if the Debtors waive a material condition to the effectiveness of the Plan described in Article 11 of the Plan, the Debtors will disseminate additional solicitation materials to such affected Class and will extend the solicitation period, in

SC1:4030163.4

each case to the extent directed by the Bankruptcy Court.  After the Confirmation Date and prior to substantial consummation of the Plan, the Debtors may institute proceedings in the Bankruptcy Court pursuant to section 1127(b) of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistencies in the Plan, this Disclosure Statement or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes of the Plan.

## 8.    ADDITIONAL FACTORS TO BE CONSIDERED PRIOR TO VOTING

HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.  THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN OR ITS IMPLEMENTATION.

### A.    Plan Risks

#### 1.    *The Plan May Not Be Confirmed.*

The Debtors can make no assurances that they will receive the requisite acceptances to confirm the Plan.  Even if the Debtors receive the requisite acceptances, there is no assurance that the Bankruptcy Court will confirm the Plan.

Even if the Bankruptcy Court determines that this Disclosure Statement and the balloting procedures and results are appropriate, the Bankruptcy Court may still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation have not been met, including that the Plan does not discriminate unfairly and is fair and equitable with respect to non-accepting Classes.  Moreover, there can be no assurance that modifications to the Plan will not be required for Confirmation or that such modifications will not necessitate the re-solicitation of votes.  If the Plan is not confirmed, it is unclear what distributions Holders of Claims or Equity Interests would ultimately receive with respect to their Claims or Equity Interests in a subsequent plan of reorganization.

#### 2.    *The Plan May Not Become Effective.*

Although the Debtors believe that the Effective Date of the Plan will occur soon after the Confirmation Date, there can be no assurance as to the occurrence of the Effective Date.  If the Effective Date does not occur by the 60th day following the Confirmation Date or such later date as the Debtors, in consultation with the Approving Bondholders, determine, the Plan shall be null and void in all respects and nothing contained in the Plan or this Disclosure Statement shall constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtors, prejudice in any manner the rights of the Debtors or any other Person, or constitute an admission, acknowledgment, offer or undertaking by the Debtors or any Person.

3.       _Undue Delay in Confirmation May Disrupt the Debtors' Operations._

The continuation of these Chapter 11 Cases, particularly if the Plan is not approved or confirmed in the time frame currently contemplated, could adversely affect the Debtors' operations and the Debtors' relationships with their charterers, vendors, employees and other constituents.  If Confirmation and Consummation of the Plan do not occur expeditiously, these Chapter 11 Cases could result in, among other things, increased costs for professional fees and similar expenses.

4.       _These Chapter 11 Cases May Negatively Impact the Debtors' Operations._

These Chapter 11 Cases may affect the Debtors' relationships with, and their ability to negotiate favorable terms with, creditors, charterers, vendors, employees, and other personnel and counterparties.  While the Debtors expect to continue normal operations, public perception of their continued viability may affect, among other things, the desire of new and existing charterers to enter into or continue their charters or other agreements or arrangements with the Debtors.  The failure to maintain any of these important relationships could adversely affect the Debtors' business, financial condition and results of operations.  Because of the public disclosure of these Chapter 11 Cases, the Debtors' ability to maintain normal credit terms with vendors may be impaired.  Also, certain transactions by the Debtors may be subject to the approval of the Bankruptcy Court, which may limit the Debtors' ability to respond on a timely basis to certain events or take advantage of certain opportunities.  As a result, the effect that these Chapter 11 Cases will have on the Debtors' business, financial condition and results of operations cannot be accurately predicted or quantified at this time.

5.       _The Plan Releases May Not Be Approved._

There can be no assurance that the Plan releases, as provided in Article 12 of the Plan, will be granted.  Failure of the Bankruptcy Court to grant such relief may result in a plan of reorganization that differs from the Plan.

6.       _The Debtors May Fail to Satisfy the Solicitation Requirements Requiring a Re-Solicitation._

To satisfy the requirements of Bankruptcy Code section 1126(b) and Bankruptcy Rule 3018(b), the Debtors will be delivering the Solicitation Materials to all Holders of Claims and Equity Interests as of the Voting Record Date in the Classes entitled to vote.  Accordingly, the Debtors believe that the solicitation is proper under section 1125 of the Bankruptcy Code.  The Debtors cannot be certain, however, that the solicitation of acceptances or rejections will be approved by the Bankruptcy Court, and if such approval is not obtained, the Confirmation of the Plan could be denied.  If the Bankruptcy Court was to conclude that the Debtors did not satisfy the solicitation requirements, then the Debtors may seek to re-solicit votes to accept or reject the Plan or to solicit votes from one or more Classes that were not previously solicited.  The Debtors cannot provide any assurances that such a re-solicitation would be successful.  Re-solicitation could delay or jeopardize confirmation of the Plan.  Non-confirmation of the Plan could result in protracted Chapter 11 Cases which could significantly and detrimentally impact relationships with vendors and charter counterparties.

SC1:4030163.4

7. *The Debtors' Cash Collateral May Be Insufficient to Fund the Debtors'
Business Operations, or May be Unavailable if the Debtors Do Not
Comply with its Terms.*

Although the Debtors project that they will have sufficient liquidity to operate its businesses through the Effective Date, there can be no assurance that the revenue generated by the Debtors' business operations and the cash made available to the Debtors under the cash collateral order will be sufficient to fund the Debtors' operations. Primorsk has not sought any debtor-in-possession financing. In the event that revenue flows are not sufficient to meet the Debtors' liquidity requirements, the Debtors may be required to seek additional financing.

There can be no assurance that such additional financing would be available or, if available, offered on terms that are acceptable to the Debtors or the Bankruptcy Court. If, for one or more reasons, the Debtors are unable to obtain such additional financing, the Debtor's business and assets may be subject to liquidation under chapter 7 of the Bankruptcy Code and the Debtors may cease to continue as going concern.

The *Final Order (A) Authorizing Use of Cash Collateral, (B) Granting Adequate Protection, (C) Modifying the Automatic Stay and (D) Authorizing Debtors to Utilize Operating Revenues* [Docket No. 64] (the "*Final Cash Collateral Order*") provides for affirmative and negative covenants applicable to the Debtors, including negative covenants restricting the ability of the Debtors to incur additional indebtedness, grant liens, as well as financial covenants applicable to the Debtors including compliance with a budget. There can be no assurance that the Debtors will be able to comply with these covenants and meet their obligations as they become due or to comply with the other terms and conditions of the Final Cash Collateral Order.

## B.    Risks Relating to the Debt and Securities to Be Issued under the Plan

1. *Reorganized Debtors May Not Be Able to Achieve Projected Financial
Results.*

Actual financial results may differ materially from the Business Plan set forth in Appendix D hereto. If the Reorganized Debtors do not achieve the projected revenue or cash flow levels, the Reorganized Debtors may lack sufficient liquidity to continue operating their business consistent with the Financial Projections after the Effective Date. The Business Plan represent the view of the Debtors based on currently known facts and assumptions about their future operations, and do not guarantee the Reorganized Debtors' future financial performance.

2. *Reorganized Debtors' Business Plan is Inherently Subject to Uncertainty
Due to the Assumptions on Which It  Is Based.*

The Business Plan is based on numerous assumptions, including the Confirmation and Consummation of the Plan in accordance with its terms and within the time frame projected by the Debtors; the anticipated future performance of the Reorganized Debtors; the performance of the shipping industry in which the Reorganized Debtors operate; general business and economic conditions; and other matters, many of which are beyond the control of the Reorganized Debtors and some or all of which may not materialize. The Business Plan assumes, for instance, (i) current and projected market conditions in the Debtors' product tanker shipping

SCI:4030163.4

market; (ii) no material acquisitions or divestitures; and (iii) emergence from these Chapter 11 Cases at or around June 30, 2016 under the terms contemplated in the Plan. There can be no assurance that these targets will be met.  In addition, unanticipated events and circumstances occurring subsequent to the approval of this Disclosure Statement by the Bankruptcy Court, including any natural disasters, terrorism or health epidemics, may affect the actual financial results of the Reorganized Debtors' operations.  Because the actual results achieved throughout the periods covered by the Financial Projections may vary from the projected results, the Financial Projections should not be relied upon as an assurance of the actual results that will occur.

Except with respect to the Business Plan and except as otherwise specifically and expressly stated herein, this Disclosure Statement does not account for any events that might occur subsequent to the date hereof.  Such events could have a material impact on the information contained in this Disclosure Statement.  Neither the Debtors nor the Reorganized Debtors intend to update the Business Plan.  The Business Plan will therefore not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the Business Plan.  For more information on the risks related to the Business Plan, see Appendix D hereto.

3.      *There is No Established Market for the Shares of the New Common Stock.*

A liquid trading market for the New Common Stock issued under the Plan does not exist and is unlikely to develop.  As of the Effective Date, the New Common Stock will not be listed for trading on any stock exchange or trading system and the Reorganized Debtors will not file any reports with the U.S. Securities and Exchange Commission.  Consequently, the trading liquidity of the New Common Stock is expected to be limited as of the Effective Date. The future liquidity of the trading markets for New Common Stock will depend, among other things, upon the number of holders of such securities and whether such securities become listed for trading on an exchange or trading system at some future time.

4.      *Sales or Transfers of the Shares of the New Common Stock May Be Restricted.*

The Reorganized Primorsk Certificate of Incorporation will provide that the shares of the New Common Stock shall be freely transferrable to existing holders of the shares of the New Common Stock and that other sales or transfers of the shares of the New Common Stock shall require the consent of the board of directors of Reorganized Primorsk, not to be unreasonably withheld, conditioned or delayed.  There is no guarantee that the consent of the board of directors of Reorganized Primorsk will be obtained for such other sales or transfers.

5.      *The Trading Price for the Shares of New Common Stock May Be Depressed Following the Effective Date.*

Assuming that the Plan becomes effective, shares of New Common Stock will be issued to Holders of certain Classes of Claims and Equity Interests.  In addition, Holders of Claims and Equity Interests that receive shares of New Common Stock may seek to sell such securities in an effort to obtain liquidity.  These sales and the volume of New Common Stock

SC1:4030163.4

available for trading could cause the trading price for the shares of New Common Stock to be depressed, particularly in the absence of an established trading market for the New Common Stock.

6.    *Allowance of Claims May Substantially Dilute the Recovery to Holders of Claims under the Plan.*

There can be no assurance that the estimated Claim amounts set forth in this Disclosure Statement are correct, and the actual Allowed amounts of Claims may differ from these estimates. These estimated amounts are based on certain assumptions with respect to a variety of factors. Should these underlying assumptions prove incorrect, the actual Allowed amounts of Claims may vary from those estimated herein. Because distributions to Holders of General Unsecured Claims under the Plan are linked to the amount and value of Allowed General Unsecured Claims, any material increase in the amount of Allowed General Unsecured Claims over the amounts estimated by the Debtors would materially reduce the recovery to Holders of General Unsecured Claims under the Plan.

7.    *The Results of an Actual Chapter 7 Liquidation May Be Different From the Liquidation Analysis.*

Conversion to chapter 7 liquidation would, in the view of the Debtors, produce a less favorable outcome for Holders of Claims and Equity Interests than would the Plan. However, underlying the Liquidation Analysis is the extensive use of estimates and assumptions that, although considered reasonable by the Debtors' advisors, are inherently subject to significant business, economic and competitive uncertainties and contingencies beyond the control of the Debtors. The Liquidation Analysis is based on assumptions with regard to liquidation decisions that are subject to change. Actual results may vary materially from the estimates and projections set forth in the Liquidation Analysis if the Debtors were, in fact, to undergo a liquidation. Events and circumstances subsequent to the date on which the Liquidation Analysis was prepared may be different from those assumed, or alternatively, may have been unanticipated.

8.    *Certain Significant Holders of Shares of New Common Stock May Have Substantial Influence Over the Reorganized Debtors Following the Effective Date.*

Assuming that the Plan becomes effective, Alexander Kirilichev, Dmitry Golomovzy and the Holders of Norwegian Bond Claims will receive a substantial percentage of the outstanding shares of New Common Stock. As a result, these owners may be in a position to influence matters requiring approval by the holders of shares of New Common Stock, including, among other things, the election of directors and the approval of a change of control of the Reorganized Debtors. These owners may have interests that differ from those of the other holders of shares of New Common Stock and may vote in a manner adverse to the interests of the other holders of shares of New Common Stock. This concentration of ownership may facilitate or may delay, prevent or deter a change of control of the Reorganized Debtors and, consequently, impact the value of the shares of New Common Stock. In addition, one or more of these owners may sell all or a large portion of its shares of New Common Stock within a short

48

period of time, which sale may adversely affect the trading price of the shares of New Common Stock.

9.    *Incorporation under the Laws of the Republic of Cyprus and Enforcement of United States Judgments by Investors.*

Upon Consummation, eight of the ten Debtors will remain incorporated in the Republic of Cyprus, including Primorsk and the following Primorsk subsidiaries: Boussol Shipping Limited, Malthus Navigation Limited, Jixandra Shipping Limited, Levaser Navigation Limited, Hermine Shipping Limited, Laperouse Shipping Limited and Prylotina Shipping Limited (the "*Cypriot Debtors*"). The remaining two Debtors, Baikal Shipping Ltd and Vostok Navigation Ltd will remain incorporated in Liberia (the "*Liberian Debtors*"). The corporate affairs of the Cypriot Debtors and the Liberian Debtors will be governed by each Debtor's certificate of incorporation and bylaws (or other formation documents in the case of a limited liability company, partnership or other form) in effect prior to the Effective Date, except to the extent such certificate of incorporation or bylaws (or other formation documents in the case of a limited liability company, partnership or other form) are amended by, or in connection with, the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be authorized pursuant hereto and without the need for any other approvals, authorizations, actions or consents. Consequentially, the Cypriot Debtors will also remain governed by the Cyprus Companies Law and the Liberian Debtors will remain governed by the General Business Law of Liberia. There have been few judicial cases in the Republic of Cyprus or the Republic of Liberia interpreting the Cyprus Companies Law or the Liberian General Business Law. As a result, the shareholders of Reorganized Primorsk may have more difficulty protecting their interests in the face of actions by management, directors or controlling shareholders than would shareholders of a corporation incorporated in a U.S. jurisdiction.

Additionally, substantially all of the Reorganized Debtors' assets are located outside the United States. As a result, it may be difficult or impossible for U.S. investors to serve process within the United States upon Reorganized Primorsk or to enforce a judgment upon Reorganized Primorsk for civil liabilities in U.S. courts. It should not be assumed that courts in the countries in which the Debtors are incorporated or where their assets are located (i) would enforce judgments of U.S. courts obtained in actions against the Debtors based upon the civil liability provisions of applicable U.S. federal and state securities laws or (ii) would enforce, in original actions, liabilities against the Debtors based upon these laws.

10.    *Certain Holders of Shares of New Common Stock May Be Restricted under Applicable Securities Laws in their Ability to Transfer or Sell Their Securities.*

The Debtors do not intend to file a registration statement under the Securities Act or pursuant to any state securities laws with respect to the offering of the New Common Stock to be issued pursuant to the Plan. The Debtors believe that the provisions of section 1145(a)(1) of the Bankruptcy Code exempt the offer and distribution of the New Common Stock from federal, state and local securities registration requirements.

49

Nevertheless, Holders of shares of New Common Stock that are deemed to be "underwriters" for the purposes of section 1145(b) of the Bankruptcy Code, including Holders that are considered "affiliates" under the Securities Act, will be subject to limitations on their ability to transfer or sell such securities. These persons will be permitted to transfer or sell such securities only pursuant to the provisions of Rule 144 under the Securities Act, if available, another available exemption from the registration requirements of the Securities Act, or an effective registration statement under the Securities Act, as discussed further in <u>Section 9</u> below.

### C.      Certain Risks Related to the Debtors' Business and Operations

#### 1.      *The Debtors May Fail to Successfully Employ Vessels.*

The Debtors believe that they will succeed in implementing and executing their business plan and financial restructuring. However, there are risks that the goals of the Debtors' going-forward business plan and financial restructuring strategy will not be achieved. In particular, the Debtors will seek to deploy their vessels through primary reliance on time charters in a manner that maximizes long-term cash flow. Although these time charters generally provide stable revenues, they also prevent the Debtors' fleet from capitalizing on spot market voyages during an upswing in the tanker industry cycle, when spot market voyages might be more profitable. The time charter market is highly competitive, and charter rates may fluctuate based primarily on the worldwide supply of tankers available in the market for the transportation of oil, natural gas and similar products and the worldwide demand for the transportation of oil and natural gas by tanker. Factors affecting the volatility of charter market voyage charter rates include the quantity of oil and natural gas produced globally, shifts in locations where oil and natural gas are produced or consumed, actions by the Organization of the Petroleum Exporting Countries, the general level of worldwide economic activity and the development and use of alternative energy sources. There can be no assurance that future time charters will be available at rates that will allow the Debtors to operate their vessels profitably.

#### 2.      *The Debtors Rely on a Limited Number of Charter Counterparties.*

The Debtors believe they will continue to derive a significant portion of their revenues and cash flow from a limited number of charter counterparties. The Debtors currently have 36-month charter agreements with a single charter counterparty for eight of their nine vessels. If this charter counterparty were to breach or terminate its time charters or renegotiate or renew them on terms less favorable than those currently in effect, or if this charter counterparty decreases the amount of business it transacts with the Debtors, or if the Debtors lose this charter counterparty or a significant portion of their revenues from this charter counterparty, the Debtors' operating results, cash flows and profitability could be materially adversely affected.

#### 3.      *The Debtors Operate in a Highly Competitive Market for Product and Crude Oil Transportation Services and May Not Be Able to Effectively Compete.*

The Debtors' vessels are employed in the highly competitive market for crude oil and natural gas transportation services, and the Debtors may not be able to effectively compete.

<p style="text-align: center;">50</p>

The Debtors' competitors include owners of other similar vessels and, to a lesser degree, owners of other size tankers. Both groups include independent oil tanker companies as well as oil companies. The Debtors do not control a sufficiently large share of the market to influence the market price charged for product and crude oil transportation services. In addition, the Debtors' market share may decrease in the future, and they may not be able to compete profitably as they expand their business into new geographic regions or provide new services. New markets may require different skills, knowledge or strategies from those the Debtors use in their current markets, and the Debtors' competitors in those new markets may have greater financial strength and capital resources than the Debtors.

### 4.      *The Debtors May Not Be Able to Replace Expiring Charters.*

When the Debtors' charters expire, the Debtors will generally attempt to re-charter their vessels at favorable rates with reputable charterers, but there can be no guarantee of the current favorable market rates. The charterers under the existing charters have no obligation to renew or extend the charters. If the Debtors cannot enter into longer-term time charters on acceptable terms, they may have to secure shorter-term charters, where charter rates are more volatile and revenues less predictable. If a further reduction occurs, upon the expiration or termination of the Debtors' vessels' current charters, the Debtors may only be able to re-charter their vessels at then market prevailing rates or they may not be able to charter these vessels at all.

Failure to obtain replacement charters will reduce the Debtors' revenue and ability to service their debt. In addition, the Debtors may have to reposition their vessels without cargo or compensation to deliver them to future charterers or to move vessels to areas where they believe that future employment may be more likely or advantageous. Repositioning the Debtors' vessels would decrease their vessel income stream which could have an adverse effect on the Debtors' results of operations and financial condition.

### 5.      *The Charterers May Default Under the Charters.*

When the Debtors enter into a charter, charter rates under that charter are fixed for the term of the charter. The ability of each of the Debtors' charterers to perform its obligations under a charter depends on a number of factors that are beyond the Debtors' control and may include, among other things, general economic conditions, the condition of the maritime industries generally, the overall financial condition of the charterer, charter rates received for specific types of vessels and various expenses. In addition, if the short-term charter rates in the shipping industry become significantly lower than the longer-term charter rates that some of the Debtors' charterers are obligated to pay the Debtors under their existing time charters, the charterers may have incentives to default under that charter or attempt to renegotiate the charter. Alternatively, it may also be the case that the financial condition of a long-term charterer deteriorates. If the Debtors' charterers default on their charters, the Debtors will seek the remedies available to them, which may include arbitration or litigation to enforce the contracts, although such efforts may not be successful. If their charterers fail to pay their obligations, the Debtors would have to attempt to re-charter their vessels at the prevailing market charter rates, which would likely be lower and would affect the Debtors' results of operations.

Additionally, the Debtors will not receive any revenues from such a vessel while it is un-chartered, but would still be required to pay the expenses necessary to maintain and insure the vessel and service any indebtedness on it.  The combination of any surplus of crude oil and natural gas shipping capacity and the expected increase in the size of the world crude oil and natural gas shipping fleet over the next few years may increase competitiveness in securing substitute employment for any of Debtors' vessels.  The loss of any of Debtors' charterers, time charters or vessels, or a decline in payments under Debtors' time charters, could have a material adverse effect on Debtors' business, results of operations and financial condition, and revenues and cash flows.

6.    *The Debtors Face Risks Related to Foreign Ports.*

The Debtors currently employ all of their vessels under charter contracts with unaffiliated parties.  Under the terms of these charters, and consistent with shipping industry practice, the charterer of each vessel pays the Debtors a daily charter rate and directs the vessel's route, loading and discharge ports and cargoes carried.  While the Debtors do not control the routes or ports of call made by their vessels, all of the charter contracts under which their vessels operate contain express prohibitions proscribing trades of their vessels in countries or areas that are subject to sanctions or blacklists by the United Nations or major trading nations as well as certain ice bound areas. The value of the Debtors may be adversely affected by the consequences of war, the effects of terrorism, civil unrest and governmental actions in these and surrounding countries.

Although the Debtors believe that they are in compliance with all applicable sanctions and embargo laws and regulations, and intend to maintain such compliance, there can be no assurance that the Debtors will be in compliance in the future, particularly as the scope of certain laws may be unclear and may be subject to changing interpretations.  Any such violation could result in fines or other penalties.  Moreover, the Debtors' charterers may violate applicable sanctions and embargo laws and regulations as a result of actions that do not involve the Debtors or their vessels, and those violations could in turn negatively affect the Debtors' reputation.

7.    *World Events Pose Risks to the Debtors.*

Since the Debtors' operations are primarily conducted outside of the United States, they may be affected by economic, political and governmental conditions in the countries where the Debtors are engaged in business or where their vessels are registered.  Future hostilities or political instability in regions where the Debtors operate or may operate could have a material adverse effect on the Debtors' business, results of operations and ability to service their debt.  In addition, tariffs, trade embargoes and other economic sanctions by the United States or other countries against countries where their vessels trade may limit trading activities with those countries, which could also harm the Debtors' business, financial condition and results of operations.

8.    *The Debtors Face Risks From Smuggling.*

The Debtors' vessels may call in areas where smugglers attempt to hide drugs, weapons and other contraband on vessels, with or without the knowledge of crew members.  To

52

the extent their vessels are found with contraband, whether with or without the knowledge of any crew member, the Debtors may face governmental or other regulatory claims which could have an adverse effect on the Debtors' business, results of operations, cash flows and financial condition.

9.    *Foreign Governments Could Seize the Debtors' Ships.*

A government could requisition one or more of the Debtors' vessels for title or hire, or seize one or more of their vessels. Requisition for title occurs when a government takes control of a vessel and becomes her owner. Requisition for hire occurs when a government takes control of a vessel and effectively becomes her charterer at dictated charter rates. Generally, requisitions occur during a period of war or emergency, although governments may elect to requisition vessels in other circumstances. Government requisition of one or more of the Debtors' vessels would negatively impact their revenues.

10.    *The Debtors' Vessels Could Be Arrested.*

Crew members, suppliers of goods and services to a vessel, shippers of cargo, vessel financing participants, charter parties, and other parties may be entitled to a maritime lien against a vessel for unsatisfied debts, claims or damages. In many jurisdictions, a maritime lien holder may enforce its lien by arresting a vessel through foreclosure proceedings. The arrest or attachment of one or more of the Debtors' vessels could interrupt the Debtors' cash flow and require them to make significant payments to have the arrest lifted.

In addition, in some jurisdictions, such as South Africa, under the "sister ship" or "associated ship" theory of liability, a claimant may arrest either the vessel which is subject to the claimant's maritime lien or any "associated" vessel, which is any vessel owned or controlled, at the time that the action is commenced, by the same owner or ultimate controller of the vessel concerned when the maritime claim arose. Claimants could try to assert "sister ship" or "associated ship" liability against one vessel in the Debtors' fleet for claims relating to another of their ships.

11.    *The Debtors' Vessels Could Be Damaged.*

The operation of the Debtors' ocean-going vessels—particularly in Artic and Subarctic waters—entails the possibility of certain inherent risks, such as marine disasters, including damage or destruction of the vessel due to accident, the loss of a vessel due to piracy or terrorism, loss of life, damage or destruction of cargo and similar events that may cause a loss of revenue from affected vessels and could damage the Debtors' business reputation, which may in turn lead to loss of business.

If the Debtors' vessels suffer damage, they may need to be repaired at a drydocking facility. The costs of drydock repairs are unpredictable and can be substantial. In addition, space at drydocking facilities is sometimes limited and not all drydocking facilities are conveniently located. The Debtors may be unable to find space at a suitable drydocking facility or the vessel in issue may be forced to travel to a drydocking facility that is distant from its then-current position. The loss of earnings while their vessels are being repaired and repositioned, as well as the actual cost of these repairs, would decrease the Debtors' earnings. The Debtors may

not have insurance that is sufficient to cover all or any of these costs or losses and may have to pay drydocking costs not covered by their insurance.  Further, the involvement of the Debtors' vessels in a disaster or delays in delivery or loss of cargo may harm their reputation as a safe and reliable vessel operator and could cause them to lose business.

12.    *Costly Vessel Maintenance Could Be Required.*

The operation of shipping vessels may create operational risks, such as damage to the vessel.  Vessels damaged due to treatment during operation may be more susceptible to breach while at sea.  Breaches of a vessel's hull in icy waters may lead to flooding, which in turn may lead to loss of a vessel.  If the Debtors do not adequately maintain their vessels, they may be unable to prevent these events, particularly given the prevalence of icebergs and other icy debris in Artic and Subarctic waters.  The occurrence of such an event could have a material adverse effect on the Debtors' business, financial condition and results of operations.

13.    *The Debtors' Insurance Could Prove Inadequate.*

The Debtors carry insurance to protect against most of the accident-related risks involved in the conduct of their business and maintain environmental damage and pollution insurance coverage.  The Debtors do not carry insurance covering the loss of revenue resulting from vessel off-hire time.  The Debtors believe that their insurance coverage is adequate to protect them against most accident-related risks involved in the conduct of their business and that they maintain appropriate levels of environmental damage and pollution insurance coverage.  However, there can be no assurance that all risks are adequately insured against, that any particular claim will be paid or that the Debtors will be able to procure adequate insurance coverage at commercially reasonable rates in the future.  More stringent environmental regulations in the past have resulted in increased costs for insurance against the risk of environmental damage or pollution.  In the future, the Debtors may be unable to procure adequate insurance coverage to protect them against environmental damage or pollution.  Moreover, in certain jurisdictions, pollution may result in criminal liability.  Criminal liability for a pollution incident could not only result in the Debtors incurring substantial penalties or fines, but may also, in some jurisdictions, facilitate civil liability claims for greater compensation than would otherwise have been payable.

Additionally, the Debtors are indemnified for legal liabilities incurred while operating their vessels through membership in protection and indemnity associations.  The Debtors cannot guarantee that the protection and indemnity associations to which they belong will remain viable or that they will not become subject to additional funding calls which could adversely affect the Debtors.

14.    *Piracy Poses Risks for Both Crew and Ships.*

Acts of piracy have historically affected ocean-going vessels trading in regions of the world such as the South China Sea, the Indian Ocean, the Arabian Sea and in the Gulf of Aden off the coast of Somalia.  If piracy attacks result in regions in which the Debtors' vessels are deployed being characterized as "war risk" zones by insurers or as "war and strikes" listed areas by the Joint War Committee, premiums payable for such coverage could increase

54

significantly and such insurance coverage may be more difficult to obtain.  Accordingly, the Debtors may not be adequately insured to cover losses from these incidents, which could have a material adverse effect on them.  Although the Debtors usually obtain war risk insurance for certain of their vessels making port calls in designated war zone areas, they cannot provide assurance that such insurance will be obtained prior to one of the Debtors' vessels entering into an actual war zone, which could result in that vessel not being insured.  Even if their insurance coverage is adequate to cover their losses, the Debtors may not be able to timely obtain a replacement vessel in the event of a loss.  In addition, detention of any of the Debtors' vessels, hijacking as a result of an act of piracy against their vessels, or an increase in cost, or unavailability, or insufficiency of insurance for their vessels, could have a material adverse impact on the Debtors' business, financial condition, results of operations and ability to service their debt.

15.    *Rising Operating Costs Could Adversely Impact the Debtors' Businesses.*

The Debtors' vessel operating expenses are comprised of a variety of costs, many of which are beyond the Debtors' control and affect the entire shipping industry.  Rising costs could materially and adversely affect the Debtors' cash flows and profitability.  With respect to the Debtors' vessels that will be employed on time charter, the charterer is generally responsible for the cost of fuel.  However, such cost may affect the charter rates that the Debtors are able to negotiate for their vessels.  The price and supply of fuel is unpredictable and fluctuates based on events outside the Debtors' control.  Changes in the price of fuel may adversely affect the Debtors' profitability.

16.    *Laws and Regulations Impose Numerous Costs on the Debtors.*

The shipping industry in general, and the Debtors' business and the operation of their vessels in particular, are subject to international conventions, national, state and local laws, and national and international regulations in force in international waters and the jurisdictions in which such tankers operate, as well as in the country or countries in which such tankers are registered, including, environmental protection requirements governing the management and disposal of hazardous substances and wastes, the cleanup of oil spills and the management of other contamination, air emissions, water discharges, and ballast water.  These laws and regulations include the International Convention for the Prevention of Pollution from Ships, the International Convention for Safety of Life at Sea of 1974 and implementing regulations adopted by the International Maritime Organization, the European Union and other international, national, and local regulatory bodies.  They also include laws and regulations in the jurisdictions where the Debtors' vessels travel and in the ports where the Debtors' vessels call.

In the United States, the requirements include the U.S. Oil Pollution Act of 1990, the U.S. Comprehensive Environmental Response Compensation and Liability Act, the U.S. Clean Water Act, the U.S. Clean Air Act and the U.S. Maritime Transportation Security Act of 2002.  Compliance with these environmental protection requirements can impose significant cost and expense, including the cost of vessel modifications and implementation of certain operating procedures.  Furthermore, the 2010 explosion of the Deepwater Horizon drilling rig and the subsequent release of oil into the Gulf of Mexico, or similar events in the future, may result in further regulation of the tanker industry, and modifications to statutory liability schemes, and

related increases in compliance costs, all of which could limit the Debtors' ability to do business or increase the cost of doing business, and that could have a material adverse effect on the Debtors' operations.

In addition, the Debtors are required by various governmental and quasigovernmental agencies to obtain certain permits, licenses and certificates with respect to their operations. Governmental regulation of tankers, particularly in the areas of safety and environmental protection, may also change in the future and impose upon the Debtors significant cost and expense with respect to their ships to keep them in compliance. Further, if a vessel in the Debtors' fleet does not maintain its class and/or fails any annual, intermediate or special survey, it will be unemployable and unable to trade between ports, which would negatively impact the Debtors' results of operations.

Moreover, the Debtors' charterers may violate applicable sanctions and embargo laws and regulations as a result of actions that do not involve the Debtors or their vessels, and those violations could in turn negatively affect the Debtors' reputation.

Further, international shipping is subject to various security and customs inspections and related procedures in countries of origin and destination. Inspection procedures can result in the seizure of contents of the Debtors' vessels, delays in loading, offloading or delivery and the levying of customs, duties, fines and other penalties against the Debtors. Changes to inspection procedures may impose additional financial and legal obligations on the Debtors or customers or render the shipment of certain types of cargo impractical. Any such changes or developments may have a material adverse effect on the Debtors' business, financial condition and results of operations.

     17.    *Discharge of Prepetition Claims and Related Legal Proceedings Could Lead to Future Legal Liability and Costs.*

The Debtors may be subject to claims in various legal proceedings and may become subject to other legal proceedings in the future. Although any such claims have been generally stayed while these Chapter 11 Cases are pending, the Debtors may not be successful in ultimately discharging or satisfying such claims. The ultimate outcome of each of these matters, including the Debtors' ability to have these matters satisfied and discharged in the bankruptcy proceeding, cannot presently be determined, nor can the liability that may potentially result from a negative outcome be reasonably estimated presently for every case. The liability the Debtors may ultimately incur with respect to any one of these matters in the event of a negative outcome may be in excess of amounts currently accrued with respect to such matters and, as a result, these matters may potentially be material to the Debtors' business, financial condition, and results of operations.

**D.    Additional Factors to Be Considered**

    *1.    The Debtors Have No Duty to Update.*

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set

forth herein since that date.  The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

2.    *No Representations Outside this Disclosure Statement Are Authorized.*

No representations concerning or related to the Debtors, these Chapter 11 Cases, once commenced, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

3.    *Forward-Looking Statements Are Not Assured, and Actual Results May Vary.*

This Disclosure Statement contains forward-looking statements.  These forward-looking statements are based on the current expectations and observations of the Debtors' management, and include factors that could cause actual results to differ materially such as: those factors described in Section 8 of this Disclosure Statement; the Debtors' ability to meet current operating needs, including its ability to maintain charterers and vendor contracts that are critical to its operation, to obtain and maintain acceptable terms with its charters and vendors and to retain employees; the Debtors' ability to obtain Bankruptcy Court approval with respect to motions in these Chapter 11 Cases; the effects of the Bankruptcy Court rulings in these Chapter 11 Cases and the outcome of the case in general; the length of time the Debtors will operate under these Chapter 11 Cases; the pursuit by the Debtors' various creditors, equity holders and other constituents of its interests in these Chapter 11 Cases; risks associated with third-party motions in these Chapter 11 Cases, which may interfere with the ability to consummate the Plan; the adverse effects of these Chapter 11 Cases on the Debtors' liquidity or results of operations generally; the increased administrative and restructuring costs related to these Chapter 11 Cases; the Debtors' ability to maintain adequate liquidity to fund operations during these Chapter 11 Cases and thereafter; the Debtors' ability in the future to arrange and consummate financing or to access capital; and the timing and realization of the recoveries of assets and the payments of Claims and the amount of expenses projected to recognize such recoveries and reconcile such Claims.

4.    *No Legal or Tax Advice is Provided to You by This Disclosure Statement.*

The contents of this Disclosure Statement should not be construed as legal, business or tax advice.  Each Holder of Claims against the Debtors should consult his, her or its own legal counsel and accountants as to legal, tax and other matters concerning such Holder's Claims.  This Disclosure Statement is not legal advice to you and may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

57

9.    **U.S. SECURITIES LAW CONSIDERATIONS**

A.    **Issuance of New Common Stock**

The Plan provides for the issuance of the New Class B Common Stock to Holders of Norwegian Bond Claims and the issuance of the New Class A Common Stock to Holders of Equity Interests.  The Debtors believe the issuance of the New Common Stock under the Plan will be exempt from registration under section 5 of the Securities Act (or any state or local law requiring registration for offer or sale of a security) pursuant to section 1145 of the Bankruptcy Code.  However, resales of New Common Stock must be separately considered as discussed in this Section 9 below.

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under section 5 of the Securities Act, and state and local securities laws, if three principal requirements are satisfied: (i) the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under the plan; (ii) the recipients of the securities must hold prepetition or administrative expense claims against the debtor or interests in the debtor; and (iii) the securities must be issued in exchange for the recipient's claim against or interest in the debtor, or a claim for an administrative expense; or principally in exchange for such claim or interest and partly for cash or property.

Accordingly, because the New Common Stock (i) will be offered and issued under the Plan, (ii) are securities of one of the Reorganized Debtors, (iii) will be issued only to holders of prepetition claims or equity interests and (iv) will be issued entirely in exchange for such claims or interests, the Debtors believe the offering of the New Common Stock pursuant to the Plan will be exempt from Securities Act registration pursuant to section 1145 of the Bankruptcy Code.

B.    **Subsequent Transfers**

The Debtors believe the New Common Stock may be freely transferred by its recipients following its initial issuance under the Plan, and all resales and subsequent transfers of the New Common Stock are exempt from registration under the Securities Act and state and local securities laws, unless the holder is an "underwriter" with respect to such securities.  Section 1145(b) of the Bankruptcy Code defines four types of "underwriters":

(i)    persons who purchase a claim against, an interest in, or a claim for an administrative expense against the debtor with a view to distributing any security received in exchange for such claim or interest;

(ii)   persons who offer to sell securities offered under a plan for the holders of such securities;

(iii)  persons who offer to buy such securities from the holders of such securities, if the offer to buy is:

(A)    with a view to distributing such securities; and

58

   (B)  under an agreement made in connection with the plan, the consummation of the plan, or with the offer or sale of securities under the plan; or

  (iv)  a person who is an "issuer" with respect to the securities as the term "issuer" is defined in section 2(a)(11) of the Securities Act.

  Under section 2(a)(11) of the Securities Act, an "issuer" includes any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control of the issuer. Any such person would also be considered an "affiliate" of the issuer under the Securities Act.

  To the extent that persons who receive New Common Stock pursuant to the Plan are deemed to be underwriters, including affiliates of the issuer, resales by such persons would not be permitted without an exemption from registration under the Securities Act or other applicable law. Rule 144 under the Securities Act ("*Rule 144*") provides an exemption for the resale of securities, such as New Common Stock, subject to compliance with certain conditions. These conditions depend on whether the holder of the securities is considered to be an "affiliate" of the issuer, as well as other circumstances. An affiliate is defined, for purposes of Rule 144, as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the issuer." An 1145 underwriter who is an affiliate of Reorganized Primorsk may resell New Common Stock only if, at the time of the sale, certain current public information regarding the issuer is available and only if the affiliate also complies with the other requirements of Rule 144, including volume, manner of sale and notice requirements. If the issuer does not file reports with the Securities and Exchange Commission under Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended (the "*Exchange Act*"), the requirement of adequate current public information is satisfied only if certain financial and other information regarding the issuer has been made publicly available. The Debtors currently do not expect that Reorganized Primorsk will be a reporting issuer and do not intend to register the New Common Stock under the Exchange Act on or after the Effective Date.

  Whether or not any particular person would be deemed to be an underwriter with respect to the New Common Stock or any other security (or an affiliate of the issuer) depends upon the facts and circumstances applicable to that person. Accordingly, the Debtors express no view as to whether any particular person receiving New Common Stock or other securities under the Plan would be an underwriter with respect to such securities.

## 10. MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

  In general, the Debtors understand that most Holders of Claims and Equity Interests are not U.S. investors and are not generally subject to United States federal income tax on their investments. Likewise, the Debtors are not United States corporations and are not generally engaged in a trade or business in the United States, and are therefore not generally subject to United States federal income tax. There should therefore in general be no significant U.S. tax consequences arising from the Plan.

SC1:4030163.4

Notwithstanding the above, a Holder of Claims or Equity Interests will generally be subject to United States federal income tax, including  possibly as a result of exchanging Claims for debt or equity securities pursuant to the Plan, and in any case in respect of the subsequent ownership of such securities, if such Holder is:

- a citizen or resident of the United States;

- a  corporation organized under the laws of the United States or a state or subdivision thereof;

- an estate whose income is subject to United States federal income tax regardless of its source;

- a trust, if a United States court can exercise primary supervision over the trust's administration and one or more United States persons are authorized to control all substantial decisions of the trust;

- an individual present in the United States for 183 days or more in the taxable year of the disposition and certain other conditions are met;

- a Holder in respect of which the gain is effectively connected with the Holder's conduct of a trade or business in the United States (or, if certain tax treaties apply, is attributable to a permanent establishment in the United States); or

- a partnership with an investor that falls into one of the above categories.

Any Holders that fall into one of these categories should consult their United States tax advisors concerning both the United States federal income tax consequences of the Plan and the potential application of relevant information reporting and backup withholding requirements.

In addition, Holders not otherwise subject to United States federal income tax that intend to participate in the Plan through United States intermediaries should consult a United States tax advisor with regard to the potential applicability of information reporting requirements.

## 11.    ALTERNATIVES TO CONFIRMATION OF THE PLAN

The Debtors believe that the Plan affords Holders of Claims and Equity Interests the potential for the greatest recovery on those Claims and Equity Interests and is therefore in the best interests of such Holders.  If the Plan is not confirmed, the alternative near-future outcomes for the Debtors include:  (a) continuation of these Chapter 11 Cases; (b) an alternative plan or plans of reorganization; or (c) liquidation of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code.

SC1:4030163.4

### A.    Continuation of these Chapter 11 Cases

If the Debtors remain in chapter 11, they will continue to operate their businesses and manage their properties as debtors-in-possession, but would remain subject to the restrictions imposed by the Bankruptcy Code.  It is not clear whether the Debtors can survive as a going concern in protracted Chapter 11 Cases.

### B.    Alternative Plans of Reorganization

If the Plan is not confirmed, the Debtors, or, after the expiration of the exclusive period in which only the Debtors may propose and solicit a reorganization plan, any other party-in-interest in these Chapter 11 Cases, will be able to propose a different plan or plans.  Such plans might involve either a reorganization and continuation of the Debtors' businesses, the liquidation of their assets, or a combination of both.

### C.    Liquidation

If no plan of reorganization is confirmed, these Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code.  In a chapter 7 case, a trustee or trustees would be appointed to liquidate the assets of the Debtors.  It is impossible to predict with precision how the proceeds of the liquidation would be distributed among Holders of Claims against or Equity Interests in the Debtors.

The Debtors believe, however, that creditors would lose substantially higher going-concern value in the event that the Debtors are liquidated.  In addition, the Debtors believe that, in a liquidation under chapter 7, the value of the Debtors' estates will be substantially eroded before creditors receive any distribution, as a result of additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants and other professionals to assist such trustees.  The assets available for distribution to creditors will be reduced by such additional expenses and by claims, some of which will be entitled to priority, which would arise by reason of the liquidation and the failure to realize the greater going-concern value of the Debtors' assets.

The Debtors may also be liquidated pursuant to a chapter 11 plan.  In a liquidation under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7.  A chapter 11 liquidation might therefore result in greater recoveries for Holders of Claims and Holders of Equity Interests than a chapter 7 liquidation, but the delay in distribution of these recoveries could result in lower present values received and higher administrative costs.  Because no trustee is appointed in a chapter 11 case, professional fees paid by the Debtors' estates could be lower than in a chapter 7 case, in which a trustee must be appointed.  However, any distribution to Holders of Claims and Holders of Equity Interests under a chapter 11 liquidation plan probably would be delayed substantially.

The Liquidation Analysis, prepared by the Debtors with their restructuring and financial advisors, is premised upon a hypothetical liquidation in a chapter 7 case.  In the Liquidation Analysis, the Debtors have taken into account the nature, status, and underlying value of their assets, the ultimate estimated realizable value of their assets, and the extent to which such assets are subject to liens and security interests.  The likely form of any liquidation

would be the wind-down and sale of individual assets in the U.S. and a forced sale of foreign assets.

Based on this analysis, it is likely that a chapter 7 liquidation of the Debtors' assets would produce less value for distribution to creditors than that recoverable under the Plan. Therefore, the Debtors submit that the projected recoveries available to Holders of Claims and Holders of Equity Interests in a chapter 7 liquidation are likely to be lower than those available under the Plan.

## 12.    DEBTORS' RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to the alternatives described herein. **Therefore, the Debtors recommend that Holders of Claims and Equity Interests entitled to vote on the Plan vote to accept it.**

Dated: March 15, 2016
New York, New York

Respectfully submitted,

**PRIMORSK INTERNATIONAL SHIPPING
LIMITED
(for itself and on behalf of each of the Debtors)**

By: */s/ Holly Felder Etlin*
      Name:  Holly Felder Etlin
      Title:  Chief Restructuring Officer of the
            Debtors

# INDEX OF DEFINED TERMS

Capitalized terms not defined in this Disclosure Statement have the meaning assigned to them in the Plan.

DEFINED TERM                                                                                                    LOCATION

Apington ........................................................................................................... 2. B. 3.
Bankruptcy Code ....................................................................................................... 1.
Bar Date Motion ................................................................................................. 3. C.
Best Interests Test ............................................................................................. 6. C. 1.
Business Plan ..................................................................................................... 4. C.
Claims Bar Date ................................................................................................. 3. C.
Claims Bar Date Order ....................................................................................... 3. C.
Class B Directors ............................................................................................... 4. D.
Company ........................................................................................................... 2. A.
Cypriot Debtors .............................................................................................. 8. B. 9.
Debtors .................................................................................................................. 1.
Disclosure Statement ........................................................................................ 1. A.
Exchange Act .................................................................................................... 9. B.
Exculpated Parties ........................................................................................... 5. B. 8.
First Day Motions ............................................................................................ 3. B. 1.
First Day Orders .............................................................................................. 3. B. 1.
General Unsecured Claims ............................................................................. 5. A. 2. g.
Holder ............................................................................................................. 5. B. 6.
Junior Secured Claims ................................................................................... 5. A. 2. d.
Junior Secured Facility .................................................................................. 2. B. 1. a.
Liberian Debtors ............................................................................................ 8. B. 9.
Liquidation Analysis ...................................................................................... 6. C. 3.
New Management Services Agreement .............................................................. 4. D.
Norwegian Bond Claims ............................................................................... 5. A. 2. f.
Norwegian Bond Indenture ............................................................................. 2. B. 2.
Norwegian Bond Trustee ................................................................................ 2. B. 2.
Norwegian Bonds ........................................................................................... 2. B. 2.
Notice and Claims Agent ................................................................................ 1. D. 2
Other Priority Claim ..................................................................................... 5. A. 2. a.
Other Secured Claim ..................................................................................... 5. A. 2. b.
Peraticos Holders .......................................................................................... 2. B. 2.c.
Petition Date ....................................................................................................... 1.
Plan ..................................................................................................................... 1.
Primorsk ............................................................................................................. 1.
Prisco ................................................................................................................ 4. D.
Released Parties ............................................................................................. 5. B. 6.
Releasing Parties ............................................................................................ 5. B. 6.
Retention Applications ..................................................................................... 3. B. 2.
Rule 144 .......................................................................................................... 9. B.
Schedules ........................................................................................................ 3. C.

Secured Debt .................................................................................................................. 2. B. 1.
Secured Facility ............................................................................................................. 2. B. 1.
Secured Agent ............................................................................................................ 2. B. 1. a.
Secured Lenders ......................................................................................................... 2. B. 1. a.
Secured Loan Agreement ........................................................................................... 2. B. 1. a.
Securities Act ........................................................................................................................ ii.
Senior Secured Claims ............................................................................................. 5. A. 2. c.
Senior Secured Facility ............................................................................................. 2. B. 1. a.
Solicitation Procedures Order ......................................................................................... 7.
Swap Agent ............................................................................................................... 2. B. 1. b.
Swap Facility .............................................................................................................. 2. B. 1.
Swap Loan Agreement ............................................................................................. 2. B. 1. b.
Swap Lenders ............................................................................................................ 2. B. 1. b.
Swap Secured Claims ............................................................................................... 5. A. 2. e.
U.S. Trustee ................................................................................................................ 3. A.

2

**Appendix A: Debtors' Plan of Reorganization**

SC1:4030163.4

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------- x

In re

PRIMORSK INTERNATIONAL SHIPPING
LIMITED, *et al.*, [1]

                       Debtors.

---------------------------------------------------------------- x

:    Chapter 11

:    Case No. 16-10073 (MG)

:    Jointly Administered

## JOINT CHAPTER 11 PLAN OF REORGANIZATION OF PRIMORSK INTERNATIONAL SHIPPING LIMITED AND ITS DEBTOR AFFILIATES

Andrew G. Dietderich
Brian D. Glueckstein
Alexa J. Kranzley
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone:   (212) 558-4000

Counsel to the Debtors and
Debtors-in-Possession

Dated: March 15, 2016

---

[1]   The Debtors in these Chapter 11 Cases and, if applicable, the last four digits of their U.S. taxpayer identification numbers are: Primorsk International Shipping Limited (Cyprus), Boussol Shipping Limited (Cyprus) (6402) – m/t "Zaliv Amerika", Malthus Navigation Limited (Cyprus) (6401) – m/t "Zaliv Amurskiy", Jixandra Shipping Limited (Cyprus) (6168) – m/t "Prisco Alexandra", Levaser Navigation Limited (Cyprus) (0605) – m/t "Prisco Ekaterina", Hermine Shipping Limited (Cyprus) (0596) – m/t "Prisco Irina", Laperouse Shipping Limited (Cyprus) (0603) – m/t "Prisco Elizaveta", Prylotina Shipping Limited (Cyprus) (6085) – m/t "Prisco Elena", Baikal Shipping Ltd (Liberia) (6592) – m/t "Zaliv Baikal" and Vostok Navigation Ltd (Liberia) (1745) – m/t "Zaliv Vostok".

# TABLE OF CONTENTS

**Page**

1.    INTRODUCTION ................................................................................1

2.    DEFINITIONS AND RULES OF INTERPRETATION ...................................2

    2.1.    Defined Terms ................................................................ 2
    2.2.    Rules of Interpretation ...................................................... 13
    2.3.    Governing Law .............................................................. 13
    2.4.    Computation of Time ........................................................ 14

3.    GENERAL ADMINISTRATIVE CLAIMS, PROFESSIONAL CLAIMS AND
    UNITED STATES TRUSTEE STATUTORY FEES ....................................15

    3.1.    Administrative Claim Bar Date .............................................. 15
    3.2.    General Administrative Claims............................................... 15
    3.3.    Professional Claims ......................................................... 16
    3.4.    Statutory Fees Payable Pursuant to 28 U.S.C. § 1930 ....................... 16

4.    CLASSIFICATION, TREATMENT AND VOTING OF CLAIMS AND
    EQUITY INTERESTS.......................................................................17

    4.1.    Classification of Claims and Equity Interests.............................. 17
    4.2.    Treatment of Claims and Equity Interests ................................. 17
    4.3.    Intercompany Claims and Interests.......................................... 21
    4.4.    Special Provision Governing Unimpaired Claims ............................. 21
    4.5.    Confirmation Pursuant to Sections 1129(a) and 1129(b) of the Bankruptcy
    Code ........................................................................ 21

5.    IMPLEMENTATION OF THE PLAN .......................................................22

    5.1.    Operations Between the Confirmation Date and Effective Date .............. 22
    5.2.    Other Restructuring Transactions .......................................... 22
    5.3.    Vesting of Assets in the Reorganized Debtors .............................. 22
    5.4.    Cancelation of Existing Agreements, Notes and Equity Interests ........... 22
    5.5.    New Common Stock .......................................................... 23
    5.6.    Exemption from Registration................................................ 23
    5.7.    Replacement Loans ......................................................... 23
    5.8.    Section 1146 Exemption from Certain Transfer Taxes and Recording Fees........ 24
    5.9.    Preservation of Causes of Action........................................... 25
    5.10.    Effectuating Documents and Further Transactions........................... 25
    5.11.    Reinstatement of Interests in Debtor Subsidiaries ........................ 25
    5.12.    Intercompany Account Settlement........................................... 25
    5.13.    Fees and Expenses of the Agents and Norwegian Bond Trustee.............. 26

6.    CORPORATE GOVERNANCE AND MANAGEMENT...............................................27

    6.1.    Corporate Existence ........................................................ 27

6.2.    Organizational Documents..................................................................... 27
6.3.    Indemnification Provisions in Organizational Documents..................... 27
6.4.    Directors and Officers of the Reorganized Debtors............................... 27

7.    COMPENSATION AND BENEFITS PROGRAMS........................................28

7.1.    Continuing Compensation and Benefits Programs............................. 28
7.2.    New Management Agreements........................................................... 28
7.3.    Compensation Arrangements with APS ............................................. 28

8.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ..........29

8.1.    Assumption of Executory Contracts and Unexpired Leases................. 29
8.2.    Rejection of Specified Contracts ....................................................... 29
8.3.    Claims Against the Debtors Upon Rejection ..................................... 29
8.4.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases ....... 29
8.5.    Effect of Assumption ...................................................................... 30
8.6.    Modification, Amendments, Supplements, Restatements or Other
        Agreements .................................................................................. 31
8.7.    Reservation of Rights...................................................................... 31
8.8.    Contracts and Leases Entered Into After the Petition Date ................. 31

9.    PROVISIONS GOVERNING DISTRIBUTIONS ........................................32

9.1.    Distributions.................................................................................. 32
9.2.    Record Date and Delivery of Distributions ....................................... 32
9.3.    Distribution Agents ........................................................................ 33
9.4.    Fractional and De Minimis Distributions .......................................... 34
9.5.    Undeliverable Distributions ............................................................ 34
9.6.    Reversion ...................................................................................... 34
9.7.    Surrender of Canceled Instruments or Securities................................ 35
9.8.    Compliance with Tax Requirements and Allocations to Principal and
        Interest......................................................................................... 35
9.9.    Setoffs .......................................................................................... 35
9.10.   No Postpetition Interest on Claims .................................................. 36
9.11.   No Payment Over the Full Amount .................................................. 36

10.   PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND
      DISPUTED CLAIMS ........................................................................37

10.1.   Objections to Claims....................................................................... 37
10.2.   Estimation of Claims....................................................................... 37
10.3.   Expungement and Disallowance of Claims ........................................ 37
10.4.   Amendments to Proofs of Claim ...................................................... 38
10.5.   No Distributions Pending Allowance ................................................ 38
10.6.   Distributions After Allowance ......................................................... 38
10.7.   Administration Responsibilities........................................................ 38

SC1:4030160.8

11. CONDITIONS PRECEDENT TO EFFECTIVENESS OF THE PLAN ..........................39

    11.1. Conditions Precedent to the Effective Date ................................ 39
    11.2. Waiver of Conditions ................................................. 39
    11.3. Simultaneous Transactions ........................................... 39
    11.4. Effect of Non-Occurrence of the Effective Date ...................... 40

12. SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS ..............41

    12.1. Compromise and Settlement .......................................... 41
    12.2. Subordinated Claims ................................................ 41
    12.3. Discharge of Claims and Termination of Equity Interests............. 41
    12.4. Release of Liens ................................................... 41
    12.5. Debtor Release ..................................................... 42
    12.6. Voluntary Release by Holders of Claims and Equity Interests......... 42
    12.7. Scope of Releases .................................................. 43
    12.8. Exculpation ........................................................ 43
    12.9. Injunction ......................................................... 44
    12.10. Limitations on Exculpations and Releases .......................... 44

13. MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN ..................45

    13.1. Modification of Plan ............................................... 45
    13.2. Effect of Confirmation on Modification ............................. 45
    13.3. Revocation of Plan ................................................. 45

14. RETENTION OF JURISDICTION ...............................................46

    14.1. Retention of Jurisdiction .......................................... 46

15. MISCELLANEOUS PROVISIONS ................................................49

    15.1. Immediate Binding Effect ........................................... 49
    15.2. Additional Documents ............................................... 49
    15.3. Reservation of Rights .............................................. 49
    15.4. Successors and Assigns.............................................. 49
    15.5. Term of Injunction or Stays ........................................ 49
    15.6. Entire Agreement ................................................... 50
    15.7. Exhibits ........................................................... 50
    15.8. Nonseverability of Plan Provisions Upon Confirmation ............... 50
    15.9. Closing of Chapter 11 Cases ........................................ 50
    15.10. Conflicts ......................................................... 50
    15.11. Further Assurances................................................. 51
    15.12. No Stay of Confirmation Order ..................................... 51
    15.13. Waiver or Estoppel ................................................ 51
    15.14. Post-Effective Date Service ....................................... 51
    15.15. Notices ........................................................... 51

## 1.   <u>INTRODUCTION</u>

Primorsk International Shipping Limited ("*Primorsk*") and its debtor affiliates, as debtors-in-possession in the above-captioned Chapter 11 Cases (each a "*Debtor Subsidiary*" and together with Primorsk, the "*Debtors*"), propose the following joint plan of reorganization (including the Plan Supplement and all other exhibits and schedules thereto, the "*Plan*") pursuant to section 1121(a) of the Bankruptcy Code.  These Chapter 11 Cases are being jointly administered pursuant to an order of the Bankruptcy Court dated January 21, 2016.  Each Debtor is a proponent of the Plan for purposes of section 1129 of the Bankruptcy Code.

2. **DEFINITIONS AND RULES OF INTERPRETATION**

2.1. Defined Terms

Except as otherwise provided herein, each capitalized term used in this Plan shall have the meaning set forth below.

2.1.1 "*Administrative Claim*" means a Claim arising under section 503(b) or 507(b) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Professional Claims; (c) Claims arising under section 361(1) of the Bankruptcy Code; and (d) all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code, 28 U.S.C. 1911 and 1930.

2.1.2 "*Administrative Claim Bar Date*" means the date by which Proofs of Claim in respect of Administrative Claims must be filed, as determined by an order of the Bankruptcy Court.

2.1.3 "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

2.1.4 "*Agents*" means the Secured Agent and the Swap Agent.

2.1.5 "*Allowed*" means, with respect to any Claim, that (a) such Claim has been allowed by the Plan or an order of the Bankruptcy Court; (b) such Claim has been allowed, compromised or settled in writing (i) prior to the Effective Date, by the Debtors in accordance with authority granted by an order of the Bankruptcy Court; or (ii) on or after the Effective Date, by the Reorganized Debtors; (c) such Claim is listed in the Schedules as not disputed, not contingent and not unliquidated and (i) no Proof of Claim has been filed; (ii) no objection to allowance, request for estimation, motion to deem the Schedules amended or other challenge has been filed prior to the Claims Objection Bar Date; and (iii) such Claim is not otherwise subject to disallowance under section 502(d) of the Bankruptcy Code; (d) such Claim is evidenced by a valid and timely filed Proof of Claim and (i) no objection to allowance, request for estimation, or other challenge has been filed prior to the Claims Objection Bar Date, as applicable; and (ii) such Claim is not otherwise subject to disallowance under section 502(d); or (e) in the case of an Administrative Claim, such Claim is subject to a request for payment timely filed and served in accordance with Section 3.1 herein and no objection to such Claim is timely filed and served pursuant to such Section.

2.1.6 "*Amortizing*" means the amortization of the Tranche A Replacement Loans as set forth in Exhibit 2 attached hereto, as amended and modified by the Plan Supplement.

2.1.7 "*Applicable Margin*" means the applicable margin of the Replacement Loans as set forth in Exhibit 2 attached hereto, as amended and modified by the Plan Supplement.

2.1.8      "*Approving Bondholder*" means any Holder of a Norwegian Bond Claim who (a) duly voted to accept the Plan by the Voting Deadline and (b) continues to hold Norwegian Bond Claims that would entitle such Holder to receive at least 25% of the aggregate New Common Stock in accordance with the Plan.

2.1.9      "*APS*" means AP Services, LLC.

2.1.10      "*APS Retention Order*" means the Order Pursuant to 11 U.S.C. §§ 105(a) and 363(b) (I) Authorizing the Retention and Employment of AP Services, LLC and (II) Designating Holly Felder Etlin as Chief Restructuring Officer *Nunc Pro Tunc* to the Petition Dated, dated February 18, 2016 [Docket No. 61].

2.1.11      "*Avoidance Actions*" means any and all actual or potential claims and causes of action to avoid a transfer of property or an obligation incurred by any of the Debtors pursuant to any applicable section of the Bankruptcy Code, including sections 544, 545, 547, 548, 549, 550, 551, 553(b) and 724(a) of the Bankruptcy Code, or under similar or related state or federal statutes and common law.

2.1.12      "*Ballots*" means the ballots accompanying the Disclosure Statement upon which certain Holders of Impaired Claims entitled to vote shall, among other things, indicate their acceptance or rejection of the Plan in accordance with the Plan and the procedures governing the solicitation process, and which must be actually received on or before the Voting Deadline.

2.1.13      "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*

2.1.14      "*Bankruptcy Court*" or "*Court*" means the United States Bankruptcy Court for the Southern District of New York.

2.1.15      "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to these Chapter 11 Cases, and the general, local and chambers rules of the Bankruptcy Court.

2.1.16      "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

2.1.17      "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

2.1.18      "*Cause of Action*" means any action, claim, cause of action, controversy, demand, right, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law.  Causes of

Action also include:  (a) any right of setoff, counterclaim or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity; (b) the right to object to Claims or interests; (c) any claim pursuant to section 362 of the Bankruptcy Code; (d) any Avoidance Action; (e) any claim or defense, including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; and (f) any state law fraudulent transfer claim.

2.1.19    "*Certificate*" means any instrument evidencing a Claim or an Equity Interest.

2.1.20    "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the chapter 11 case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all Debtors, the jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

2.1.21    "*Claim*" means any claim against a Debtor as defined in section 101(5) of the Bankruptcy Code.

2.1.22    "*Claims Bar Date*" means (a) 4:00 p.m. (Eastern Time) on [_____], 2016; or (b) such other date established by order of the Bankruptcy Court by which Proofs of Claim must have been filed.

2.1.23    "*Claims Objection Bar Date*" means (a) the date that is the later of (i) 120 days after the Effective Date, or (ii) as to Proofs of Claim filed after the applicable Claims Bar Date, the 60th day after a Final Order is entered by the Bankruptcy Court deeming the late-filed Proof of Claim to be treated as timely filed; or (b) such later date as may be established by order of the Bankruptcy Court upon a motion by the Reorganized Debtors, with notice only to those parties entitled to receive notice pursuant to Bankruptcy Rule 2002.

2.1.24    "*Claims Register*" means the official register of Claims maintained by the Notice and Claims Agent.

2.1.25    "*Class*" means a class of Claims or Equity Interests as set forth in Article 4 herein pursuant to section 1122(a) of the Bankruptcy Code.

2.1.26    "*Compensation and Benefits Programs*" means all contracts, plans, policies, agreements, programs and other arrangements (and all amendments and modifications thereto) for compensation or benefits, in each case in place as of the Effective Date, applicable to the Debtors' employees, including all savings plans, retirement plans, health care plans, travel benefits, vacation benefits, welfare benefits, disability plans, severance benefit plans, incentive or retention plans and life, accidental death and dismemberment insurance plans.

2.1.27    "*Continuing Compensation and Benefits Programs*" means all Compensation and Benefits Programs that are not (a) rejected or terminated prior to the Effective Date; (b) listed in the Plan Supplement to be rejected or terminated as of the Effective Date; or (c) as of the Effective Date, the subject of a pending motion to reject.

SC1:4030160.8

2.1.28    "*Confirmation*" means the entry of the Confirmation Order on the docket of these Chapter 11 Cases.

2.1.29    "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of these Chapter 11 Cases.

2.1.30    "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

2.1.31    "*Confirmation Order*" means the order entered by the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

2.1.32    "*Consummation*" means the occurrence of the Effective Date.

2.1.33    "*Cure Amounts*" means all cure amounts required to be paid under section 365 of the Bankruptcy Code in connection with the assumption of an Executory Contract or Unexpired Lease, as determined by the Bankruptcy Court or as agreed to by the Debtors and the non-Debtor counterparty to such Executory Contract or Unexpired Lease.

2.1.34    "*Cure Notice*" means a notice of assumption of an Executory Contract or Unexpired Lease and the related Cure Amounts, if any, to be served on the counterparty of such Executory Contract or Unexpired Lease in accordance with Section 8.4 herein.

2.1.35    "*Cure Schedule*" means the schedule setting forth the Cure Amounts, if any, for each Executory Contract and Unexpired Lease to be assumed pursuant to Section 8.1 herein.

2.1.36    "*Debtor Subsidiary*" has the meaning set forth in the Introduction hereto.

2.1.37    "*Debtors*" has the meaning set forth in the Introduction hereto.

2.1.38    "*Disclosure Statement*" means the Disclosure Statement for the Plan, as approved by the Bankruptcy Court pursuant to the Solicitation Procedures Order, including all exhibits and schedules thereto and references therein that relate to the Plan.

2.1.39    "*Disputed Claim*" means any Claim that has not been Allowed.

2.1.40    "*Distribution*" means a distribution of property pursuant to the Plan, to take place as provided for herein.

2.1.41    "*Distribution Agent*" means the Reorganized Debtors or any Entity or Entities chosen by the Reorganized Debtors, and may include the Notice and Claims Agent.

2.1.42    "*Distribution Date*" means the Business Day that is as soon as practicable after the Effective Date when Distributions under the Plan shall commence, which date shall be no later than 20 Business Days after the Effective Date unless extended by the Bankruptcy Court for cause shown.

2.1.43    "*Distributions Record Date*" means, for the purpose of making Distributions hereunder, the Confirmation Date.

2.1.44    "*Effective Date*" means, following the Confirmation Date, 12:01 a.m. prevailing Eastern Time on a Business Day selected by the Debtors, on which all conditions to the occurrence of the Effective Date set forth in Sections 11.1 and 11.2 herein are satisfied or waived.

2.1.45    "*Entity*" incorporates the meaning set forth in section 101(15) of the Bankruptcy Code.

2.1.46    "*Equity Interest*" means any equity security (as defined in section 101(16) of the Bankruptcy Code), including any issued or unissued share of common stock, preferred stock, or other instrument evidencing an ownership interest in a Debtor, whether or not transferable, and any option, warrant or right, contractual or otherwise, to acquire any such interest in a Debtor that existed immediately prior to the Effective Date; *provided* that Equity Interest does not include any Intercompany Interest.

2.1.47    "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

2.1.48    "*Exchange Rate*" means the closing exchange rate on January 14, 2016, as published by *The Wall Street Journal*.

2.1.49    "*Exculpated Parties*" means (a) the Debtors and the Reorganized Debtors; and (b) the current and former directors, officers (including the chief restructuring officer and interim management), employees, agents, attorneys, financial advisors, restructuring advisors, investment bankers, accountants, and other professionals or representatives of the Debtors and the Reorganized Debtors, in their capacities as such; and (c) with respect to each Entity named in (a) and (b), such Entity's directors, officers, employees, agents, Affiliates, parents, subsidiaries, predecessors, successors, heirs, executors and assigns, attorneys, financial advisors, restructuring advisors, investment bankers, accountants and other Professionals or representatives when acting in any such capacities.

2.1.50    "*Executory Contract*" means a contract that a Debtor may assume or reject under section 365 or 1123 of the Bankruptcy Code.

2.1.51    "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to appeal, seek certiorari or move for a new trial, re-argument or rehearing has expired and no appeal, petition for certiorari or motion for a new trial, re-argument or rehearing has been timely filed, or as to which any appeal that has been taken, any petition for certiorari, or motion for a new trial, review, re-argument, or rehearing that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought; *provided* that the possibility that a motion under rule 60 of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 9024, may be filed relating to an order shall not by itself cause such order to not be a Final Order.

2.1.52    "*General Administrative Claim*" means an Administrative Claim other than a Professional Claim.

2.1.53    "*General Unsecured Claim*" means any Claim that is not an (a) Administrative Claim, (b) Other Priority Claim, (c) Other Secured Claim, (d) Senior Secured Claim, (e) Junior Secured Claim, (f) Swap Secured Claim, (g) Norwegian Bond Claim, (h) Equity Interest or (i) Intercompany Claim.

2.1.54    "*Holder*" means an Entity holding a Claim against or an Equity Interest in any of the Debtors.

2.1.55    "*Impaired*" means, with respect to any Claim or Equity Interest, a Claim or Equity Interest that is in a Class that is "impaired" within the meaning of section 1124 of the Bankruptcy Code.

2.1.56    "*Intercompany Claim*" means any Claim held by a Debtor against another Debtor or a Non-Debtor Subsidiary, or any Claim held by a Non-Debtor Subsidiary against a Debtor.

2.1.57    "*Intercompany Interest*" means any equity security (as defined in section 101(16) of the Bankruptcy Code), including any issued or unissued share of common stock, preferred stock, or other instrument, evidencing an ownership interest in a Debtor (other than Primorsk) or a subsidiary held by another Debtor.

2.1.58    "*Junior Secured Claim*" mean any Claim arising under or in connection with the junior revolving credit facility pursuant to the Secured Loan Agreement.

2.1.59    "*Lien*" means a lien as defined in section 101(37) of the Bankruptcy Code.

2.1.60    "*Management Agreements*" means the Debtors' existing ship management agreements with Prisco.

2.1.61    "*New Class A Common Stock*" means the class A common stock of Reorganized Primorsk authorized pursuant to the Reorganized Primorsk Certificate of Incorporation, with the material terms as set forth in <u>Exhibit 1</u> attached hereto, as amended and modified by the Plan Supplement.

2.1.62    "*New Class B Common Stock*" means the class B common stock of Reorganized Primorsk authorized pursuant to the Reorganized Primorsk Certificate of Incorporation, with the material terms as set forth in <u>Exhibit 1</u> attached hereto, as amended and modified by the Plan Supplement.

2.1.63    "*New Common Stock*" means the New Class A Common Stock and the New Class B Common Stock.

2.1.64    "*New Management Agreements*" means the Reorganized Debtors' new management services agreements with Prisco, with the material terms as set forth in Exhibit 3 attached hereto, as amended and modified by the Plan Supplement.

2.1.65    "*Non-Debtor Subsidiary*" means Isardia Holdings Limited, Walmer Shipping Co. Limited or Shipworth Shipping Company Limited.

2.1.66    "*Norwegian Bonds*" means the bonds issued by Primorsk pursuant to the Norwegian Bond Indenture.

2.1.67    "*Norwegian Bond Claim*" mean any Claim arising under or in connection with the Norwegian Bond Indenture, excluding any Claim of the Norwegian Bond Trustee for fees, costs, and expenses under or in connection with the Norwegian Bond Indenture or any related documents.

2.1.68    "*Norwegian Bond Indenture*" means the loan agreement, dated as of February 23, 2007, among Primorsk, the Norwegian Bond Trustee and the bondholders party thereto, as such agreement has been and may be amended, supplemented, or otherwise modified from time to time.

2.1.69    "*Norwegian Bond Trustee*" means Nordic Trustee ASA (f/k/a Norsk Tillitsmann ASA), as loan trustee to the bondholders pursuant to the Norwegian Bond Indenture.

2.1.70    "*Notice and Claims Agent*" means Kurtzman Carson Consultants LLC, located at 2335 Alaska Avenue, El Segundo, California 90245, retained and approved by the Bankruptcy Court as the Debtors' notice and claims agent.

2.1.71    "*Ordinary Course General Administrative Claim*" means a General Administrative Claim that is a monetary obligation for (a) goods or services incurred by the Debtors in the ordinary course of the Debtors' business or (b) Continuing Compensation and Benefits Programs.

2.1.72    "*Other Priority Claim*" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than an Administrative Claim.

2.1.73    "*Other Secured Claim*" means any Secured Claim other than a Senior Secured Claim, a Junior Secured Claim or a Swap Secured Claim.

2.1.74    "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

2.1.75    "*Petition Date*" means January 15, 2016.

2.1.76    "*Plan*" has the meaning set forth in the Introduction hereto.

2.1.77    "*Plan Supplement*" means the initial compilation of documents and forms of documents, schedules and exhibits to the Plan, to be filed by Primorsk and available on the Notice and Claims Agent's website, www.kccllc.net/primorsk, no later than seven days prior

- 8 -

to the Voting Deadline or such later date as may be approved by the Bankruptcy Court, and additional documents filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement.[2]

2.1.78    "*Prepetition*" means prior to the Petition Date of January 15, 2016.

2.1.79    "*Primorsk*" has the meaning set forth in the Introduction hereto.

2.1.80    "*Prisco*" means Prisco (Singapore) Pte Ltd.

2.1.81    "*Pro Rata*" means, with respect to an Allowed Claim, the percentage represented by a fraction (a) the numerator of which shall be an amount equal to such Claim, and (b) the denominator of which shall be an amount equal to the aggregate amount of Allowed, Disputed and estimated Claims in the same Class as such Claim, except in cases where Pro Rata is used in reference to multiple Classes, in which case Pro Rata means the proportion that such Holder's Claim in a particular Class bears to the aggregate amount of all Allowed, Disputed and estimated Claims in such multiple Classes.

2.1.82    "*Professional*" means an Entity (a) employed pursuant to a Bankruptcy Court order in accordance with section 327, 363 or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date pursuant to section 327, 328, 329, 330, 331 or 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

2.1.83    "*Professional Claim*" means an Administrative Claim for the compensation of a Professional and the reimbursement of expenses incurred by such Professional through the Confirmation Date.

2.1.84    "*Professional Fee Escrow Account*" means an account to be funded by the Reorganized Debtors upon the Effective Date in an amount equal to the Professional Fee Reserve Amount.

2.1.85    "*Professional Fee Order*" means the order entered by the Bankruptcy Court on February 18, 2016 establishing procedures for interim compensation and reimbursement of expenses of certain Professionals.

2.1.86    "*Professional Fee Reserve Amount*" means the aggregate amount of unpaid Professional Claims for all Professionals through the Confirmation Date as estimated, in the Debtors' reasonable discretion, in accordance with Section 3.4.3 herein.

---

[2]    The Plan Supplement may include, among other documents, the following: (a) the material Replacement Loan Documents; (b) the form of Reorganized Primorsk Certificate of Incorporation and other organizational documents of the Reorganized Debtors; (c) the Amended Management Agreements; (d) the identity and affiliations of each director and officer of the Reorganized Debtors, as well as the nature and amount of compensation of any director or officer who is an insider under section 101(31) of the Bankruptcy Code; and (e) a list of Specified Contracts. Any Plan Supplement documents filed after the Voting Deadline shall be in form and substance reasonably acceptable to each Approving Bondholder.

SC1:4030160.8

2.1.87    "*Proof of Claim*" means a proof of Claim filed against any of the Debtors in these Chapter 11 Cases.

2.1.88    "*Reinstated*" has the meaning pursuant to section 1124 and all other applicable sections of the Bankruptcy Code.

2.1.89    "*Released Parties*" means (a) the Exculpated Parties; (b) the Agents, in their capacity as such; (c) the Norwegian Bond Trustee, in its capacity as such; and (d) with respect to each Entity named in (b) and (c), such Entity's directors, officers, employees, agents, Affiliates, parents, subsidiaries, predecessors, successors, heirs, executors and assigns, attorneys, financial advisors, restructuring advisors, investment bankers, accountants and other professionals or representatives when acting in any such capacities.

2.1.90    "*Releasing Parties*" means (a) the Agents; (b) the Norwegian Bond Trustee; and (c) each Holder of a Claim or an Equity Interest that was provided a Ballot and (i) affirmatively votes to accept the Plan; or (ii) either (A) abstains from voting; or (B) votes to reject the Plan; and, in case of either (A) or (B), does not opt out of the Voluntary Release by Holders of Claims and Equity Interests in compliance with the instructions set forth in the Solicitation Materials.  For the avoidance of doubt, Holders who (i) were not provided a Ballot; and (ii) are not listed in clauses (a) – (c) above are not Releasing Parties.

2.1.91    "*Reorganized*" means, with respect to the Debtors, any Debtor or any successor thereto, by merger, consolidation, reorganization or otherwise, on or after the Effective Date.

2.1.92    "*Reorganized Debtors*" means the Debtors, as reorganized pursuant to and under the Plan, or any successor thereto, by merger, consolidation or otherwise, on or after the Effective Date.

2.1.93    "*Reorganized Primorsk*" means Primorsk, as reorganized pursuant to and under the Plan, or any successor thereto, by merger, consolidation or otherwise, on or after the Effective Date.

2.1.94    "*Reorganized Primorsk Certificate of Incorporation*" means the amended and restated Certificate of Incorporation of Reorganized Primorsk in the form set forth in the Plan Supplement.

2.1.95    "*Replacement Loans*" means the Tranche A Replacement Loans, the Tranche B Replacement Loans, and the Tranche C Replacement Loans.

2.1.96    "*Replacement Loan Documents*" means all loan and security documents, intercreditor agreements, and other documents and filings related to the Replacement Loans.

2.1.97    "*Schedules*" means the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs filed by the Debtors in these Chapter 11 Cases as amended from time to time.

- 10 -

2.1.98    "*Secured Agent*" means Nordea Bank Norge ASA, as agent and security trustee to the lenders pursuant to the Secured Loan Agreement.

2.1.99    "*Secured Claim*" means a Claim (a) secured by a Lien on property in which an Estate has an interest, to the extent such Lien is valid, perfected and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code and to the extent of the value of its Holder's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed as such pursuant to the Plan.

2.1.100    "*Secured Loan Agreement*" means the loan agreement, dated as of January 2, 2008, among Primorsk, certain of Primorsk's subsidiaries, the Secured Agent and the banks, financial institutions and other lenders party thereto, as such agreement may be amended from time to time.

2.1.101    "*Securities Act*" means the United States Securities Act of 1933, as amended.

2.1.102    "*Security*" means a security as defined in section 2(a)(1) of the Securities Act.

2.1.103    "*Senior Secured Claim*" means any Claim arising under or in connection with the senior term loan facility pursuant to the Secured Loan Agreement.

2.1.104    "*Servicer*" means an indenture trustee, agent, servicer or other authorized representative of Holders of Claims or Equity Interests recognized by the Debtors or the Reorganized Debtors, as applicable.

2.1.105    "*Solicitation Materials*" means the solicitation package, including Ballots, authorized pursuant to the Solicitation Procedures Order.

2.1.106    "*Solicitation Procedures Order*" means the Order [(I) Approving the Disclosure Statement; (II) Establishing a Voting Record Date for the Plan; (III) Approving Solicitation Packages and Procedures for the Distribution Thereof; (IV) Approving the Forms of Ballots; (V) Establishing Procedures for Voting on the Plan; (VI) Establishing Notice and Objection Procedures for Confirmation of the Plan; and (VIII) Establishing Notice and Objection Procedures for the Assumption and Rejection of Executory Contracts and Unexpired Leases under the Plan], entered by the Bankruptcy Court on [_____], 2016 [Docket No. __], together with any supplemental order(s) that may be entered by the Bankruptcy Court in connection therewith.

2.1.107    "*Specified Contract*" means any Executory Contract or Unexpired Lease identified on the schedule of Executory Contracts and Unexpired Leases that are proposed to be rejected pursuant to the Plan.

2.1.108    "*Swap Agent*" means BNP Paribas, as facility agent to the lenders pursuant to the Swap Loan Agreement.

- 11 -

2.1.109    "*Swap Secured Claim*" means any Claim arising under or in connection with the Swap Loan Agreement.

2.1.110    "*Swap Loan Agreement*" means the secured loan agreement, dated as of June 7, 2011, among Primorsk, the Swap Agent and the banks, financial institutions and other lenders party thereto, as such agreement may be amended from time to time.

2.1.111    "*Tranche A Replacement Loans*" means a credit facility of Reorganized Primorsk to be issued in favor of the Holders of the Senior Secured Claims, with the material terms as set forth in Exhibit 2 attached hereto, as amended and modified by the Plan Supplement.

2.1.112    "*Tranche B Replacement Loans*" means a credit facility of Reorganized Primorsk to be issued in favor of the Holders of the Junior Secured Claims, with the material terms as set forth in Exhibit 2 attached hereto, as amended and modified by the Plan Supplement.

2.1.113    "*Tranche C Replacement Loans*" means a credit facility of Reorganized Primorsk to be issued in favor of the Holders of the Swap Secured Claims, with the material terms as set forth in Exhibit 2 attached hereto, as amended and modified by the Plan Supplement.

2.1.114    "*Unclaimed Distribution*" means any Distribution under the Plan on account of an Allowed Claim to a Holder that has not:  (a) accepted a particular Distribution or, in the case of a Distribution made by check, negotiated such check; (b) given written notice to the Distribution Agent of an intent to accept a particular Distribution; (c) responded in writing to the request of the Distribution Agent for information necessary to facilitate a particular Distribution; or (d) taken any other action necessary to facilitate such Distribution.

2.1.115    "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

2.1.116    "*Unimpaired*" means any Claim or Equity Interest that is not Impaired.

2.1.117    "*Unsecured Claim*" means any Claim that is not an (a) Administrative Claim, (b) Other Priority Claim, (c) Other Secured Claim, (d) Senior Secured Claim, (e) Junior Secured Claim, (f) Swap Secured Claim, (g) Equity Interest or (h) Intercompany Claim.

2.1.118    "*U.S. Trustee*" means the United States Trustee for Region 2.

2.1.119    "*U.S. Trustee Fees*" means fees arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

2.1.120    "*Voluntary Release by Holders of Claims and Equity Interests*" means the release by Holders of Claims and Equity Interests as set forth in Section 12.6 herein.

2.1.121    "*Voting*" means the process by which a Holder of a Claim may vote to accept or reject the Plan, pursuant to the conditions in Article 4 herein.

2.1.122    "*Voting Deadline*" means 8:00 p.m. (Eastern Time) on [_____],
2016, by which time all Ballots must be actually received by the Notice and Claims Agent.

2.2.    <u>Rules of Interpretation</u>

For the purposes of this Plan:  (a) any reference herein to the word "including" or
word of similar import shall be read to mean "including without limitation"; (b) unless otherwise
specified, all references herein to "Articles" are references to Articles hereof or hereto; (c) unless
otherwise specified, the words "herein," "hereof" and "hereto" refer to the Plan in its entirety
rather than a particular portion of the Plan; (d) captions and headings to Articles are inserted for
the convenience of reference only and are not intended to be a part of or to affect the
interpretation of the Plan; (e) unless otherwise specified herein, the rules of construction set forth
in section 102 of the Bankruptcy Code shall apply; (f) unless otherwise specified, all references
herein to exhibits are references to exhibits in the Plan Supplement; (g) all references to docket
numbers of documents filed in these Chapter 11 Cases are references to the docket numbers
under the Bankruptcy Court's CM/ECF system; (h) all references to statutes, regulations, orders,
rules of courts and the like shall mean as amended from time to time, and as applicable to these
Chapter 11 Cases, unless otherwise stated; (i) any reference herein to a contract, agreement,
lease, plan, policy, document or instrument being in a particular form or on particular terms and
conditions means that the same shall be substantially in that form or substantially on those terms
and conditions; (j) any reference herein to a contract, agreement, lease, plan, policy, document or
instrument or schedule or exhibit thereto, whether or not filed, shall mean the same as amended,
restated, modified or supplemented from time to time in accordance with the terms hereof or
thereof; (k) any immaterial effectuating provisions may be interpreted by the Debtors and the
Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of
the Plan, all without further Bankruptcy Court order; (l) any reference to an Entity as a Holder of
a Claim or Equity Interest includes that Entity's successors and permitted assigns; (m) except as
otherwise expressly provided in this Plan, where this Plan contemplates that any Debtor or
Reorganized Debtor shall take any action, incur any obligation, issue any security or adopt,
assume, execute or deliver any contract, agreement, lease, plan, policy, document or instrument
on or prior to the Effective Date, the same shall be duly and validly authorized by the Plan and
effective against and binding upon such Debtor and/or Reorganized Debtor, as applicable, on and
after the Effective Date without further notice to, order of or other approval by the Bankruptcy
Court, action under applicable law, regulation, order or rule, or the vote, consent, authorization
or approval of the board of directors of any Debtor or Reorganized Debtor or any other Entity;
and (n) except as otherwise provided in the Plan, anything required to be done by the Debtors or
the Reorganized Debtors, as applicable, on the Effective Date may be done on the Effective Date
or as soon as reasonably practicable thereafter.

2.3.    <u>Governing Law</u>

Unless a rule of law or procedure is supplied by federal law (including the
Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the
State of New York, without giving effect to the principles of conflicts of laws, shall govern the
construction and implementation of the Plan and any agreement, document or instrument
executed or entered into in connection with the Plan.

2.4.    <u>Computation of Time</u>

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

SC1:4030160.8

3.    **GENERAL ADMINISTRATIVE CLAIMS, PROFESSIONAL CLAIMS AND UNITED STATES TRUSTEE STATUTORY FEES**

In accordance with section 1123(a)(1) of the Bankruptcy Code, the Plan does not classify General Administrative Claims and Professional Claims, payment of which is provided for below.

3.1.    Administrative Claim Bar Date

Any request for payment of a General Administrative Claim must be filed and served on the Reorganized Debtors pursuant to the procedures specified in the notice of entry of the Confirmation Order and the Confirmation Order on or prior to the Administrative Claim Bar Date; *provided* that no request for payment is required to be filed and served with respect to any:

(a)    Allowed Administrative Claim as of the Administrative Claim Bar Date;

(b)    Ordinary Course General Administrative Claim;

(c)    Professional Claim; or

(d)    Claim for U.S. Trustee Fees.

Any Holder of a General Administrative Claim who is required to, but does not, file and serve a request for payment of such General Administrative Claim pursuant to the procedures specified in the Confirmation Order on or prior to the Administrative Claim Bar Date shall be forever barred, estopped and enjoined from asserting such General Administrative Claim against the Debtors or the Reorganized Debtors or their respective property, and such General Administrative Claim shall be deemed discharged as of the Effective Date.

Any objection to a request for payment of a General Administrative Claim that is required to be filed and served pursuant to this Section 3.1 must be filed and served on the Reorganized Debtors and the requesting party creditor (a) no later than 90 days after the Administrative Claim Bar Date or (b) by such later date as may be established by order of the Bankruptcy Court upon a motion by a Reorganized Debtor, with notice only to those parties entitled to receive notice pursuant to Bankruptcy Rule 2002.

3.2.    General Administrative Claims

Except to the extent that a Holder of an Allowed General Administrative Claim agrees to less favorable treatment, the Holder of each Allowed General Administrative Claim shall receive Cash in an amount equal to the full unpaid amount of such Allowed General Administrative Claim on the later of (a) the Effective Date or as soon as reasonably practicable thereafter, (b) the date on which such Claim is Allowed or as soon as reasonably practicable thereafter, or (c) with respect to Ordinary Course General Administrative Claims, the date such amount is due in accordance with applicable non-bankruptcy law and the terms and conditions of any applicable agreement or instrument.

3.3.    Professional Claims

    3.3.1    Final Fee Applications.  All final requests for payment of Professional Claims shall be filed and served no later than 60 days after the Effective Date, in the manner set forth in the Professional Fee Order or, as it relates to APS, in the APS Retention Order.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Claims.

    3.3.2    Professional Fee Escrow Amount.  The Debtors shall establish and fund on or prior to the Effective Date the Professional Fee Escrow Account with Cash equal to the Professional Fee Reserve Amount.  The Professional Fee Escrow Account shall be maintained in trust for the Professionals.  Except as provided in the last sentence of this paragraph, such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors, as applicable.  The Reorganized Debtors shall pay Professional Claims in Cash as soon as reasonably practicable after such Claims are Allowed by order of the Bankruptcy Court.  When all Allowed Professional Claims have been paid in full, amounts remaining in the Professional Fee Escrow Account, if any, shall revert to the Reorganized Debtors.

    3.3.3    Professional Fee Reserve Amount.  Professionals shall provide good faith estimates of their Professional Claims for purposes of the Professional Fee Escrow Account and shall deliver such estimates to the Debtors no later than 10 days prior to the Confirmation Hearing; *provided* that such estimates shall not be considered an admission or limitation with respect to the fees and expenses of such Professionals.  If a Professional does not provide such an estimate, the Reorganized Debtors may estimate, in their reasonable discretion, the Professional Claims of such Professional.

    3.3.4    Post-Effective Date Fees and Expenses.  Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Debtors or the Reorganized Debtors, as the case may be, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional or other fees and expenses.  Except as otherwise specifically provided in the Plan, upon the Effective Date, any requirement that Professionals comply with section 327, 328, 329, 330, 331 or 1103 of the Bankruptcy Code or the Professional Fee Order (or, as it relates to APS, the APS Retention Order) in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business.

3.4.    Statutory Fees Payable Pursuant to 28 U.S.C. § 1930

    The Debtors or the Reorganized Debtors, as applicable, shall pay all U.S. Trustee Fees for each quarter (including any fraction thereof) until these Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

SC1:4030160.8

4.    **CLASSIFICATION, TREATMENT AND VOTING OF CLAIMS AND EQUITY INTERESTS**

4.1.    Classification of Claims and Equity Interests

All Claims and Equity Interests, except for Administrative Claims and Professional Claims, are classified in the Classes set forth in this Article 4.  A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Equity Interest qualifies within the description of such other Classes.  A Claim or Equity Interest also is classified in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim or Equity Interest is Allowed as a Claim or Equity Interest in that Class and has not been paid, released or otherwise satisfied prior to the Effective Date.

4.1.1    Deemed Substantive Consolidation.  The Plan shall serve as a motion by the Debtors seeking entry of a Bankruptcy Court order deeming the substantive consolidation of the Debtors' Estates into a single Estate for certain limited purposes related to the Plan, including Voting, Confirmation and Distribution.  As a result of the deemed substantive consolidation of the Estates, each Class of Claims and Equity Interests will be treated as against a single consolidated Estate without regard to the separate legal existence of the Debtors.  The Plan will not result in the merger or otherwise affect the separate legal existence of each Debtor, other than with respect to voting and distribution rights under the Plan.

4.1.2    Summary of Classification and Treatment.  The classification of Claims and Equity Interests pursuant to the Plan is as follows:

| Class | Claims and Equity Interests | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3A | Senior Secured Claims | Impaired | Entitled to Vote |
| 3B | Junior Secured Claims | Impaired | Entitled to Vote |
| 3C | Swap Secured Claims | Impaired | Entitled to Vote |
| 4 | Norwegian Bond Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Equity Interests in Primorsk | Impaired | Entitled to Vote |

4.2.    Treatment of Claims and Equity Interests

4.2.1    Class 1 – Other Priority Claims

(a)    *Classification*:  Class 1 consists of all Other Priority Claims.

(b)    *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange

- 17 -

for its Allowed Other Priority Claim, each Holder of such Allowed Other Priority Claim shall be paid in full in Cash on or as soon as reasonably practicable after the latest of (i) the Effective Date, (ii) the date on which such Other Priority Claim becomes Allowed, and (iii) such other date as may be ordered by the Bankruptcy Court.

(c)     *Voting*:  Class 1 is Unimpaired.  Each Holder of an Other Priority Claim is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of Other Priority Claims is entitled to vote to accept or reject the Plan.

### 4.2.2     Class 2 – Other Secured Claims

(a)     *Classification*:  Class 2 consists of Other Secured Claims.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive one of the following treatments, in the sole discretion of the applicable Debtor:  (i) payment in full in Cash including the payment of any interest payable under section 506(b) of the Bankruptcy Code; (ii) delivery of the collateral securing such Allowed Other Secured Claim; or (iii) treatment of such Allowed Other Secured Claim in any other manner that renders the Claim Unimpaired.

(c)     *Voting*:  Class 2 is Unimpaired.  Each Holder of an Other Secured Claim is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of an Other Secured Claim is entitled to vote to accept or reject the Plan.

### 4.2.3     Class 3A – Senior Secured Claims

(a)     *Classification*:  Class 3 consists of all Senior Secured Claims.

(b)     *Allowance*:  The Senior Secured Claims shall be Allowed in an aggregate amount equal to $194,269,474, representing principal and accrued and unpaid interest at the non-default contractual rate up to and including the Petition Date.

(c)     *Treatment*:  Except to the extent that a Holder of an Allowed Senior Secured Claim agrees to a less favorable treatment, and in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed Senior Secured Claim, each Holder of an Allowed Senior Secured Claim shall receive its Pro Rata share of the Tranche A Replacement Loans; *provided*, *however*, if

- 18 -

Classes 3A, 3B and 3C all vote to accept the Plan, each Holder of an Allowed Senior Secured Claim shall receive its Pro Rata share of the Amortizing Tranche A Replacement Loans in addition to the other Amortizing payments as set forth in Exhibit 2 attached hereto, as amended and modified by the Plan Supplement; in each case with such modifications, if any, as the Debtors may determine to be appropriate in light of the requirements of section 1129(b) of the Bankruptcy Code.

(d)     *Voting*:  Class 3A is Impaired and each Holder of a Senior Secured Claim is entitled to vote to accept or reject the Plan.

### 4.2.4     Class 3B – Junior Secured Claims

(a)     *Classification*:  Class 3B consists of all Junior Secured Claims.

(b)     *Allowance*:  The Junior Secured Claims shall be Allowed in an aggregate amount equal to $51,625,000, representing principal and accrued and unpaid interest at the non-default contractual rate up to and including the Petition Date.

(c)     *Treatment*:  Except to the extent that a Holder of an Allowed Junior Secured Claim agrees to a less favorable treatment, and in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed Junior Secured Claim, each Holder of an Allowed Junior Secured Claim shall receive its Pro Rata share of the Tranche B Replacement Loans; *provided*, *however*, if Classes 3A, 3B and 3C all vote to accept the Plan, the Tranche A Replacement Loans shall be Amortizing and the Applicable Margin of the Tranche B Replacement Loans shall be 1.75%, and if any of Class 3A, 3B or 3C votes to reject the Plan, the Tranche A Replacement Loans shall not be Amortizing and the Applicable Margin of the Tranche B Replacement Loans shall be 2.00%; in each case with such modifications, if any, as the Debtors may determine to be appropriate in light of the requirements of section 1129(b) of the Bankruptcy Code.

(d)     *Voting*:  Class 3B is Impaired and each Holder of a Junior Secured Claim is entitled to vote to accept or reject the Plan.

### 4.2.5     Class 3C – Swap Secured Claims

(a)     *Classification*:  Class 3C consists of all Swap Secured Claims.

(b)     *Allowance*:  The Swap Secured Claims shall be Allowed in an aggregate amount equal to $16,400,988, representing principal and accrued and unpaid interest at the non-default contractual rate up to and including the Petition Date.

- 19 -

(c)    *Treatment*:  Except to the extent that a Holder of an Allowed Swap Secured Claim agrees to a less favorable treatment, and in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed Swap Secured Claim, each Holder of an Allowed Swap Secured Claim shall receive its Pro Rata share of the Tranche C Replacement Loans; *provided*, *however*, if Classes 3A, 3B and 3C vote to accept the Plan, the Tranche A Replacement Loans shall be Amortizing and the Applicable Margin of the Tranche C Replacement Loans shall be 2.00%, and if any of Class 3A, 3B or 3C votes to reject the Plan, the Tranche A Replacement Loans shall not be Amortizing and the Applicable Margin of the Tranche C Replacement Loans shall be 2.25%; in each case with such modifications, if any, as the Debtors may determine to be appropriate in light of the requirements of section 1129(b) of the Bankruptcy Code.

(d)    *Voting*:  Class 3C is Impaired and each Holder of a Swap Secured Claim is entitled to vote to accept or reject the Plan.

4.2.6    Class 4 – Norwegian Bond Claims

(a)    *Classification*:  Class 4 consists of all Norwegian Bond Claims.

(b)    *Allowance*:  The Norwegian Bond Claims shall be Allowed in an aggregate amount equal to $80,868,077.

(c)    *Treatment*:  Except to the extent that a Holder of an Allowed Norwegian Bond Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Norwegian Bond Claim, each Holder of an Allowed Norwegian Bond Claim shall receive its Pro Rata share of the New Class B Common Stock.

(d)    *Voting*:  Class 4 is Impaired and each Holder of a Norwegian Bond Claim is entitled to vote to accept or reject the Plan.

4.2.7    Class 5 – General Unsecured Claims

(a)    *Classification*:  Class 5 consists of all General Unsecured Claims.

(b)    *Treatment*:  Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, on the later of the Effective Date or as soon as practicable after a General Unsecured Claim becomes Allowed, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive payment in Cash

SC1:4030160.8

in an amount equal to 75 percent of such Allowed General Unsecured Claim.

(c)  *Voting*:  Class 5 is Impaired and each Holder of a General Unsecured Claim is entitled to vote to accept or reject the Plan.

### 4.2.8    Class 6 – Equity Interests in Primorsk

(a)  *Classification*:  Class 6 consists of all Equity Interests in Primorsk.

(b)  *Treatment*:  Except to the extent that a Holder of an Equity Interest in Primorsk agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for its portion of the Equity Interests in Primorsk, each Holder of an Equity Interest in Primorsk shall receive its Pro Rata share of the New Class A Common Stock.

(c)  *Voting*:  Class 6 is Impaired and each Holder of an Equity Interest in Primorsk is entitled to vote to accept or reject the Plan.

### 4.3.    Intercompany Claims and Interests

Notwithstanding anything herein to the contrary, on the Effective Date or as soon thereafter as is reasonably practicable, at the option of the Reorganized Debtors, all Intercompany Claims and Intercompany Interests will be:  (a) preserved and reinstated, in full or in part; (b) canceled and discharged, in full or in part, in which case such discharged and satisfied portion shall be eliminated and the Holders thereof shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such portion under the Plan; (c) eliminated or waived based on accounting entries in the Debtors' or the Reorganized Debtors' books and records and other corporate activities by the Debtors or the Reorganized Debtors; (d) contributed to the capital of the obligor entity; or (e) otherwise compromised.  In no event shall Intercompany Claims be allowed as General Unsecured Claims or entitled to any Distribution under the Plan.

### 4.4.    Special Provision Governing Unimpaired Claims

Except as otherwise provided herein, the Plan shall not affect the Debtors' or the Reorganized Debtors' rights in respect of any Unimpaired Claims, including legal and equitable defenses or setoff or recoupment rights with respect thereto.

### 4.5.    Confirmation Pursuant to Sections 1129(a) and 1129(b) of the Bankruptcy Code

For purposes of Confirmation, section 1129(a)(10) of the Bankruptcy Code shall be satisfied if any one of Classes 3 – 5 accepts the Plan.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class or Classes of Claims.

SC1:4030160.8

5.   **IMPLEMENTATION OF THE PLAN**

5.1.   Operations Between the Confirmation Date and Effective Date

During the period from the Confirmation Date through and until the Effective Date, the Debtors may continue to operate their businesses as debtors-in-possession, subject to all applicable orders of the Bankruptcy Court.

5.2.   Other Restructuring Transactions

Following the Confirmation Date, the Debtors may reorganize their corporate structure by eliminating certain entities (including non-Debtor entities) that are deemed no longer helpful, and may take all actions as may be necessary or appropriate to effect such transactions, including any transaction described in, approved by, contemplated by or necessary to effectuate the Plan, including:  (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, liquidation, domestication, continuation or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any property, right, liability, debt or obligation on terms consistent with the terms of the Plan; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion or dissolution with the appropriate governmental authorities pursuant to applicable law; and (d) all other actions that the Debtors determine are necessary or appropriate, including making filings or recordings that may be required by applicable law.  Notwithstanding anything else to the contrary herein, the Debtors may engage in any restructuring, reorganizations, liquidation, intercompany sales and similar transactions in order to implement tax planning.

5.3.   Vesting of Assets in the Reorganized Debtors

Except as otherwise provided herein or in the Confirmation Order, as of the Effective Date, all property of each Estate (including Causes of Action) and any property acquired by any Debtor under the Plan shall vest in the applicable Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances or interests to the extent permitted by section 1141 of the Bankruptcy Code; *provided* that nothing in this Section 5.3 shall limit the ability under the Bankruptcy Code of any party-in-interest to object to any Claim prior to the Claims Objection Bar Date unless otherwise ordered by the Bankruptcy Court.  For the avoidance of doubt, the immediately preceding sentence does not apply to any property of a non-Debtor Affiliate of the Debtors.  On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtors may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims or Causes of Action without supervision or approval of the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

5.4.   Cancelation of Existing Agreements, Notes and Equity Interests

On the Effective Date, except as otherwise specifically provided for in the Plan, the Secured Loan Agreement, Swap Loan Agreement, Norwegian Bond Indenture and any other

- 22 -

Certificate, Equity Interest, share, note, bond, indenture, purchase right, option, warrant, intercreditor agreement or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors or giving rise to any Claim or Equity Interest (except such Certificates, notes or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors that are Reinstated pursuant to the Plan), shall be canceled, and the Reorganized Debtors and their Affiliates shall not have any obligations thereunder and shall be released and discharged therefrom.

5.5.    New Common Stock

On the Effective Date, the Reorganized Primorsk Certificate of Incorporation shall have provided for the authorization of the New Common Stock.  The shares of New Common Stock issued in connection with the Plan shall be authorized without the need for further corporate action or without any further action by any Person, and once issued, shall be duly authorized, validly issued, fully paid and non-assessable.

Any share of New Common Stock issued to a creditor of any Debtor that is not Primorsk shall be treated as (a) a contribution of cash by Reorganized Primorsk to the applicable Debtor in the amount equal to the fair market value of such New Common Stock, followed by (b) the issuance of New Common Stock by Reorganized Primorsk to the applicable Debtor in return for such cash, followed by (c) the transfer of the New Common Stock by the applicable Debtor to the applicable creditor.

5.6.    Exemption from Registration

Except with respect to any Person that is an underwriter as defined in section 1145(b) of the Bankruptcy Code, the offer, issuance, sale or distribution under the Plan of the shares of New Common Stock shall all be exempt from registration under Section 5 of the Securities Act (or any state or local law requiring registration for offer or sale of a security) and under section 1145 of the Bankruptcy Code.

5.7.    Replacement Loans

Confirmation of the Plan shall be deemed (a) approval of the Replacement Loans and all transactions contemplated hereby and thereof, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, and (b) authorization for the Reorganized Debtors to enter into and perform under the Replacement Loan Documents.  The Replacement Loan Documents shall constitute legal, valid, binding and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms.

On the Effective Date, all of the liens and security interests to be granted in accordance with the Replacement Loan Documents (a) shall be deemed to be approved; (b) shall be legal, binding and enforceable liens on, and security interests in, the collateral granted under the respective Replacement Loan Documents in accordance with the terms of the Replacement Loan Documents; (c) shall be deemed perfected on the Effective Date, subject only to such liens and security interests as may be permitted under the Replacement Loan Documents, and the priorities of such liens and security interests shall be as set forth in the respective Replacement Loan Documents; and (d) shall not be subject to avoidance, recharacterization, or subordination

(including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.  The Reorganized Debtors and the parties under such Replacement Loan Documents are hereby authorized to make all filings and recordings, and to obtain all governmental approvals and consents to establish and perfect such liens and security interests under the provisions of the applicable federal or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection of such liens and security interests granted under the Replacement Loan Documents shall occur automatically by virtue of the entry of the Confirmation Order and funding on or after the Effective Date, and any such filings, recordings, approvals and consents shall not be necessary or required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such liens and security interests to third parties.  To the extent that any Holder of a Secured Claim that has been satisfied or discharged pursuant to the Plan, or any agent of such Holder, has filed or recorded any liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent of such Holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors or any administrative agent under the Replacement Loan Documents that are necessary to cancel and/or extinguish such liens and/or security interests (it being understood that such liens and security interests shall be automatically canceled and/or extinguished automatically on the Effective Date by virtue of the entry of the Confirmation Order).

5.8.    <u>Section 1146 Exemption from Certain Transfer Taxes and Recording Fees</u>

Pursuant to, and to the fullest extent permitted by, section 1146(a) of the Bankruptcy Code, any transfers from the Debtors to the Reorganized Debtors or to any other Person, pursuant to, in contemplation of, or in connection with the Plan (including any transfer pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Reorganized Debtors; (b) the creation, modification, consolidation, assumption, termination, refinancing and/or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means; (c) the making, assignment or recording of any lease or sublease; or (d) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan) shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, sales and use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local government officials or agents shall, and shall be directed to, forgo the collection of any such tax, recordation fee or government assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee or government assessment.  The Bankruptcy Court shall retain specific jurisdiction with respect to these matters.

- 24 -

5.9.    Preservation of Causes of Action

Except as otherwise provided in Article 12 or 16 herein or the other provisions of the Plan, each Cause of Action of a Debtor shall be preserved and, along with the exclusive right to enforce such Cause of Action, shall vest exclusively in the applicable Reorganized Debtor as of the Effective Date; *provided* that nothing in this Section 5.9 shall limit the ability under the Bankruptcy Code of any party-in-interest to object to any Claim prior to the Claims Objection Bar Date unless otherwise ordered by the Bankruptcy Court.  Unless a Cause of Action is expressly waived, relinquished, released or compromised in the Plan or an order of the Bankruptcy Court, the Reorganized Debtors expressly reserve such Cause of Action for later adjudication and, accordingly, no doctrine of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), laches or other preclusion doctrine shall apply to such Cause of Action as a consequence of the Confirmation, the Plan, the vesting of such Cause of Action in the Reorganized Debtors, any order of the Bankruptcy Court or these Chapter 11 Cases.  **No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as an indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue such Cause of Action.**

5.10.    Effectuating Documents and Further Transactions

The Debtors or the Reorganized Debtors, as applicable, may take all actions to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan, including the distribution of the securities to be issued pursuant hereto in the name of, and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, actions or consents except for those expressly required pursuant hereto.  The secretary and any assistant secretary of each Debtor shall be authorized to certify or attest to any of the foregoing actions.

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the shareholders, directors or members of the Debtors shall be deemed to have been so approved and shall be in effect prior to, on or after the Effective Date (as appropriate), pursuant to applicable law, and without any requirement of further action by the shareholders, directors, managers or partners of the Debtors, or the need for any approvals, authorizations, actions or consents.

5.11.    Reinstatement of Interests in Debtor Subsidiaries

In the event that the Debtors elect to reinstate Intercompany Interests pursuant to Section 4.3 herein, each Reorganized Debtor may issue authorized new equity securities to the Reorganized Debtor that was that Debtor's corporate parent prior to the Effective Date so that each Reorganized Debtor will retain its 100% ownership of its pre-Petition Date Debtor Subsidiaries.

5.12.    Intercompany Account Settlement

The Debtors and Reorganized Debtors, and their respective subsidiaries, will be entitled to transfer funds between and among themselves as they determine to be necessary or

appropriate to enable the Debtors or Reorganized Debtors (as applicable) to satisfy their obligations under the Plan.

     5.13.   <u>Fees and Expenses of the Agents and Norwegian Bond Trustee</u>

     Reasonable and documented fees and expenses incurred by the Agents during the pendency of these Chapter 11 Cases, solely in their capacity as such, shall, without duplication and to the extent unpaid by the Debtors prior to the Effective Date, be Allowed Administrative Claims and paid by the Reorganized Debtors without further Bankruptcy Court approval upon the submission of invoices to the Reorganized Debtors and the U.S. Trustee.  Reasonable and documented fees and expenses incurred by the Norwegian Bond Trustee during the pendency of these Chapter 11 Cases, solely in its capacity as such, shall, without duplication, be paid as Allowed Administrative Claims by the Reorganized Debtors on the Effective Date of the Plan, subject to approval by the Bankruptcy Court.

SC1:4030160.8

6.     **CORPORATE GOVERNANCE AND MANAGEMENT**

6.1.     Corporate Existence

Subject to any restructuring transactions as permitted under Article 5 herein or as otherwise expressly provided herein, each of the Debtors shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership or other form, as the case may be, pursuant to applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed, and pursuant to the respective certificate of incorporation and bylaws (or other formation documents in the case of a limited liability company, partnership or other form) in effect prior to the Effective Date, except to the extent such certificates of incorporation or bylaws (or other formation documents in the case of a limited liability company, partnership or other form) are amended by, or in connection with, the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be authorized pursuant hereto and without the need for any other approvals, authorizations, actions or consents.

6.2.     Organizational Documents

The Reorganized Primorsk Certificate of Incorporation shall be filed with the Registrar of Companies and Official Receiver (D.R.C.O.R.) of the Republic of Cyprus on the Effective Date on or prior to the Effective Date.  The amended and restated bylaws of Reorganized Primorsk and certificates of incorporation and bylaws of the other Reorganized Debtors (or other formation documents relating to limited liability companies, partnerships or other forms) shall be in the form set forth in the Plan Supplement and filed with the applicable state officers or entities on or as soon as reasonably practicable after the Effective Date.

6.3.     Indemnification Provisions in Organizational Documents

As of the Effective Date, each Reorganized Debtor's bylaws or articles of association shall provide for the indemnification, defense, reimbursement, exculpation and/or limitation of liability of, and advancement of fees and expenses to, directors or officers of such Debtor who served in such capacity after the Petition Date, at least to the same extent as the bylaws or articles of association of each of the respective Debtors did on the Petition Date, against any claims or Causes of Action, whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, and none of the Reorganized Debtors shall amend and/or restate their certificates of incorporation, bylaws or articles of association before or after the Effective Date to terminate or materially adversely affect any of these obligations of the Reorganized Debtors' or such directors', officers', employees' or agents' rights.

6.4.     Directors and Officers of the Reorganized Debtors

The identity and affiliations of each individual proposed to serve as a director, officer or voting trustee of any Reorganized Debtor after the Effective Date will be disclosed in the Plan Supplement no later than the Confirmation Hearing.

- 27 -

7.    **COMPENSATION AND BENEFITS PROGRAMS**

7.1.    Continuing Compensation and Benefits Programs

On the Effective Date, with respect to all Continuing Compensation and Benefits Programs, each Reorganized Debtor shall assume and continue to honor in accordance with their terms and applicable laws and perform all Continuing Compensation and Benefits Programs to which the applicable Debtor is party, subject to any rights to terminate or modify such plans.

The Debtors' or Reorganized Debtors' performance under any employment agreement will not entitle any person to any benefit or alleged entitlement under any contract, agreement, policy, program or plan that has expired or been terminated before the Effective Date, or restore, reinstate or revive any such benefit or alleged entitlement under any such contract, agreement, policy, program or plan, and any Continuing Compensation and Benefits Programs shall be subject to modification in accordance with their terms. Nothing herein shall limit, diminish or otherwise alter the Debtors' or the Reorganized Debtors' defenses, claims, Causes of Action or other rights with respect to any such contracts, agreements, policies, programs and plans, including the Reorganized Debtors' rights to modify unvested benefits pursuant to their terms, nor shall confirmation of the Plan and/or consummation of any restructuring transactions constitute a change in control or change in ownership under any such contracts, agreements, policies, programs and plans.

7.2.    New Management Agreements

The Management Agreements shall be rejected pursuant to the Plan. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the rejection of the Management Agreements, with such rejection being deemed effective upon and contingent on the Consummation of the Plan.

On the Effective Date, the Reorganized Debtors and Prisco shall enter into the New Management Agreements. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the Reorganized Debtors' entry into the New Management Agreements, with such entry being deemed effective upon and contingent on the Consummation of the Plan.

7.3.    Compensation Arrangements with APS

On the Effective Date, Reorganized Primorsk shall assume, and continue to honor and perform, any compensation agreements with APS in connection with its role and specifically in connection with its provision of a chief restructuring officer.

SC1:4030160.8

8.    **TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

8.1.    Assumption of Executory Contracts and Unexpired Leases

Except as otherwise provided herein, all Executory Contracts and Unexpired Leases will be assumed by the Plan on the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code, other than (a) Executory Contracts or Unexpired Leases previously assumed or rejected pursuant to an order of the Bankruptcy Court, (b) Executory Contracts or Unexpired Leases that are the subject of a motion to reject that is pending on the Effective Date and (c) Specified Contracts that Primorsk elects to reject pursuant to the Plan.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumption of such Executory Contracts and Unexpired Leases pursuant to sections 365 and 1123 of the Bankruptcy Code.

8.2.    Rejection of Specified Contracts

Any counterparty to a Specified Contract that fails to object timely to the proposed rejection of such Specified Contract will be deemed to have consented to the rejection on the terms provided in the notice, and entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the rejection under such Specified Contract pursuant to sections 365 and 1123 of the Bankruptcy Code.

8.3.    Claims Against the Debtors Upon Rejection

No Executory Contract or Unexpired Lease rejected by the Debtors on or prior to the Effective Date shall create any obligation or liability of the Debtors or the Reorganized Debtors that is not a Claim.  Any Proof of Claim arising from or relating to the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan must be filed with the Bankruptcy Court within 30 days after the Effective Date, unless rejected at a later date as a result of a disputed assumption, assignment or cure amount as set forth in Section 8.5 herein.  Any Claim arising from or relating to the rejection of an Executory Contract or Unexpired Lease that is not filed with the Bankruptcy Court within such time will be automatically disallowed, and forever barred from assertion, and shall not be enforceable against the Debtors, the Reorganized Debtors or any of their property.  Any Allowed Claim arising from the rejection of an Executory Contract or Unexpired Lease shall be classified as an General Unsecured Claim, and shall be treated in accordance with Section 4.2 herein.

8.4.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

Except to the extent that less favorable treatment has been agreed to by the non-Debtor party or parties to each Executory Contract or Unexpired Lease to be assumed pursuant to the Plan, any monetary defaults arising under such Executory Contract or Unexpired Lease shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Amounts in full in Cash on the later of 30 days after: (a) the Effective Date; or (b) the date on which any dispute relating to such Cure Amounts has been resolved, either consensually or by order of the Bankruptcy Court.

- 29 -

No later than 10 calendar days prior to the deadline to file objections to the Plan, the Debtors shall file the Cure Schedule and serve the Cure Notices on each applicable counterparty.  Any such counterparty that fails to object to the proposed assumption of the applicable Executory Contract or Unexpired Lease and the applicable Cure Amounts listed on the Cure Notice by the deadline to file objections to the Plan shall be forever barred, estopped and enjoined from disputing the assumption of the applicable Executory Contract or Unexpired Lease and the Cure Amounts listed on the Cure Notice (including a Cure Amount of $0.00) and/or asserting any Claim against the applicable Debtor or Reorganized Debtor arising under section 365(b)(1) of the Bankruptcy Code.

In the event of a dispute regarding (a) the Cure Amounts; (b) the ability of the applicable Reorganized Debtor to provide adequate assurance of future performance in accordance with section 365 of the Bankruptcy Code under the Executory Contract or Unexpired Lease to be assumed; or (c) any other matter pertaining to the proposed assumption, the proposed Cure Amounts shall be made following the entry of a Final Order resolving such dispute and approving the assumption of such Executory Contract or Unexpired Lease.  To the extent such a dispute relates solely to the Cure Amounts, the applicable Debtor may assume the applicable Executory Contract or Unexpired Lease prior to the resolution of such dispute, *provided* that such Debtor reserves Cash in an amount sufficient to pay the Cure Amounts.  To the extent any dispute is resolved or determined against the applicable Debtor or Reorganized Debtor, as applicable, such Debtor or Reorganized Debtor, as applicable, may reject the applicable Executory Contract or Unexpired Lease after such determination, and the counterparty may thereafter file a proof of claim in the manner set forth in Section 8.3 herein.

8.5.    Effect of Assumption

Assumption of any Executory Contract or Unexpired Lease, pursuant to the Plan or otherwise, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, and the deemed waiver of any termination right or remedial provision arising under any such Executory Contract or Unexpired Lease at any time prior to the effective date of its assumption, or as a result of such assumption, the transactions contemplated by the Plan or any changes in control or ownership of any Debtors during these Chapter 11 Cases as a result of the implementation of the Plan.  Notwithstanding the foregoing, with respect to Executory Contracts with customers of the Debtors that are assumed pursuant to the Plan, the Reorganized Debtors shall remain obligated to honor any obligations set forth in such contracts to provide rebates or discounts, to the extent such rebates or discounts accrued but are not yet due under the terms of such contracts, in the ordinary course of business.  Any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged without further notice to, or action, order or approval of, the Bankruptcy Court, except in the event that the applicable Debtor and the counterparty to an Executory Contract or Unexpired Lease have separately agreed to a waiver or reduction of obligations that would otherwise constitute cure obligations, subject to the counterparties' explicit retention of their rights to assert any such amounts as General Unsecured Claims.

Each Executory Contract and Unexpired Lease assumed pursuant to this Article 8 or any order of the Bankruptcy Court shall vest in, and be fully enforceable by, the applicable

Reorganized Debtor in accordance with its terms, except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court.

8.6.    Modification, Amendments, Supplements, Restatements or Other Agreements

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed or rejected shall include all modifications, amendments, supplements, restatements or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests, unless any of the foregoing agreements have been previously rejected or repudiated or are rejected or repudiated under the Plan.

Modifications, amendments, supplements and restatements to Prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during these Chapter 11 Cases shall not be deemed to alter the Prepetition nature of such Executory Contract or Unexpired Leases or the validity, priority or amount of any Claims that may arise in connection therewith.

8.7.    Reservation of Rights

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease as a Specified Contract, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease, or that any Reorganized Debtor has any liability thereunder.

8.8.    Contracts and Leases Entered Into After the Petition Date

Each Reorganized Debtor will perform its obligations under each contract and lease entered into by such Reorganized Debtor after the Petition Date, including any Executory Contract and Unexpired Lease assumed by such Reorganized Debtor, in each case, in accordance with and subject to the then-applicable terms.  Accordingly, such contracts and leases (including any assumed Executory Contracts or Unexpired Leases) will survive and remain unaffected by the entry of the Confirmation Order.

SC1:4030160.8

9.    **PROVISIONS GOVERNING DISTRIBUTIONS**

9.1.    Distributions

Beginning on the Distribution Date, the Distribution Agent shall make Distributions under the Plan on account of each Claim that is Allowed on or prior to the Effective Date.

The Agents shall be deemed to be the holder of all Senior Secured Claims (in the case of the Secured Agent), all Junior Secured Claims (in the case of the Secured Agent) and all Swap Secured Claims (in the case of the Swap Agent), and all Distributions on account of such claims shall be made to or on behalf of the Agents.  The Agents shall hold or direct such Distributions for the benefit of the holders of such claims.  As soon as practicable following compliance with the other requirements set forth in this Article 9, the Agents shall arrange to deliver such Distributions to, or on behalf of, the holders of such claims.  Any such Distributions that are Unclaimed Distributions for a period of six months shall be deemed unclaimed property and shall revest in the Reorganized Debtors in accordance with Section 9.6 herein.  The Agents shall promptly report to the Reorganized Debtors any Unclaimed Distributions six months after receipt of any Distribution.  For the avoidance of doubt, the Agents shall only be required to act to make Distributions in accordance with the terms of the Plan.  The Debtors' obligations to make Distributions to the Holders of the Senior Secured Claims, the Junior Secured Claims and the Swap Secured Claims in accordance with Article 4 herein shall be deemed satisfied upon delivery of Distributions to the Agents, or if the consent of the Agents is given, to the Distribution Agent on behalf of the Agents, as provided for herein.

In accordance with Section 9.3 herein, all Distributions on account of Allowed Norwegian Bond Claims shall be made by the Distribution Agent to Nordea Securities Services as custodian for the Norwegian Bonds for the account of the applicable Holders of such Allowed Norwegian Bond Claims.  Nordea Securities Services shall make all Distributions to the Holders of the Allowed Norwegian Bond Claims in accordance with its applicable policies and procedures.  Any such Distributions that constitute Unclaimed Distributions for a period of six months shall be deemed unclaimed property within the meaning of section 347(b) of the Bankruptcy Code, and shall revest in the Reorganized Debtors in accordance with Section 9.6 herein.  Nordea Securities Services shall promptly report to the Distribution Agent any Unclaimed Distributions six months after receipt of any Distribution.

9.2.    Record Date and Delivery of Distributions

9.2.1    Record Date for Distributions.  On the Distributions Record Date, the Claims Register shall be closed and the Distribution Agent shall be authorized and entitled to recognize only those Holders of Claims listed on the Claims Register as of the close of business on the Distributions Record Date.  If a Claim, other than one based on a publicly traded security, is transferred 20 or fewer days before the Distributions Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practical, and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

- 32 -

9.2.2    <u>Delivery of Distributions in General</u>.  Except as otherwise provided herein, the Distribution Agent shall make all Distributions required under the Plan to Holders of Allowed Claims, except that distributions to Holders of Allowed Claims governed by a separate agreement and administered by a Servicer shall be deposited with the appropriate Servicer, at which time such distributions shall be deemed complete, and the Servicer shall deliver such distributions in accordance with the Plan and the terms of the governing agreement.  Except as otherwise provided herein, and notwithstanding any authority to the contrary, Distributions to Holders of Allowed Claims shall be made to Holders of record as of the Distributions Record Date by the Distribution Agent or a Servicer, as appropriate: (a) to the signatory set forth on any of the Proofs of Claim filed by such Holder or other representative identified therein (or at the last known address of such Holder if no Proof of Claim is filed or if the Debtors, the Reorganized Debtors or the Distribution Agent have been notified in writing of a change of address); (b) at the address set forth in any written notice of change of address delivered to the Notice and Claims Agent; or (c) at the address reflected in the Schedules if no Proof of Claim has been filed and the Notice and Claims Agent has not received a written notice of a change of address.  The Debtors, the Reorganized Debtors, the Distribution Agent and the Notice and Claims Agent shall not incur any liability whatsoever on account of the delivery of any Distributions under the Plan.

9.2.3    <u>Foreign Currency Exchange Rate</u>.  Except as otherwise provided herein, an order of the Bankruptcy Court or as agreed to by the Holder and the Debtors or the Reorganized Debtors, as applicable, any Claim asserted in a currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollars at the Exchange Rate.

9.3.    <u>Distribution Agents</u>

The Debtors and the Reorganized Debtors, as applicable, shall have the authority, in their sole discretion, to enter into agreements with one or more Distribution Agents to facilitate the Distributions required hereunder.  To the extent the Debtors and the Reorganized Debtors, as applicable, do determine to utilize a Distribution Agent to facilitate the Distributions, such Distribution Agent would first be required to: (a) affirm its obligation to facilitate the prompt distribution of any documents; (b) affirm its obligation to facilitate the prompt distribution of any recoveries or Distributions required under the Plan; and (c) waive any right or ability to set off, deduct from or assert any Lien or other encumbrance against the Distributions required under the Plan to be distributed by such Distribution Agent.

The Debtors or the Reorganized Debtors, as applicable, shall pay to the Distribution Agents all of their reasonable and documented fees and expenses without the need for any approvals, authorizations, actions or consents of the Bankruptcy Court or otherwise.  The Distribution Agents shall submit detailed invoices to the Debtors or the Reorganized Debtors, as applicable, for all fees and expenses for which the Distribution Agents seek reimbursement, and the Debtors or the Reorganized Debtors, as applicable, shall pay those amounts that they, in their sole discretion, deem reasonable, and shall object in writing to those fees and expenses, if any, that the Debtors or the Reorganized Debtors, as applicable, deem to be unreasonable.  In the event that the Debtors or the Reorganized Debtors, as applicable, object to all or any portion of the amounts requested to be reimbursed in a Distribution Agent's invoice, the Debtors or the Reorganized Debtors, as applicable, and such Distribution Agent shall endeavor, in good faith, to

- 33 -

reach mutual agreement on the amount of the appropriate payment of such disputed fees and/or expenses. In the event that the Debtors or the Reorganized Debtors, as applicable, and a Distribution Agent are unable to resolve any differences regarding disputed fees or expenses, either party shall be authorized to move to have such dispute heard by the Bankruptcy Court.

9.4.    <u>Fractional and De Minimis Distributions</u>

Notwithstanding anything herein to the contrary, the Reorganized Debtors and the Distribution Agent shall not be required to make Distributions or payments of less than $50.00, which amount shall be set forth in the Plan Supplement (whether in Cash or otherwise) and shall not be required to make partial Distributions or Distributions of fractional shares of New Common Stock. Whenever any payment or Distribution of a fractional share of New Common Stock under the Plan would otherwise be called for, the actual payment or Distribution will reflect a rounding of such fraction to the nearest number of shares of New Common Stock (up or down), with half shares of New Common Stock or less being rounded down.

9.5.    <u>Undeliverable Distributions</u>

In the event that any Distribution to any Holder is returned as undeliverable, or no address for such Holder is found in the Debtors' records, no further Distribution to such Holder shall be made unless and until the Reorganized Debtors or the Distribution Agent is notified in writing of the then-current address of such Holder, at which time such Distribution shall be made to such Holder not less than 30 days thereafter. Undeliverable Distributions shall remain in the possession of the Reorganized Debtors and the Distribution Agent until such time as such Distribution becomes deliverable or such Distribution reverts to the Reorganized Debtors or is canceled pursuant to Section 9.10 herein, and shall not be supplemented with any interest, dividends, or other accruals of any kind.

9.6.    <u>Reversion</u>

Any Distribution under the Plan, including Distributions made by the Agents and the Norwegian Bond Trustee in accordance with Section 9.1, that is an Unclaimed Distribution for a period of six months thereafter shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code, and such Unclaimed Distribution shall revest in the Reorganized Debtors and, to the extent such Unclaimed Distribution is New Common Stock, such Unclaimed Distribution shall be deemed canceled. Upon such revesting or cancelation, the Claim of any Holder or its successors and assigns with respect to such property shall be canceled, discharged and forever barred, notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary. The provisions of the Plan regarding undeliverable Distributions and Unclaimed Distributions shall apply with equal force to Distributions that are issued by the Debtors, the Reorganized Debtors, or the Distribution Agent made pursuant to any indenture or Certificate, notwithstanding any provision in such indenture or Certificate to the contrary and notwithstanding any otherwise applicable federal or state escheat, abandoned or unclaimed property law.

SC1:4030160.8

Nothing contained herein shall require the Reorganized Debtors to attempt to locate any Holder of an Allowed Claim whose Distribution is declared an undeliverable or Unclaimed Distribution.

### 9.7.    Surrender of Canceled Instruments or Securities

Except as otherwise provided in the Plan, on the Effective Date, or as soon as reasonably practicable thereafter, each holder of a Certificate shall be deemed to have surrendered such Certificate to the Distribution Agent or a Servicer (to the extent the relevant Claim is administered by a Servicer).  Subject to the foregoing sentence, regardless of any actual surrender of a Certificate, the deemed surrender shall have the same effect as if its Holder had actually surrendered such Certificate (including the discharge of such Holder's Claim or Equity Interest pursuant to the Plan), and such Holder shall be deemed to have relinquished all rights, Claims and Equity Interests with respect to such Certificate.  Notwithstanding the foregoing paragraph, this Section 9.7 shall not apply to any Claims Reinstated pursuant to the terms of the Plan.

### 9.8.    Compliance with Tax Requirements and Allocations to Principal and Interest

In connection with the Plan, to the extent applicable, the Reorganized Debtors and the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any tax law, and all Distributions pursuant hereto shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including withholding in kind (including withholding New Common Stock), liquidating a portion of the Distributions to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding Distributions pending receipt of information necessary to facilitate such Distributions or establishing any other mechanisms they believe are reasonable and appropriate.  For purposes of the Plan, any withheld amount (or property) shall be treated as if paid to the applicable claimant.  The Reorganized Debtors reserve the right to allocate all Distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens and encumbrances.  Distributions in full or partial satisfaction of Allowed Claims shall be allocated first to trust fund-type taxes, then to other taxes and then to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that has accrued on such Claims.

### 9.9.    Setoffs

Except as otherwise provided herein, a Final Order of the Bankruptcy Court, or as agreed to by the Holder and the Debtors or the Reorganized Debtors, as applicable, each Debtor or Reorganized Debtor, pursuant to the Bankruptcy Code (including section 553 thereof), applicable non-bankruptcy law, or such terms as may be agreed to by the Holder and the Debtors or the Reorganized Debtors, as applicable, may, without any further notice to, or action, order or approval of the Bankruptcy Court, set off against any Allowed Claim and the Distributions to be made on account of such Allowed Claim (before any Distribution is made on account of such Allowed Claim), any claims, rights and Causes of Action of any nature that such Debtor or

Reorganized Debtor, as applicable, may hold against the Holder of such Allowed Claim, to the extent such claims, rights or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided* that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Debtor or Reorganized Debtor of any such Claims, rights, and Causes of Action that such Debtor or Reorganized Debtor may possess against such Holder.  In no event shall any Holder of a Claim be entitled to set off any Claim against any Claim, right, or Cause of Action of a Debtor or a Reorganized Debtor, as applicable, unless such Holder has filed a Proof of Claim in these Chapter 11 Cases by the applicable Claims Bar Date preserving such setoff and a Final Order of the Bankruptcy Court has been entered, authorizing and approving such setoff.

9.10.    <u>No Postpetition Interest on Claims</u>

Unless otherwise specifically provided for in the Plan or the Confirmation Order, required by applicable law, or agreed to by the Debtors or the Reorganized Debtors, as applicable, no Holder of a Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date with respect to such Claim, notwithstanding any dispute or other delay with respect to any Distribution.

9.11.    <u>No Payment Over the Full Amount</u>

In no event shall a Holder of a Claim receive more than the full payment of such Claim.  To the extent any Holder has received payment in full with respect to a Claim, such Claim shall be disallowed and expunged without an objection to such Claim having been filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

SC1:4030160.8

## 10.    PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

### 10.1.    Objections to Claims

Any objections to Claims (other than Administrative Claims) shall be filed on or before the Claims Objection Bar Date.

### 10.2.    Estimation of Claims

Before or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not yet been the subject of a Final Order, shall be deemed to be estimated at zero dollars unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including, but not limited to, for purposes of Distributions).

Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court or under the Plan. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation of such Claim unless the Holder of such Claim has filed a motion with the Bankruptcy Court requesting the right to seek such reconsideration on or before 20 calendar days after the date such Claim is estimated by the Bankruptcy Court.

### 10.3.    Expungement and Disallowance of Claims

10.3.1    Paid, Satisfied, Amended, Duplicate or Superseded Claims.  Any Claim that has been paid, satisfied, amended, duplicated (by virtue of the substantive consolidation provided for under this Plan, or otherwise) or superseded, may be adjusted or expunged on the Claims Register by the Reorganized Debtors on or after 14 calendar days after the date on which notice of such adjustment or expungement has been filed with the Bankruptcy Court, without an objection to such Claim having to be filed, and without any further action, order or approval of the Bankruptcy Court.

10.3.2    Claims by Persons From Which Property Is Recoverable.  Unless otherwise agreed to by the Reorganized Debtors or ordered by the Bankruptcy Court, any Claims held by any Person or Entity from which property is recoverable under section 542, 543, 550 or 553 of the Bankruptcy Code, or that is a transferee of a transfer avoidable under section 522(f),

522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and any Holder of such Claim may not receive any Distributions on account of such Claim until such time as any related Cause of Action asserted against that Person or Entity by the Debtors or the Reorganized Debtors has been resolved.

### 10.4.    Amendments to Proofs of Claim

On or after the Effective Date, a Proof of Claim may not be amended (other than solely to update or correct the name or address of the Holder of such Claim) without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and any such amended Proof of Claim filed without such prior authorization shall be deemed disallowed in full and expunged without any further notice to or action, order or approval of the Bankruptcy Court.

### 10.5.    No Distributions Pending Allowance

If an objection to a Claim or a portion thereof is filed as set forth in this Article 10 or the Claim otherwise remains a Disputed Claim, except as otherwise provided in a Final Order of the Bankruptcy Court, no payment or Distribution provided under the Plan shall be made on account of such Claim or portion thereof, as applicable, unless and until such Disputed Claim becomes an Allowed Claim.

### 10.6.    Distributions After Allowance

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, Distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the applicable provisions of the Plan.

### 10.7.    Administration Responsibilities

Except as otherwise specifically provided in the Plan, after the Effective Date the Reorganized Debtors shall have the sole authority to (a) file, withdraw or litigate to judgment objections to Claims, (b) settle or compromise any Disputed Claim without any further notice to or action, order or approval of the Bankruptcy Court, and (c) administer and adjust, or cause to be administered and adjusted, the Claims Register to reflect any such settlements or compromises without any further notice to or action, order or approval of the Bankruptcy Court.

SC1:4030160.8

## 11.    CONDITIONS PRECEDENT TO EFFECTIVENESS OF THE PLAN

### 11.1.    Conditions Precedent to the Effective Date

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of this Article 11.

(a)    Confirmation Order.  The Confirmation Order shall have been entered in a form and substance reasonably satisfactory to the Debtors and each Approving Bondholder, and there shall not be a stay or injunction in effect with respect thereto.

(b)    New Primorsk Charter.  The Reorganized Primorsk Certificate of Incorporation shall have been duly filed with the Registrar of Companies and Official Receiver (D.R.C.O.R.) of the Republic of Cyprus.

(c)    Replacement Loans.  The Replacement Loan Documents shall have been duly executed and delivered by the Reorganized Debtors parties thereto, and all conditions precedent to the consummation of the Replacement Loans shall have been waived or satisfied in accordance with the terms thereof and the closing of the Replacement Loans shall have occurred.

(d)    Professional Fee Escrow Account.  The Debtors shall have established and funded the Professional Fee Escrow Account in accordance with Section 3.4.2 herein.

(e)    Necessary Documents.  All actions, documents, certificates and agreements necessary to implement the Plan shall have been effected or executed and delivered, as applicable.

(f)    Necessary Authorizations.  All authorizations, consents, regulatory approvals, rulings or documents that are necessary to implement and effectuate the Plan as of the Effective Date shall have been received, waived or otherwise resolved.

### 11.2.    Waiver of Conditions

The Debtors, in consultation with the Approving Bondholders, may waive conditions to the occurrence of the Effective Date set forth in this Article 11 at any time.

### 11.3.    Simultaneous Transactions

Except as otherwise expressly set forth in the Plan, the Confirmation Order or a written agreement by Primorsk, each action to be taken on the Effective Date shall be deemed to occur simultaneously as part of a single transaction.

- 39 -

11.4.   <u>Effect of Non-Occurrence of the Effective Date</u>

If the Effective Date does not occur by the 60th day following the Confirmation Date or such later date as the Debtors, in consultation with the Approving Bondholders, determine, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtors, prejudice in any manner the rights of the Debtors or any other Person, or constitute an admission, acknowledgment, offer or undertaking by the Debtors or any Person.

- 40 -

## 12.    SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS

### 12.1.    Compromise and Settlement

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the Distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Equity Interests and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim, or any Distribution to be made on account of such Allowed Claim.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors and their Estates and is fair, equitable and reasonable.

### 12.2.    Subordinated Claims

The allowance, classification and treatment of all Allowed Claims and Equity Interests and the respective Distributions and treatments under the Plan take into account, conform to and satisfy the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto; however, the Debtors reserve the right to reclassify or modify the treatment of any Allowed Claim or Equity Interest in accordance with any contractual, legal or equitable subordination relating thereto, unless otherwise provided in a settlement agreement concerning such Allowed Claim or Equity Interest.

### 12.3.    Discharge of Claims and Termination of Equity Interests

Pursuant to and to the fullest extent permitted by the Bankruptcy Code, except as otherwise specifically provided in the Plan or the Confirmation Order, the treatment of Claims and Equity Interests under the Plan shall be in full and final satisfaction, settlement, release, discharge, and termination, as of the Effective Date, of all Claims of any nature whatsoever, whether known or unknown, against, and Equity Interests in, the Debtors, any property of the Estates, the Reorganized Debtors or any property of the Reorganized Debtors, including all Claims of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a Proof of Claim or Equity Interest based upon such Claim, debt, right, or Equity Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Equity Interest based upon such Claim, liability, obligation or Equity Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim, liability, obligation or Equity Interest has accepted the Plan.  Except as otherwise provided herein, any default by the Debtors or their Affiliates with respect to any Claim that existed immediately prior to or on account of the filing of these Chapter 11 Cases shall be deemed cured on the Effective Date.

### 12.4.    Release of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the

SC1:4030160.8

Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released and discharged, and all of the rights, title and interest of any Holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Reorganized Debtors and their successors and assigns.

12.5.    **Debtor Release**

**Except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, on and after the Effective Date, the Released Parties are hereby released and discharged by the Debtors, the Reorganized Debtors and the Estates, including any successor to the Debtors or any Estate representative, from all claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereafter arising, in law, at equity or otherwise, whether for indemnification, tort, contract, violations of federal or state securities laws or otherwise, including, those that any of the Debtors, the Reorganized Debtors or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or any other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors and their non-Debtor Subsidiaries, the Estates, the conduct of the businesses of the Debtors and their non-Debtor Subsidiaries, these Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the restructuring of Claims and Equity Interests prior to or during these Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Disclosure Statement, the Replacement Loans or, in each case, related agreements, instruments or other documents, any action or omission with respect to Intercompany Claims, any action or omission as an officer, director, agent, representative, fiduciary, controlling person, affiliate or responsible party, or any transaction entered into or affecting, a Non-Debtor Subsidiary, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan, other than claims or liabilities arising out of or relating to any act or omission of a Released Party to the extent such act or omission is determined by a Final Order to have constituted willful misconduct, gross negligence, fraud, or a criminal act.**

12.6.    **Voluntary Release by Holders of Claims and Equity Interests**

**Except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, on and after the Effective Date, to the fullest extent permitted by applicable law, the Releasing Parties (regardless of whether a Releasing Party is a Released Party) shall be deemed to conclusively, absolutely, unconditionally, irrevocably and forever release, waive and discharge the Released Parties of any and all claims, obligations, rights, suits, damages,**

- 42 -

Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereafter arising, in law, at equity or otherwise, whether for indemnification, tort, contract, violations of federal or state securities laws or otherwise, including, those that any of the Debtors, the Reorganized Debtors or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or any other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors and their non-Debtor Subsidiaries, the Estates, the conduct of the businesses of the Debtors and their non-Debtor Subsidiaries, these Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the restructuring of Claims and Equity Interests prior to or during these Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Disclosure Statement, the Replacement Loans or, in each case, related agreements, instruments or other documents, any action or omission with respect to Intercompany Claims, any action or omission as an officer, director, agent, representative, fiduciary, controlling person, affiliate or responsible party, or any transaction entered into or affecting, a Non-Debtor Subsidiary, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan, other than claims or liabilities arising out of or relating to any act or omission of a Released Party to the extent such act or omission is determined by a Final Order to have constituted willful misconduct, gross negligence, fraud, or a criminal act.

12.7.    **Scope of Releases**

Each Person providing releases under the Plan, including the Debtors, the Reorganized Debtors, the Estates and the Releasing Parties, shall be deemed to have granted the releases set forth in the Plan notwithstanding that such Person may hereafter discover facts in addition to, or different from, those which it now knows or believes to be true, and without regard to the subsequent discovery or existence of such different or additional facts, and such Person expressly waives any and all rights that it may have under any statute or common law principle which would limit the effect of such releases to those claims or causes of action actually known or suspected to exist at the time of execution of such release.

12.8.    **Exculpation**

Notwithstanding anything herein to the contrary, as of the Effective Date, the Debtors and their directors, officers (including the chief restructuring officer and interim management), employees, attorneys, investment bankers, financial advisors, restructuring advisors and other professional advisors, representatives and agents will be deemed to have solicited acceptances of this Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including section 1125(e) of the Bankruptcy Code and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with the solicitation.

SC1:4030160.8

Except with respect to any acts or omissions expressly set forth in and preserved by the Plan, the Plan Supplement or related documents, the Exculpated Parties shall neither have nor incur any liability to any Entity for any Prepetition or postpetition act taken or omitted to be taken in connection with, or arising from or relating in any way to, these Chapter 11 Cases, including (a) the operation of the Debtors' businesses during the pendency of these Chapter 11 Cases; (b) formulating, negotiating, preparing, disseminating, implementing, administering, confirming and/or effecting the issuance of any shares of New Common Stock in connection with the Plan, the Disclosure Statement and the Plan, the Plan Supplement, the Replacement Loans and any related contract, instrument, release or other agreement or document created or entered into in connection therewith (including the solicitation of votes for the Plan and other actions taken in furtherance of Confirmation and Consummation of the Plan); (c) the offer and issuance of any securities under or in connection with the Plan; or (d) any other Prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, other than liability resulting from any act or omission that is determined by Final Order to have constituted willful misconduct, gross negligence, fraud, or a criminal act.

12.9.    <u>Injunction</u>

Except as otherwise expressly provided in the Plan or Confirmation Order, the satisfaction, release and discharge pursuant to this Article 12 shall also act as a permanent injunction against any Person who has held, holds or may hold Claims or Equity Interests against commencing or continuing any action, employment of process or act to collect, enforce, offset, recoup or recover any Claim or Cause of Action satisfied, released, or discharged under the Plan or the Confirmation Order to the fullest extent authorized or provided by the Bankruptcy Code, including to the extent provided for or authorized by sections 524 and 1141 thereof.

12.10.    <u>Limitations on Exculpations and Releases</u>

Notwithstanding anything to the contrary herein, none of the releases or exculpations set forth herein shall operate to waive or release any obligation or Causes of Action of any Person or Entity:  (a) arising under any contract, instrument, agreement, release or document delivered pursuant to the Plan or documents, agreements or instruments executed in connection therewith, including all post Effective Date obligations, or (b) expressly set forth in and preserved by the Plan, the Plan Supplement or related documents.

- 44 -

13.  **MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN**

13.1.  Modification of Plan

Subject to the limitations contained in the Plan: (a) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications with respect to the treatment of Classes 3 – 6 to satisfy section 1129(b) of the Bankruptcy Code and amendments or modifications to the terms of the New Class A Common Stock, the New Class B Common Stock or other equity or corporate governance arrangements; and (b) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors may, upon order of the Bankruptcy Court, (i) amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or (ii) remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

13.2.  Effect of Confirmation on Modification

Entry of a Confirmation Order shall mean that all modifications and amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code, and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

13.3.  Revocation of Plan

The Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date and to file subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if the Confirmation Order is not entered or the Effective Date does not occur, then:  (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan, assumption or rejection of executory contracts or leases affected by the Plan, and any document or agreement executed pursuant hereto shall be deemed null and void; and (c) nothing contained in the Plan shall:  (i) constitute a waiver or release of any claims by or Claims against, or any Equity Interests in, any Debtor or any other Entity; (ii) prejudice in any manner the rights of the Debtors or any other Entity; or (iii) constitute an admission of any sort by the Debtors or any other Entity.

14.    **RETENTION OF JURISDICTION**

14.1.    Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain its existing exclusive jurisdiction over all matters arising in or out of, or related to, these Chapter 11 Cases or the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

(a)    Allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured or unsecured status, or amount of any Claim or Equity Interest, including the resolution of any request for payment of any General Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Equity Interests;

(b)    Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

(c)    Resolve any matters related to: (i) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is a party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including any disputes regarding cure obligations in accordance with Section 8.3 herein; and (ii) any dispute regarding whether a contract or lease is, or was, executory or expired;

(d)    Ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the Plan and adjudicate any and all disputes from, or relating to Distributions under the Plan;

(e)    Adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters and Causes of Action, and grant or deny any applications, involving a Debtor that may be pending before the Bankruptcy Court on the Effective Date;

(f)    Adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(g)    Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, Plan Supplement or the Disclosure Statement;

(h)     Enter and enforce any order for the sale of property pursuant to section 363, 1123, or 1146(a) of the Bankruptcy Code;

(i)     Adjudicate, decide or resolve any and all disputes as to the ownership of any Claim or Equity Interest;

(j)     Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with enforcement of the Plan;

(k)     Resolve any cases, controversies, suits, disputes or Causes of Action with respect to the existence, nature and scope of the releases, injunctions, and other provisions contained in the Plan, and enter such orders as may be necessary or appropriate to implement and enforce such releases, injunctions, and other provisions;

(l)     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

(m)    Determine any other matters that may arise in connection with or relate to the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan, the Plan Supplement or the Disclosure Statement;

(n)     Enter an order or final decree concluding or closing these Chapter 11 Cases;

(o)     Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

(p)     Hear and determine disputes, cases, controversies or Causes of Action arising in connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation Order, including disputes arising under agreements, documents or instruments executed in connection with the Plan (other than any dispute arising after the Effective Date under, or directly with respect to, the Replacement Loans and any related intercreditor agreement, which disputes shall be adjudicated in accordance with the terms of such agreements);

(q)     Hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retirement benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

- 47 -

(r)  Enforce all orders previously entered by the Bankruptcy Court; and

(s)  Hear any other matter not inconsistent with the Bankruptcy Code.

SC1:4030160.8

## 15.    **MISCELLANEOUS PROVISIONS**

### 15.1.    Immediate Binding Effect

Notwithstanding Bankruptcy Rule 3020(e), 6004(g) or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors and any and all Holders of Claims and Equity Interests (irrespective of whether Holders of such Claims or Equity Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

### 15.2.    Additional Documents

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or the Reorganized Debtors, as applicable, and all Holders of Claims or Equity Interests receiving Distributions pursuant to the Plan and all other parties-in-interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### 15.3.    Reservation of Rights

Except as expressly set forth herein, the Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order.  Neither the filing of the Plan, any statement or provision contained herein, nor the taking of any action by a Debtor or any other Entity with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of: (a) any Debtor with respect to the Holders of Claims or Equity Interests or other Entity; or (b) any Holder of a Claim or an Equity Interest or other Entity prior to the Effective Date.

### 15.4.    Successors and Assigns

The rights, benefits and obligations of any Entity named or referred to herein shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

### 15.5.    Term of Injunction or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in these Chapter 11 Cases pursuant to section 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

SC1:4030160.8

15.6.    Entire Agreement

On the Effective Date, the Plan and the Plan Supplement shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations with respect to this subject matter, all of which have become merged and integrated into the Plan.

15.7.    Exhibits

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  Copies of such exhibits and documents may be obtained upon written request to the Debtors' counsel at the address below or by downloading such exhibits and documents from the Bankruptcy Court's website at www.nysb.uscourts.gov or the website of the Debtors' notice and claims agent at www.kccllc.net/primorsk.

15.8.    Nonseverability of Plan Provisions Upon Confirmation

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing is: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors; and (c) nonseverable and mutually dependent.

15.9.    Closing of Chapter 11 Cases

The Reorganized Debtors shall, promptly after the full administration of these Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close these Chapter 11 Cases.

15.10.    Conflicts

Except as set forth in the Plan, to the extent that any provisions of the Disclosure Statement, the Plan Supplement, or any order of the Bankruptcy Court (other than the Confirmation Order) referenced in the Plan (or any exhibits, appendices, supplements, or amendments to any of the foregoing), conflicts with or is in any way inconsistent with any provision of the Plan, the Plan shall govern and control.

15.11.  Further Assurances

The Debtors, Reorganized Debtors, all Holders of Claims receiving Distributions hereunder, and all other parties-in-interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

15.12.  No Stay of Confirmation Order

The Confirmation Order shall contain a waiver of any stay of enforcement otherwise applicable, including pursuant to Bankruptcy Rules 3020(e) and 7062.

15.13.  Waiver or Estoppel

Each Holder of a Claim or an Equity Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Equity Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement or papers filed with the Bankruptcy Court prior to the Confirmation Date.

15.14.  Post-Effective Date Service

After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities that have filed renewed requests for service.

15.15.  Notices

All notices, requests, pleadings and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

> (a)    If to the Debtors, to:
>
> Primorsk International Shipping Limited
> c/o Prisco (Singapore) Pte Ltd
> No. 8 Temasek Boulevard
> #24-02 Suntec Tower Three
> Singapore 038988
> Attn:   Dmitry Golomovzy

with copies to:

Sullivan & Cromwell LLP
125 Broad St.
New York, NY 10004
Attn:   Andrew G. Dietderich
        Brian. D. Glueckstein

(b)     If to the Secured Agent, to:

White & Case LLP
1155 Avenue of the Americas
New York, NY 10036
Attn:   Scott Greissman

(c)     If to the Swap Agent, to:

Luskin, Stern & Eisler LLP
Eleven Times Square
New York, NY 10036
Attn:   Richard Stern

(d)     If to the Norwegian Bond Trustee, to:

Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022
Attn:   Douglas P. Bartner
        Ned S. Schodek

(e)     If to the U.S. Trustee, to:

Office of the United States Trustee
U.S. Department of Justice
33 Whitehall Street, 21st Floor
New York, NY 10004
Attn:   Richard Morrissey

- 52 -

New York, New York
Dated: March 15, 2016

PRIMORSK INTERNATIONAL SHIPPING
LIMITED, on behalf of itself and all other Debtors

By:     */s/ Holly Felder Etlin*_____
        Name: Holly Felder Etlin
        Title:  Chief Restructuring Officer of the
                Debtors

## Exhibit 1

**Material Terms for New Common Stock**

Capitalized terms not defined herein have the meanings specified in the Plan.

| | |
|---|---|
| <u>Issuer</u> | Reorganized Primorsk (the "*Company*") |

<u>Jurisdiction</u>  The Company shall be organized in Cyprus.  The Company's articles of incorporation and other governing corporate documents (collectively, the "*Articles*") shall conform to this <u>Exhibit 1</u> and otherwise include such provisions as are set forth in the Plan Supplement.

<u>Share Capital</u>  The share capital of the Company will consist of two classes of ordinary shares (the "*Shares*") – 75% of the Shares will be New Class B Common Stock issued to Holders of Class 4 Norwegian Bond Claims and 25% of the Shares will be New Class A Common Stock issued to Holders of Class 6 Equity Interests. The Shares will rank pari passu with each other as to dividends, distributions and the proceeds of winding-up or liquidation.

<u>Voting</u>  Each Share will have one vote with respect to all matters other than the election of Directors.

Except as otherwise required by Cyprus law, the holders of Shares ("*Shareholders*") may act by resolution of a simple majority (more than 50%) of the issued and outstanding Shares (a "*Simple Majority*"), *provided* that no action by Shareholders with respect to the matters described in "Supermajority Matters" below ("*Supermajority Matters*") shall be taken unless approved by the affirmative vote of holders of at least two-thirds of the aggregate number of issued and outstanding Shares.

The same voting thresholds will apply in the case of actions by written consent of Shareholders.  The Articles shall include procedures for meetings and written consents of Shareholders.

<u>Directors</u>  The board of directors (the "*Board*") of the Company will consist of the same directors.

The Board will have five directors consisting of:

(i) two directors appointed by the action of Shareholders holding a Simple Majority of the New Class A Common Stock, voting as a separate class;

(ii) two directors appointed by action of Shareholders holding a Simple Majority of the New Class B Common Stock, voting as a separate class (each a "*Class B Director*"); and

(iii) the Chief Executive Officer of the Company, who shall be the Chairman of the Board.

The initial Board members at completion of the Restructuring shall be identified in the Plan Supplement.

The Board shall be vested with control over the Company other than with respect to such matters as are reserved for the Shareholders by applicable law or the Articles.

Actions by the Board may be taken by a majority of three directors, *provided* that (i) no action by the Board with respect to Supermajority Matters may be taken without (A) the unanimous approval of the directors or (B) the approval of at least three directors *and* the approval of Shareholders holding at least two-thirds of the aggregate number of issued and outstanding Shares; and (ii) no amendment or modification to the New Management Agreements may be approved by the Company without the consent of at least one Class B Director.

Supermajority
Matters

The following actions after the Effective Date shall constitute Supermajority Matters:

1.  The issuance of new share capital of the Company or securities convertible into share capital of the Company.

2.  Any modification of the rights of Shareholders in their capacity as such, except as may be expressly permitted by the Articles or applicable law.

3.  Any increase or decrease in the size of the Board.

4.  The sale of all or substantially all of the assets of the Company or the merger of the Company with or into any other entity.

5.  The appointment or removal of the Chief Executive Officer.

6.  The entering into of any material transaction with the Chief Executive Officer or any Affiliates of the Chief Executive Officer other than on arm's-length terms.

7.  The direct or indirect sale of a vessel with dead weight tonnage exceeding 10,000 tonnes (a "*Vessel*") if the total number of Vessels operated by the Company would be fewer than nine after giving effect to such sale.

8.  The making of a loan or extension of credit to any person for a period longer than 90 days outside of the ordinary course of the business of the Company.

9.  The incurrence of new funded debt other than debt to finance the acquisition of a Vessel and the refinancing of funded debt (including accrued interest, costs and fees) from time to time.

|  | 10. | The taking of certain insolvency-related actions described in the Plan Supplement and concerning the Company or any entity directly or indirectly owning a Vessel (a "*Material Subsidiary*"). |

|  | 11. | Other matters as may be reasonably determined by the Company and included in the Plan Supplement as Supermajority Matters. |

**Fees and Expenses**  Non-executive directors will receive remuneration determined by a Simple Majority of the Board, plus reimbursement of out-of-pocket expenses.

**Transfers**  The Shares shall be freely transferable to existing Shareholders of the Company.  Other transfers of Shares shall require the consent of the Board, not to be unreasonably withheld, conditioned or delayed.

**Drag-Along**  On a proposed transfer resulting in any person holding two-thirds or more of the Shares, all remaining Shareholders shall, if the proposed buyer so directs at its discretion, be required to sell all of their Shares on at least as favorable terms and conditions and at a cash price equal to the price paid per Share by the proposed buyer.

**Tag-Along**  On a proposed transfer resulting in any person holding more than one-third of the Shares, each Shareholder shall have the right (but not the obligation) to require the proposed buyer to purchase for cash all of his Shares, at a price equal to and on other terms and conditions no worse than the price paid per Share by the proposed buyer.

**Information Requests**  Each Shareholder shall take any action the Company may reasonably request in connection with the informational requests of lenders to or investors in the Company, including providing all "Know Your Customer" and other customary information and materials.  It is understood that any information provided by a Shareholder may be provided subject to such confidentiality arrangements as such Shareholder may reasonably require.

### Exhibit 2

### Material Terms for the Replacement Loans

The Replacement Loans will be issued in three tranches – Tranche A Replacement Loans, Tranche B Replacement Loans and Tranche C Replacement Loans.  The following provisions apply to all the Replacement Loans, except where otherwise indicated.  Capitalized terms not defined herein have the meanings specified in the Plan.

| | |
|---|---|
| Borrower | Reorganized Primorsk (the "*Company*"). |
| Guarantors | Each of the nine existing vessel-owning subsidiaries and any subsidiary in the future (each, a "*Vessel Subsidiary*") that owns a vessel with dead weight tonnage over 10,000 tonnes (each, a "*Vessel*"). |
| Administrative Agent | The Secured Agent or such other financial institution as the Debtor may determine. |
| Collateral Agent | The Secured Agent or such other financial institution as the Debtor may determine. |
| Ranking | Replacement Loans will be general unsubordinated obligations of Reorganized Primorsk and each Vessel Subsidiary, except as provided under "Lien Subordination" below. |
| Liens | Replacement Loans will be secured by a perfected security interest in: (i) all shares in each Vessel Subsidiary, (ii) each Vessel held by a Vessel Subsidiary, (iii) any charter party contract relating to such Vessel, (iv) bank accounts, and (v) the proceeds of any of the foregoing ("*Collateral*"). |
| Lien Subordination | The security documentation shall provide that the proceeds of any realization of Collateral after default and the proceeds of any disposition of Collateral outside of the ordinary course of business shall be applied by the Collateral Agent pursuant to a customary waterfall in which proceeds are applied, *first*, to pay amounts due under the Tranche A Replacement Loans, *second*, to pay amounts due under the Tranche B Replacement Loans and, *third*, to pay amounts due under the Tranche C Replacement Loans. |
| Principal Amount | The initial principal amount of the Tranche A Replacement Loans shall be the amount of the Allowed Senior Secured Claims.<br><br>The initial principal amount of the Tranche B Replacement Loans shall be the amount of the Allowed Junior Secured Claims. |

The initial principal amount of the Tranche C Replacement Loans shall be the amount of the Allowed Swap Secured Claims.

Maturity

December 31, 2021.

Amortization

If Tranche A Replacement Loans are Amortizing, Reorganized Primorsk shall be required to make the following mandatory prepayments:

(a) within 30 days of the Effective Date, an initial payment equal to 2% of the aggregate initial principal amount of Tranche A, B and C Replacement Loans; and

(b) within 30 days of the end of each quarter ended after the Effective Date, a quarterly amortization payment equal to US $5 million.

For example, if the Effective Date is July 15, 2016, Reorganized Primorsk shall be required to make an initial payment of approximately $5.2 million on or prior to August 15, 2016 and an amortization payment of $5 million with respect to the third quarter of 2016 on or prior to October 30, 2016.

Interest Payments

Interest paid in cash quarterly in arrears.  Interest shall be at a rate per annum equal to LIBOR plus the Applicable Margin.

Applicable Margin

The Applicable Margin shall depend on whether Tranche A Replacement Loans are Amortizing, as follows:

|  | Tranche A Amortizing | Tranche A Not Amortizing |
| --- | --- | --- |
| **Tranche A** | 1.50% | 1.75% |
| **Tranche B** | 1.75% | 2.00% |
| **Tranche C** | 2.00% | 2.25% |

Voluntary Prepayment

At any time after the Effective Date upon at least 15 days' written notice, the Company, in its sole discretion, may refinance, repay or otherwise acquire or retire all or part of all amounts outstanding under any Tranche of Replacement Loans, at a prepayment price equal to 100% of the principal amount thereof plus accrued and unpaid interest, if any, to, but not including, the prepayment date without premium or penalty.  Voluntary prepayments will decrease required amortizations in chronological order of scheduled payments.

| | |
|---|---|
| <u>Undertakings/Covenants</u> | The Replacement Loans shall benefit from covenants with respect to the following matters, as reasonably determined by the Debtors and set forth in the Plan Supplement. |

- No change of business.
- No dividend or any other distribution, redemption, purchase or return of share capital without the consent of holders of a majority in principal amount of each Tranche.
- No direct or indirect disposal of Vessels outside of the ordinary course of business unless the proceeds of such disposition are (a) reinvested in the business within 270 days or (b) applied to make voluntary prepayments of Replacement Loans.
- Vessel covenants:
  - Approved flag;
  - No change to vessel's name or port of registry;
  - Good condition and repair;
  - Classification society undertakings;
  - Inspections;
  - Prevention of and release of each vessel from arrest;
  - Compliance with laws;
  - Maintenance of insurance;
  - Provision of reasonably requested information and notification of certain events;
  - Restrictions on chartering, appointment of managers; and
  - Registration and notice of mortgage.
- Each Vessel, its earnings and insurances to be free from all security interests and encumbrances, other than purchase money liens and other exclusions to be specified in the Plan Supplement.
- Information covenants:
  - Financial statements, in specified form;
  - Access to books and records upon reasonable request;
  - Notification of litigation; and
  - Notification of default.
- Each long-term charter entered into to be accompanied by a charter assignment.
- Each new Vessel to be owned by a new special purpose vehicle which will guarantee the Replacements Loans and will be subject to security arrangements (with liens and guarantees in favor of the Replacement Loans subordinated to acquisition financing).
- Maintenance of corporate existence and good standing.
- No provision of credit or financial assistance to any person.

- No acquisition of securities other than marketable securities.
- Compliance with Anti-Corruption Laws and Sanctions regimes and applicable laws.
- Others as the Company may reasonably agree.

"Know Your Customer" Undertaking

As a condition to the Effective Date and on an on-going as-requested basis, the Company will use its reasonable best efforts to provide the lenders of the Replacement Loans all information and materials necessary for "Know Your Customer" and other customary money laundering checks, subject to appropriate confidentiality arrangements to be agreed.

Events of Default

The Replacement Loans shall benefit from covenants with respect to the following matters, as reasonably determined by the Debtors and set forth in the Plan Supplement.

- Failure to pay amounts when due.
- Breach of certain fundamental obligations (e.g., limitation on dividends) or breach of other obligations that cause a material adverse effect on the ability of the Company to repay the Replacement Loans.
- Acceleration of other indebtedness in excess of $20 million in aggregate.
- Insolvency, enforcement of judgments or related events.
- Others as the Company may reasonably agree.

Governing Law

The Replacement Loans will be governed by the laws of the State of New York.  The security documents will be governed by such laws as the Company determines appropriate in light of their purpose and function.

<u>**Exhibit 3**</u>

**Material Terms for New Management Agreements**

Capitalized terms not defined herein have the meanings specified in the Plan.

| | |
|---|---|
| <u>Parties</u> | Each of the nine Debtor Subsidiaries shall be party to a separate New Management Agreement with Prisco (Singapore) Pte Ltd ("*Prisco*"). |
| <u>Services</u> | Each New Management Agreement shall include the following services as reasonably negotiated between Reorganized Primorsk and Prisco (in consultation with counsel to the Peraticos Holders so long as they continue to hold a substantial portion of the Norwegian Bonds) and set forth in the Plan Supplement. |

- Crew Management
- Technical Management
- Commercial Management
- Insurance Arrangements
- Accounting Services
- Sale or Purchase of the Vessel
- Provisions
- Bunkering
- Chartering Services
- Owners' Insurance

| | |
|---|---|
| <u>Management Fee</u> | Annual management fees will vary by Vessel Subsidiary, however average fees per vessel per day for all the New Management Agreements to be equal to $2,000 per vessel per day from the Effective Date until June 30, 2017, after which average fees per vessel per day will be equal to $1,800 per vessel. |
| <u>Additional Fees</u> | 1.25% chartering commission for charters arranged by Prisco and in place on the Effective Date and any new charters thereafter.<br><br>1.0% of gross sale or purchase price for vessel disposition and acquisition. |
| <u>Term</u> | Five years from the Effective Date, subject to renewals with mutual consent. |
| <u>Early Termination Right</u> | Reorganized Primorsk shall have the right to terminate all (but not some) of the New Management Agreements without the consent of Prisco at any time prior to the Effective Date or the 90th day thereafter if the directors of the Company appointed by the holders of New Class B Common Stock (the "*Class B Directors*") determine that the New Management Agreements are not as favorable to the Company as another available alternative.  Such termination will be effective 90 days after notice from the Class B Directors. |

| Amendments and Modification | Each New Management Agreement shall provide that no amendment or modification thereto shall be effective without the signature of at least one Class B Director. |

**Appendix B: Solicitation Procedures Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

In re

PRIMORSK INTERNATIONAL SHIPPING
LIMITED, *et al.*,[1]

　　　　　　　　　　　　　　　Debtors.

---------------------------------------------------------------x

: 　Chapter 11
:
:
: 　Case No. 16-10073 (MG)
:
: 　Jointly Administered
:
:

**ORDER (I) APPROVING THE DISCLOSURE STATEMENT;
(II) ESTABLISHING A VOTING RECORD DATE FOR THE PLAN;
(III) APPROVING SOLICITATION PACKAGES AND PROCEDURES FOR
THE DISTRIBUTION THEREOF; (IV) APPROVING THE FORMS OF BALLOTS;
(V) ESTABLISHING PROCEDURES FOR VOTING ON THE PLAN;
(VI) ESTABLISHING NOTICE AND OBJECTION PROCEDURES FOR
THE CONFIRMATION OF THE PLAN; AND (VII) ESTABLISHING NOTICE AND
OBJECTION PROCEDURES FOR THE ASSUMPTION AND REJECTION OF
EXECUTORY CONTRACTS AND UNEXPIRED LEASES UNDER THE PLAN**

Upon the Motion[2] of Primorsk International Shipping Limited, and its affiliated

debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), for

entry of an order (this "Order"), pursuant to section 1125 of the Bankruptcy Code, Bankruptcy

Rules 2002, 3017, 3018 and 3020 and Local Rules 2002-1, 3018-1 and 3020-1, (i) approving the

*Disclosure Statement for the Debtors' Joint Plan of Reorganization Under Chapter 11 of the*

*Bankruptcy Code* (as may be amended, modified or supplemented, the "Disclosure Statement");

(ii) establishing a record date for purposes of voting on the *Joint Chapter 11 Plan of*

*Reorganization of Primorsk International Shipping Limited and its Debtor Affiliates* (as may be

---

[1]　　The Debtors in these chapter 11 cases and, if applicable, the last four digits of their U.S. taxpayer identification numbers are: Primorsk International Shipping Limited (Cyprus), Boussol Shipping Limited (Cyprus) (6402) – m/t "Zaliv Amerika", Malthus Navigation Limited (Cyprus) (6401) – m/t "Zaliv Amurskiy", Jixandra Shipping Limited (Cyprus) (6168) – m/t "Prisco Alexandra", Levaser Navigation Limited (Cyprus) (0605) – m/t "Prisco Ekaterina", Hermine Shipping Limited (Cyprus) (0596) – m/t "Prisco Irina", Laperouse Shipping Limited (Cyprus) (0603) – m/t "Prisco Elizaveta", Prylotina Shipping Limited (Cyprus) (6085) – m/t "Prisco Elena", Baikal Shipping Ltd (Liberia) (6592) – m/t "Zaliv Baikal" and Vostok Navigation Ltd (Liberia) (1745) – m/t "Zaliv Vostok".

[2]　　Capitalized terms used and not defined herein shall have the meanings ascribed to them in the Motion.

amended, modified or supplemented, the "Plan"); (iii) approving solicitation packages and

procedures for the distribution thereof; (iv) approving the forms of ballots; (v) establishing

procedures for voting on the Plan; (vi) establishing notice and objection procedures relating to

the confirmation of the Plan; and (vii) establishing notice and objection procedures for the

assumption and rejection of Executory Contracts and Unexpired Leases under the Plan; this

Court having jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334; and

venue of these chapter 11 cases and the Motion in this district being proper pursuant to 28 U.S.C.

§§ 1408 and 1409; and this matter being a core proceeding pursuant to 28 U.S.C. § 157(b); and

this Court having found that proper and adequate notice of the Motion and the relief requested

therein has been provided in accordance with the Bankruptcy Rules, the Local Rules, the

*Administrative Order Establishing Case Management Procedures* [Docket No. 71] (the "Case

Management Order") and the *Order (I) Scheduling a Hearing to Consider Approval of*

*Disclosure Statement; (II) Fixing Time for Filing Objections Thereto and (III) Approving the*

*Form and Manner of Notice Related Thereto* [Docket No. __] and that, except as otherwise

ordered herein, no other or further notice is necessary; and any objections (if any) to the Motion

having been withdrawn or overruled on the merits; and a hearing having been held to consider

the relief requested in the Motion (the "Disclosure Statement Hearing"); and upon the record of

the Disclosure Statement Hearing and all of the proceedings had before this Court; and this Court

having found and determined that the relief sought in the Motion is in the best interests of the

Debtors, their estates, their creditors and all other parties-in-interest; and that the legal and

factual bases set forth in the Motion establish just cause for the relief granted herein; and after

due deliberation and sufficient cause appearing therefor;

<div align="center">IT IS HEREBY FOUND AND DETERMINED THAT:</div>

<div align="center">2</div>

1.     <u>Disclosure Statement</u>.  The Disclosure Statement (together with the exhibits thereto) provides Holders of Claims and Equity Interests entitled to vote on the Plan with adequate information in accordance with section 1125(b) of the Bankruptcy Code and otherwise complies with the applicable requirements of section 1125 of the Bankruptcy Code.

2.     <u>Solicitation and Confirmation Schedule</u>.  The Debtors' proposed schedule and procedures relating to solicitation of votes on the Plan and confirmation of the Plan, as set forth herein, provides parties-in-interest with sufficient time to review and consider all solicitation materials, including the Plan, the Disclosure Statement, the Plan Supplement, and other information and materials relating to confirmation of the Plan, provides Holders of Claims and Equity Interests with sufficient time, prior to the Confirmation Hearing, to make an informed judgment to accept or reject the Plan, and provides all parties-in-interest in these chapter 11 cases with sufficient time to object to confirmation of the Plan.

3.     <u>Ballots and Voting and Tabulation Procedures</u>.  The Voting and Tabulation Procedures set forth in the Motion, and the Ballots substantially in the forms attached to the Motion as <u>Exhibit F</u> and accompanying instructions, in each case, adequately address the circumstances of these chapter 11 cases and provide for a fair and equitable voting process appropriate for Holders of Claims and Equity Interests in Classes 3A, 3B, 3C, 4, 5 and 6 that are entitled to vote on the Plan (the "<u>Voting Classes</u>").  The Ballots are consistent with Official Bankruptcy Form No. 314 and comply with Bankruptcy Rule 3018(c).  Ballots need not be provided to Holders of Claims in Classes 1 and 2, which are classified as unimpaired under the Plan and are conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code.

SC1:4034711.4

4. <u>Distribution Procedures and Unimpaired Creditor Notice</u>.  The proposed Distribution Procedures set forth in the Motion, including the delivery of the Solicitation Package to Holders of Claims and Equity Interests in Voting Classes, and the delivery of the notice substantially in the form attached to the Motion as <u>Exhibit D</u> (the "<u>Unimpaired Creditor Notice</u>") to Holders of Claims in Classes 1 and 2, provide sufficient information to Holders of Claims relating to the relief granted by this Order, in accordance with Bankruptcy Rule 3017(d) and other applicable provisions of the Bankruptcy Code, Bankruptcy Rules, Local Rules and Case Management Order.

5. <u>Confirmation Hearing Notice</u>.  Service of notice of the date, time and location of the Confirmation Hearing, the deadline for objecting to confirmation of the Plan and information regarding the discharge, injunction, exculpation and release provisions set forth in Article 12 of the Plan, substantially in the form attached to the Motion as <u>Exhibit C</u> (the "<u>Confirmation Hearing Notice</u>"), pursuant to the Distribution Procedures and as otherwise set forth in the Motion, constitutes good and sufficient notice of the Confirmation Hearing to Holders of Claims and Equity Interests in Voting Classes and other parties-in-interest in these chapter 11 cases, in satisfaction of the requirements of due process and in accordance with Bankruptcy Rules 2002(b) and 3017(d) and other applicable provisions of the Bankruptcy Code, Bankruptcy Rules, Local Rules and Case Management Order.

IT IS THEREFORE HEREBY ORDERED THAT:

1. The Motion is GRANTED as set forth herein.

A. <u>Approval of the Disclosure Statement</u>

2. The Disclosure Statement is approved pursuant to section 1125(b) of the Bankruptcy Code and Bankruptcy Rule 3017(b) and, to the extent not withdrawn, settled or otherwise resolved, any objections to the approval of the Disclosure Statement are overruled.

4

B.    Establishment of Schedule for Solicitation and Confirmation

3.    The following dates and deadlines are hereby established with respect to

solicitation of votes on the Plan and confirmation of the Plan:

a.    **April 29, 2016 at 4:00 p.m. (Eastern Time)** shall be the record date for purposes of determining:  (a) the Holders of Claims and Equity Interests entitled to receive a Solicitation Package; (b) the Holders of Claims and Equity Interests entitled to vote on the Plan; and (c) whether Claims or Equity Interests have been properly transferred to an assignee pursuant to Bankruptcy Rule 3001(e) such that the assignee can vote as the Holder of such Claim (the "Voting Record Date");

b.    The Debtors shall distribute the Solicitation Packages, the Unimpaired Creditor Notice and Confirmation Hearing Notice to Holders of Claims and Equity Interests on **May 9, 2016** (the "Solicitation Mailing Deadline");

c.    **May 11, 2016 at 4:00 p.m. (Eastern Time)** shall be the deadline for the Debtors to request that a claim be expunged, reclassified or allowed in a reduced amount for voting purposes;

d.    **May 25, 2016 at 4:00 p.m. (Eastern Time)** shall be the deadline for Holders of Claims and Equity Interests to file and serve any Rule 3018(a) Motion (as defined below);

e.    All Holders of Claims and Equity Interests entitled to vote on the Plan (other than Beneficial Holders of Norwegian Bond Claims as set forth herein) must complete, execute and return their Ballots so that they are **actually received** by KCC pursuant to the Voting and Tabulation Procedures, on or before **June 15, 2016 at 8:00 p.m. (Eastern Time)** (the "Voting Deadline");

f.    **June 20, 2016 at 4:00 p.m. (Eastern Time)** shall be the deadline to file the Cure Schedule (as defined below);

g.    **July 1, 2016 at 4:00 p.m. (Eastern Time)** shall be the date by which objections to the Confirmation of the Plan must be filed with this Court and served so as to be **actually received** by the Notice Parties (the "Confirmation Objection Deadline");

h.    **July 1, 2016** shall be the deadline to file the Voting Report; and

i.    This Court shall consider the confirmation of the Plan at a hearing to be held on **July 20, 2016 at 10:00 a.m. (Eastern Time)** (the "Confirmation Hearing").

C.    <u>Approval of Solicitation Packages, Distribution Procedures and Unimpaired
Creditor Notice</u>

4.    The Distribution Procedures are hereby approved as set forth herein.  On or before the Solicitation Mailing Deadline, the Debtors shall cause Kurtzman Carson Consultants LLC, the Debtors' claims and noticing agent ("<u>KCC</u>") to distribute a solicitation package to each Holder of a Claim or Equity Interest in the Voting Classes (other than Norwegian Bond Claims), containing the following materials (collectively, the "<u>Solicitation Package</u>"), which are hereby approved:

    a.    a cover letter, substantially in the form attached to the Motion as <u>Exhibit B</u>: (i) describing the contents of the Solicitation Package, the contents of the enclosed CD-ROM and instructions for obtaining hard copies of materials provided on CD-ROM, and (ii) informing the Holders of the Debtors' recommendation to accept the Plan;

    b.    a printed copy of the Confirmation Hearing Notice;

    c.    an appropriate Ballot (as defined below), together with a pre-addressed, postage prepaid return envelope for submitting such Ballot;

    d.    the Disclosure Statement (together with all exhibits thereto, including the Plan and all exhibits to the Plan) in electronic format on a CD-ROM; and

    e.    a copy of this Order (without exhibits) in electronic format on a CD-ROM.

5.    Any party that has filed duplicate proofs of claim which are classified under the Plan in the same Class, whether against the same Debtor or multiple Debtors, shall receive only one Solicitation Package for voting the relevant Claim with respect to such Class.

6.    No Solicitation Packages shall be distributed to (a) Holders of Claims that have been paid in full (<u>provided</u> that each such Holder shall be served with a copy of the Confirmation Hearing Notice) or (b) any person to whom the Debtors have mailed a notice of the Disclosure Statement Hearing, if such notice has been returned as undeliverable, except to the

6

extent the Debtors are provided with accurate addresses for the applicable parties prior to the

Solicitation Mailing Deadline.

7.        The Debtors shall, at their expense, provide paper copies of the Plan,

Disclosure Statement or Solicitation Procedures Order to any party submitting a request for such

paper copies:  (a) through the Debtors' restructuring website at www.kccllc.net/primorsk or (b) in

writing to:  Primorsk Ballot Processing, c/o Kurtzman Carson Consultants LLC, 2335 Alaska

Avenue, El Segundo, California 90245.

8.        KCC shall transmit an electronic copy of the Solicitation Package to

Nordea Securities Services ("Nordea Securities"), as custodian for the bonds issued pursuant to

the Norwegian Bond Indenture, for delivery to the Voting Nominees.  The Voting Nominees

shall forward the Solicitation Package, including individual ballots in substantially the form

attached to the Motion as Exhibit F-5 (each, a "Beneficial Ballot"), to beneficial holders of

Norwegian Bond Claims as of the Voting Record Date (the "Beneficial Holders") who hold

Norwegian Bond Claims through such Voting Nominees.

9.        Each Voting Nominee shall summarize the individual votes of the

Beneficial Holders, as indicated on Beneficial Ballots received from such Beneficial Holders, on

a master ballot in substantially the form attached to the Motion as Exhibit F-4 (the "Master

Ballot"), and return such Master Ballot to KCC **so that it is actually received on or before the**

**Voting Deadline**.  Each Voting Nominee shall instruct Nordea Securities to disclose such Voting

Nominee's Voting Record Date holdings of Norwegian Bond Claims to KCC.  The  distribution

of Solicitation Packages to Beneficial Holders of Norwegian Bond Claims shall be deemed good,

adequate, and sufficient if the Solicitation Package is delivered by electronic mail to Nordea

Securities on or before the Solicitation Mailing Deadline.

7

10.     Holders of Claims in Classes 1 and 2, which are conclusively presumed to have accepted the Plan, shall receive the Unimpaired Creditor Notice, which is hereby approved.

11.     The Debtors are hereby authorized to modify the Disclosure Statement, the Plan and the Ballots and other related documents approved pursuant to this Order, without further order of this Court, at any time before distributing Solicitation Packages in accordance with this Order, <u>provided</u> that such modifications are not material as determined by the Debtors in good faith.  The Debtors shall file a notice of any such modification with this Court, together with a marked version reflecting such modification.

D.      <u>Approval of Forms of Ballots and Voting and Tabulation Procedures</u>

12.     The Ballots are hereby approved.

13.     The Debtors are authorized to solicit, receive and tabulate votes on the Plan in accordance with the Voting and Tabulation Procedures, which are hereby approved as set forth herein.

14.     The following procedures for determining the amounts of Claims or Equity Interests for voting purposes are hereby approved:

a.   Subject to subparagraphs (b)-(h) below, each Holder of a Claim who has timely filed a proof of claim and is entitled to vote on the Plan may vote the face amount of such Claim as set forth on the relevant proof of claim as of the Voting Record Date.

b.   A Claim that is scheduled in the Debtors' Schedules (<u>provided</u> that such Claim is not scheduled as contingent, unliquidated, disputed, undetermined, or in a $0.00 amount) and with respect to which no proof of claim has been filed, shall be deemed allowed, solely for purposes of voting, in the amount set forth in the Schedules.

c.   Claims scheduled as contingent, unliquidated, disputed, undetermined in amount, or in a $0.00 amount, for which no proof of claim has been filed, shall not be entitled to vote.

d.   Proofs of claim filed for $0.00 shall not be entitled to vote.

8

    e.   If a Claim is partially liquidated and partially unliquidated, such Claim shall be allowed for voting purposes only in the liquidated amount.

    f.   Timely-filed proofs of claim that are filed in their entirety as contingent, unliquidated, undetermined and/or disputed shall vote in the amount of $1.00.

    g.   The Debtors must file, and serve by overnight or electronic mail, any motion or Claim objection requesting that a Claim be expunged, reclassified or allowed in a reduced amount for voting purposes on or before **May 11, 2016 at 4:00 p.m. (Eastern Time)**.  Any such Claim shall be expunged, reclassified or allowed in a reduced amount as requested by the Debtors, unless otherwise determined by this Court.

    h.   Holders of Claims or Equity Interests must file and serve any motion to allow a Claim or Equity Interest in a specified amount for voting purposes, or to reclassify a Claim or Equity Interest (a "Rule 3018(a) Motion") on or before **May 25, 2016 at 4:00 p.m. (Eastern Time)** (the "Rule 3018(a) Motion Deadline").  Any such Claim or Equity Interest shall be counted in the amount estimated or allowed by this Court or in such other amount as agreed by the Debtors and the Holder of such Claim or Equity Interest. The Debtors shall provide each party that timely files a Rule 3018(a) Motion with an appropriate provisional Ballot and a pre-addressed, postage prepaid return envelope within two business days after the Rule 3018(a) Motion Deadline.  All Rule 3018(a) Motions must:  (i) be in writing, (ii) comply with the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules, (iii) set forth the name of the party asserting the Rule 3018(a) Motion, (iv) state the basis and the specific grounds therefor, (v) be heard at the Confirmation Hearing and (vi) be filed with this Court, together with proof of service thereof, and served upon and received by the Notice Parties no later than the Rule 3018(a) Motion Deadline.

    i.   Objections to any Rule 3018(a) Motion must be filed on or before **June 1, 2016 at 4:00 p.m. (Eastern Time)**.  KCC shall inform this Court at or prior to the Confirmation Hearing whether counting the applicable provisional Ballot would affect the outcome of voting on the Plan.  The tabulation of each provisional Ballot shall be determined by order of this Court.

15.    The following voting procedures and standard assumptions in tabulating

Ballots are hereby approved:

    a.   <u>Votes Not Counted</u>.  The following Ballots shall not be counted or considered for any purpose in determining whether the Plan has been accepted or rejected:

9

i.    any Ballot received by KCC after the Voting Deadline, unless the Debtors shall have granted in writing an extension of the Voting Deadline with respect to such Ballot;

ii.    any Ballot that is illegible or contains insufficient information to identify the Holder of the Claim or Equity Interest;

iii.    any Ballot cast by a person or entity that (A) does not hold a Claim or Equity Interest in a Class that is entitled to vote on the Plan or (B) is not otherwise entitled to vote pursuant to the procedures described herein;

iv.    any Ballot sent to the Debtors or the Debtors' financial or legal advisors, agents or representatives (other than KCC);

v.    any unsigned Ballot;

vi.    any Ballot not received in its executed, original form;

vii.    any Ballot that is received by KCC by facsimile or other means of electronic transmission; or

viii.    any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan.

b.    <u>Multiple Ballots</u>.  If multiple Ballots are received from the same Holder with respect to the same Claim or Equity Interest prior to the Voting Deadline, the latest dated Ballot received by the Voting Deadline shall be counted for voting purposes, subject to contrary order of the Court; <u>provided</u>, <u>however</u>, that where ambiguity exists with respect to which Ballot was the latest dated, KCC has the right to determine the appropriate tabulation of such Ballot and to contact the respective Holder to determine such Holder's intent in connection therewith.

c.    <u>No Vote Splitting</u>.  All Claims and Equity Interests must be voted in their entirety to either accept or reject the Plan.

d.    <u>Ballots Signed by Representative</u>.  If a Ballot is signed by a trustee, executor, administrator, guardian, attorney in fact or other person acting in a fiduciary or representative capacity, such person shall be required to indicate such capacity when signing the Ballot.  The Debtors may request proper evidence of such representative's authority to sign the Ballot.

e.    <u>Defective Ballots</u>.  Subject to contrary order of this Court, the Debtors may, in their sole discretion, waive any defects or irregularities as to any particular Ballot at any time (including the timeliness of the submission of a Ballot), either before or after the Voting Deadline; <u>provided</u>, <u>however</u>, that:

SC1:4034711.4

i.     any such waivers shall be documented in the voting reports completed by KCC;

ii.    neither the Debtors, nor any other person or entity, will be under any duty to provide notification of such defects or irregularities other than as provided in the voting reports prepared by KCC, nor will any of them incur any liability for failure to provide such notification; and

iii.   unless waived by the Debtors, subject to contrary order of this Court, any defects or irregularities associated with the delivery of Ballots must be cured prior to the Voting Deadline or such Ballots will <u>not</u> be counted.

f.   <u>Lack of Good Faith Designation</u>.  In the event a designation of lack of good faith is requested by a party-in-interest under section 1126(e) of the Bankruptcy Code, this Court shall determine whether any vote to accept or reject the Plan will be counted for purposes of determining whether the Plan has been accepted or rejected by the applicable person or entity.

E.     <u>Approval of Notice and Objection Procedures for Confirmation of the Plan</u>

16.     The Confirmation Hearing Notice is hereby approved.

17.     On or before the Solicitation Mailing Deadline and simultaneously with the distribution of the Solicitation Packages, the Debtors shall serve the Confirmation Hearing Notice on:  (a) the U.S. Trustee; (b) all known creditors; (c) all equity security holders; (d) the Internal Revenue Service; (e) counsel to the agent for the Debtors' prepetition secured lenders, White & Case LLP, 1155 Avenue of the Americas, New York, New York 10036 (Attn: Scott Greissman); (f) counsel to the agent for the Debtors' prepetition swap lenders, Luskin, Stern & Eisler LLP, Eleven Times Square, New York, New York 10036 (Attn: Richard Stern); (g) counsel to the agent for and the ad hoc group of the Debtors' prepetition bondholders, Shearman & Sterling LLP, 599 Lexington Avenue, New York, New York 10022 (Attn: Douglas Bartner); (h) the parties identified on the Debtors' consolidated list of 30 largest unsecured creditors; and (i) all parties who have filed a notice of appearance and request for service of

documents pursuant to the Case Management Order, in each case only to the extent such parties

have not otherwise been served with the Confirmation Hearing Notice pursuant to this Order.

18.     Any objection to confirmation of the Plan must:  (a) be in writing,

(b) comply with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, (c) set forth

the name of the objector, the nature and amount of Claims or Equity Interests held or asserted by

the objector against the particular Debtor or Debtors, (d) state the basis and the specific grounds

therefor and (e) be filed with the Court, together with proof of service thereof, and served upon

and received by each of the following (collectively, the "Notice Parties") no later than the

Confirmation Objection Deadline of **July 1, 2016 at 4:00 p.m. (Eastern Time)**:  (i) the

Chambers of the Honorable Martin Glenn, United States Bankruptcy Court for the Southern

District of New York, One Bowling Green, New York, New York 10004; (ii) the Debtors and

their counsel (Sullivan & Cromwell LLP, Attn: Andrew G. Dietderich and Brian Glueckstein,

125 Broad Street, New York, New York 10004); and (iii) the U.S. Trustee, 201 Varick Street,

Suite 1006, New York, New York 10014.  A hard copy of any objection also must be delivered

via first-class mail to the U.S. Trustee by the Confirmation Objection Deadline.

F.     Approval of Notice of Filing of the Plan Supplement

19.     The Plan Supplement shall be filed by the Debtors no later than **June 8,**

**2016** (the "Plan Supplement Filing Deadline").  The Plan Supplement Notice in the form

attached to the Motion as Exhibit E is hereby approved.  On or before the Plan Supplement

Filing Deadline, the Debtors shall serve the Plan Supplement Notice on:  (a) the U.S. Trustee; (b)

counsel to the agent for the Debtors' prepetition secured lenders, White & Case LLP, 1155

Avenue of the Americas, New York, New York 10036 (Attn: Scott Greissman); (c) counsel to

the agent for the Debtors' prepetition swap lenders, Luskin, Stern & Eisler LLP, Eleven Times

Square, New York, New York 10036 (Attn: Richard Stern); (d) counsel to the agent for and the

12

ad hoc group of the Debtors' prepetition bondholders, Shearman & Sterling LLP, 599 Lexington

Avenue, New York, New York 10022 (Attn: Douglas Bartner); (e) the parties identified on the

Debtors' consolidated list of 30 largest unsecured creditors; (f) all parties who have filed a notice

of appearance and request for service of documents pursuant to the Case Management Order and

(g) those parties receiving the Solicitation Package.  Such service of the Plan Supplement Notice

shall constitute good and sufficient notice of the filing of the Plan Supplement.

      G.     <u>Approval of Notice and Objection Procedures for the Assumption and Rejection of Executory Contracts and Unexpired Leases Under the Plan</u>

      20.     The following notice and objection procedures for assumption and/or

assignment of Executory Contracts and Unexpired Leases and fixing of Cure Amounts are

hereby approved:

      a.     No later than **June 20, 2016 at 4:00 p.m. (Eastern Time)**, the Debtors shall file a schedule (the "<u>Cure Schedule</u>") setting forth the proposed cure amounts (the "<u>Cure Amounts</u>"), if any, for each Executory Contract and Unexpired Lease to be assumed as of the Effective Date (each, a "<u>Proposed Assumed Contract</u>") and serve a notice of assumption and cure amount, substantially in the form attached hereto as <u>Exhibit G</u> (the "<u>Cure Notice</u>") on each Proposed Assumed Contract counterparty.  Objections to the proposed assumption of the Proposed Assumed Contract, the Cure Amounts, the ability of the applicable Reorganized Debtor to provide adequate assurance of future performance or any other matter pertaining to the proposed assumption must be filed by the Confirmation Objection Deadline.  Any such counterparty that fails to do so by the Confirmation Objection Deadline shall be forever barred, estopped and enjoined from disputing such assumption and such Cure Amounts (including a Cure Amount of $0.00) and/or asserting any claim against the applicable Debtor or Reorganized Debtor under section 365(b)(1) of the Bankruptcy Code.

      b.     If no objections are received by the Confirmation Objection Deadline, the assumption of such Proposed Assumed Contract shall be deemed authorized and the proposed Cure Amounts shall be binding for all purposes.

      c.     In the event of a dispute regarding (i) the Cure Amounts; (ii) the ability of the applicable Reorganized Debtor to provide adequate assurance of future performance in accordance with section 365 of the Bankruptcy Code under the applicable Proposed Assumed Contract; or (iii) any other matter

13

pertaining to the proposed assumption, the proposed Cure Amounts shall be made following the entry of a final order of this Court resolving such dispute and approving the assumption of such Proposed Assumed Contract (which may be before or after the Effective Date). To the extent such a dispute relates solely to the Cure Amounts, the applicable Debtor may assume the applicable Proposed Assumed Contract prior to the resolution of such dispute provided that such Debtor reserves cash in an amount sufficient to pay the Cure Amounts. To the extent any dispute is resolved or determined against the applicable Debtor or Reorganized Debtor, as applicable, such Debtor or Applicable Debtor, as applicable, may reject the applicable Proposed Assumed Contract, and such counterparty may file a proof of claim.

21.      The following notice and objection procedures with respect to the

rejection of Executory Contracts and Unexpired Leases are hereby approved:

a.  The Plan Supplement shall include a schedule of Executory Contracts and Unexpired Leases to be rejected. The Debtors shall serve notice of the filing of any such schedule or of any motion to reject any Executory Contract or Unexpired Lease on each applicable counterparty. Objections to such rejection must be filed within 10 days of the filing of the Plan Supplement or rejection motion. Any order authorizing the rejection of such Executory Contract or Unexpired Lease, including, but not limited to, the order confirming the Plan, shall be served by the Debtors on each applicable counterparty.

b.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed rejection of such Executory Contract or Unexpired Lease will be deemed to have consented to such rejection, and entry of the order confirming the Plan shall constitute approval of the rejection under such Executory Contract or Unexpired Lease pursuant to sections 365 and 1123 of the Bankruptcy Code.

c.  All proofs of claim arising from or relating to the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan must be filed within 30 days of the Effective Date, provided that, with respect to any Executory Contract or Unexpired Lease rejected as a result of a disputed assumption or cure amount, proofs of claim must be filed within 30 days of the entry of an order authorizing such rejection. Failure to timely file a proof of claim arising from or relating to the rejection of an Executory Contract or Unexpired Lease will result in any such claim being automatically disallowed, forever barred from assertion, and such claim shall not be enforceable against the Debtors, the Reorganized Debtors or any of their property. Any allowed claim arising from the rejection of an Executory Contract or Unexpired Lease shall be classified as a General Unsecured Claim for purposes of the Plan.

14

H.      Other

22.     The Debtors and KCC are authorized and empowered to execute and deliver such documents, and to take and perform all actions necessary to implement and effectuate the relief granted in this Order.

23.     Nothing in this Order shall be construed as a waiver of the right of the Debtors or any other party-in-interest, as applicable, to object to a proof of claim after the Voting Record Date.

24.     Nothing in the Motion or this Order, nor as a result of any payment made pursuant to this Order, shall be deemed or construed as an admission as to the validity or priority of any claim against the Debtors, an approval or assumption of any agreement, contract or lease pursuant to section 365 of the Bankruptcy Code or a waiver of the right of the Debtors, or shall impair the ability of the Debtors, to contest the validity and amount of any payment made pursuant to this Order.

25.     The requirements set forth in Local Rule 9013-1(b) are satisfied.

26.     This Order is immediately effective and enforceable, notwithstanding the possible applicability of Bankruptcy Rule 6004(h) or otherwise.

27.     This Court retains jurisdiction with respect to any matters, claims, rights or disputes arising from or related to this Order.

Dated: _____, 2016
       New York, New York                    _____
                                             Martin Glenn
                                             United States Bankruptcy Judge

SC1:4034711.4

**Appendix C: Debtors' Corporate Structure Chart**

PRIMORSK INTERNATIONAL SHIPPING LIMITED
Structure Chart
(as of 1/14/2016)

Debtors
Non-Debtor Entities
Non-Debtor Subsidiaries Controlled by Primorsk International Shipping Limited

*Held directly or controlled via special purpose subsidiaries. Remainder of interest held by Isardia Holdings Limited and public shareholders.

**Appendix D: Business Plan**

SC1:4030163.4

## *Summary of Significant Assumptions*

The financial projections were developed by management and their advisors and are based upon: a) current and projected market conditions in the Debtors' product tanker shipping market; b) no material acquisitions or divestures; and c) emergence from chapter 11 at or around June 30, 2016 under the terms contemplated in the Plan. Intercompany claims, as allowed under the Plan, are assumed to be reinstated upon the Effective Date. Consistent with the Debtors financial reporting, the financial projections are presented in U.S. dollars. The projected financial statements of the Debtors set forth below have been prepared based on an assumed Effective Date of June 30, 2016. Although the Debtors presently intend to seek to cause the Effective Date to occur as soon as practicable, there can be no assurances as to when the Effective Date will occur.

*Industry Overview -*

The seaborne transportation industry is a vital link in international trade, with oceangoing vessels representing the most efficient, and often the only means of transporting large volumes of basic commodities and finished products. Crude oil tankers transport crude oil or, where capable, certain refined crude oil products between oil production locations or reservoirs and oil consumption locations, typically in refineries or storage facilities. Customers in this sector include integrated oil companies, specialized oil companies, oil traders, refineries, government agencies and storage facility operators. Demand for oil tankers is primarily determined by the volume of crude oil and refined petroleum products transported and the distances over which they are transported. Demand is normally expressed in terms of ton miles, which is calculated by multiplying the volume of cargo carried on a route by the distance between the load and discharge ports. The oil tanker industry is divided between crude tankers that carry dirty products, and product tankers that carry clean products. Product tankers are able to transport a variety of liquids, but the construction of the cargo tanks and piping systems on board these vessels makes them most suitable for carrying refined crude oil products. In particular, purpose-built product tankers have specially coated tanks that facilitate cleaning of their tanks to prevent cargo contamination. Product tankers generally transport oil products from refineries or storage facilities to places of consumption or to other storage facilities for onward transportation by land or pipeline. While product tankers can carry dirty products, they generally do not switch between clean and dirty cargoes, as a vessel's tank must be cleaned prior to loading a different cargo type.

The oil tanker shipping industry is both cyclical and volatile in terms of time charter hire rates and profitability. Fluctuations in oil tanker time charter rates result from changes in the supply and demand for vessel capacity which are driven by global fleet capacity and utilization and changes in the supply and demand for crude oil and refined crude oil internationally transported by oil tankers. The factors that influence demand for oil tankers capacity include, among others: general economic conditions, increases and decreases in industrial production, oil prices, environmental concerns, weather conditions and competition from alternative energy sources.

Factors that influence the supply of oil tankers capacity include, among others: the number of newbuilding orders and deliveries; the extent of newbuilding vessel deferrals; the scrapping rate of older tankers; newbuilding prices and tanker owner access to capital to finance the construction of newbuildings; charter rates and the price of steel and other raw materials; changes in environmental and other regulations that may limit the useful life of oil tankers; the number of oil tankers that are slow-steaming or extra slow-steaming to

1

conserve fuel; the number of oil tankers that are idle; port congestion and canal closures; and demand for fleet renewal.

*Significant Assumptions-*

## Methodology

The financial projections represent summarized income statement, balance sheet and cash flows for the projection period. The financial projections were developed on a vessel-by-vessel, bottom-up basis and evidence multiple sources of information including general business and economic conditions as well as industry and competitive trends. The financial projections reflect the vessel build up and are combined with corporate G&A expenses. Revenue from time charter contracts entered into by the Debtors and the income associated with providing ice-classed, double-hulled tankers and shipping services to the Debtors' customers is included in the projections. The Debtors deploy their vessels under time charters with leading oil majors, traders and international shipping companies. A time charter is a contract to charter a vessel for a fixed period of time at a set daily rate and can last from a few days up to several years. Under a typical time charter the charterer pays for most voyage expenses, such as port, canal and fuel costs, agents' fees, extra war risks insurance and any other expenses related to the cargoes, and the vessel owner pays for vessel operating expenses, which include, among other costs, costs for crewing, provisions, stores, lubricants, insurance, maintenance and repairs, dry-docking and intermediate and special surveys.

**Revenue:** Revenue is projected by multiplying the projected daily time charter rate, net of commissions, by the estimated number of on-hire days in each period. Where existing charters are in place, the projected daily time charter rate is equivalent to the current contracted rate (see Time Charter Profile chart below), and after existing charters reach expiration the projected daily time charter rate is equivalent to the base level time charter rate projections for each vessel provided by an independent broker. (See Average Annual Projected Daily Time Charter Rates chart below.) Eight of the company's nine vessels are chartered to a single charterer. The commencement dates of the charters are given below. In the model, termination date is planned at end of 2018. The assumed number of on-hire days in each year is equal to the total calendar days net of off-hire days associated with unplanned repairs, dry dockings and special surveys. The number of off-hire days assumed each year for unplanned repairs is in line with the average of the last 3 years. Days associated with dry-docking and with special surveys, which is an out-of-service period during which planned repairs, maintenance and inspections, are estimated to be 15 days once every five years and are based on the Debtors' schedule for special surveys (see additional information regarding the timing of the special surveys below). Based on the new charter rates the Company has increased revenue from 2015 to 2016 by 19%.

**Commencement dates:**

| | |
|---|---|
| Z. Baikal: | Jan 1, 2016 |
| Z. Vostok: | Jan 1, 2016 |
| Z. Amerika: | May 1, 2016 (continuation with existing charterer) |
| Z. Amurskiy: | Jan 1, 2016 |
| P. Alexandra: | Jan 25, 2016 |
| P. Ekaterina: | Jan 1, 2016 |
| P. Irina: | Feb 24, 2016 |
| P. Elizaveta: | Feb 21, 2016 |
| P. Elena: | Jan 1, 2016 |

**Time Charter Profile**

| Vessel | Type | Projected Expiration Date | Daily Rate (Gross) |
|---|---|---|---|
| Z. Baikal | LR2 | Dec 31, 2018 | $22,000 |
| Z. Vostok | LR2 | Dec 31, 2018 | $22,000 |
| Z. Amerika | Aframax | Jun 1, 2016 | $23,000 |
| | | Apr 1, 2017 | $25,000 |
| Z. Amurskiy | LR2 | Dec 31, 2018 | $22,000 |
| P. Alexandra | MR | Jan 25, 2019 | $17,100 |
| P. Ekaterina | MR | Dec 31, 2018 | $17,100 |
| P. Irina | MR | Feb 24, 2019 | $17,100 |
| P. Elizaveta | MR | Feb 21, 2019 | $17,100 |
| P. Elena | MR | Dec 31, 2018 | $17,100 |

3

**Average Annual Projected Daily Time Charter Rates**

| Vessel | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|
| Z. Baikal | $22,000 | $22,000 | $22,000 | $22,000 | $22,000 | $22,000 |
| Z. Vostok | $22,000 | $22,000 | $22,000 | $22,000 | $22,000 | $22,000 |
| Z. Amerika | $22,000 | $22,000 | $22,000 | $22,000 | $22,000 | $22,000 |
| Z. Amurskiy | $22,000 | $22,000 | $22,000 | $22,000 | $22,000 | $22,000 |
| P. Alexandra | $17,100 | $17,100 | $17,100 | $17,100 | $17,100 | $17,100 |
| P. Ekaterina | $17,100 | $17,100 | $17,100 | $17,100 | $17,100 | $17,100 |
| P. Irina | $17,100 | $17,100 | $17,100 | $17,100 | $17,100 | $17,100 |
| P. Elizaveta | $17,100 | $17,100 | $17,100 | $17,100 | $17,100 | $17,100 |
| P. Elena | $17,100 | $17,100 | $17,100 | $17,100 | $17,100 | $17,100 |

**Vessel Operating Expenses:** Operating expenses take into account (i) technical expenses such as repairs and maintenance, the cost of spares and consumable stores, lubricant costs and (ii) other expenses, including crewing cost, insurance, expenses for third party technical manager fees, statutory and classification expenses and other miscellaneous expenses. In the financial projections, vessel operating expenses are calculated by multiplying the number of calendar days in a relevant period by a daily budget for each vessel.  The daily budget is based on the Debtors' 2016 calendar year budget for each vessel.  Technical expenses in 2017 and 2018 are lower as some expenses are transferred (repair work and spares to be changed) and planned in the special survey budget (the years prior to dry-docking).  In years 2019, 2020, and 2021 the full operating budget is subject to a 2.0% inflation adjustment.

The table below summarizes the projected daily Vessel Operating Expenses over the Projection Period.

**Projected Daily Vessel Opex in USD**

| Vessel | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|
| Z. Baikal | 6,470 | 6,772 | 6,897 | 7,035 | 7,176 | 7,320 |
| Z. Vostok | 6,470 | 6,740 | 6,823 | 6,959 | 7,098 | 7,240 |
| Z. Amerika | 6,470 | 6,676 | 6,515 | 6,645 | 6,778 | 6,914 |
| Z. Amurskiy | 6,470 | 6,710 | 6,550 | 6,681 | 6,815 | 6,951 |
| P. Alexandra | 6,620 | 6,528 | 6,450 | 6,579 | 6,711 | 6,845 |
| P. Ekaterina | 6,550 | 6,493 | 6,414 | 6,542 | 6,673 | 6,807 |
| P. Irina | 6,590 | 6,540 | 6,623 | 6,755 | 6,890 | 7,028 |
| P. Elizaveta | 6,550 | 6,581 | 6,667 | 6,800 | 6,936 | 7,075 |
| P. Elena | 6,550 | 6,524 | 6,608 | 6,740 | 6,875 | 7,013 |

**General and Administrative Expenses:** In the financial projections, general and administrative expenses are projected based on historical general and administrative costs adjusted for non-recurring expenses and planned changes. General and administrative expenses include management fees paid to PISL, audit and legal fees, other outsourced professional services, corporate payroll and benefits and office expenses. Management fees paid to Prisco Singapore by PISL are assumed to be $2,300 per day until June 30,2016, Jun-16 to June-17 - $2,000 / day from July 1 2016 to June 30, 2017 followed by $1,800 / day per vessel for the next four years. Approximately $7.4 million of professional fees has been included for the various stakeholders and their advisors during the restructuring process.

**Vessel Depreciation:** The vessels are depreciated on a straight-line basis over their remaining estimated useful lives (assumed to be 25 years from original delivery), after considering the estimated residual value. Depreciation includes depreciation of the vessel as well as the depreciation of periodic dry-docking expenses. The cost of periodic maintenance or dry dockings, whereby actual costs incurred improve the efficiency or safety of a vessel, is capitalized and depreciated on a straight line basis over the period until the next scheduled dry-docking.

**Interest Expense:** Interest expense is based upon projected debt levels and applicable interest rates, as outlined under Debt Structure below. Interest rate margins are as follows: 530S 1.5%, 530J 1.75% and Swap Loans 2%. Margins are calculated at three month LIBOR rates based on implied forward rates which range from 0.6% in 2016 to 2% in 2021.

5

**Projected interest expense in USD millions**

|  | __2016__ | __2017__ | __2018__ | __2019__ | __2020__ | __2021__ |
|---|---|---|---|---|---|---|
| **530S** | (7,934) | (7,637) | (6,407) | (5,518) | (4,657) | (3,023) |
| **530J** | (2,893) | (3,080) | (3,158) | (3,062) | (3,044) | (2,371) |
| **Swap Loan** | (914) | (973) | (998) | (967) | (962) | (749) |
| **Total interest charges** | (12,512) | (11,690) | (10,563) | (9,547) | (8,663) | (6,143) |

**Debt Structure:** The 530 Senior Facility is amortized by $5 million a quarter after exiting Chapter 11. In addition, there is a 5.2M paydown upon exit assumed to be June 2016. The bonds are converted to 75% equity with existing shareholders/management retaining the other 25% of the fully diluted issued share capital.

**Changes to Working Capital:** Working capital changes include changes to trade and other receivables, inventory, accrued expenses and accounts payable. The financial projections reflect no material changes to working capital over the projection period.

**Capital Expenditures:** Capital expenditures represent the cash costs associated with periodic dry-docking and special surveys. The Debtors' vessels are subject to dry docking when special surveys are conducted every five years. During dry-dock, vessels incur significant "one time" expenses associated with dry docking and surveys, including shipyard expenses, paints, spares, and engineer services. Dry-dock cost estimates in 2018 range between $1.1 million and $1.2 million per vessel for those vessels scheduled to dry-dock. The Debtors prepare dry-dock cost estimates based on historical costs, the age and size of the vessel and the expected location of dry-dock services. (Costs are higher in European shipyards as compare with Asian yards.) The place of dry-dock will depend on geographical trading patterns of the vessels that time. In addition, the financial projections assume an additional $1.0-$1.2 million expense for each vessel in its next scheduled dry-docking to install ballast water treatment equipment.

**Projected Dry-Docking Dates**

| Vessel | Next Scheduled Date |
|---|---|
| Z. Baikal | Dec 2018 |
| Z. Vostok | Dec 2018 |
| Z. Amerika | Dec 2017 |
| Z. Amurskiy | Jun 2018 |
| P. Alexandra | Oct 2018 |
| P. Ekaterina | Nov 2018 |
| P. Irina | Feb 2019 |
| P. Elizaveta | Mar 2019 |
| P. Elena | Apr 2019 |

**Polar crew boat asset:** A non-debtor subsidiary owns a 50% interest in 2 crew boats vessel operating in the Sakhalin project. The crew boats provide support for shuttle tankers on 5 year time charters expiring December 2019. The Debtors do not control the amount or timing of any distributions from this joint venture.

FINANCIAL PROJECTIONS

**PRIMORSK INTERNATIONAL SHIPPING LIMITED, et al.**
**Income Statement**

| ($ in thousands) | Fiscal Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | FY2016 | FY2017 | FY2018 | FY2019 | FY2020 | FY2021 |
| **Revenues** | 63,638 | 62,743 | 61,052 | 61,776 | 62,707 | 62,536 |
| Vessel Operating Expenses | (21,499) | (21,741) | (21,735) | (22,169) | (22,675) | (23,065) |
| Other Operating and Administrative Expenses | (7,079) | (6,239) | (5,913) | (5,913) | (5,929) | (5,913) |
| **EBITDA** | 35,059 | 34,763 | 33,404 | 33,694 | 34,103 | 33,558 |
| Vessel Depreciation | (14,906) | (14,906) | (15,175) | (16,113) | (16,216) | (16,216) |
| **EBIT** | 20,153 | 19,857 | 18,229 | 17,580 | 17,887 | 17,342 |
| Interest Expense, Net | (7,613) | (7,215) | (6,963) | (6,736) | (6,465) | (6,055) |
| Gain/(Loss) on Disposal of Vessels | - | - | - | - | - | - |
| Other Income/(Expenses) | - | - | - | - | - | - |
| Income Taxes | - | - | - | - | - | - |
| **Net Income** | 12,540 | 12,642 | 11,266 | 10,844 | 11,423 | 11,287 |

**PRIMORSK INTERNATIONAL SHIPPING LIMITED, et al.**
**Cash Flow Statement**

| ($ in thousands) | Fiscal Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | FY2016 | FY2017 | FY2018 | FY2019 | FY2020 | FY2021 |
| **Operating Activities** | | | | | | |
| Net Profit (Loss) | 12,540 | 12,642 | 11,266 | 10,844 | 11,423 | 11,287 |
| Non-Cash Adjustments | | | | | | |
| Depreciation and Amortization | 14,906 | 14,906 | 15,175 | 16,113 | 16,216 | 16,216 |
| Interest Expense, Net | 7,613 | 7,215 | 6,963 | 6,736 | 6,465 | 6,055 |
| Restructuring fees | (7,400) | | | | | |
| Changes in Working Capital | - | - | - | - | - | - |
| **Cash from Operating Activities** | 27,659 | 34,763 | 33,404 | 33,694 | 34,103 | 33,558 |
| **Investing Activities** | | | | | | |
| Capital Expenditures / Dry Docking Reserve, Net | - | (2,400) | (11,400) | (6,300) | - | - |
| **Cash from Investing Activities** | - | (2,400) | (11,400) | (6,300) | - | - |
| **Financing Activities** | | | | | | |
| Loan Repayments | (22,530) | (20,000) | (20,000) | (20,000) | (20,000) | (20,000) |
| Interest Expense, Net | (7,613) | (7,215) | (6,963) | (6,736) | (6,465) | (6,055) |
| **Cash from Financing Activities** | (30,143) | (27,215) | (26,963) | (26,736) | (26,465) | (26,055) |
| **Beginning Cash and Cash Equivalents** | 14,374 | 11,890 | 17,038 | 12,079 | 12,736 | 20,375 |
| Net Change in Cash | (2,484) | 5,148 | (4,959) | 658 | 7,639 | 7,503 |
| **Ending Cash and Cash Equivalents** | 11,890 | 17,038 | 12,079 | 12,736 | 20,375 | 27,878 |
| **Beginning Dry dock reserve** | - | - | - | - | - | - |
| Dry dock allocation | - | 2,400 | 11,400 | 6,300 | - | - |
| Dry dock capex | - | (2,400) | (11,400) | (6,300) | - | - |
| **Dry dock reserve account** | - | - | - | - | - | - |

**PRIMORSK INTERNATIONAL SHIPPING LIMITED, et al.**
**Balance Sheet**

| ($ in thousands) | Projected 31/12/15 | Adjustments | Proforma 30/6/16 | Fiscal Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | FY2016 | FY2017 | FY2018 | FY2019 | FY2020 | FY2021 |
| Cash and Cash Equivalents | 14,374 | (6,712) | 7,662 | 11,890 | 17,038 | 12,079 | 12,736 | 20,375 | 27,878 |
| Drydocking reserve | - | | - | - | - | - | - | - | - |
| Inventories | 1,038 | - | 1,038 | 1,038 | 1,038 | 1,038 | 1,038 | 1,038 | 1,038 |
| Trade and Other Receivables | 1,491 | - | 1,491 | 1,491 | 1,491 | 1,491 | 1,491 | 1,491 | 1,491 |
| **Total Current Assets** | 16,903 | (6,712) | 10,191 | 14,419 | 19,567 | 14,608 | 15,265 | 22,904 | 30,407 |
| Vessels, Net | 308,625 | (7,453) | 301,172 | 293,719 | 281,213 | 277,438 | 267,624 | 251,408 | 235,192 |
| Polar Crewboat JV | 2,500 | | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 |
| Financial assets | 2,156 | - | 2,156 | 2,156 | 2,156 | 2,156 | 2,156 | 2,156 | 2,156 |
| **Total Non-Current Assets** | 313,281 | (7,453) | 305,828 | 298,375 | 285,869 | 282,094 | 272,280 | 256,064 | 239,848 |
| **TOTAL ASSETS** | 330,184 | (14,165) | 316,019 | 312,794 | 305,436 | 296,702 | 287,546 | 278,969 | 270,255 |
| Trade Payables and Other Current Liabilities | 7,275 | - | 7,275 | 7,275 | 7,275 | 7,275 | 7,275 | 7,275 | 7,275 |
| Bonds | 80,955 | (80,955) | - | - | - | - | - | - | - |
| **Long-Term Debt** | | | | | | | | | |
| Secured Term Loan-530 Senior | 201,554 | (12,530) | 189,024 | 179,024 | 159,024 | 139,024 | 119,024 | 99,024 | 79,024 |
| Secured Term Loan-530 Junior | 51,625 | - | 51,625 | 51,625 | 51,625 | 51,625 | 51,625 | 51,625 | 51,625 |
| Secured Term Loan-SWAP loan | 16,401 | - | 16,401 | 16,401 | 16,401 | 16,401 | 16,401 | 16,401 | 16,401 |
| **Total Debt** | 269,580 | (12,530) | 257,050 | 247,050 | 227,050 | 207,050 | 187,050 | 167,050 | 147,050 |
| Shareholder's Equity | (27,626) | 79,321 | 51,694 | 58,469 | 71,111 | 82,377 | 93,221 | 104,644 | 115,931 |
| **TOTAL LIABILITIES AND SHAREHOLDER'S EQUITY** | 330,184 | (14,165) | 316,019 | 312,794 | 305,436 | 296,702 | 287,546 | 278,969 | 270,255 |

**Appendix E: Liquidation Analysis**

**PRIMORSK INTERNATIONAL SHIPPING LIMITED, et al.**

**Liquidation Assumptions**

**Liquidation Analysis**

Pursuant to Section 1129(a) (7) of the Bankruptcy Code (often called the "Best Interests Test"), holders of Allowed Claims and Interests must either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Plan's assumed Effective Date, that is not less than the value such non-accepting holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code ("Chapter 7").

In determining whether the Best Interests Test has been met, the first step is to determine the dollar amount that would be generated from a hypothetical liquidation of the Debtors' assets under Chapter 7. The Debtors, with assistance of their financial advisor, have prepared this hypothetical Liquidation Analysis (the "Liquidation Analysis") in connection with the Disclosure Statement. The Liquidation Analysis reflects the estimated cash proceeds net of liquidation-related costs that would be available to the Debtors' creditors if the Debtors were to be liquidated under Chapter 7 as an alternative to continued operation of the Debtors businesses under the Plan. Accordingly, asset values discussed herein may be different than amounts referred to in the Plan. The Liquidation Analysis is based upon the assumptions discussed herein and in the Disclosure Statement.

UNDERLYING THE LIQUIDATION ANALYSIS ARE NUMEROUS ESTIMATES AND ASSUMPTIONS

REGARDING LIQUIDATION PROCEEDS THAT, ALTHOUGH DEVELOPED AND CONSIDERED

REASONABLE BY THE DEBTORS' MANAGEMENT AND ITS ADVISORS ARE INHERENTLY SUBJECT

TO SIGNIFICANT BUSINESS, ECONOMIC, REGULATORY AND COMPETITIVE UNCERTAINTIES AND

CONTINGENCIES BEYOND THE CONTROL OF THE DEBTOR AND ITS MANAGEMENT.

ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THE

LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE DEBTORS WERE, IN FACT, LIQUIDATED,

AND ACTUAL RESULTS COULD MATERIALLY DIFFER FROM THE RESULTS SET FORTH HEREIN.

**GENERAL ASSUMPTIONS**

***Overview of the Liquidation Process***

The Debtors prepared this Liquidation Analysis in connection with its solicitation of votes to accept or reject its Plan, which contemplates a reorganization of PRIMORSK INTERNATIONAL SHIPPING LIMITED, et al. (Collectively, "Primorsk"), along with 9 of their direct subsidiaries (the "Debtor Subsidiaries"). Under the hypothetical Chapter 7 scenario in this Liquidation Analysis, Primorsk and its Debtor Subsidiaries are collectively referred to as the "Chapter 7 Debtors."

In this case, it is assumed that the Debtors would continue to operate in the normal course for 120 to 150 days in order to sell their vessels. After the vessels are sold, the case would convert to a Chapter 7 liquidation and a trustee (the "Chapter 7 Trustee") would be appointed to manage the Chapter 7 Debtors' remaining affairs. The Debtors' would cease substantially all operations in an orderly manner and use their cash position to pay claims in accordance with the priority scheme set forth in the Bankruptcy Code.

### Hypothetical Liquidation Period

The Liquidation Analysis assumes an expedited, but orderly wind-down of the Debtors' operations to maximize recovery values. The hypothetical Chapter 7 liquidation is assumed to commence following the sale of the Debtors' vessels and conversion to a Chapter 7. For the purposes of this analysis the Company's Vessels are valued using broker estimates as of December 31, 2015.

### Estimate of Net Proceeds

The estimated cash proceeds that could be realized in liquidation are approximated by evaluating the Chapter 7 Debtors' assets. The Chapter 7 Debtors' assets primarily consist of (i) cash proceeds from the sale of their fleet of tankers, (ii) other cash and cash equivalents, and (iii) any additional operating assets such as customer receivables and other current assets. The net proceeds estimated in the Liquidation Analysis are based on estimated, unaudited asset and liability account balances for the Debtors as of June 30, 2016.[2]

### Estimate of Costs

The estimated liquidation costs include fees payable to a Chapter 7 Trustee as well as those to attorneys and other professionals that the Chapter 7 Trustee may engage. The Chapter 7 trustee is assumed to be paid 3% of the proceeds available from the Chapter 7 estate for their services. Priority expenses would include any obligations and unpaid expenses the Debtors incurred both during the chapter 11 cases and from the start and until the conclusion of the Chapter 7 case. In a Chapter 7 case, the wind-down expenses may be greater or less than the estimated amount. Such expenses are in part dependent on the length of time of the liquidation.

### Distribution of Net Proceeds

The proceeds available represent the sum of the disposition of the Chapter 7 Debtors' assets and cash on the balance sheet at the commencement of the hypothetical Chapter 7 liquidation.

Available proceeds from the liquidation of assets and cash would be first applied to the payment of Postpetition Administrative Claims (first claims arising from the wind-down of the Chapter 7 Debtors' business during the Chapter 7 liquidation process and thereafter to any Postpetition expenses associated with the chapter 11 reorganization process). Following the payment of Administrative Claims, net proceeds attributable to the liquidation of the Debtors' assets would first be applied to satisfaction of debt obligations secured by the Chapter 7 Debtors' various assets. Any remaining liquidated proceeds and cash would be available for the satisfaction of unsecured claims "Unsecured Claims", which shall

consist of General Unsecured Claims and any additional unsecured claims that arise in Chapter 7 liquidation "Additional Unsecured Claims." The holders of the Lender Claims have first priority liens or mortgages on, security interests in, and assignments, charges, or pledges on certain property, including, without limitation, (i) nine Vessels owned by the Debtor Subsidiaries, (ii) deeds of covenant assigning certain agreements related thereto, including, without limitation, charters, management agreements, earnings, and insurance, and (iii) Cash Collateral, as well as second priority liens or mortgages on, security interests in, and assignments, charges, or pledges on certain property, including, without limitation, (iv) nine Vessels owned by the Debtor Subsidiaries, and (v) deeds of covenant assigning certain agreements related thereto, including charters, management agreements, earnings, and insurance, that will partially fund the chapter 11 and Chapter 7 processes.

Any secured claims that are not satisfied by the liquidation of the underlying collateral securing the claims would represent an unsecured deficiency claim.

The table below summarizes the estimated proceeds that would be available for distribution to the Chapter 7 Debtors' creditors and equity interest holders in a hypothetical liquidation of the estates under Chapter 7 of the Bankruptcy Code. The estimated recoveries do not reflect any potential negative impact on the distributable value available to the Chapter 7 Debtors' creditors on account of any potential unknown and contingent liabilities. Additional assumptions with respect to the Liquidation Analysis are provided below.

**PRIMORSK INTERNATIONAL SHIPPING LIMITED, et al.**
**Scenario: Consensual Liquidation Process**

*$ in thousands*

| | Amount | % Recovery Low | % Recovery High | Liquidation Proceeds Low | Liquidation Proceeds High | See Note |
|---|---|---|---|---|---|---|
| **Assets Available for Distribution** | | | | | | |
| Cash & Cash Equivalents | $ 9,782 | 100% | 100% | $ 9,782 | $ 9,782 | 1 |
| Accounts Receivable | 1,491 | 50% | 75% | 746 | 1,118 | 2 |
| Inventory and Other Assets | 1,038 | 50% | 75% | 519 | 779 | 3 |
| Polar Crewboat JV | 2,500 | 25% | 50% | 625 | 1,250 | 4 |
| Value of Vessels | 299,930 | 82% | 95% | 245,000 | 285,000 | 5 |
| Interim Free Cash Flows | 2,278 | 80% | 100% | 1,822 | 2,278 | 6 |
| Proceeds Available for Post-Petition Administrative Claims | $ 317,019 | | | $ 258,494 | $ 300,207 | |
| **Estimated Liquidation Expenses** | | | | | | |
| Less: Chapter 7 Trustee Fees (3% of Gross Proceeds) | | | | (7,755) | (9,006) | 7 |
| Less: Broker Commission & Other Professional Fees | | | | (5,150) | (5,950) | 8 |
| Estimated Proceeds Available for Allocation After Administrative Claims | | | | $ 245,589 | $ 285,251 | |

| | Estimated Claims Low | Estimated Claims High | Estimated Creditor Recovery Percentage Low | Estimated Creditor Recovery Percentage High | Hypothetical Creditor Recovery Values Low | Hypothetical Creditor Recovery Values High | |
|---|---|---|---|---|---|---|---|
| **Estimated Creditor Recoveries** | | | | | | | |
| Senior Maritime Claims | $ - | $ - | na | na | $ - | $ - | 9 |
| **Estimated Net Proceeds Available to Secured Creditors** | | | | | $ 245,589 | $ 285,251 | |
| | | | | | | | |
| Lender Claims | $ 262,295 | $ 262,295 | | | | | |
| *530S* | $ 194,269 | $ 194,269 | 100% | 100% | $ 194,269 | $ 194,269 | |
| *530J* | $ 51,625 | $ 51,625 | 99% | 100% | $ 51,320 | $ 51,625 | |
| *Swap Loan* | $ 16,401 | $ 16,401 | 0% | 100% | $ - | $ 16,401 | |
| Bondholders Claims | $ 80,955 | $ 80,955 | 0% | 28% | $ - | $ 22,955 | |
| **Estimated Net Proceeds Available to Unsecured Creditors** | | | | | $ - | $ - | |
| | | | | | | | |
| **Other Claims** | | | | | | | |
| Charterers Claim | 6,534 | 6,534 | 0% | 0% | - | - | |
| Non debtor intercompany Claim | 7,653 | 7,653 | 0% | 0% | - | - | |
| Non debtor affiliate Claim | 1,889 | 1,889 | 0% | 0% | | | |
| Unsecured Claims | 218 | 218 | 0% | 0% | - | - | |
| **Estimated Other Claims** | 16,294 | 16,294 | | | - | - | 11 |
| | | | | | | | |
| **Equity Holders** | n/a | n/a | | | - | - | |

**SPECIFIC ASSUMPTIONS**

***Note 1 – Cash and Cash Equivalents***

As of June 30, 2016, cash and cash equivalents at Primorsk International Shipping Limited and their Debtor Subsidiaries is estimated to be $9.8 million. The cash is pledged to the $530 million and $7.5 million loan facilities. None of the cash is unencumbered.

***Note 2 – Accounts Receivable***

Estimated proceeds realized from accounts receivable under liquidation are based on management's estimate of collectability and the assumption that every reasonable effort will be made by the Chapter 7 Trustee to collect receivables from customers, a number of whom may be in various foreign jurisdictions. Accounts Receivable includes amounts due from charters.

***Note 3 – Inventory and Other Assets***

Inventory and Other Assets include lubricants inventory and prepaid insurance. Lubricants inventory, which is used to operate Vessels, is stored on-board the Vessels at the time of purchase and, depending on the flag of the Vessel, may also be pledged to the Secured Credit Facilities lenders. Prepaid insurance includes insurance premiums paid in advance which cover a period of time which has not elapsed.

***Note 4 – Polar Crew boat Joint Venture***

Shares in the joint venture are not liquid as the joint venture partner has a right of first refusal. The project is specific and the number of potential buyers is limited.

***Notes 5 – Value of Debtors' Vessels***

The Liquidation Analysis assumes that the Debtors' vessels will be sold in the secondary market over a 120-day period. The Debtors have received appraisals from two independent shipping brokers, which conducted an asset-level appraisal of the fleet as of December 2015. The values as of June 2016 have been estimated on a straight-line basis depreciation over their remaining estimated useful lives (assumed to be 25 years from original delivery), after considering the estimated residual value. These appraisals and indications of value are based on macroeconomic forecasts, industry conditions and recent asset transactions observed in the market and assume the vessels to be in sound condition, free of average damage, free of charter commitments, and the existence of a willing seller and willing buyer. The Liquidation Analysis applies a discount of 5% to 18% to each vessel's appraised value to account for the forced nature of the transaction, the expedited time frame (120 days) and the magnitude of supply being sold into the market.

***Note 6 – Interim Free Cash Flows***

The Liquidation Analysis assumes that the Debtors will sell the vessels in 120 days and then the case will convert to a Chapter 7 liquidation. From July 1, 2016 through November 31 2016, the Debtors' vessels are expected to generate unlevered free cash flows of approximately $2.3 million. In addition, pursuant

to the terms of the crew employment contracts, the Debtors are expected to incur severance cost of approximately $500,000.

### Note 7 – Chapter 7 Trustee and Other Liquidator Fees

The estate will incur Chapter 7 Trustee fees of approximately $7.7 million to $9.0 million in aggregate, calculated as 3.0% of the gross proceeds available for distribution. The Liquidation Analysis assumes that one Chapter 7 Trustee is appointed for all Debtors. However, it is possible that if all of the Debtors were to liquidate under Chapter 7, multiple Chapter 7 Trustees could be appointed, resulting in additional costs. The Liquidation Analysis does not account for possible fees by foreign administrators or liquidators in the event of a foreign insolvency proceeding. In addition, it is assumed the Trustee will require professional fees of $250,000.

### Note 8 –Wind-Down Costs and Other Professional Fees

During the 120 day sale period, Prisco (Singapore) will continue to provide management services until the vessels are sold.  Professional fees of $5.0 million to $5.8 million in aggregate are calculated as a 2.0% broker fee on the proceeds from the sale of the vessels.

### Note 9 – Maritime Payables

Maritime Payables arise from claims related to providing "necessaries" associated with vessel operations and include crew wages, vessel repairs and voyage supplies such as bunkers. These Maritime Payables are frequently secured by maritime liens. The Liquidation Analysis assumes that maritime liens, in the form of trade accounts payable at the individual Vessel-owning Debtor Subsidiaries, are senior to the secured loan claims at the vessel owning Debtor Subsidiaries and therefore are satisfied first through net proceeds available after the payment of Administrative Claims. In the event of Chapter 7 liquidation, charter counterparties may assert claims for the potential cancellation of their charter and/or the bunker inventory that is stored on the vessels. While these claims may be secured by maritime liens, the Liquidation Analysis does not take into account these potential claims.

### Note 10 – Lender Claims

Balances are estimated as of June 2016 and claims are ranked in order of priority.

### Note 11 – Bondholder Claims

Balance is estimated as of June 2016.

### Note 12 – Unsecured Claims

Cancellation of the existing charters will constitute an unsecured claim. This claim is valued at the difference of the charter rates as compared to average market rates at the date when the charters are assumed to be broken, which is October 30, 2016.

Non Debtor intercompany of $7.7 million and an estimated 25 unsecured creditors have with pre-petition claims for a total claim of approximately $8 million.

Non Debtor affiliate claim of $1.8 million constitutes three calendar months of management fees due to the termination of the ship management contracts.