UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
: 
In re                                                          :    Chapter 11
                                                               :
                                                               :    Case No. 16-10073 (MG)
PRIMORSK INTERNATIONAL SHIPPING                                :
LIMITED, *et al.*,[1]                                          :
                                                               :    Jointly Administered
                             Debtors.                          :
---------------------------------------------------------------x

**DECLARATION OF HOLLY FELDER ETLIN
IN SUPPORT OF THE DEBTORS' MOTIONS FOR AN ORDER
AUTHORIZING (A) THE SALE OF THE DEBTORS' VESSELS
FREE AND CLEAR OF ALL CLAIMS AND INTERESTS,
(B) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY
CONTRACTS AND UNEXPIRED LEASES IN CONNECTION THEREWITH
AND (C) WIND-DOWN EXPENDITURES AND
<u>DISTRIBUTIONS TO FIRST LIEN CREDITORS</u>**

I, Holly Felder Etlin, hereby declare as follows:

1.    I am over the age of 18 and am competent to testify. I currently serve as the Chief Restructuring Officer ("<u>CRO</u>") of Primorsk International Shipping Limited, a private limited liability company organized under the laws of Cyprus ("<u>Primorsk</u>"), and each of the debtors and debtors-in-possession in these chapter 11 cases (together with Primorsk, the "<u>Debtors</u>"). I submit this declaration in support of the Debtors' motion (the "<u>Sale Motion</u>")[2] for

---

[1] The Debtors in these Chapter 11 Cases and, if applicable, the last four digits of their U.S. taxpayer identification numbers are: Primorsk International Shipping Limited (Cyprus), Boussol Shipping Limited (Cyprus) (6402) – m/t "Zaliv Amerika", Malthus Navigation Limited (Cyprus) (6401) – m/t "Zaliv Amurskiy", Jixandra Shipping Limited (Cyprus) (6168) – m/t "Prisco Alexandra", Levaser Navigation Limited (Cyprus) (0605) – m/t "Prisco Ekaterina", Hermine Shipping Limited (Cyprus) (0596) – m/t "Prisco Irina", Laperouse Shipping Limited (Cyprus) (0603) – m/t "Prisco Elizaveta", Prylotina Shipping Limited (Cyprus) (6085) – m/t "Prisco Elena", Baikal Shipping Ltd (Liberia) (6592) – m/t "Zaliv Baikal" and Vostok Navigation Ltd (Liberia) (1745) – m/t "Zaliv Vostok".

[2] *Debtor's Motion for Orders (I) (A) Approving the Bid Procedures and Certain Bidding Protections, (B) Approving the Notice Procedures, (C) Authorizing the Debtors to Set a Date For The Sale Hearing and (D) Approving Assumption and Assignment Procedures and (II) Authorizing (A) the Sale of The Debtors'*

SC1:4164026.2

an order authorizing, among other things: (a) the sale of the Debtors' nine vessels (the "Vessels") free and clear of all claims and interests, (b) the assumption and assignment of certain executory contracts in connection therewith, and (c) wind-down expenditures and distributions to the First Lien Creditors (as defined below).

2. Except as otherwise indicated, the facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees working under my supervision, or my opinion based upon experience with the Debtors' business and the shipping industry as a whole. I am authorized to submit this declaration on behalf of each Debtor, and if called upon to testify, I would testify competently to the facts set forth herein. I am not being compensated specifically for this testimony other than through payments received as the CRO of the Debtors in these chapter 11 cases.

### Qualifications; Expertise

3. I have served as CRO of the Debtors since January 14, 2016. Although the Debtors are each independent legal entities, given the worldwide coordination of their business as an integrated group of companies, I have, as CRO, become familiar with the day-to-day operations and business and financial affairs of the Debtors as a group. AlixPartners has been engaged by the Debtors to assist in various restructuring negotiations since 2012.

4. I am a Managing Director at AlixPartners operating in the firm's Turnaround and Restructuring practice. I am based in the New York office of AlixPartners, and I have over 30 years of experience in providing restructuring and reorganization services for companies. Prior to AlixPartners, I was a principal with XRoads Solutions Group.

---

*Vessels Free and Clear of All Claims and Interests and (B) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith*, filed April 19, 2016 [Docket No. 148].

-2-

5.      I have advised companies, creditors and investors in connection with numerous in-court and out-of-court restructurings and recapitalizations and have served distressed companies in executive roles, including CRO and acting Chief Executive Officer ("CEO") of Tanner & Haley, CEO and CRO of New Century Financial, Interim Chief Financial Officer of Freedom Communications and CRO and then CEO at Borders, among others. I have a bachelor's degree from the University of California, Los Angeles, and am a certified insolvency and restructuring advisor and certified turnaround professional.

## The Marketing and Sale Process

6.      In accordance with the bid procedures (the "Bid Procedures") attached as Exhibit 1 to the bid procedures order (the "Bid Procedures Order"),[3] the Debtors and their advisors engaged in a multi-month and wide-ranging marketing process for the Vessels. Beginning in early April, Clarksons Platou AS ("Clarksons"), the Debtors' retained broker, identified and approached 48 prospective buyers regarding a transaction. Of the 48 prospective buyers, 24 parties negotiated and executed non-disclosure agreements with the Debtors. Each of these 24 parties were provided access to a data room of diligence materials and access to inspect each of the Vessels. 9 of these 24 parties conducted inspections of the Vessels.

7.      From April to the June 15, 2016 bid deadline, Clarksons engaged in extensive discussions with each of the interested parties regarding a potential transaction. On June 15, the Debtors received five bids for the Debtors' entire fleet of Vessels. Most of these bids included certain closing conditions and contingencies.

---

[3] *Order (A) Approving the Bid Procedures And Certain Bidding Protections, (B) Approving the Notice Procedures, (C) Authorizing the Debtors to set a Date for the Sale Hearing and (D) Approving Assumption and Assignment Procedures* entered on April 29, 2016 [Docket No. 164]. Capitalized terms not otherwise defined herein are to be given the meanings ascribed to them in the Bid Procedures.

SC1:4164026.2

8.  The Debtors and their advisors reviewed these bids and determined, in consultation with the Agents, that each of the five bids received was a Qualified Bid and that each such bidder is a Qualified Bidder. In accordance with the Bid Procedures, the Debtors invited each of these Qualified Bidders to the Auction on June 30, 2016 at the offices of White & Case LLP, 5 Old Broad Street, London EC2N 1DW, United Kingdom.

9.  In accordance with the Bid Procedures, two business days prior to the Auction, counsel to the Debtors distributed to all Qualified Bidders copies of all auction form documentation—memoranda of agreement, accompanying master rider and form of proposed sale order—and informed the Qualified Bidders of the Starting Bid.

10.  From the receipt of the bids on June 15, 2016 up to immediately prior to the Auction, the Debtors engaged in extensive discussions with each of the Qualified Bidders to finalize the terms of the memoranda of agreement, master rider and proposed form of sale order. The Debtors were able to remove conditions and contingencies to various bids and significantly improve the certainty of consummation of the proposed transaction. Although the Qualified Bidders each had slight technical variations to their agreements, the Debtors, in consultation with the Agents, were satisfied that the agreements were sufficiently similar such that they could be compared mainly on the basis of price.

11.  Once documentation was agreed to with each of the four Qualified Bidders attending the Auction,[4] the Auction commenced with a Starting Bid of $205 million and a $1 million minimum bid increment. The Qualified Bidders participated in multiple rounds of bidding. The Debtors, in consultation with the Agents, reviewed and evaluated each bid made at

---

[4] Prior to the commencement of the Auction, one of the Qualified Bidders informed counsel to the Debtors that based on the Starting Bid, they would not be attending.

-4-

the Auction on the basis of financial and contractual terms and other factors relevant to the sale process.  At the conclusion of the Auction, the Debtors, in consultation with the Agents, determined that the bid received from SCF Tankers Limited with a purchase price of $215 million was the highest or otherwise best offer and named SCF Tankers Limited the Successful Bidder.  Additionally, the Debtors, in consultation with the Agents, determined that the bid received from Hafnia Tankers Limited with a purchase price of $208 million was the next highest or otherwise best offer and named Hafnia Tankers Limited the Alternate Bidder.  As CRO, I support moving forward with a sale of the Vessels now on the terms agreed with the Successful Bidder and, if necessary, the Alternate Bidder.

12. On July 5, 2016, the Debtors executed the sale agreement (together with all schedules, exhibits and annexes thereto, the "Sale Agreement"), pursuant to which SCF Tankers Limited agreed to purchase the Vessels and to assume the Assumed Liabilities (as defined in the Sale Agreement). On July 5, 2016, the Debtors also executed the sale agreement (together with all schedules, exhibits and annexes thereto, the "Alternate Sale Agreement"), pursuant to which Hafnia Tankers Limited agreed to purchase the Vessels and to assume certain assumed liabilities as set forth in the Alternate Sale Agreement in the event that the Successful Bidder does not consummate the Sale.

13. The Debtors negotiated the terms of the Sale Agreement and the Alternate Sale Agreement in good faith and from an arm's-length bargaining position.  The Debtors and their advisors engaged in continuing negotiations regarding the Sale and relevant transaction documents with each Qualified Bidder and their respective advisors, prior to and throughout the Auction. I believe the terms of the Sale Agreement and the Alternate Sale Agreement have been subject to a robust market test.  No other entity or group of entities has proposed a viable

transaction involving the Vessels for greater value to the Debtors' estate than the Successful Bidder and I believe that there are no other entities interested in and capable of consummating a transaction involving the Vessels other than the approximately 48 parties that were contacted by the Debtors and Clarksons in the marketing process. Based on this comprehensive canvassing of the market undertaken by the Debtors, Clarksons and the Debtors' other advisors, and the results of the sale process, which was conducted by the Debtors without collusion and in accordance with the Bid Procedures, I believe the Successful Bid represents the highest and best offer received by the Debtors for the Vessels and the Alternate Bid represents the next highest and best offer.

14. I believe that the sale process conducted by the Debtors and Clarksons was in accordance with the Bid Procedures and provided all creditors and other parties in interest a full, fair and reasonable opportunity to qualify as bidders, and provided potential purchasers sufficient information to enable them to make an informed judgment on whether to bid. Furthermore, throughout the sale process, the Debtors have consulted with the Senior Lenders and Swap Lenders, and have worked closely with the Agents' advisors to address issues and concerns regarding the Sale and sale process. Among other things, the Debtors' professionals and I held calls at least weekly to directly update the Senior Lenders and the Swap Lenders on the Sale and the sale process. The Agents for the Senior Lenders and the Swap Lenders and their counsel and financial advisors also attended the Auction, provided input on the documentation for each Qualified Bidder and were consulted with respect to the auction procedures and the selection of the Successful Bidder and the Alternative Bidder. I believe that the process conducted by the Debtors and their advisors, in active consultation with the Senior Lenders and Swap Lenders, resulted in the best possible transaction for the Vessels under the circumstances.

15.     Accordingly, I believe that the Debtors have exercised good, sufficient and sound business reasons for entering into both the Sale Agreement and the Alternate Sale Agreement and approval of the sale of the Vessels to the Successful Bidder and the consummation of the transactions contemplated by the Sale Agreement are in the best interests of the Debtors and their estates, creditors and all parties in interest in these chapter 11 cases. I believe the approval of the sale of the Vessels to the Alternate Bidder as an alternative to the Sale to the Successful Bidder, and the consummation of the transactions contemplated by the Alternate Sale Agreement in the case that the Successful Bidder does not consummate the Sale, are in the best interests of the Debtors and their estates, creditors and all parties in interest in these chapter 11 cases.

### Prisco Commission Claims

16.     Three Debtors are party to charter contracts that include a right of Prisco (Singapore) Pte Ltd to receive commissions payable by the applicable Debtor as "Owner" under the charter contract. The relevant language in each of the charter contract reads as follows: "1.25% commission is payable by Owners ([applicable Debtor]) to Prisco (Singapore) Pte Ltd, on gross hire paid and any further extensions of the Time Charter Party." Each of these charter contracts was entered into prior to the commencement of these chapter 11 cases and any brokerage or other services provided by Prisco (Singapore) Pte Ltd with respect to the arrangement of these contracts has been fully performed.

17.     In negotiations, the Successful Bidder requested that the sale of the applicable Vessel and assumption and assignment of the applicable Assigned 365 Debtor Contract be free and clear of such claims of Prisco (Singapore) Pte Ltd and informed the Debtors and their professionals that they refuse to accept any liability for these claims. Accordingly, I

believe that if the sale of the Vessels and the assumption and assignment of the applicable 365 Debtor Contracts is not free and clear of the claims for these commissions, the Successful Bidder and Qualified Bidder would not have entered into the Sale Agreement and the Alternate Sale Agreement, respectively.

18. In the event that it is determined to be necessary or appropriate for the Debtors to make a payment to Prisco (Singapore) Pte Ltd with respect to the amounts due with respect to these commissions during the remaining term of the applicable charter contracts, the wind-down budget discussed below provides sufficient resources to make such payment in cash in full.

### Wind-Down Expenditures and Distribution to First Lien Creditors

19. I believe the wind-down budget, attached hereto as Exhibit A, is an appropriate budget and reserve for the remainder of these chapter 11 cases.

20. I believe that the proceeds from the Sale will exceed the outstanding principal amount and accrued and unpaid prepetition interest owed to the senior secured term lenders (the "First Lien Creditors") of the $450 million secured term loan of that certain facility agreement relating to a $530,000,000 loan facility, dated January 2, 2008 (the "Senior Secured Term Loan") under the Senior Secured Term Loan Facility.

21. I understand that the First Lien Creditors have asserted a right to payment of post-petition interest during these chapter 11 cases and are receiving such interest. The rate of post-petition interest under the Senior Secured Term Loan is higher than the rate of interest that the Debtors can reasonably expect to earn on the Debtors' cash deposits. The Debtors' do not anticipate having any other use or need for cash proceeds from the Sale, beyond what is required in the wind-down budget and to make distributions to creditors in connection with a chapter 11

plan of reorganization, which the Debtors intend to file promptly. Accordingly, I believe that the application of excess proceeds from the Sale to pay First Lien Creditors prior to the effectiveness of a chapter 11 plan of reorganization is in the best interests of the Debtors and their stakeholders.

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: July 5, 2016
       New York, New York

*/s/ Holly Felder Etlin*
Holly Felder Etlin
Chief Restructuring Officer

# **Exhibit A**
Wind-Down Budget

**Primorsk International Shipping Limited**
**Wind down forecast**
**($ USD)**

| Fiscal Period | 2016 | 2016 | 2016 | 2016 | 2016 | 2016 | 2016 | 2016 | 2016 | 2016 | 2016 | 2016 | 2016 | 2016 | 14 weeks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4-4-5 Month | 7 | 8 | 8 | 8 | 8 | 9 | 9 | 9 | 9 | 9 | 10 | 10 | 10 | 10 | as of |
| Fiscal Week # | Week 31 | Week 32 | Week 33 | Week 34 | Week 35 | Week 36 | Week 37 | Week 38 | Week 39 | Week 40 | Week 41 | Week 42 | Week 43 | Week 44 | 25/07/2016 |
| Week Commencing | 25/07/2016 | 01/08/2016 | 08/08/2016 | 15/08/2016 | 22/08/2016 | 29/08/2016 | 05/09/2016 | 12/09/2016 | 19/09/2016 | 26/09/2016 | 03/10/2016 | 10/10/2016 | 17/10/2016 | 24/10/2016 | |
| Week Ending | 31/07/2016 | 07/08/2016 | 14/08/2016 | 21/08/2016 | 28/08/2016 | 04/09/2016 | 11/09/2016 | 18/09/2016 | 25/09/2016 | 02/10/2016 | 09/10/2016 | 16/10/2016 | 23/10/2016 | 30/10/2016 | |
| Forecast/Actual | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Total |
| **Total starting cash balance (exc Bond reserve account)** | **9,371,454** | **7,099,483** | **7,607,095** | **6,411,831** | **5,942,062** | **5,480,758** | **4,544,318** | **4,035,085** | **3,652,102** | **3,216,022** | **678,433** | **562,556** | **446,678** | **146,301** | **9,371,454** |
| **Cash receipts** | | | | | | | | | | | | | | | |
| Vessels operating receipts | - | 3,756,999 | - | - | - | 1,123,226 | - | - | - | - | - | - | - | - | 4,880,225 |
| **Total cash receipts** | - | **3,756,999** | - | - | - | **1,123,226** | - | - | - | - | - | - | - | - | **4,880,225** |
| **Cash disbursements** | | | | | | | | | | | | | | | |
| Total Operating Expenses | - | (174,052) | (1,195,264) | (469,769) | (172,754) | (59,230) | (509,233) | (382,984) | (210,180) | (615,877) | (115,877) | (115,877) | (115,877) | (701,339) | (4,838,314) |
| Management fees | - | (642,010) | - | - | - | (621,300) | - | - | - | (642,010) | - | - | - | - | (1,905,320) |
| Legal & Professional fees - Co. side / US Trustee fee | (408,600) | (493,950) | - | - | (288,550) | (354,765) | - | - | (225,900) | (321,975) | - | - | (184,500) | (1,559,410) | (3,837,650) |
| Contingency | (1,000,000) | - | - | - | - | - | - | - | - | - | - | - | - | - | (1,000,000) |
| Legal & Professional fees - Bank / Swap. side | - | (1,939,375) | - | - | - | (161,000) | - | - | - | (118,000) | - | - | - | (64,000) | (2,282,375) |
| **Total operating cash disbursements** | **(1,408,600)** | **(3,249,387)** | **(1,195,264)** | **(469,769)** | **(461,304)** | **(1,196,295)** | **(509,233)** | **(382,984)** | **(436,080)** | **(1,697,862)** | **(115,877)** | **(115,877)** | **(300,377)** | **(2,324,749)** | **(13,863,659)** |
| **Net inflow/ (outflow) from operations** | **(1,408,600)** | **507,612** | **(1,195,264)** | **(469,769)** | **(461,304)** | **(73,069)** | **(509,233)** | **(382,984)** | **(436,080)** | **(1,697,862)** | **(115,877)** | **(115,877)** | **(300,377)** | **(2,324,749)** | **(8,983,434)** |
| Interest & Fees | (863,371) | - | - | - | - | (863,371) | - | - | - | (839,726) | - | - | - | - | (2,566,468) |
| **Total ending cash balance (exc Bond reserve account)** | **7,099,483** | **7,607,095** | **6,411,831** | **5,942,062** | **5,480,758** | **4,544,318** | **4,035,085** | **3,652,102** | **3,216,022** | **678,433** | **562,556** | **446,678** | **146,301** | **(2,178,448)** | **(2,178,448)** |

**Assumptions**

**First vessel handover starts in w/e 31 July 2016 and last vessel handover completed by w/e 25 Sept 2016 with all wind down costs paid by w/e 30 Oct 2016.**

**Timing is subject to confirmation with the buyer and could change the budget.**