**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————————— x

In re                                :         Chapter 11
                                      :
PRIMORSK INTERNATIONAL SHIPPING   :         Case No. 16-10073 (MG)
LIMITED, *et al.*, [1]                        :
                                      :         Jointly Administered
                      Debtors.   :

———————————————————————— x

## DISCLOSURE STATEMENT FOR DEBTORS' JOINT PLAN OF LIQUIDATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

Andrew G. Dietderich
Brian D. Glueckstein
Alexa J. Kranzley
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone:   (212) 558-4000

Counsel to the Debtors and Debtors-in-Possession

Dated:  August 2, 2016

---

[1]   The Debtors in these Chapter 11 Cases and, if applicable, the last four digits of their U.S. taxpayer identification numbers are: Primorsk International Shipping Limited (Cyprus), Boussol Shipping Limited (Cyprus) (6402) – m/t "Zaliv Amerika", Malthus Navigation Limited (Cyprus) (6401) – m/t "Zaliv Amurskiy", Jixandra Shipping Limited (Cyprus) (6168) – m/t "Prisco Alexandra", Levaser Navigation Limited (Cyprus) (0605) – m/t "Prisco Ekaterina", Hermine Shipping Limited (Cyprus) (0596) – m/t "Prisco Irina", Laperouse Shipping Limited (Cyprus) (0603) – m/t "Prisco Elizaveta", Prylotina Shipping Limited (Cyprus) (6085) – m/t "Prisco Elena", Baikal Shipping Ltd (Liberia) (6592) – m/t "Zaliv Baikal" and Vostok Navigation Ltd (Liberia) (1745) – m/t "Zaliv Vostok".

THE BOARD OF DIRECTORS (OR THE EQUIVALENT AUTHORIZED BODY) OF EACH OF THE DEBTORS HAS APPROVED THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN AND THE TRANSACTIONS CONTEMPLATED AND DESCRIBED HEREIN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED FOR THE PURPOSE OF SOLICITING VOTES TO ACCEPT OR REJECT THE CHAPTER 11 PLAN IT DESCRIBES HEREIN. NO PERSON SHOULD USE OR RELY ON THIS DISCLOSURE STATEMENT FOR ANY OTHER PURPOSE.

THIS DISCLOSURE STATEMENT IS BEING DISTRIBUTED TO PARTIES-IN-INTEREST AS A SETTLEMENT PROPOSAL AND IS THEREFORE SUBJECT TO FEDERAL RULE OF EVIDENCE 408 AND OTHER APPLICABLE RULES, AND DOES NOT CONSTITUTE AND MAY NOT BE CONSTRUED AS AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER IN CONNECTION WITH ANY PENDING, THREATENED AND POTENTIAL LITIGATION, ARBITRATIONS OR DISPUTES.

THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PLAN AND DOCUMENTS RELATED THERETO; STATUTORY PROVISIONS RELEVANT TO CONFIRMATION OF THE PLAN; EVENTS IN THESE CHAPTER 11 CASES; AND FINANCIAL INFORMATION. ALTHOUGH THE DEBTORS BELIEVE SUCH SUMMARIES ARE FAIR AND ACCURATE, THEY ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRETY OF SUCH DOCUMENTS OR STATUTORY PROVISIONS.

FACTUAL INFORMATION INCLUDED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' ADVISORS, MANAGEMENT AND EMPLOYEES OF PRISCO (SINGAPORE) PTE LTD, THE DEBTORS' MANAGEMENT SERVICES PROVIDER, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO. HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED.

NO PERSON SHOULD RELY ON ANY OTHER INFORMATION THAN THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED BY REFERENCE HEREIN. THE DEBTORS HAVE NOT AUTHORIZED ANYONE TO PROVIDE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.

SC1:4134577.6

## TABLE OF CONTENTS

1.    Executive Summary .............................................................................................1
      A.    Purpose of this Disclosure Statement ....................................................1
      B.    Recovery Analysis and Treatment of Claims and Equity Interests .........2
      C.    Deemed Substantive Consolidation of the Debtors ...............................4
      D.    Voting on the Plan .................................................................................5
      E.    Confirmation of the Plan ........................................................................6

2.    Background to These Chapter 11 Cases ...............................................................8
      A.    The Debtors...........................................................................................8
      B.    Prepetition Capital Structure..................................................................8
      C.    Events Leading Up to These Chapter 11 Cases .....................................12

3.    Significant Events and Initiatives in These Chapter 11 Cases............................14
      A.    Overview of Chapter 11 ......................................................................14
      B.    The Debtors' Operations in Chapter 11 ................................................15
      C.    Summary of the Claims Process ...........................................................16
      D.    The March 15 Plan and Disclosure Statement......................................16
      E.    Extension of Exclusivity ......................................................................17
      F.    Vessel Sale Process .............................................................................17

4.    Summary of the Plan............................................................................................20
      A.    Classification, Treatment and Voting of Claims and Equity Interests...................20
      B.    Establishment of the Liquidating Trust; Vesting of Assets in the
            Liquidating Trust .................................................................................24
      C.    Settlement, Release, Injunction and Related Provisions.......................25

5.    Statutory Requirements for Confirmation of the Plan .......................................30
      A.    The Confirmation Hearing....................................................................30
      B.    Confirmation Standards .......................................................................31
      C.    Best Interests Test................................................................................32
      D.    Financial Feasibility.............................................................................34
      E.    Acceptance by Impaired Classes ..........................................................34
      F.    Confirmation Without Acceptance by All Impaired Classes................35

6.    Voting Procedures................................................................................................36
      A.    Parties-in-Interest Entitled to Vote ......................................................38
      B.    Voluntary Releases under the Plan .......................................................38
      C.    Classes under the Plan .........................................................................39
      D.    Solicitation Packages for Voting Classes ..............................................39
      E.    Solicitation Packages for Non-Voting Classes ......................................40
      F.    Voting Procedures................................................................................40

7.    Additional Factors to Be Considered Prior to Voting........................................41

iii

A.    Plan Risks.................................................................................................................41

8.    Material United States Federal Income Tax Consequences of the Plan ...........................44
A.    Federal Income Tax Consequences to Debtors.......................................................44
B.    Consequences of the Liquidating Trust ................................................................45
C.    General Tax Reporting by the Liquidating Trust and Liquidating Trust
Beneficiaries ........................................................................................................45

9.    Alternative to Confirmation of the Plan.............................................................................47
A.    Chapter 7 Liquidation ..........................................................................................47

10.    Debtors' Recommendation ...............................................................................................47

Index of Defined Terms .............................................................................................................1

iv

# **Appendices**

Appendix A: Debtors' Plan of Liquidation

Appendix B: Solicitation Procedures Order

Appendix C: Debtors' Corporate Structure Chart

Appendix D: Liquidation Analysis

SC1:4134577.6

## 1. EXECUTIVE SUMMARY

On January 15, 2016 (the "*Petition Date*"), Primorsk International Shipping Limited ("*Primorsk*") and the other Debtors in these Chapter 11 Cases (collectively, the "*Debtors*") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "*Bankruptcy Code*"). The Debtors have continued to operate in the ordinary course of business since the Petition Date and certain of Primorsk's other subsidiaries are not subject to these Chapter 11 Cases.

Simultaneous with the filing of this Disclosure Statement, the Debtors are filing the *Joint Chapter 11 Plan of Liquidation of Primorsk International Shipping Limited and its Debtor Affiliates* (as may be further amended, supplemented or modified from time to time, including the Plan Supplement and all other exhibits and schedules thereto, in each case, as they may be further amended, modified or supplemented from time to time, the "*Plan*"),[2] attached hereto as Appendix A.

### A. Purpose of this Disclosure Statement

Chapter 11 is the chapter of the Bankruptcy Code primarily used for business reorganization and orderly liquidations. Chapter 11 helps a company to maximize recovery to all stakeholders. The consummation of a plan is the principal objective of a chapter 11 case. A plan sets forth the means for satisfying claims against, and interests in, the debtor. Confirmation of a plan by a bankruptcy court binds the debtors and any creditor or interest holder of the debtors. Subject to certain limited exceptions, the order approving confirmation of a plan discharges the debtors from any debt that arose prior to the date of confirmation of the plan and enjoins all parties from bringing any causes of action in connection with such debts.

In general, a plan (i) divides claims and interests into separate classes, (ii) specifies the property that each class is to receive under the plan, and (iii) contains provisions necessary to implement the plan. Under the Bankruptcy Code, "claims" and "interests," rather than "creditors" and "shareholders," are classified because creditors and shareholders may hold claims and interests in more than one class.

The Debtors submit this *Disclosure Statement for Debtors' Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code* (this "*Disclosure Statement*") pursuant to section 1125 of the Bankruptcy Code for the purpose of soliciting votes on the proposed Plan. The purpose of this Disclosure Statement is to provide the Holders of Claims who are entitled or solicited to vote on the Plan with adequate information to make an informed judgment about the Plan. According to section 1125 of the Bankruptcy Code, acceptances of a chapter 11 plan may be solicited only after a Bankruptcy Court approved written disclosure statement has been provided to each creditor or interest holder who is entitled to vote on the plan.

---

[2]   Capitalized terms not defined herein shall have the meanings given to them in the Plan.

**B.     Recovery Analysis and Treatment of Claims and Equity Interests**

The Plan organizes the Debtors' creditor and equity constituencies into groups called Classes.  For each Class, the Plan describes (a) the underlying Claim or Equity Interest, (b) the recovery available to the Holders of Claims or Equity Interests in that Class under the Plan, (c) whether the Class is Impaired under the Plan, meaning that each Holder will receive less than full value on account of its Claim or Equity Interest or that the rights of Holders under law will be altered in some way, and (d) the form of any consideration (*e.g.*, Cash, stock or a combination thereof) that Holders will receive on account of their respective Claims or Equity Interests.

In accordance with section 1123(a)(1) of the Bankruptcy Code, the Plan does not classify General Administrative Claims or Professional Claims, which will generally be paid in Cash when approved by the Bankruptcy Court or in the ordinary course on or after the Effective Date.

The classification of Claims and Equity Interests pursuant to the Plan is as follows:

| CLASS | CLAIMS AND EQUITY INTERESTS | STATUS | VOTING RIGHTS |
|-------|------------------------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3A | Senior Loan Claims | Impaired | Entitled to Vote |
| 3B | Junior Loan Claims | Impaired | Entitled to Vote |
| 3C | Swap Claims | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Impaired | Deemed to Reject |
| 5 | Equity Interests in Primorsk | Impaired | Deemed to Reject |

The table below provides a summary of the classification, treatment and estimated recoveries of Claims and Equity Interests under the Plan.  This information is provided in summary form for illustrative purposes only, is subject to material change based on contingencies related to the claims reconciliation process, and is qualified in its entirety by reference to the provisions of the Plan.  For a more detailed description of the treatment of Claims and Equity Interests under the Plan, see <u>Section 4</u> below—Summary of the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ARE THEREFORE SUBJECT TO CHANGE.**

**<u>SUMMARY OF TREATMENT OF CLAIMS AND EQUITY INTERESTS AND ESTIMATED RECOVERIES</u>[3]**

---

[3]     Figures are as of January 14, 2016, and are subject to material change.

SC1:4134577.6

| CLASS | TREATMENT | ESTIMATED ALLOWED CLAIMS[4] | ESTIMATED PERCENT RECOVERY | |
|---|---|---|---|---|
| | | | Plan | Liquidation |
| **Class 1** <br> Other Priority Claims | Each Holder of an Allowed Other Priority Claim shall be paid in full in Cash on or as soon as reasonably practicable after the latest of (i) the Effective Date, (ii) the date on which such Other Priority Claim becomes Allowed, and (iii) such other date as may be ordered by the Bankruptcy Court. | $0 | 100% | 100% |
| **Class 2** <br> Other Secured Claims | Each Holder of an Allowed Other Secured Claim shall receive one of the following treatments, in the sole discretion of the applicable Debtor: (i) payment in full in Cash including the payment of any interest payable under section 506(b) of the Bankruptcy Code; (ii) delivery of the collateral securing such Allowed Other Secured Claim; or (iii) treatment of such Allowed Other Secured Claim in any other manner that renders the Claim Unimpaired. | $0 | 100% | 100% |
| **Class 3A** <br> Senior Loan Claims | Each Holder of an Allowed Senior Loan Claim shall be paid in full in Cash in accordance with the Sale Order. | $194,269,474 and to the extent provided for in the 530 Loan Agreement, unpaid postpetition interest at the default contractual rate until the principal and all unpaid interest are repaid in full | 100% | 100% |
| **Class 3B** <br> Junior Loan Claims | Each Holder of an Allowed Junior Loan Claim shall receive (i) its Pro Rata share of remaining Encumbered Cash, following the provision of a reserve for line items in the Wind-Down Budget and the distributions made to the Holders of Senior Loan Claims, and (ii) its Pro Rata share of the Liquidating Trust Distributable Cash, in each of cases (i) and (ii) until such time as such Holder has received Cash distributions equal to the Allowed amount of such Allowed Junior Loan Claim. | $51,625,000 | 35% | 20% |

---

[4]    Estimated aggregate amount of claims currently asserted against or scheduled by the Debtors, incorporating provisions of the Plan and excluding duplicative claims.

SC1:4134577.6

| CLASS | TREATMENT | ESTIMATED ALLOWED CLAIMS[4] | ESTIMATED PERCENT RECOVERY | |
|---|---|---|---|---|
| | | | Plan | Liquidation |
| **Class 3C** Swap Claims | Each Holder of an Allowed Swap Claim shall receive its Pro Rata share of the Liquidation Trust Distributable Cash, following the distributions made to the Holders of the Junior Loan Claims. | $16,400,988 | 0% | 0% |
| **Class 4** General Unsecured Claims | No Holder of a General Unsecured Claim shall receive any Distributions on account of its General Unsecured Claim. On and after the Effective Date, all General Unsecured Claims shall be released and shall be of no further force or effect. | $0 | 0% | 0% |
| **Class 5** Equity Interests in Primorsk | No Holder of an Equity Interest in Primorsk shall receive any Distributions on account of its Equity Interest. On and after the Effective Date, all Equity Interests in Primorsk shall be cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise. | N/A | 0% | 0% |

## C.    Deemed Substantive Consolidation of the Debtors

The Plan shall serve as a motion by the Debtors seeking entry of a Bankruptcy Court order deeming the substantive consolidation of the Debtors' Estates into a single Estate for certain limited purposes related to the Plan, including Voting, Confirmation and Distribution. The deemed substantive consolidation of the Debtors' Estates for certain limited purposes is for administrative convenience only, and the Debtors do not contend that substantive consolidation is appropriate under the applicable legal standard.

As explained in <u>Section 2.A</u> below, the Debtors consist of Primorsk and its nine wholly-owned subsidiaries. The Debtors are an integrated enterprise, managed across geographic boundaries and legal entities. Holders of Allowed Claims against or Equity Interests in each of the Debtors will receive the same recovery provided to other Holders of Allowed Claims or Equity Interests in the applicable Class. The Debtors believe that no creditor will receive a recovery inferior to that which it would receive if each Debtor proposed a plan of liquidation that was completely separate from that proposed by each other entity and, therefore, the Debtors do not believe that any creditor will be materially adversely affected by not voting and receiving distributions on an entity-by-entity basis.

SC1:4134577.6

### D.    Voting on the Plan

#### 1.    *Parties-in-Interest Entitled to Vote*

Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless:  (a) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof; or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

In general, under section 1126(a) of the Bankruptcy Code, the holder of a claim or interest that is allowed under a plan is entitled to vote to accept or reject the plan if such claim or interest is impaired under the plan.  Under section 1126(f) of the Bankruptcy Code, the holder of a claim that is not impaired under a plan is deemed to have accepted the plan, and the plan proponent need not solicit such holder's vote. Under section 1126(g) of the Bankruptcy Code, the holder of an impaired claim or impaired interest that will not receive any distribution under the plan in respect of such claim or interest is deemed to have rejected the plan and is not entitled to vote on the plan.  For a detailed description of the treatment of Claims and Equity Interests under the Plan, refer to <u>Section 4</u> below—Summary of the Plan.

Classes 1 and 2 are Unimpaired under, and deemed under section 1126(f) of the Bankruptcy Code to have accepted, the Plan.

Classes 3A, 3B and 3C are Impaired under, and entitled to vote to accept or reject, the Plan.

Except as described in <u>Section 5</u> below, the Bankruptcy Code requires, as a condition to confirmation of the Plan, that each Impaired Class accept the Plan.  Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by an impaired class of claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in such class that have voted to accept or reject the plan.  Holders of claims who fail to vote are deemed neither to accept nor to reject the plan.  For a more detailed description of the requirements for confirmation of the Plan, refer to <u>Section 6</u> below—Statutory Requirements for Confirmation of the Plan.

Even if the Plan has not been accepted by all Impaired Classes entitled to vote, section 1129(b) of the Bankruptcy Code allows the Bankruptcy Court to confirm the Plan, provided that the Plan has been accepted by at least one Impaired Class of creditors. Notwithstanding the failure of an Impaired Class to accept the Plan, the Plan can be confirmed in a procedure commonly known as cram-down, so long as the Plan does not "discriminate unfairly" and is "fair and equitable," for the purposes of the Bankruptcy Code, with respect to each Class of Claims or Equity Interests that is Impaired under, and has not accepted, the Plan. For a more detailed description of the requirements for confirmation of a nonconsensual plan, refer to <u>Section 5</u> below—Statutory Requirements for Confirmation of the Plan.

SC1:4134577.6

### 2. *Submitting a Ballot*

Classes 3A, 3B and 3C are entitled to or are being solicited to vote to accept or reject the Plan.  If you are entitled or are being solicited to vote, you should carefully review this Disclosure Statement, including the attached appendices and the instructions accompanying your Ballot or Ballots.  Then, indicate your acceptance or rejection of the Plan by voting for or against the Plan on the enclosed Ballot or Ballots and return the Ballot or Ballots to Kurtzman Carson Consultants LLC (the "*Notice and Claims Agent*"). For further information, refer to Section 6 below—Voting Procedures, and the Solicitation Procedures Order attached hereto as Appendix B.

Ballots cast by Holders in Classes entitled to vote must be received by the Notice and Claims Agent by 8:00 p.m. (Eastern Time) on September 13, 2016. For further information, refer to Section 6 below—Voting Procedures.

Ballots received after the Voting Deadline will not be counted.

The method of delivery of Ballots to be sent to the Notice and Claims Agent is at the election and risk of each Holder of a Claim.  Except as otherwise provided in the Plan or Solicitation Procedures Order, delivery of a Ballot will be deemed made only when the original executed Ballot is actually received by the Notice and Claims Agent.  In all cases, sufficient time should be allowed to ensure timely delivery.  Original executed Ballots are required.

Delivery of a Ballot to the Notice and Claims Agent by facsimile, e-mail or any other electronic means will not be accepted.  No Ballot should be sent to the Debtors or the Debtors' financial or legal advisors, agents or representatives (other than the Notice and Claims Agent), and if so sent, will not be counted.

### 3. *Recommendation*

**The Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept it.  All such recommendations herein are by the Debtors' Chief Restructuring Officer, Holly Felder Etlin.**

### E. Confirmation of the Plan

### 1. *Plan Objection Deadline*

Objections to Confirmation of the Plan must be filed with the Court and served so as to be actually received on or before 4:00 p.m. (Eastern Time) on September 13, 2016.

Unless objections to Confirmation are timely served and filed in compliance with the Solicitation Procedures Order, they will not be considered by the Bankruptcy Court.  For further information, refer to Section 5 below—Statutory Requirements for Confirmation of the Plan.

SC1:4134577.6

2. _Confirmation Hearing_

The Bankruptcy Court has scheduled the Confirmation Hearing for **September 20, 2016 at 10:00 a.m. (Eastern Time)**.  The Confirmation Hearing may be adjourned by the Bankruptcy Court or the Debtors without further notice other than by announcement in open court and/or notice(s) of adjournment filed on the docket with the Bankruptcy Court's permission.

SC1:4134577.6

## 2. Background to These Chapter 11 Cases

### A.    The Debtors

The Debtors conduct their business directly and through two wholly-owned non-Debtor subsidiaries, Isardia Holdings Limited and Walmer Shipping Co. Limited, the latter of which holds a 50% interest in Shipworth Shipping Company Limited (collectively with the Debtors, the "*Company*").  A corporate structure chart of the Company is attached hereto as Appendix C.

Primorsk's fleet is comprised of nine wholly-owned product and crude oil tankers and two joint venture vessels.  The core fleet is comprised of ice class vessels with hull reinforcement, steel propellers and other winterization features that enable transportation in harsh environments such as the Arctic, Russia Far East (Sakhalin) and Baltic areas.

### B.    Prepetition Capital Structure

#### 1.    *Senior Debt*

As of the Petition Date, the Debtors had outstanding funded secured debt (the "*Senior Debt*") in an aggregate amount of principal and accrued interest of $262,295,462.  It consisted of (a) approximately $194.3 million pursuant to a senior secured term loan facility and approximately $51.6 million pursuant to a junior revolving credit facility (collectively the "*530 Loan Facility*") and (b) approximately $16.4 million pursuant to a third ranking term loan facility taken to refinance certain swap liabilities (the "*Swap Facility*").

The outstanding amounts of the Senior Debt were held by the following:

| NAME OF CREDITOR | TOTAL AMOUNT OF SENIOR DEBT HELD | TOTAL AMOUNT OF SENIOR LOAN DEBT HELD | TOTAL AMOUNT OF JUNIOR LOAN DEBT HELD | TOTAL AMOUNT OF SWAP DEBT HELD |
|---|---|---|---|---|
| BNP Paribas S.A. | $54,046,095 | $37,645,107 | $0 | $16,400,988 |
| Oaktree/ OCM Starfish Debtco S.a.r.l | $53,239,220 | $18,822,553 | $34,416,667 | $0 |
| Nordea Bank Norge ASA | $36,030,887 | $18,822,553 | $17,208,333 | $0 |
| DnB Bank ASA | $25,039,177 | $25,039,177 | $0 | $0 |
| Credit Agricole Corporate and Investment Bank | $25,039,177 | $25,039,177 | $0 | $0 |
| DVB Bank SE | $25,039,177 | $25,039,177 | $0 | $0 |
| Credit Suisse AG | $25,039,177 | $25,039,177 | $0 | $0 |
| ING Bank N.V. | $18,822,554 | $18,822,554 | $0 | $0 |
| TOTAL | $262,295,462 | $194,269,474 | $51,625,000 | $16,400,988 |

   a.    530 Loan Facility

        The 530 Loan Facility was entered into on January 2, 2008 and initially consisted
of a $450 million senior secured term loan bearing interest at LIBOR plus a margin of 1.05%
(the "*Senior Facility*") and a $80 million junior revolving credit facility bearing interest at
LIBOR plus a margin of 2% (the "*Junior Facility*").  The blended margin over LIBOR of the 530
Loan Facility was initially 1.19%.  The 530 Loan Facility had a term ranging from five to
slightly over six years depending on the dates of disbursement.

        The 530 Loan Facility has been repaid substantially as a result of vessel
dispositions and other accommodations made in discussions with the Senior Lenders (as defined
below) beginning in December 2010.   Currently, approximately $194.3 million in aggregate
principal amount of the Senior Facility and approximately $51.6 million in aggregate principal
amount of the Junior Facility are outstanding.

        The 530 Loan Facility was evidenced by a loan agreement (as amended from time
to time, the "*530 Loan Agreement*") with Nordea Bank Norge ASA, as agent and security trustee
(the "*Senior Agent*") and the banks, financial institutions and other lenders party thereto (the
"*Senior Lenders*").  The 530 Loan Facility is secured by mortgages over the Debtors' vessels,
and charges over certain bank accounts and shareholdings of Primorsk in the Debtor
Subsidiaries.  In addition, general assignments were created in favor of the 530 Loan Facility, in

9

respect of, amongst other things, the earnings, insurances and requisition compensation insurances related to the Debtors' vessels.  As between the senior term loan lenders and the junior revolving credit lenders, the 530 Loan Agreement provides that the security interest of the senior term loan lenders takes priority.  Primorsk and each other Debtor Subsidiary also guarantee the 530 Loan Facility.

As part of its discussions with the Senior Lenders while the 530 Loan Facility was in default, on December 21, 2012, Primorsk, the Senior Agent and the Senior Lenders amended the 530 Loan Agreement and the interest on the Senior Facility was increased to LIBOR plus a margin of 3% and the interest on the Junior Facility was increased to LIBOR plus 4.5%.  The Company has continued to pay interest at these contractual interest rates during these Chapter 11 Cases.  The Company has timely made interest payments on the 530 Loan Facility at the contractual rate at all times prior to and during these Chapter 11 Cases.

b.    Swap Facility

On June 7, 2011, while in discussions with its Senior Lenders, Primorsk entered into a loan agreement (as may be amended from time to time, the "*Swap  Loan Agreement*") with BNP Paribas, as agent (the "*Swap Agent*") and the banks, financial institutions and other lenders party thereto (the "*Swap Lenders*").  The Swap Loan Agreement refinanced interest rate swap exposure created to comply with certain covenants in the 530 Loan Facility.  As of the Petition Date, approximately $16.4 million remain outstanding.  The Company has continued to pay interest at LIBOR plus a margin of 4.5% during these Chapter 11 Cases.

The Swap Facility is secured by a number of second ranking priority mortgages over the Debtors' vessels and second ranking priority charges over certain bank accounts and shareholdings of Primorsk in the Debtor Subsidiaries.  In addition a second priority general assignment was created in respect of, amongst other things, the earnings, insurances and requisition compensation insurances related to the Debtors' vessels.  Primorsk and each other Debtor Subsidiary also guarantee the Swap Facility.

2.    *Norwegian Bonds*

a.    General

Primorsk is obligated under two tranches of publicly-traded bonds governed by Norwegian law (the "*Norwegian Bonds*").  The Norwegian Bonds—$15.2 million denominated in United States Dollars and $350 million denominated in Norwegian Kroner—were issued pursuant to an agreement, dated as of February 23, 2007 (as may be amended from time to time, the "*Norwegian Bond Indenture*"), between Primorsk and Nordic Trustee ASA (f/k/a Norsk Tillitsmann ASA), as trustee (the "*Norwegian Bond Trustee*").  The Norwegian Bonds bore an interest rate of LIBOR plus 3.6% for the United States Dollar tranche and NIBOR plus 3.6% for the Norwegian Kroner tranche.

In 2011, a number of amendments were made to the Norwegian Bonds.  First, in February 2011, the margins on all the Norwegian Bonds were increased to 6% over LIBOR or NIBOR, as applicable.  In August 2011, the Norwegian Bonds were given the benefit of

SC1:4134577.6

upstream guarantees by the Debtor Subsidiaries, as well as junior mortgages (fourth-ranking) in the Debtor Subsidiaries' vessels and other collateral.

In 2015, further amendments were made to the Norwegian Bonds purportedly to release the junior mortgages and other security. These amendments purportedly left in place the unsecured guarantees by the Debtor Subsidiaries, but as general unsecured claims. In addition, on October 1, 2015, all accrued and unpaid interest due on the Norwegian Bonds was capitalized. Mortgage liens were never released of record. There is an intercreditor agreement that governs the relevant obligations, rights and remedies of the Senior Agent for the Senior Lenders, on the one hand, and the Norwegian Bond Trustee for the bondholders, on the other hand.

Currently, the Norwegian Bonds consist of an approximately $21.7 million tranche denominated in United States Dollars and an approximately $59.2 million tranche denominated in Norwegian Kroner.

b.    Norwegian Bondholders

An affiliate of the Company, Lenarda Services Inc. ("*Lenarda*") repurchased Norwegian Bonds in secondary trading transactions. Lenarda is a wholly-owned subsidiary of Apington (defined below), the Company's immediate parent. As of the Petition Date, Lenarda holds 32% of the aggregate principal amount of the Norwegian Bonds.

Additionally, an investment vehicle controlled by members of the Peraticos family, Wealth Holdings, Inc., or its affiliated funds (the "*Peraticos Holders*"), have purchased approximately 60% of the Norwegian Bonds in secondary trading transactions. While the Peraticos Holders are not affiliated with the Company or Apington, the Peraticos Holders and Apington have a prepetition relationship concerning the Peraticos Holders' holdings of the Norwegian Bonds. Pursuant to this relationship, Apington funded the Peraticos Holders' acquisition of the Norwegian Bonds and has control of the disposition of the Norwegian Bonds held by the Peraticos Holders.

The Company is not aware of any other Holder of a substantial amount of the Norwegian Bonds.

3.    *Equity Ownership*

As of the Petition Date, Primorsk had 1,000 authorized and outstanding shares of ordinary stock, €1.71 par value, all of which were held by Apington Investments Limited ("*Apington*"), a British Virgin Islands holding company. Apington is not a Debtor. As noted in the corporate structure chart, attached hereto as Appendix C, Alexander Kirilichev holds 55% equity ownership of Apington, Dmitry Golomovzy holds 25% equity ownership of Apington and the remaining 20% equity ownership of Apington is held by other management and non-management employees, with no individual holding more than 10%.

Each other Debtor is wholly-owned by Primorsk directly.

SC1:4134577.6

C.      **Events Leading Up to These Chapter 11 Cases**

1.      *Historical Overview*

Founded in 2004, the Company is an international specialty shipping company and one of the world's leading operators of modern ice-classed, double-hulled tankers. The Company is renowned for its ice navigation expertise and has extensive experience operating in the Artic under extreme conditions. The Company has a highly-experienced management team across international shipping sectors and market cycles.

After its formation in 2004, Primorsk grew steadily in response to customer demand, increasing and diversifying its fleet of vessels. In 2007, Primorsk issued the Norwegian Bonds to raise additional funding to build or otherwise acquire additional vessels.

Shortly after issuing the Norwegian Bonds, Primorsk's operations were affected by the global economic downturn at the end of 2007. Although Primorsk has consistently generated positive operating income, falling pricing for time-charters impaired Primorsk's profitability and limited its ability to repay debt, refinance existing debt and obtain new financing to purchase additional vessels.

2.      *Prepetition Restructuring Initiatives*

On October 1, 2009, the Debtors undertook an extensive review of all non-essential expenditures. All cost budgets were reviewed to reduce expenses and headcount in line with recent ship dispositions. The Debtors implemented tight budget control over operating and technical costs.

Additionally, Primorsk initiated discussions with the Senior Agent, the Senior Lenders, the Swap Agent, the Swap Lenders, the Norwegian Bond Trustee and the Norwegian Bondholders in the second half of 2009. In connection with these discussions, the Debtors, the Senior Agent, the Senior Lenders, the Swap Agent, the Swap Lenders and the Norwegian Bond Trustee, on behalf of the Norwegian Bondholders, entered into waivers of certain financial covenants.

In December 2010, Primorsk reached an agreement with the Senior Agent and the Senior Lenders whereby it sold six shuttle tankers to OAO Sovcomflot for $281.5 million, yielding net sale proceeds of $277.3 million. Approximately $230 million of the sale proceeds were used to repay outstanding amounts under the 530 Loan and Swap Facilities, with the balance being maintained by Primorsk as a liquidity buffer. This restructuring and amendment stabilized cash flows and deleveraged Primorsk.

However, the shipping business benefits from economies of scale in terms of the necessary corporate overhead as well as relationships with customers and vendors. After the reduction in size agreed to with its creditors, Primorsk's financial issues continued. As a result of continued challenging market conditions, Primorsk tightened its liquidity position and agreed to service interest-bearing debt with significant regular debt repayments. In 2012, Primorsk entered into an amendment with the Senior Agent and Senior Lenders pursuant to which, Primorsk agreed to (i) cease paying interest to the Norwegian Bondholders, and (ii) increase the

SC1:4134577.6

margin on the Senior Facility to 3.0% per annum and the margin on the Junior Facility to 4.5% per annum.  Primorsk also entered into an amendment with the Swap Agent and Swap Lenders pursuant to which the Swap Facility was restructured to ensure that 75% of the quarter balance would be capitalized as a new swap loan, with the remaining 25% of the amounts due to be paid each quarter.

With fewer vessels and larger debt service payments, Primorsk was left with little liquidity buffer as global financial conditions continued to worsen.  The 530 Loan Facility Lenders demanded more vessel sales to facilitate repayment of the Senior Debt, including two drybulk vessels in 2012, a crude tanker in 2013, two Suezmax tankers, and other unencumbered assets, including a 25% interest in the ice class LNG carrier in 2014 and a 50% interest in the ice class ice-breaking tug "Polar Pevek".  Those vessel sales further decreased the size of the Company, putting pressure on its per vessel operating costs as well as market position.

*3.*    *Prepetition Sale Process*

The 530 Loan and Swap Facilities matured in June 2015.  In an effort to reach a consensual resolution, the Debtors undertook to explore in the fall of 2015 the sale of all their vessels.  The prepetition sale process was conducted over a four-month period.  The sale process failed to provide a viable solution.

*4.*    *Amended Charters*

In December 2015, the charters for five of the Debtors' nine vessels came up for regular renewal.

On December 25, 2015, Primorsk amended and extended these five existing charters.  Additionally, at the same time, Primorsk entered into new charters with respect to three other vessels.  The charter durations of these amended and new charters were extended to January 1, 2019 (subject to minor adjustments) and the per diem charter rates were increased. With respect to the five vessels that were amended and extended, the rate increases took effect immediately and applied for the remainder of the existing charter period.

The Company's remaining vessel's charter expired on June 1, 2016.  The Debtors reached an agreement with the existing charter counterparty to extend the charter for 10 to 12 months at an increased rate of $25,000 per day.

The terms of these charter amendments and new charters are as follows:

| VESSEL | PREVIOUS CHARTER RATE | NEW CHARTER RATE | CHARTER DURATION |
|---|---|---|---|
| Zaliv Vostok | $16,500/day | $22,000/day | 36 months from January 1, 2016 |
| Zaliv Amurskiy | $17,250/day | $22,000/day | 36 months from January 1, 2016 |
| Prisco Ekaterina | $15,800/day | $17,100/day | 36 months from January 1, 2016 |

13

SC1:4134577.6

| VESSEL | PREVIOUS CHARTER RATE | NEW CHARTER RATE | CHARTER DURATION |
|---|---|---|---|
| Prisco Elena | $16,000/day | $17,100/day | 36 months from January 1, 2016 |
| Prisco Alexandra | $14,000/day | $17,100/day | 36 months from January 25, 2016 |
| Prisco Elizaveta | $15,700/day | $17,100/day | 36 months from redelivery from the current charterer whose charter is scheduled to terminate on March 24, 2016 |
| Prisco Irina | $15,300/day | $17,100/day | 36 months from redelivery from the current charterer whose charter is scheduled to terminate on March 20, 2016 |
| Zaliv Baikal | $14,500/day | $22,000/day | 36 months from January 1, 2016 |
| Zaliv Amerika | $23,000/day | $25,000/day | 10 to 12 months from June 1, 2016 |

<div align="center">

*5.*     *Cash Sweep and Threat of Vessel Arrests*

</div>

On January 12, 2016, the Senior Agent sent the Debtors a principal payment notice and simultaneously took possession of approximately $7.3 million from the Nordea Account in London (Primorsk's primary banking account at the time) and applied the funds to the outstanding balance of the 530 Loan Facility.  This unanticipated seizure reduced Primorsk's cash available at such time to only slightly more than one month's operating expenses, although monthly charter payments were expected to continue.  Additionally, on the next day, the Senior Agent sent an acceleration notice demanding immediate payment of all amounts owing under the 530 Loan Facility.

As a result, and to prevent any further unanticipated enforcement actions, the Debtors, after careful consideration of all alternatives, filed these Chapter 11 Cases.

# 3.  SIGNIFICANT EVENTS AND INITIATIVES IN THESE CHAPTER 11 CASES

The following is a general summary of significant events in these Chapter 11 Cases, including a discussion of the Debtors' restructuring and business initiatives since the commencement of these Chapter 11 Cases.

## A.    Overview of Chapter 11

Chapter 11 is the chapter of the Bankruptcy Code primarily used for business reorganization and orderly liquidation.  Chapter 11 helps a company to maximize recovery to all stakeholders.  Chapter 11 promotes equality of treatment for similarly situated creditors and interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate comprising all property and all other legal and equitable interests of the debtor as of the date of the debtor's petition for chapter 11 protection. The Bankruptcy Code allows the debtor to continue all business operations and remain in possession of all property of the estate as a "debtor-in-possession."

The United States Trustee for the Southern District of New York (the "*U.S. Trustee*") monitors the progress of a chapter 11 case and supervises its administration. In particular, the U.S. Trustee is responsible for monitoring the debtor in possession's operation of the business and the submission of operating reports and fees.

A chapter 11 case culminates in the consummation of a chapter 11 plan. The plan includes a classification of claims against and interests in the debtor and specifies how each class will be treated. Among other things, the plan must be confirmed by the bankruptcy court before it is implemented.

### B.    The Debtors' Operations in Chapter 11

On January 15, 2016, the Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code in the Bankruptcy Court. These Chapter 11 Cases are being jointly administered for procedural purposes under case number 16-10073 (MG). The Debtors have continued to operate as debtors-in-possession.

### 1.    *First Day Relief*

On the Petition Date, the Debtors filed numerous motions seeking relief intended to ensure a seamless transition between the Debtors' prepetition and postpetition business operations, and to facilitate the administration of these Chapter 11 Cases (the "*First Day Motions*"). Among other things, the orders entered by the Bankruptcy Court granting the First Day Motions (the "*First Day Orders*") allowed the Debtors to continue certain normal business activities not specifically authorized under the Bankruptcy Code or as to which the Bankruptcy Code requires prior court approval. The First Day Motions and the First Day Orders are available at the Debtors' case information website, http://www.kccllc.net/primorsk.

In particular, the First Day Orders authorized the Debtors to:

- pay prepetition claims of critical vendors;

- pay prepetition wages, pay and honor crew benefits and other programs, and continue crew obligations;

- continue to use their prepetition cash management system, bank accounts and business forms;

- pay prepetition taxes; and

- use cash collateral.

SC1:4134577.6

In addition, the commencement of the Debtors' Chapter 11 Cases triggered the automatic stay under section 362 of the Bankruptcy Code, which, with limited exceptions, enjoined all collection efforts and actions by creditors, the enforcement of all liens against property of the Debtors and the commencement or continuation of prepetition litigation against the Debtors.  Subject to limited exceptions, the automatic stay will remain in effect until the Effective Date of the Plan.

### 2.    *Retention of Professionals*

In addition to the First Day Motions, shortly after the Petition Date, the Debtors filed applications to retain their professionals.  These included:  (i) an application to retain Sullivan & Cromwell LLP as counsel to the Debtors, (ii) an application to retain APS to provide interim management and restructuring services and to designate Holly Felder Etlin as chief restructuring officer, (iii) an application to retain Kurtzman Carson Consultants LLC as the Debtors' administrative agent, and (iv) a motion to retain, compensate and reimburse professionals utilized in the ordinary course of business (collectively, the "*Retention Applications*").  Each of the Retention Applications was approved on February 18, 2016.

### 3.    *Continuation of the Debtors' Operations*

Since the Petition Date, the Debtors have continued business operations in the ordinary course.  In accordance with the First Day Orders, the Debtors paid certain prepetition claims of critical vendors and employees, and the Debtors continue to pay their vendors and employees in the ordinary course of business postpetition as amounts become due and payable.

### C.    Summary of the Claims Process

On February 29, 2016, the Debtors filed their schedules of assets and liabilities and statements of financial affairs (the "*Schedules*") with the Bankruptcy Court.  The Schedules are available for review at the Debtors' case information website, http://www.kccllc.net/primorsk.

On March 23, 2016, the Bankruptcy Court entered an order [Docket No. 118] (the "*Claims Bar Date Order*") establishing April 29, 2016 as the general bar date for the filing of proofs of claim in these Chapter 11 Cases (the "*Claims Bar Date*").  Subject to certain exceptions, the Claims Bar Date Order required all persons and entities holding prepetition claims to file a proof of claim on or before the Claims Bar Date.  As of the Claims Bar Date, 11 proofs of claim had been filed by various creditors.

### D.    The March 15 Plan and Disclosure Statement

On March 15, the Debtors filed the *Joint Chapter 11 Plan of Reorganization of Primorsk International Shipping Limited and its Debtor Affiliates* [Docket No. 103] (the "*March Plan*") and the *Disclosure Statement for Debtors' Joint Chapter 11 Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* [Docket No. 104] (the "*March Disclosure Statement*").

16

     1.     *Exploration of Alternative Resolutions*

Shortly after the filing of the March Plan and March Disclosure Statement, the Debtors' advisors were notified of the prepetition relationship between the Peraticos Holders and Apington.  The Debtors' advisors immediately notified all key stakeholders and the Court in a telephonic conference on March 23, 2016.

The Debtors, following consultation with the Company's management and key stakeholders, determined to withdraw the March Plan and March Disclosure Statement and explore other alternatives.  On March 25, 2016, the Debtors filed the *Notice of Withdrawal of Debtors' Joint Plan of Reorganization, Related Disclosure Statement and Solicitation Procedures Motion* [Docket No. 123].

     2.     *Amended Cash Collateral Order*

In connection with the withdrawal of the March Plan and the decision to explore other alternatives, the Debtors negotiated an amended order for the use of cash collateral.  On April 1, 2016, after extensive discussions with the Senior Agent and Senior Lenders, the Debtors filed the *Notice of Filing of Amended and Restated Final Order (A) Authorizing Use of Cash Collateral, (B) Granting Adequate Protection, (C) Modifying the Automatic Stay and (D) Authorizing the Debtors to Utilize Operating Revenues* [Docket No. 128].  On April 6, the Court entered the *Amended and Restated Final Order (A) Authorizing Use of Cash Collateral, (B) Granting Adequate Protection, (C) Modifying the Automatic Stay and (D) Authorizing Debtors to Utilize Operating Revenues* [Docket No. 135] (the "*Amended Cash Collateral Order*") reflecting a revised consensual agreement to the use of cash collateral.  The Amended Cash Collateral Order granted the Debtors access to cash collateral through August 15, 2016 to pay expenses as set forth in the Debtors' 13-week cash flow forecast.

**E.     Extension of Exclusivity**

On April 22, 2016, the Debtors filed the *Debtors' Motion for an Order Extending the Exclusive Periods During Which Only the Debtors May File a Chapter 11 Plan and Solicit Acceptances Thereof* [Docket No. 158] (the "*Exclusivity Motion*") seeking to extend by 120 days (i) the period to file a chapter 11 plan for each Debtor through and including September 12, 2016 and (ii) the period to solicit acceptances of a chapter 11 plan of each Debtor through and including November 10, 2016.  The Exclusivity Motion was uncontested and on May 6, 2016, the Court entered the *Order Extending the Exclusive Periods During Which Only the Debtors May File a Chapter 11 Plan and Solicit Acceptances Thereof* [Docket No. 170].

Accordingly, the Debtors' exclusive period to file a chapter 11 plan for each Debtor is extended through and including September 12, 2016 and the Debtors' exclusive period to solicit acceptances on a chapter 11 plan of each Debtor is extended through and including November 10, 2016.

**F.     Vessel Sale Process**

In consultation with the Senior Lenders and the Swap Lenders and their respective advisors, the Debtors determined that it was in the best interests of the Debtors and their estates

to pursue a potential sale of the Debtors' nine vessels in order to provide the best opportunity to maximize the value of the vessels in a manner that is fully consensual with the Senior Lenders and the Swap Lenders.

### 1.     Retention of Clarksons

In accordance with the Amended Cash Collateral Order, the Debtors engaged in discussions with the Senior Lenders, Senior Agent, Swap Lenders and Swap Agent regarding the retention of a broker to assist the Debtors' in a potential disposition of their vessels.  On April 8, 2016, the Debtors filed the *Debtors' Application for an Order Authorizing the Retention and Employment of Clarksons Platou AS as Broker for the Debtors and Debtors-in-Possession* Nunc Pro Tunc *to April 8, 2016* [Docket No. 140] (the "*Clarksons Retention Application*").  The Clarksons Retention Application was uncontested and on April 20, 2016, the Court entered the *Order Authorizing the Retention and Employment of Clarksons Platou AS as Broker for the Debtors and Debtors-in-Possession* Nunc Pro Tunc *to April 8, 2016* [Docket No. 150].

Clarkons Platou AS ("*Clarksons*") as the Debtors' broker in connection with the potential disposition of the vessels, among other things, assisted the Debtors with identifying potential purchasers; coordinating potential purchasers' inspections of the vessels; negotiating the terms and conditions of each agreement; and providing documentation for delivery of the vessels.  Throughout the sale process, Clarksons provided regular updates to the Debtors' chief restructuring officer and management team.  Additionally, Clarksons and the Debtors' chief restructuring officer provided weekly updates to the Senior Lenders, Senior Agent, Swap Lenders and Swap Agent and their respective advisors throughout the sale process.

### 2.     Bid Procedures Motion

In accordance with the Amended Cash Collateral Order, the Debtors also engaged in discussions with the Senior Lenders, Senior Agent, Swap Lenders and Swap Agent regarding bid procedures for the potential disposition of the Debtors' vessels.  On April 19, 2016, the Debtors filed a motion [Docket No. 148] (the "*Bid Procedures Motion*") seeking Court approval of, among other things, consensually-agreed bid procedures for the marketing and potential sale of the Debtors' nine vessels.  On April 29, 2016, the Court approved the Bid Procedures Motion and entered the *Order (A) Approving the Bid Procedures and Certain Bidding Protections, (B) Approving the Notice Procedures, (C) Authorizing the Debtors to Set a Date For the Sale Hearing and (D) Approving Assumption and Assignment Procedures* [Docket No. 164].

The approved bid procedures (the "*Bid Procedures*") provided that potential bidders must submit bids via a letter outlining their offer, along with an executed purchase agreement, prior to the June 15, 2016 bid deadline.  In order to incentivize a bidder to serve as the stalking horse bid, the Bid Procedures permitted the Debtors to offer a potential stalking horse bidder a breakup fee of up to 1.0% of the cash portion of the purchase price, expense reimbursement of up to $100,000 and minimum bid increments.  If the Debtors received multiple bids, the Debtors were authorized to conduct an auction (the "*Auction*").  The Bid Procedures then provided for a sale hearing to be held before the Court on a date to be determined by the Debtors in consultation with the Agents.

3.    *Sale Process*

Clarksons contacted approximately 48 prospective buyers in connection with the potential disposition of the Debtors' vessels.  Of these prospective buyers, 24 interested parties signed confidentiality agreements to access diligence material posted to an electronic data room by the Debtors and Clarksons and nine interested parties conducted vessel and cargo tank inspections aboard the Debtors' vessels.  After over two months of marketing the vessels, the Debtors received five bids on the bid deadline.  Each bid was for the sale of the entire fleet.  The bids included different conditions, including financial contingencies and modifications and amendments to the time charters.  The Debtors determined that all five bids were qualified bids under the Bid Procedures and invited all five bidders to attend the Auction.

The Auction for the Debtors' vessels was held in London on June 30, 2016.  The Auction was attended by the Debtors and their advisors, four of the qualified bidders and their counsel, the Agents and their advisors and counsel to the charterer of the majority of the Debtors' vessels.  Prior to the start of the Auction, the Debtors negotiated form documentation with each of the bidders so that the only substantive difference between bids was the purchase price.  After several rounds of bidding, the Debtors designated SCF Tankers as the successful bidder with a purchase price of $215 million and Hafnia Tankers as the alternate bidder with a purchase price of $208 million.

At a hearing before the Bankruptcy Court on July 7, 2016, the Debtors sought approval of the sale of the vessels to SCF Tankers or, in the alternative, to Hafnia Tankers, as well as approval of distributions of the sale proceeds to the holders of Senior Loan Claims and of a Wind-Down Budget to fund the orderly dissolution of the Debtors' estates following the sale closing.  On July 13, 2016, the Court approved the sale and entered the *Order Authorizing (A) the Sale of the Debtors' Vessels Free and Clear of All Claims and Interests, (B) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith and (C) Wind-Down Expenditures and Distributions to Term Loan Lenders* (the "*Sale Order*") [Docket No. 216].

4.    *Second Amended Cash Collateral Order*

In connection with the sale, the anticipated dissolution of the estates and the August 15, 2016 termination of the Amended Cash Collateral Order, the Debtors negotiated a further amended order to permit the continued use of cash collateral.  On July 19, 2016, after discussion with the Senior Agent and Swap Agent, the Debtors filed the *Notice of Presentment of Second Amended and Restated Final Order (A) Authorizing Use of Cash Collateral, (B) Granting Adequate Protection, (C) Modifying the Automatic Stay and (D) Authorizing the Debtors to Utilize Operating Revenues* [Docket No. 224].  On July 20, the Court entered the *Second Amended and Restated Final Order (A) Authorizing Use of Cash Collateral, (B) Granting Adequate Protection, (C) Modifying the Automatic Stay and (D) Authorizing Debtors to Utilize Operating Revenues* [Docket No. 226] (the "*Second Amended Cash Collateral Order*") reflecting a consensual agreement to the use of cash collateral.  The Second Amended Cash Collateral Order grants the Debtors access to cash collateral through October 30, 2016 to pay expenses as set forth in the annexed Wind-Down Budget.  The Debtors are required to provide

the Senior Agent with reasonable prior notice of all disbursements and other forms of adequate protection.

## 4. SUMMARY OF THE PLAN

The Plan effectuates an orderly distribution of the Debtors' Encumbered Cash and wind down of the Debtors' estates.  The Debtors' Encumbered Cash consists of the Cash proceeds from the sale of the Vessels, net of all expenses and costs and net of distributions made in accordance with the Sale Order, along with Cash held by the Debtors in their bank accounts with Nordea.  A portion of the Encumbered Cash will be set aside to fund the line items in the Wind-Down Budget, including operating expenses, management fees, and legal and professional fees.  The Encumbered Cash will then be distributed to the Holders of Claims in the following order: (i) Class 1 (Other Priority Claims), (ii) Class 2 (Other Secured Claims), and (iii) Class 3B (Junior Loan Claims).

The Plan provides that a trust (the "*Liquidating Trust*") may be established pursuant to the Liquidating Trust Agreement.  If established, the Liquidating Trust will contain (a) any remaining assets of the Debtors; (b) the Cash proceeds of the Debtors' remaining assets, net of all expenses and costs of operating the Liquidating Trust; (c) any Cash remaining in the Wind-Down Budget reserve after the payment in full of all items in the Wind-Down Budget; (d) any Cash remaining in the Professional Fee Escrow Account after the payment in full of all Allowed Professional Claims; and (e) any undeliverable or Unclaimed Distributions which shall revest in the Liquidating Trust in accordance with Section 7 of the Plan (together the "*Liquidating Trust Distributable Cash*").  The Liquidating Trust Distributable Cash (if any) will be distributed Pro Rata to holders of Junior Loan Claims.  Holders of General Unsecured Claims and Equity Interests will not receive any distribution under the Plan.

The classification, treatment and voting of Claims and Equity Interests and settlement, release, injunction and related provisions are summarized below.  For all other provisions relating to the Plan, including implementation of the Plan; treatment of Executory Contracts and Unexpired Leases; provisions governing distributions; conditions precedent to effectiveness of the Plan; modification, revocation or withdrawal of the Plan and retention of jurisdiction, please refer to the Plan attached hereto as Appendix A.

### A.    Classification, Treatment and Voting of Claims and Equity Interests

#### 1.    *Classification of Claims and Equity Interests*

All Claims and Equity Interests, except for Administrative Claims and Professional Claims, are classified in the Classes set forth in Article 4 of the Plan.  A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Equity Interest qualifies within the description of such other Classes.  A Claim or Equity Interest also is classified in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim or Equity Interest is Allowed as a Claim or Equity Interest in that Class and has not been paid, released or otherwise satisfied prior to the Effective Date.

20

a.      Deemed Substantive Consolidation

The Plan shall serve as a motion by the Debtors seeking entry of a Bankruptcy Court order deeming the substantive consolidation of the Debtors' Estates into a single Estate for certain limited purposes related to the Plan, including Voting, Confirmation and Distribution. As a result of the deemed substantive consolidation of the Estates, each Class of Claims and Equity Interests will be treated as against a single consolidated Estate without regard to the separate legal existence of the Debtors.  The Plan will not result in the merger or otherwise affect the separate legal existence of each Debtor, other than with respect to voting and distribution rights under the Plan.

b.      Summary of Classification and Treatment

The classification of Claims and Equity Interests pursuant to the Plan is as follows:

| CLASS | CLAIMS AND EQUITY INTERESTS | STATUS | VOTING RIGHTS |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3A | Senior Loan Claims | Impaired | Entitled to Vote |
| 3B | Junior Loan Claims | Impaired | Entitled to Vote |
| 3C | Swap Claims | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Impaired | Deemed to Reject |
| 5 | Equity Interests in Primorsk | Impaired | Deemed to Reject |

2.      *Treatment of Claims and Equity Interests*

a.      Class 1 – Other Priority Claims

"*Other Priority Claim*" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than an Administrative Claim.

Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed Other Priority Claim, each Holder of such Allowed Other Priority Claim shall be paid in full in Cash on or as soon as reasonably practicable after the latest of (i) the Effective Date, (ii) the date on which such Other Priority Claim becomes Allowed, and (iii) such other date as may be ordered by the Bankruptcy Court.

Class 1 is Unimpaired.  Each Holder of an Other Priority Claim is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of Other Priority Claims is entitled to vote to accept or reject the Plan.

b.      Class 2 – Other Secured Claims

"*Other Secured Claim*" means any Secured Claim other than a Senior Loan Claim, a Junior Loan Claim or a Swap Claim.

21

Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive one of the following treatments, in the sole discretion of the applicable Debtor: (i) payment in full in Cash including the payment of any interest payable under section 506(b) of the Bankruptcy Code; (ii) delivery of the collateral securing such Allowed Other Secured Claim; or (iii) treatment of such Allowed Other Secured Claim in any other manner that renders the Claim Unimpaired.

Class 2 is Unimpaired.  Each Holder of an Other Secured Claim is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of an Other Secured Claim is entitled to vote to accept or reject the Plan.

c.    <u>Class 3A – Senior Loan Claims</u>

"*Senior Loan Claims*" means all Claims arising under or in connection with the Senior Facility.

The Senior Loan Claims shall be Allowed in an aggregate amount equal to (i) $194,269,474 representing principal and accrued and unpaid interest at the non-default contractual rate up to and including the Petition Date and (ii) to the extent provided for in the 530 Loan Agreement, unpaid postpetition interest at the default contractual rate until the principal and all unpaid interest are repaid in full.

Except to the extent that a Holder of an Allowed Senior Loan Claim agrees to a less favorable treatment, and in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed Senior Loan Claim, each Holder of an Allowed Senior Loan Claim shall be paid in full in Cash in accordance with the Sale Order.

Class 3A is Impaired and each Holder of a Senior Loan Claim is entitled to vote to accept or reject the Plan.

d.    <u>Class 3B – Junior Loan Claims</u>

"*Junior Loan Claims*" means all Claims arising under or in connection with the Junior Facility.

The Junior Loan Claims shall be Allowed in an aggregate amount equal to $51,625,000, representing principal and accrued and unpaid interest at the non-default contractual rate up to and including the Petition Date.

Except to the extent that a Holder of an Allowed Junior Loan Claim agrees to a less favorable treatment, and in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed Junior Loan Claim, each Holder of an Allowed Junior Loan Claim shall receive (i) its Pro Rata share of remaining Encumbered Cash, following the provision of a reserve for line items in the Wind-Down Budget and the distributions made to the Holders of Senior Loan Claims, and (ii) its Pro Rata share of the Liquidating Trust Distributable

SC1:4134577.6

Cash, in each of cases (i) and (ii) until such time as such Holder has received Cash distributions equal to the Allowed amount of such Allowed Junior Loan Claim.

Class 3B is Impaired and each Holder of a Junior Loan Claim is entitled to vote to accept or reject the Plan.

e.    Class 3C – Swap Claims

"*Swap Claims*" means all Claims arising under or in connection with the Swap Loan Agreement.

The Swap Claims shall be Allowed in an aggregate amount equal to $16,400,988, representing principal and accrued and unpaid interest at the non-default contractual rate up to and including the Petition Date.

Except to the extent that a Holder of an Allowed Swap Claim agrees to a less favorable treatment, and in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed Swap Claim, each Holder of an Allowed Swap Claim shall receive its Pro Rata share of the Liquidation Trust Distributable Cash, following the distributions made to the Holders of the Junior Loan Claims.

Class 3C is Impaired and each Holder of a Swap Claim is entitled to vote to accept or reject the Plan.

f.    Class 4 – General Unsecured Claims

"*General Unsecured Claims*" means any Claim that is not an (a) Administrative Claim, (b) Other Priority Claim, (c) Other Secured Claim, (d) Senior Loan Claim, (e) Junior Loan Claim, (f) Swap Claim, (g) Equity Interest or (h) Intercompany Claim.

No Holder of a General Unsecured Claim shall receive any Distributions on account of its General Unsecured Claim.  On and after the Effective Date, all General Unsecured Claims shall be released and shall be of no further force or effect.

Class 4 is Impaired and each Holder of a General Unsecured Claim is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  No Holder of a General Unsecured Claim is entitled to vote to accept or reject the Plan.

g.    Class 5 – Equity Interests in Primorsk

No Holder of an Equity Interest in Primorsk shall receive any Distributions on account of its Equity Interest.  On and after the Effective Date, all Equity Interests in Primorsk shall be cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

Class 5 is Impaired and each Holder of an Equity Interest in Primorsk is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  No Holder of an Equity Interest in Primorsk is entitled to vote to accept or reject the Plan.

23

3.    *Intercompany Claims and Interests*

Notwithstanding anything herein to the contrary, on the Effective Date or as soon thereafter as is reasonably practicable, all Intercompany Claims and Intercompany Interests will be canceled and discharged, in full or in part, in which case such discharged and satisfied portion shall be eliminated and the Holders thereof shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such portion under the Plan.  In no event shall Intercompany Claims be allowed as General Unsecured Claims or entitled to any Distribution under the Plan.

4.    *Special Provision Governing Unimpaired Claims*

Except as otherwise provided herein, the Plan shall not affect the Debtors' or the Liquidating Trustee's rights in respect of any Unimpaired Claims, including legal and equitable defenses or setoff or recoupment rights with respect thereto.

5.    *Confirmation Pursuant to Sections 1129(a) and 1129(b) of the Bankruptcy Code*

For purposes of Confirmation, section 1129(a)(10) of the Bankruptcy Code shall be satisfied if any one of Classes 3A, 3B or 3C accepts the Plan.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class or Classes of Claims.

**B.    Establishment of the Liquidating Trust; Vesting of Assets in the Liquidating Trust**

On or before the Effective Date, the Debtors, on their own behalf and on behalf of the beneficiaries, may execute the Liquidating Trust Agreement, and may take all necessary to establish the Liquidating Trust.  If established, the Liquidating Trust shall be established for the sole purpose of distributing the Liquidating Trust assets for the benefit of the beneficiaries of the Liquidating Trust with no objective to continue or engage in the conduct of a trade or business.  If the Liquidating Trust is established, the Liquidating Trustee shall be vested with all powers and authority set forth in the Plan and the Liquidating Trust Agreement.  If the Liquidating Trust is established, the Liquidating Trustee shall be deemed to have been appointed as the Debtors' Estates' representative pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.  The costs associated with the Liquidating Trust shall be borne in accordance with the terms of the Liquidating Trust Agreement and are not provided for in the Wind-Down Budget.

Except as otherwise provided in the Plan or in the Confirmation Order, as of the Effective Date, if the Liquidating Trust is established, all property of each Estate (including Causes of Action and any remaining Encumbered Cash following the provision of a reserve for line items in the Wind-Down Budget and distributions made to the Holders of Senior Loan Claims, Junior Loan Claims and Swap Claims) and any property acquired by any Debtor under the Plan shall vest in the Liquidating Trust, free and clear of all Liens, Claims, charges or other encumbrances or interests.  For the avoidance of doubt, the immediately preceding sentence does not apply to any property of a non-Debtor Affiliate of the Debtors.

SC1:4134577.6

### C.    Settlement, Release, Injunction and Related Provisions

#### 1.    *Compromise and Settlement*

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the Distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Equity Interests and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim, or any Distribution to be made on account of such Allowed Claim.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors and their Estates and is fair, equitable and reasonable.

#### 2.    *Subordinated Claims*

The allowance, classification and treatment of all Allowed Claims and Equity Interests and the respective Distributions and treatments under the Plan take into account, conform to and satisfy the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto; however, the Debtors reserve the right to reclassify or modify the treatment of any Allowed Claim or Equity Interest in accordance with any contractual, legal or equitable subordination relating thereto, unless otherwise provided in a settlement agreement concerning such Allowed Claim or Equity Interest.

#### 3.    *Discharge of Claims and Termination of Equity Interests*

Pursuant to and to the fullest extent permitted by the Bankruptcy Code, except as otherwise specifically provided in the Plan or the Confirmation Order, the treatment of Claims and Equity Interests under the Plan shall be in full and final satisfaction, settlement, release, discharge, and termination, as of the Effective Date, of all Claims of any nature whatsoever, whether known or unknown, against, and Equity Interests in, the Debtors, any property of the Estates, the Liquidating Trustee or any property of the Liquidating Trust, including all Claims of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a Proof of Claim or Equity Interest based upon such Claim, debt, right, or Equity Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Equity Interest based upon such Claim, liability, obligation or Equity Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim, liability, obligation or Equity Interest has accepted the Plan.  Except as otherwise provided in the Plan, any default by the Debtors or their Affiliates with respect to any Claim that existed immediately prior to or on account of the filing of these Chapter 11 Cases shall be deemed cured on the Effective Date.

#### 4.    *Release of Liens*

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the

SC1:4134577.6

Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released and discharged.

## 5.  *DEBTOR RELEASE*

**Except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties to facilitate the liquidation of the Debtors and the implementation of the restructuring contemplated by the Plan, on and after the Effective Date, the Released Parties are hereby released and discharged by the Debtors, the Liquidating Trustee and the Estates, including any successor to the Debtors or any Estate representative, from all claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereafter arising, in law, at equity or otherwise, whether for indemnification, tort, contract, violations of federal or state securities laws or otherwise, including, those that any of the Debtors, the Liquidating Trustee or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or any other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors and their non-Debtor Subsidiaries, the Estates, the conduct of the businesses of the Debtors and their non-Debtor Subsidiaries, these Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any Security of the Debtors, the release or discharge of any mortgage, lien or security interest, the distribution of proceeds, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the restructuring of Claims and Equity Interests prior to or during these Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Disclosure Statement, or, in each case, related agreements, instruments or other documents, any action or omission with respect to Intercompany Claims, any action or omission as an officer, director, agent, representative, fiduciary, controlling person, affiliate or responsible party, or any transaction entered into or affecting, a Non-Debtor Subsidiary, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan, other than claims or liabilities arising out of or relating to any act or omission of a Released Party to the extent such act or omission is determined by a Final Order to have constituted willful misconduct, gross negligence, fraud, or a criminal act.**

26

## 6.    *VOLUNTARY RELEASE BY HOLDERS OF CLAIMS*[5]

**HOLDERS OF CLAIMS THAT VOTE IN FAVOR OF THE PLAN ARE DEEMED TO AGREE TO THE RELEASES CONTAINED IN SECTION 9.6 OF THE PLAN.  Holders of Claims that (a) vote to reject the Plan or (b) abstain from voting may, in each case, opt out of the releases contained in Section 9.6 of the Plan by clearly marking the "opt-out" box on the Ballot provided to such Holder.  Assuming such Ballot is timely received and in proper form, Holders of Claims who check the "opt-out" box on the Ballot will not be Releasing Parties for purposes of Section 9.6 of the Plan.  All other Holders of Claims that are entitled to vote on the Plan are deemed to agree to the releases contained in Section 9.6 of the Plan with respect to all Claims.**

**Except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties to facilitate the orderly liquidation of the Debtors, the implementation of the restructuring contemplated by the Plan, the release of mortgages, liens and security interests on estate property and the distribution of proceeds, on and after the Effective Date, to the fullest extent permitted by applicable law, the Releasing Parties (regardless of whether a Releasing Party is a Released Party) shall be deemed to conclusively, absolutely, unconditionally, irrevocably and forever release, waive and discharge the Released Parties of any and all claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereafter arising, in law, at equity or otherwise, whether for indemnification, tort, contract, violations of federal or state securities laws or otherwise, including, those that any of the**

---

[5]    This and the following Sections should be read in conjunction with the following definitions:

"*Holder*" means an Entity holding a Claim (as defined in section 101(5) of the Bankruptcy Code) against any of the Debtors.

"*Releasing Parties*" means (a) the Agents and lenders party to the 530 Loan Agreement and Swap Loan Agreement, each in their capacities as such and (b) each Holder of a Claim or an Equity Interest that was provided a Ballot and (i) affirmatively votes to accept the Plan; or (ii) either (A) abstains from voting; or (B) votes to reject the Plan; and, in case of either (A) or (B), does not opt out of the Voluntary Release by Holders of Claims in compliance with the instructions set forth in the Solicitation Materials.  For the avoidance of doubt, Holders who (i) were not provided a Ballot; and (ii) are not listed in clauses (a) – (b) above are not Releasing Parties.

"*Released Parties*" means (a) the Exculpated Parties (as defined below); (b) Nordic Trustee ASA (but not, for the avoidance of doubt, Wealth Holdings, Inc., Nicolas Peraticos or any legal or beneficial owner of bonds issued pursuant to the Norwegian Bond Indenture or any such Entity's directors, officers, employees, agents, Affiliates, parents, subsidiaries, predecessors, successors, heirs, executors and assigns, attorneys, financial advisors, restructuring advisors, investment bankers, accountants and other professionals or representatives); (c) the Agents and lenders party to the 530 Loan Agreement and Swap Loan Agreement, each in their capacities as such; and (d) with respect to each Entity named in (c), such Entity's directors, officers, employees, agents, Affiliates, parents, subsidiaries, predecessors, successors, heirs, executors and assigns, attorneys, financial advisors, restructuring advisors, investment bankers, accountants and other professionals or representatives when acting in any such capacities; *provided, however* that Nordic Trustee shall not be a Released Party if it objects to confirmation of the Plan and the Swap Agent and lenders party to the Swap Loan Agreement, each in their capacities as such, shall not be Released Parties if (i) the Swap Agent or any Holder of a Swap Claim objects to the confirmation of the Plan or (ii) if Class 3C votes to reject the Plan.

Debtors, the Liquidating Trustee or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or any other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors and their non-Debtor Subsidiaries, the Estates, the conduct of the businesses of the Debtors and their non-Debtor Subsidiaries, these Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the restructuring of Claims and Equity Interests prior to or during these Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Disclosure Statement, or, in each case, related agreements, instruments or other documents, any action or omission with respect to Intercompany Claims, any action or omission as an officer, director, agent, representative, fiduciary, controlling person, affiliate or responsible party, or any transaction entered into or affecting, a Non-Debtor Subsidiary, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan, other than claims arising under the Intercreditor Deed including, for the avoidance of doubt, disgorgement of interest and fees paid to the Swap Agent in its capacity as such during the Chapter 11 Cases and claims or liabilities arising out of or relating to any act or omission of a Released Party to the extent such act or omission is determined by a Final Order to have constituted willful misconduct, gross negligence, fraud, or a criminal act.

### 7.    _Scope of Releases_

Each Person providing releases under the Plan, including the Debtors, the Liquidating Trustee, the Estates and the Releasing Parties, shall be deemed to have granted the releases set forth in those sections notwithstanding that such Person may hereafter discover facts in addition to, or different from, those which it now knows or believes to be true, and without regard to the subsequent discovery or existence of such different or additional facts, and such Person expressly waives any and all rights that it may have under any statute or common law principle which would limit the effect of such releases to those claims or causes of action actually known or suspected to exist at the time of execution of such release.

SC1:4134577.6

8.      _**Exculpation**_[6]

Notwithstanding anything in the Plan to the contrary, as of the Effective Date, the Debtors and their directors, officers (including the chief restructuring officer and interim management), employees, attorneys, investment bankers, financial advisors, restructuring advisors and other professional advisors, representatives and agents will be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including section 1125(e) of the Bankruptcy Code and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with the solicitation.

Except with respect to any acts or omissions expressly set forth in and preserved by the Plan, the Plan Supplement or related documents, the Exculpated Parties shall neither have nor incur any liability to any Entity for any Prepetition or postpetition act taken or omitted to be taken in connection with, or arising from or relating in any way to, these Chapter 11 Cases, including (a) the operation of the Debtors' businesses during the pendency of these Chapter 11 Cases; (b) formulating, negotiating, preparing, disseminating, implementing, administering, confirming and/or effecting the Disclosure Statement and the Plan, the Plan Supplement, and any related contract, instrument, release or other agreement or document created or entered into in connection therewith (including the solicitation of votes for the Plan and other actions taken in furtherance of Confirmation and Consummation of the Plan); (c) the offer and issuance of any securities under or in connection with the Plan; or (d) any other Prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, other than liability resulting from any act or omission that is determined by Final Order to have constituted willful misconduct, gross negligence, fraud, or a criminal act.

9.      _**Injunction**_

Except as otherwise expressly provided in the Plan or Confirmation Order, the satisfaction, release and discharge pursuant to Article 9 of the Plan shall also act as a permanent injunction against any Person who has held, holds or may hold Claims or Equity Interests against commencing or continuing any action, employment of process or act to collect, enforce, offset, recoup or recover any Claim or Cause of Action satisfied, released, or discharged under the Plan or the Confirmation Order to the fullest extent

---

[6]     This Section should be read in conjunction with the following definition: "_Exculpated Parties_" means (a) the Debtors and the Liquidating Trustee; and (b) the current and former directors, officers (including the chief restructuring officer and interim management), employees, agents, attorneys, financial advisors, restructuring advisors, investment bankers, accountants, and other professionals or representatives of the Debtors and the Liquidating Trustee (other than Prisco (Singapore) Pte Ltd, Watson Farley & Williams LLP and Frank Dunn, Esq.), in their capacities as such; and (c) with respect to each Entity named in (a) and (b), such Entity's directors, officers, employees, agents, predecessors, successors, heirs, executors and assigns, attorneys, financial advisors, restructuring advisors, investment bankers, accountants and other Professionals or representatives when acting in any such capacities; _provided_, _however_, the current and former directors and officers of the Debtors and any persons designated by the current and former directors of the Debtors to act on behalf of or in the name of the Debtors (in each case, other than the chief restructuring officer and interim management), in their capacities as such, shall not be Exculpated Parties with respect to any act taken or omitted to be taken prior to March 23, 2016.

SC1:4134577.6

**authorized or provided by the Bankruptcy Code, including to the extent provided for or authorized by sections 524 and 1141 thereof.**

10.     *Limitations on Exculpations and Releases*

Notwithstanding anything to the contrary herein, none of the releases or exculpations set forth herein shall operate to waive or release any obligation or Causes of Action of any Person or Entity:  (a) arising under the Intercreditor Deed, (b) arising under any contract, instrument, agreement, release or document delivered pursuant to the Plan or documents, agreements or instruments executed in connection therewith, including all post Effective Date obligations, or (c) expressly set forth in and preserved by the Plan, the Plan Supplement or related documents.

## 5. STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

The following is a brief summary of the process of confirmation of the Plan. Holders of Claims and Equity Interests are encouraged to review the relevant provisions of the Bankruptcy Code and/or consult their own attorneys.

### A.     The Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing at which the Debtors will seek confirmation of the Plan.  Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to confirmation of the Plan.

**THE CONFIRMATION HEARING IS SCHEDULED TO BE HELD ON SEPTEMBER 20, 2016 AT 10:00 A.M. (EASTERN TIME), BEFORE THE HONORABLE MARTIN GLENN, UNITED STATES BANKRUPTCY JUDGE, IN THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, ONE BOWLING GREEN, NEW YORK, NEW YORK 10004.  THE CONFIRMATION HEARING MAY BE ADJOURNED FROM TIME TO TIME BY THE BANKRUPTCY COURT OR THE DEBTORS WITHOUT FURTHER NOTICE OTHER THAN BY ANNOUNCEMENT IN OPEN COURT AND/OR NOTICE(S) OF ADJOURNMENT FILED ON THE DOCKET WITH THE BANKRUPTCY COURT'S PERMISSION.**

**OBJECTIONS TO CONFIRMATION OF THE PLAN MUST BE FILED WITH THE COURT AND SERVED SO AS TO BE ACTUALLY RECEIVED ON OR BEFORE 4:00 P.M. (EASTERN TIME) ON SEPTEMBER 13, 2016, IN ACCORDANCE WITH THE SOLICITATION PROCEDURES ORDER.  UNLESS OBJECTIONS TO CONFIRMATION ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE SOLICITATION PROCEDURES ORDER, THEY WILL NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

### B.    Confirmation Standards

To confirm the Plan, the Bankruptcy Court must find that the requirements of section 1129 of the Bankruptcy Code have been satisfied.  The Debtors believe that section 1129 has been satisfied because, among other things:

(i)    the Plan complies with the applicable provisions of the Bankruptcy Code;

(ii)    the Debtors, as plan proponents, have complied with the applicable provisions of the Bankruptcy Code;

(iii)    the Plan has been proposed in good faith and not by any means forbidden by law;

(iv)    any payment made or promised under the Plan for services or for costs and expenses in or in connection with these Chapter 11 Cases, or in connection with the Plan and incident to these Chapter 11 Cases, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable;

(v)    with respect to each Class of Impaired Claims or Equity Interests, either each Holder of a Claim or Equity Interest in such Class has accepted the Plan or will receive or retain under the Plan on account of such Claim or Equity Interest property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on such date under chapter 7 of the Bankruptcy Code (see Section 5.C below – Best Interests Test);

(vi)    each Class of Claims or Equity Interests has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such class pursuant to section 1129(b) of the Bankruptcy Code;

(vii)    except to the extent that the Holder of a particular General Administrative Claim has agreed or will agree to a different treatment of such Claim, the Plan provides that Allowed General Administrative Claims will be paid in full in Cash on the Effective Date;

(viii)    except to the extent that a holder of an Allowed Other Priority Claim has agreed to a different treatment of such Claim, each such Holder shall receive Cash in an amount equal to the Allowed amount of such Claim, or treatment in any other manner so that such Claim shall otherwise be rendered Unimpaired, (i) on the Effective Date or as soon as reasonably practicable thereafter; (ii) if an Other Priority Claim is Allowed after the Effective Date, on the date such Other Priority Claim is Allowed or as soon as reasonably practicable thereafter;

31

(iii) at such time and upon such terms as may be agreed upon by such Holder and the Debtors; or (iv) at such time and upon such terms as set forth in an order of the Bankruptcy Court;

(ix)     at least one Class of Impaired Claims will accept the Plan, determined without including any acceptance of the Plan by any insider holding a Claim of that Class.

(x)     Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan (see Section 5.D below – Financial Feasibility); and

(xi)     all fees payable under section 1930 of title 28 of the United States Code will be paid as of the Effective Date of the Plan.

**C.**    **Best Interests Test**

*1.*    *Explanation of the Best Interests Test*

Pursuant to section 1129(a)(7) of the Bankruptcy Code, Confirmation of the Plan requires that, with respect to each Class of Impaired Claims or Equity Interests, each Holder of a Claim or Equity Interest in such Class either (i) accepts the Plan or (ii) receives or retains under the Plan on account of such Claim or Equity Interest, property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on such date under chapter 7 of the Bankruptcy Code (this latter clause is known as the "*Best Interests Test*").

To determine the probable distribution to Holders of Claims and Equity Interests in each Impaired Class, if the Debtors were liquidated under chapter 7 of the Bankruptcy Code, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation.

The Debtors' chapter 7 liquidation value would consist primarily of the unencumbered and unrestricted cash held by the Debtors at the time of the conversion to a chapter 7 liquidation and the proceeds resulting from the sale of the Debtors' remaining unencumbered assets and properties by a chapter 7 trustee. The gross cash available for distribution would be reduced by the costs and expenses of the chapter 7 liquidation and any additional Administrative Claims that might arise as a result of the chapter 7 cases. Costs and expenses incurred as a result of the chapter 7 liquidation would include, among other things, the fees payable to a trustee in bankruptcy and the fees payable to attorneys and other professionals engaged by such trustee. Additional Administrative Claims could arise by reason of, among other things, the breach or rejection of obligations incurred and leases and executory contracts assumed or entered into by the Debtors during the pendency of these Chapter 11 Cases. Such Administrative Claims and any other Administrative Claims that might arise in a liquidation case or result from these Chapter 11 Cases, such as compensation for attorneys, financial advisors and

SC1:4134577.6

accountants, would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay prepetition Claims.

To determine if the Plan is in the best interests of each Impaired Class, the present value of the distributions from the proceeds of a chapter 7 liquidation of the Debtors' unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses and Administrative Claims associated with a chapter 7 liquidation, must be compared with the value offered to such Impaired Classes under the Plan.  If the hypothetical chapter 7 liquidation distribution to Holders of Claims or Equity Interests in any Impaired Class is greater than the distributions to be received by such parties under the Plan, then the Plan is not in the best interests of the Holders of Claims or Equity Interests in such Impaired Class.

2.    *Liquidation Analysis of the Debtors*

Amounts that a Holder of Claims and Equity Interests in Impaired Classes would receive in a hypothetical chapter 7 liquidation are discussed in the liquidation analysis of the Debtors prepared by the Debtors' management with the assistance of its advisors, attached to this Disclosure Statement as Appendix D (the "*Liquidation Analysis*").

As described in the Liquidation Analysis, underlying this analysis is the extensive use of estimates and assumptions that, although considered reasonable by the Debtors' management and their financial advisors, are inherently subject to significant business, economic and competitive uncertainties and contingencies beyond the control of the Debtors.  The Liquidation Analysis is based on assumptions with regard to liquidation decisions that are subject to change.  Actual results may vary materially from the estimates and projections set forth in the Liquidation Analysis if the Debtors were, in fact, to undergo a liquidation.

The Liquidation Analysis was developed solely for purposes of the formulation and negotiation of the Plan and to enable Holders of Claims entitled to vote under the Plan to make an informed judgment about the Plan, and should not be used or relied upon for any other purpose, including the purchase or sale of securities of, or Claims or Equity Interests in, the Debtors or any of their affiliates.

Events and circumstances subsequent to the date on which the Liquidation Analysis was prepared may be different from those assumed, or alternatively, may have been unanticipated, and thus the occurrence of these events may affect financial results in a materially adverse or materially beneficial manner.  The Debtors do not intend and do not undertake any obligation to update or otherwise revise the Liquidation Analysis to reflect events or circumstances existing or arising after the date the Liquidation Analysis is initially filed or to reflect the occurrence of unanticipated events.  Therefore, the Liquidation Analysis may not be relied upon as a guarantee or other assurance of actual future results.

In deciding whether to vote to accept or reject the Plan, Holders of Claims must make their own determinations as to the reasonableness of any assumptions underlying the Liquidation Analysis and the reliability of the Liquidation Analysis.

      3.      *Application of the Best Interests Test to the Liquidation Analysis of the Debtors.*

Notwithstanding the difficulties in quantifying with precision the recoveries to Holders of Claims and Equity Interests, the Debtors believe that, based on a comparison between the recoveries under the Plan and the Liquidation Analysis, the Debtors' proposed Plan satisfies the requirements of the Best Interests Test.  As the following table indicates, members of each Impaired Class will receive more (or no less) under the Plan than they would through a liquidation of the Debtors in a hypothetical chapter 7 case.

| CLASS | DESCRIPTION | ESTIMATED RECOVERY | |
|---|---|---|---|
| | | PLAN | LIQUIDATION |
| 1 | Other Priority Claims | 100% | 100% |
| 2 | Other Secured Claims | 100% | 100% |
| 3A | Senior Loan Claims | 100% | 100% |
| 3B | Junior Loan Claims | 35% | 20% |
| 3C | Swap Claims | 0% | 0% |
| 4 | General Unsecured Claims | 0% | 0% |
| 5 | Equity Interests in Primorsk | 0% | 0% |

Accordingly, the Debtors believe that the Plan will allow the realization of greater value for their respective Impaired Classes than a hypothetical liquidation.

**D.**      **Financial Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires, as a condition to confirmation of the Plan, that the Bankruptcy Court find that confirmation is not likely to be followed by the liquidation of the Debtors or the need for further financial reorganization, unless such liquidation or reorganization is contemplated by the Plan.

The ability to make the distributions described in the Plan does not depend on future earnings or operations of the Debtors, but only on the orderly wind down of the Debtors' remaining assets.  The Debtors will continue to operate to facilitate the sale of the Debtors' vessels.  Upon the completion of the sale of all of the Debtors' vessels, the Debtors will cease all business operations.  Accordingly, the Debtors believe that the Plan is feasible and meets the requirements of section 1129(a)(11) of the Bankruptcy Code.

**E.**      **Acceptance by Impaired Classes**

Except as described in Section 5.F below, the Bankruptcy Code requires, as a condition to confirmation of the Plan, that each Impaired Class accept the Plan.  A class of claims that is unimpaired under the plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.  Under section 1124 of the Bankruptcy Code, a class is impaired under a plan unless (a) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof; or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

34

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by an impaired class of claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class; only those holders that actually vote to accept or reject the plan are counted for purposes of determining whether these dollar and number thresholds are met. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number that actually vote cast their ballots in favor of acceptance. Holders of claims who fail to vote are deemed neither to accept nor to reject the plan.

### F.    Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows the Bankruptcy Court to confirm the Plan, provided that the Plan has been accepted by at least one Impaired Class of creditors. Notwithstanding the failure of an Impaired Class to accept the Plan, the Plan will be confirmed in a procedure commonly known as cram-down, so long as the Plan does not "discriminate unfairly" and is "fair and equitable," for the purposes of the Bankruptcy Code, with respect to each Class of Claims or Equity Interests that is Impaired under, and has not accepted, the Plan. Pursuant to Section 4.5 of the Plan, the Debtors reserve the right to seek confirmation under section 1129(b) of the Bankruptcy Code if necessary.

#### 1.    *Unfair Discrimination*

The Plan does not "discriminate unfairly" for the purposes of section 1129 of the Bankruptcy Code if the Plan gives substantially equivalent treatment to each Class of equal rank; in determining whether a plan discriminates unfairly, courts take into account a number of factors, including the effect of applicable subordination agreements between parties.

#### 2.    *Fair and Equitable*

The condition that the Plan be fair and equitable includes the following requirement as applicable:

    (i)    with respect to a non-accepting Class of Secured Claims, that: (a) the Holders of such Secured Claims retain the Liens securing such Claims to the extent of the Allowed amount of the Secured Claims, whether the property subject to the liens is retained by the Debtors or transferred to another entity under the Plan; and (b) each Holder of a Secured Claim in the Class receive deferred cash payments totaling at least the Allowed amount of such Claim with a present value, as of the Effective Date, at least equivalent to the value of such Secured Claim Holder's interest in the Debtors' property subject to the Liens.

    (ii)    with respect to a non-accepting Class of General Unsecured Claims, that either: (a) the Plan provide that each Claim Holder in such Class receive or retain, on account of such Claim, property of a value, as of the Effective Date, equal to the Allowed amount of such Claim; or (b) no Holder of any Claim or Equity Interest that is junior to the Claims

35

or Equity Interests of such Class receive or retain any property under the Plan on account of such junior Claim or Equity Interest.

(iii)      with respect to a non-accepting Class of Equity Interests, that either: (a) the Plan provide that each Holder of an Equity Interest in such Class receive or retain under the Plan, on account of such Equity Interest, property of a value, as of the Effective Date, equal to the greater of:  (i) the Allowed amount of any fixed liquidation preference to which such Holder is entitled; (ii) any fixed redemption price to which such Holder is entitled; or (iii) the value of such Equity Interest; or (b) if the Class does not receive property in the amount required under (a), no Class of Equity Interests junior to the non-accepting Class receive a distribution under the Plan.

*3.       Confirmation of the Plan Pursuant to Section 1129(b)*

The Debtors may seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any Impaired Class presumed to reject the Plan, and reserve the right to do so with respect to any other rejecting Class of Claims, and/or to modify the Plan. Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of confirmation of the Plan by the acceptance of the Plan by at least one Class that is Impaired under the Plan.

The Debtors submit that the Plan does not "discriminate unfairly" for the purposes of section 1129(b) of the Bankruptcy Code because all Classes of equal rank receive substantially equivalent treatment under the Plan.

The Debtors submit that the Plan is "fair and equitable" for the purposes of section 1129(b) of the Bankruptcy Code because, as set forth above and in the Plan, the Holders of Claims in Classes 1 and 2 are Unimpaired and therefore deemed to have accepted the Plan. The Holders of Claims in Classes 3A, 3B and 3C may not receive, and the Holders of Claims in Class 4 and Holders of Equity Interests in Class 5 will not receive, a distribution equal to the Allowed amount of their Claims, but no Holders of Claims or Equity Interests junior to these Classes will receive a distribution under the Plan on account of such junior Claims or Equity Interests.

Therefore, the requirements of section 1129(b) of the Bankruptcy Code would be satisfied in the event that the Debtors are required to cram down.

## 6. VOTING PROCEDURES

On August __, 2016, the Bankruptcy Court entered an order, among other things, approving this Disclosure Statement, approving procedures for soliciting votes on the Plan, approving the form of the solicitation documents and various other notices, setting the voting record date, the Voting Deadline and the date of the Confirmation Hearing and establishing the

SC1:4134577.6

relevant objection deadlines and procedures associated with Confirmation of the Plan [Docket No. __] (the "*Solicitation Procedures Order*").[7]

The Solicitation Procedures Order, a copy of which is attached hereto as Appendix B, is hereby incorporated by reference as though fully set forth herein. The Solicitation Procedures Order should be read in conjunction with this Section 6 of this Disclosure Statement.

If you have any questions about: (a) the procedures for voting your Claim or with respect to materials that you have received or (b) the amount of your Claim or Equity Interest, or wish to obtain (at no charge) an additional copy of the Plan, this Disclosure Statement or other solicitation documents, please contact:

> Primorsk Balloting Center
> c/o Kurtzman Carson Consultants LLC
> 2335 Alaska Avenue
> El Segundo, CA 90245
> T: 888-249-2721
> http://www.kccllc.net/primorsk

The Bankruptcy Court may confirm the Plan only if it determines that the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code and that the disclosure by the Debtors concerning the Plan has been adequate and includes information concerning all payments made or promised by the Debtors in connection with the Plan and these Chapter 11 Cases. In addition, the Bankruptcy Court must determine that the Plan has been proposed in good faith and not by any means forbidden by law and, under Bankruptcy Rule 3020(b)(2), it may make such a determination without receiving evidence if no objection is timely filed.

In particular, and as described in more detail below, the Bankruptcy Code requires the Bankruptcy Court to find, among other things, that: (a) the Plan has been accepted by the requisite votes of all Classes of Impaired Claims unless approval will be sought under section 1129(b) of the Bankruptcy Code in spite of the nonacceptance by one or more such Classes; (b) the Plan is "feasible," meaning there is a reasonable probability that the Debtors will be able to perform their obligations under the Plan and continue to operate their businesses without further financial reorganization or liquidation; and (c) the Plan is in the "best interests" of all Holders of Claims and Equity Interests, meaning that all such Holders will receive at least as much under the Plan as they would receive in a liquidation under chapter 7 of the Bankruptcy Code.

The Bankruptcy Court must find that all conditions mentioned above are met before it can confirm the Plan. Thus, even if all classes of Impaired Claims accept the Plan by the requisite votes, the Bankruptcy Court must still make an independent finding that the Plan satisfies these requirements of the Bankruptcy Code, that the Plan is feasible, and that the Plan is in the best interests of the Holders of Claims against and Equity Interests in the Debtors.

---

[7]    Capitalized terms in this Section 6 not otherwise defined in this Disclosure Statement or the Plan shall have the meanings ascribed to them in the Solicitation Procedures Order.

SC1:4134577.6

UNLESS THE BALLOT BEING FURNISHED IS TIMELY RECEIVED BY THE NOTICE AND CLAIMS AGENT ON OR PRIOR TO SEPTEMBER 13, 2016 AT 8:00 P.M. (EASTERN TIME) TOGETHER WITH ANY OTHER DOCUMENTS REQUIRED TO BE SUBMITTED WITH SUCH BALLOT, THE DEBTORS MAY, IN THEIR SOLE DISCRETION, REJECT SUCH BALLOT AS INVALID AND, ACCORDINGLY, DECLINE TO COUNT IT AS AN ACCEPTANCE OR REJECTION OF THE PLAN.  IN NO CASE SHOULD A BALLOT OR ANY OF THE CERTIFICATES BE DELIVERED TO THE DEBTORS OR ANY OF THEIR ADVISORS.

### A.    Parties-in-Interest Entitled to Vote

Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless:  (a) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof; or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

In general, under section 1126(a) of the Bankruptcy Code, the holder of a claim or interest that is allowed under a plan is entitled to vote to accept or reject the plan if such claim or interest is impaired under the plan.  Under section 1126(f) of the Bankruptcy Code, the holder of a claim that is not impaired under a plan is deemed to have accepted the plan, and the plan proponent need not solicit such holder's vote. Under section 1126(g) of the Bankruptcy Code, the holder of an impaired claim or impaired interest that will not receive any distribution under the plan in respect of such claim or interest is deemed to have rejected the plan and is not entitled to vote on the plan.  For a detailed description of the treatment of Claims and Equity Interests under the Plan, refer to <u>Section 4</u> above—Summary of the Plan.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that such vote was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.  The Solicitation Procedures Order also sets forth assumptions and procedures for tabulating Ballots, including Ballots that are not completed fully or correctly.

### B.    Voluntary Releases under the Plan

The third-party release and injunction language in Article 9 of the Plan is described above in <u>Section 4</u> of this Disclosure Statement.

**HOLDERS OF CLAIMS THAT VOTE IN FAVOR OF THE PLAN ARE DEEMED TO AGREE TO THE RELEASES CONTAINED IN SECTION 9.6 OF THE PLAN.  HOLDERS OF CLAIMS THAT (A) VOTE TO REJECT THE PLAN OR (B) ABSTAIN FROM VOTING MAY, IN EACH CASE, OPT OUT OF THE RELEASES CONTAINED IN SECTION 9.6 OF THE PLAN BY CLEARLY MARKING THE "OPT-OUT" BOX ON THE BALLOT PROVIDED TO SUCH HOLDER.  ASSUMING SUCH BALLOT IS TIMELY RECEIVED AND IN PROPER FORM, HOLDERS OF CLAIMS WHO CHECK THE "OPT-OUT" BOX ON THE BALLOT WILL NOT BE RELEASING**

SC1:4134577.6

**PARTIES FOR PURPOSES OF SECTION 9.6 OF THE PLAN.  ALL OTHER HOLDERS OF CLAIMS THAT ARE ENTITLED TO VOTE ON THE PLAN ARE DEEMED TO AGREE TO THE RELEASES CONTAINED IN SECTION 9.6 OF THE PLAN WITH RESPECT TO ALL CLAIMS.**

### C.    Classes under the Plan

#### 1.    *Voting Impaired Classes*

Classes 3A, 3B and 3C are Impaired under, and entitled to vote to accept or reject, the Plan.

#### 2.    *Unimpaired Classes of Claims*

Classes 1 and 2 are Unimpaired under the Plan and deemed under section 1126(f) of the Bankruptcy Code to have accepted the Plan.

#### 3.    *Non-Voting Impaired Classes*

Classes 4 and 5 receive no distributions under the Plan and are deemed under section 1126(g) of the Bankruptcy Code to have rejected the Plan.

### D.    Solicitation Packages for Voting Classes

As set forth in the Solicitation Procedures Order, the Debtors will distribute or cause to be distributed, a solicitation package to each Holder of a Claim entitled to vote on the Plan (a "Solicitation Package").  The Solicitation Packages will contain:

(i)     a cover letter (a) describing the contents of the Solicitation Package, the contents of the enclosed CD-ROM and instructions for obtaining hard copies of materials provided on CD-ROM and (b) informing the Holders of the Debtors' recommendation to accept the Plan;

(ii)    the Confirmation Hearing Notice;

(iii)   an appropriate Ballot, together with a pre-addressed, postage prepaid return envelope;

(iv)    this Disclosure Statement (with the Plan annexed thereto and other exhibits) in electronic format on a CD-ROM; and

(v)     the Solicitation Procedures Order (without exhibits) in electronic format on a CD-ROM.

SC1:4134577.6

E.        **Solicitation Packages for Non-Voting Classes**

1.      *Unimpaired Classes of Claims Not Eligible to Vote*

Under section 1126(f) of the Bankruptcy Code, classes that are not impaired under a plan are deemed to accept the plan. The following Classes are Unimpaired under the Plan and deemed under section 1126(f) of the Bankruptcy Code to accept the Plan: Classes 1 and 2. Their votes to accept or reject the Plan will not be solicited. Pursuant to the Solicitation Procedures Order, these parties should only receive a notice of the Confirmation Hearing and a notice of non-voting status with respect to Unimpaired Classes deemed to accept the Plan.

F.        **Voting Procedures**

Ballots cast by Holders in Classes entitled to vote must be received by the Notice and Claims Agent by the Voting Deadline at the following address:

**For Ballots, if by First-Class Mail, Courier or Hand Delivery:**

Primorsk Ballot Processing
c/o Kurtzman Carson Consultants LLC
2335 Alaska Avenue
El Segundo, CA 90245

IF YOU HAVE ANY QUESTIONS ON THE VOTING PROCEDURES, PLEASE CALL THE NOTICE AND CLAIMS AGENT AT (888) 733-1521.

Ballots received after the Voting Deadline will not be counted or considered for any purpose in determining whether the Plan has been accepted or rejected. The method of delivery of Ballots to be sent to the Notice and Claims Agent is at the election and risk of each Holder of a Claim. Except as otherwise provided in the Plan, such delivery will be deemed made only when the original executed Ballot is actually received by the Notice and Claims Agent. In all cases, sufficient time should be allowed to ensure timely delivery. Ballots must be signed and legible, and must be clearly marked to either accept or reject the Plan (but not both). If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, or other person acting in a fiduciary or representative capacity, such person must indicate such capacity when signing the Ballot. Original executed Ballots are required. Delivery of a Ballot to the Notice and Claims Agent by facsimile, e-mail or any other electronic means will not be accepted. No Ballot should be sent to the Debtors or the Debtors' financial or legal advisors, agents or representatives (other than the Notice and Claims Agent), and if so sent, will not be counted.

Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and those restrictions on modifications set forth in the Plan, the Debtors, or the Liquidating Trustee, as applicable, may alter, amend or modify the Plan, without additional disclosure pursuant to section 1125 of the Bankruptcy Code. If the Debtors make changes in the terms of the Plan materially adverse to any Holder of Claims or Equity Interests or if the Debtors waive a material condition to the effectiveness of the Plan described in Article 11 of the Plan, the Debtors will disseminate additional solicitation materials to such affected Class and will extend

40

the solicitation period, in each case to the extent directed by the Bankruptcy Court.  After the Confirmation Date and prior to substantial consummation of the Plan, the Debtors may institute proceedings in the Bankruptcy Court pursuant to section 1127(b) of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistencies in the Plan, this Disclosure Statement or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes of the Plan.

## 7.  ADDITIONAL FACTORS TO BE CONSIDERED PRIOR TO VOTING

HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.  THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN OR ITS IMPLEMENTATION.

### A.    Plan Risks

#### 1.    *The Plan May Not Be Confirmed.*

The Debtors can make no assurances that they will receive the requisite acceptances to confirm the Plan.  Even if the Debtors receive the requisite acceptances, there is no assurance that the Bankruptcy Court will confirm the Plan.

Even if the Bankruptcy Court determines that this Disclosure Statement and the balloting procedures and results are appropriate, the Bankruptcy Court may still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation have not been met, including that the Plan does not discriminate unfairly and is fair and equitable with respect to non-accepting Classes.  Moreover, there can be no assurance that modifications to the Plan will not be required for Confirmation or that such modifications will not necessitate the re-solicitation of votes.  If the Plan is not confirmed, it is unclear what distributions Holders of Claims or Equity Interests would ultimately receive with respect to their Claims or Equity Interests in a subsequent plan of reorganization or liquidation.

#### 2.    *The Plan May Not Become Effective.*

Although the Debtors believe that the Effective Date of the Plan will occur soon after the Confirmation Date, there can be no assurance as to the occurrence of the Effective Date. Confirmation of the Plan is conditioned on, among other things, the Court's approval and entering of a Confirmation Order in form and substance reasonably satisfactory to the Debtors (with no stay or injunction in effect with respect thereto), the establishment and funding of the Professional Fee Escrow Account, the Debtors' reservation of sufficient Cash to pay for the line items in the Wind-Down Budget, the execution and delivery of all necessary documents and the granting of all necessary authorizations for Plan effectiveness.  As of the date of this Disclosure Statement, there can be no assurance that any or all of the foregoing conditions will be met or

that the other conditions to consummation, if any, will be satisfied.  Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated.

> ### 3.    The Debtors May Fail to Satisfy the Solicitation Requirements Requiring a Re-Solicitation.

To satisfy the requirements of Bankruptcy Code section 1126(b) and Bankruptcy Rule 3018(b), the Debtors will be delivering the Solicitation Materials to all Holders of Claims as of the voting record date in the Classes entitled to vote.  Accordingly, the Debtors believe that the solicitation is proper under section 1125 of the Bankruptcy Code.  The Debtors cannot be certain, however, that the solicitation of acceptances or rejections will be approved by the Bankruptcy Court, and if such approval is not obtained, the Confirmation of the Plan could be denied.  If the Bankruptcy Court was to conclude that the Debtors did not satisfy the solicitation requirements, then the Debtors may seek to re-solicit votes to accept or reject the Plan or to solicit votes from one or more Classes that were not previously solicited.  The Debtors cannot provide any assurances that such a re-solicitation would be successful.  Re-solicitation could delay or jeopardize confirmation of the Plan.  Non-confirmation of the Plan could result in protracted Chapter 11 Cases which could significantly and detrimentally impact relationships with vendors and charter counterparties.

> ### 4.    Undue Delay in Confirmation May Disrupt the Debtors' Operations.

The continuation of these Chapter 11 Cases, particularly if the Plan is not approved or confirmed in the time frame currently contemplated, could adversely affect the Debtors' operations and the Debtors' relationships with their charterers, vendors, employees and other parties-in-interest.  If Confirmation and Consummation of the Plan do not occur expeditiously, these Chapter 11 Cases could result in, among other things, increased costs for professional fees and similar expenses.

> ### 5.    The Results of an Actual Chapter 7 Liquidation May Be Different From the Liquidation Analysis.

Conversion to chapter 7 liquidation would, in the view of the Debtors, produce a less favorable outcome for Holders of Claims and Equity Interests than would the Plan.  However, underlying the Liquidation Analysis is the extensive use of estimates and assumptions that, although considered reasonable by the Debtors' advisors, are inherently subject to significant business, economic and competitive uncertainties and contingencies beyond the control of the Debtors.  The Liquidation Analysis is based on assumptions with regard to liquidation decisions that are subject to change.  Actual results may vary materially from the estimates and projections set forth in the Liquidation Analysis if the Debtors were, in fact, to undergo a liquidation.  Events and circumstances subsequent to the date on which the Liquidation Analysis was prepared may be different from those assumed, or alternatively, may have been unanticipated.

SC1:4134577.6

6.    *The Debtors Have No Duty to Update.*

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

7.    *No Representations Outside this Disclosure Statement Are Authorized.*

No representations concerning or related to the Debtors, these Chapter 11 Cases, once commenced, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

8.    *Forward-Looking Statements Are Not Assured, and Actual Results May Vary.*

This Disclosure Statement contains forward-looking statements.  These forward-looking statements are based on the current expectations and observations of the Debtors' management, and include factors that could cause actual results to differ materially such as: those factors described in Section 7 of this Disclosure Statement; the Debtors' ability to obtain Bankruptcy Court approval with respect to motions in these Chapter 11 Cases; the effects of the Bankruptcy Court rulings in these Chapter 11 Cases and the outcome of the case in general; the length of time the Debtors will operate under these Chapter 11 Cases; the pursuit by the Debtors' various creditors, equity holders and other constituents of its interests in these Chapter 11 Cases; risks associated with third-party motions in these Chapter 11 Cases, which may interfere with the ability to consummate the Plan; the adverse effects of these Chapter 11 Cases on the Debtors' liquidity or results of operations generally; the increased administrative and restructuring costs related to these Chapter 11 Cases; the Debtors' ability to maintain adequate liquidity to fund operations during these Chapter 11 Cases and thereafter; and the timing and realization of the recoveries of assets and the payments of Claims and the amount of expenses projected to recognize such recoveries and reconcile such Claims.

9.    *No Legal or Tax Advice is Provided to You by This Disclosure Statement.*

The contents of this Disclosure Statement should not be construed as legal, business or tax advice.  Each Holder of Claims against the Debtors should consult his, her or its own legal counsel and accountants as to legal, tax and other matters concerning such Holder's Claims.  This Disclosure Statement is not legal advice to you and may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

43

## 8. MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    Federal Income Tax Consequences to Debtors

In general, the Debtors understand that most Holders of Claims and Equity Interests are not U.S. investors and are not generally subject to United States federal income tax on their investments.  Likewise, the Debtors are not United States corporations and are not generally engaged in a trade or business in the United States, and are therefore not generally subject to United States federal income tax.  There should therefore in general be no significant U.S. tax consequences arising from the Plan.

Notwithstanding the above, a Holder of Claims or Equity Interests will generally be subject to United States federal income tax if such Holder is:

- a citizen or resident of the United States;

- a  corporation organized under the laws of the United States or a state or subdivision thereof;

- an estate whose income is subject to United States federal income tax regardless of its source;

- a trust, if a United States court can exercise primary supervision over the trust's administration and one or more United States persons are authorized to control all substantial decisions of the trust;

- an individual present in the United States for 183 days or more in the taxable year of the disposition and certain other conditions are met;

- a Holder in respect of which the gain is effectively connected with the Holder's conduct of a trade or business in the United States (or, if certain tax treaties apply, is attributable to a permanent establishment in the United States); or

- a partnership with an investor that falls into one of the above categories.

Any Holders that fall into one of these categories should consult their United States tax advisors concerning both the United States federal income tax consequences of the Plan and the potential application of relevant information reporting and backup withholding requirements.

In addition, Holders not otherwise subject to United States federal income tax that intend to participate in the Plan through United States intermediaries should consult a United States tax advisor with regard to the potential applicability of information reporting requirements.

SC1:4134577.6

**B.**      **Consequences of the Liquidating Trust**

The Liquidating Trust, if established, is intended to qualify as a "liquidating trust" for U.S. federal income tax purposes. In general, a liquidating trust is not a separate taxable entity, but rather is treated for U.S. federal income tax purposes as a "grantor trust" (i.e., all income and loss is taxed directly to the liquidating trust beneficiaries). However, merely establishing a trust as a liquidating trust does not ensure that it will be treated as a grantor trust for U.S. federal income tax purposes. The Internal Revenue Service (the "*IRS*"), in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Liquidating Trust will be structured to comply with such general criteria. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including, without limitation, the Debtors, the Liquidating Trustee, and holders of Junior Loan Claims) will be required to treat, for U.S. federal income tax purposes, the Liquidating Trust as a grantor trust of which holders of Junior Loan Claims are the owners and grantors. The following discussion assumes that the Liquidating Trust will be so respected for U.S. federal income tax purposes. However, no opinion of counsel has been requested, and the Liquidating Trustee may or may not obtain a ruling from the IRS, concerning the tax status of the Liquidating Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position. If the IRS were to challenge successfully the classification of the Liquidating Trust, the U.S. federal income tax consequences to the Liquidating Trust could vary from those discussed herein (including the potential for an entity-level tax on income of the Liquidating Trust)

**C.**      **General Tax Reporting by the Liquidating Trust and Liquidating Trust Beneficiaries**

For all U.S. federal income tax purposes, all parties (including, without limitation, the Debtors, the Liquidating Trustee, and holders of Junior Loan Claims) shall treat the transfer of the assets to the Liquidating Trust in accordance with the terms of the Plan. Pursuant to the Plan, the Liquidating Trust assets (other than assets allocable to disputed claims) shall be treated, for U.S. federal income tax purposes, as having been transferred, subject to any obligations relating to those assets, directly to the holders of the respective Claims (with each holder receiving an undivided interest in such assets in accordance with their economic interests in such assets), followed by the transfer by the holders of such assets to the Liquidating Trust. Accordingly, all parties shall treat the Liquidating Trust as a grantor trust of which the holders of Junior Loan Claims are the owners and grantors, and treat such holders as the direct owners of an undivided interest in the Liquidating Trust assets (other than any assets allocable to disputed claims), consistent with their economic interests therein, for all U.S. federal income tax purposes.

Allocations of taxable income of the Liquidating Trust (other than taxable income allocable to any assets allocable to, or retained on account of, disputed claims) shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidating Trust had distributed all its assets (valued at their tax book value, and other than assets allocable to disputed claims) to the holders of Junior Loan Claims, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidating Trust. Similarly, taxable loss of the Liquidating

SC1:4134577.6

Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Liquidating Trust assets.  The tax book value of the Liquidating Trust assets for this purpose shall equal their fair market value on the date of the transfer of the Liquidating Trust assets to the Liquidating Trust, adjusted in accordance with tax accounting principles prescribed by the Internal Revenue Code of 1986, as amended, applicable regulations promulgated by the U.S. Department of the Treasury, and other applicable administrative and judicial authorities and pronouncements.

As soon as reasonably practicable after the transfer of the Liquidating Trust assets to the Liquidating Trust, the Liquidating Trustee shall make a good faith valuation of the Liquidating Trust assets.  All parties to the Liquidating Trust must consistently use such valuation for all U.S. federal income tax purposes.  The valuation will be made available from time to time, as relevant for tax reporting purposes.

Taxable income or loss allocated to a holder of a Junior Loan Claim will be treated as income or loss with respect to such holder's undivided interest in the Liquidating Trust assets, and not as income or loss with respect to its prior Allowed Claim.  The character of any income and the character and ability to use any loss will depend on the particular situation of the holder.

The U.S. federal income tax obligations of a U.S. holder with respect to its Liquidating Trust beneficial interest are not dependent on the Liquidating Trust distributing any cash or other proceeds. Thus, a holder may incur a U.S. federal income tax liability with respect to its allocable share of the Liquidating Trust's income even if the Liquidating Trust does not make a concurrent distribution to the holder.  In general, other than in respect of Cash retained on account of disputed claims and distributions resulting from undeliverable distributions (the subsequent distribution of which still relates to a holder's Allowed Claim), a distribution of cash by the Liquidating Trust will not be separately taxable to a Liquidating Trust beneficiary since the beneficiary is already regarded for federal income tax purposes as owning the underlying assets (and was taxed at the time the cash was earned or received by the Liquidating Trust).  Holders are urged to consult their tax advisors regarding the appropriate federal income tax treatment of any subsequent distributions of cash originally retained by the Liquidating Trust on account of disputed claims.

IRS CIRCULAR 230 DISCLOSURE:  TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE TAX CODE.  THE TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ATTACHMENTS) WAS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS DESCRIBED IN THIS DISCLOSURE STATEMENT.  EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

## 9. ALTERNATIVE TO CONFIRMATION OF THE PLAN

The Debtors believe that the Plan affords Holders of Claims and Equity Interests the potential for the greatest recovery on those Claims and Equity Interests and is therefore in the best interests of such Holders.  If the Plan is not confirmed, the only alternative near-future outcomes for the Debtors is the liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

### A. Chapter 7 Liquidation

If the Plan is not confirmed, these Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code.  In a chapter 7 case, a trustee or trustees would be appointed to liquidate the assets of the Debtors.  It is impossible to predict with precision how the proceeds of the liquidation would be distributed among Holders of Claims against the Debtors.

The Debtors believe, however, that creditors would receive less value in the event that the Debtors are liquidated under chapter 7.  In addition, the Debtors believe that, in a liquidation under chapter 7, the value of the Debtors' estates will be substantially eroded before creditors receive any distribution, as a result of additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants and other professionals to assist such trustees.  The assets available for distribution to creditors will be reduced by such additional expenses and by claims, some of which will be entitled to priority.

The Liquidation Analysis, prepared by the Debtors with their restructuring and financial advisors, is premised upon a hypothetical liquidation in a chapter 7 case.  In the Liquidation Analysis, the Debtors have taken into account the nature, status, and underlying value of their assets, the ultimate estimated realizable value of their assets, and the extent to which such assets are subject to liens and security interests.  The likely form of any liquidation would be the wind-down and sale of individual assets.

Based on this analysis, it is likely that a chapter 7 liquidation of the Debtors' assets would produce less value for distribution to creditors than that recoverable under the Plan.  Therefore, the Debtors submit that the projected recoveries available to Holders of Claims and Holders of Equity Interests in a chapter 7 liquidation are likely to be lower than those available under the Plan.

## 10. DEBTORS' RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to the alternatives described herein.  **Therefore, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept it.**

SC1:4134577.6

Dated:  August 2, 2016
New York, New York

Respectfully submitted,

**PRIMORSK INTERNATIONAL SHIPPING
LIMITED**
**(for itself and on behalf of each of the Debtors)**


By: *Holly Felder Etlin*
       Name:  Holly Felder Etlin
       Title:  Chief Restructuring Officer of the
            Debtors

# INDEX OF DEFINED TERMS

Capitalized terms not defined in this Disclosure Statement have the meaning assigned to them in the Plan.

DEFINED TERM                                                                        LOCATION

530 Loan Facility ........................................................................................................ 2.B.1.
Amended Cash Collateral .......................................................................................... 3.D.2.
Apington ..................................................................................................................... 2.B.3.
Auction ....................................................................................................................... 3.F.2.
Bankruptcy Code ............................................................................................................ 1.
Best Interests Test .................................................................................................... 6.C.1.
Bid Procedures Motion .............................................................................................. 3.F.2.
Budget ....................................................................................................................... 3.D.2.
Claims Bar Date ........................................................................................................... 3.C.
Claims Bar Date Order................................................................................................. 3.C.
Clarksons .................................................................................................................. 3.F.1.
Clarksons Retention Application ............................................................................... 3.F.1.
Company ..................................................................................................................... 2.A.
Debtors .......................................................................................................................... 1.
Disclosure Statement ................................................................................................. 1.A.
Exclusivity Motion....................................................................................................... 3.E.
Exculpated Parties.................................................................................................... 5.B.8.
First Day Motions ..................................................................................................... 3. B.1.
First Day Orders....................................................................................................... 3.B.1.
General Unsecured Claims .................................................................................... 5.A.2.g.
Holder .....................................................................................................................5.B.6.
IRS .............................................................................................................................8.C.
Junior Loan Claims .............................................................................................. 5.A.2.d.
Junior Facility ........................................................................................................2.B.1 a.
Lenarda ..................................................................................................................... 2.b.
Liquidating Trust ........................................................................................................ 3.4.
Liquidating Trust Distributable Cash........................................................................... 3.4.
March Disclosure Statement ..................................................................................... 3.D.
March Plan ............................................................................................................... 3.D.
Norwegian Bond Indenture......................................................................................2.B.2.
Norwegian Bond Trustee .........................................................................................2.B.2.
Norwegian Bonds.....................................................................................................2.B.2.
Notice and Claims Agent ......................................................................................... 1.D.2
Other Priority Claim .................................................................................................5.A.2 a.
Other Secured Claim ............................................................................................. 5.A.2.b.
Peraticos Holders ................................................................................................... 2.B 2.c.
Petition Date................................................................................................................. 1.
Plan ............................................................................................................................. 1.
Primorsk ..................................................................................................................... 1.

Prisco.................................................................................................................................... 4.D.
Released Parties ..............................................................................................................5.B.6.
Releasing Parties ............................................................................................................5.B.6.
Retention Applications....................................................................................................3.B.2.
Sale Order ....................................................................................................................... 3.F.3.
Schedules ........................................................................................................................ .3.C.
Second Amended Cash Collateral Order ........................................................................ 3.F.4.
Senior Debt .....................................................................................................................2.B.1.
Senior Agent ...................................................................................................................2.B.1.a.
Secured Lenders ..............................................................................................................2.B.1.a.
Securities Act ..................................................................................................................... ii.
Senior Loan Claims.........................................................................................................5.A.2.c.
Senior Facility ................................................................................................................2.B.1 a.
Solicitation Package ....................................................................................................... 6.D.
Solicitation Procedures Order ........................................................................................ 7.
Swap Agent.....................................................................................................................2.B.1.b.
Swap Facility ..................................................................................................................2.B.1.
Swap Loan Agreement....................................................................................................2.B.1.b.
Swap Lenders..................................................................................................................2.B.1.b.
Swap Claims ...................................................................................................................5.A.2.e.
U.S. Trustee .................................................................................................................... 3.A.

2

**Appendix A: Debtors' Plan of Liquidation**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

————————————————————— x
: 
In re                                                                    :          Chapter 11
                                                                              :
                                                                              :          Case No. 16-10073 (MG)
PRIMORSK INTERNATIONAL SHIPPING          :
LIMITED, *et al.*, [1]                                        :          Jointly Administered
                                                                              :
                                   Debtors.                    :
                                                                              :
————————————————————— x


## JOINT CHAPTER 11 PLAN OF LIQUIDATION OF
## PRIMORSK INTERNATIONAL SHIPPING LIMITED
## AND ITS DEBTOR AFFILIATES


Andrew G. Dietderich
Brian D. Glueckstein
Alexa J. Kranzley
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone:   (212) 558-4000



Counsel to the Debtors and
Debtors-in-Possession

Dated: August 2, 2016

---

[1]   The Debtors in these Chapter 11 Cases and, if applicable, the last four digits of their U.S. taxpayer identification numbers are: Primorsk International Shipping Limited (Cyprus), Boussol Shipping Limited (Cyprus) (6402) – m/t "Zaliv Amerika", Malthus Navigation Limited (Cyprus) (6401) – m/t "Zaliv Amurskiy", Jixandra Shipping Limited (Cyprus) (6168) – m/t "Prisco Alexandra", Levaser Navigation Limited (Cyprus) (0605) – m/t "Prisco Ekaterina", Hermine Shipping Limited (Cyprus) (0596) – m/t "Prisco Irina", Laperouse Shipping Limited (Cyprus) (0603) – m/t "Prisco Elizaveta", Prylotina Shipping Limited (Cyprus) (6085) – m/t "Prisco Elena", Baikal Shipping Ltd (Liberia) (6592) – m/t "Zaliv Baikal" and Vostok Navigation Ltd (Liberia) (1745) – m/t "Zaliv Vostok".

# TABLE OF CONTENTS

**Page**

1.    INTRODUCTION ...................................................................................1

2.    DEFINITIONS AND RULES OF INTERPRETATION ....................................2

    2.1.    Defined Terms .................................................................... 2
    2.2.    Rules of Interpretation ........................................................ 11
    2.3.    Governing Law ................................................................. 12
    2.4.    Computation of Time ......................................................... 12

3.    GENERAL ADMINISTRATIVE CLAIMS, PROFESSIONAL CLAIMS AND
      UNITED STATES TRUSTEE STATUTORY FEES .....................................13

    3.1.    Administrative Claim Bar Date ............................................. 13
    3.2.    General Administrative Claims............................................. 13
    3.3.    Professional Claims .......................................................... 14
    3.4.    Statutory Fees Payable Pursuant to 28 U.S.C. § 1930......................... 14

4.    CLASSIFICATION, TREATMENT AND VOTING OF CLAIMS AND
      EQUITY INTERESTS........................................................................15

    4.1.    Classification of Claims and Equity Interests......................... 15
    4.2.    Treatment of Claims and Equity Interests ............................. 15
    4.3.    Intercompany Claims and Interests....................................... 18
    4.4.    Special Provision Governing Unimpaired Claims................... 18
    4.5.    Confirmation Pursuant to Sections 1129(a) and 1129(b) of the Bankruptcy
           Code ........................................................................... 19

5.    IMPLEMENTATION OF THE PLAN .....................................................20

    5.1.    Operations Between the Confirmation Date and Effective Date .......... 20
    5.2.    Establishment of the Liquidating Trust................................. 20
    5.3.    Vesting of Assets in the Liquidating Trust ............................ 20
    5.4.    Cancelation of Existing Agreements, Notes and Equity Interests ....... 20
    5.5.    Section 1146 Exemption from Certain Transfer Taxes and Recording Fees........ 20
    5.6.    Preservation of Causes of Action......................................... 21
    5.7.    Effectuating Documents and Further Transactions.................. 21
    5.8.    Fees and Expenses of the Secured Agent ............................. 22

6.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ..........23

    6.1.    Rejection of Executory Contracts and Unexpired Leases.................... 23
    6.2.    Modification, Amendments, Supplements, Restatements or Other
           Agreements .................................................................. 23
    6.3.    Reservation of Rights......................................................... 23

7.    PROVISIONS GOVERNING DISTRIBUTIONS ............................................24

    7.1.    Distributions............................................................................ 24
    7.2.    Record Date and Delivery of Distributions ...................................... 24
    7.3.    Distribution Agents ................................................................... 25
    7.4.    Fractional and De Minimis Distributions .......................................... 26
    7.5.    Undeliverable Distributions ......................................................... 26
    7.6.    Reversion ................................................................................ 26
    7.7.    Surrender of Canceled Instruments or Securities................................ 26
    7.8.    Compliance with Tax Requirements and Allocations to Principal and
        Interest.................................................................................... 27
    7.9.    Setoffs ................................................................................... 27
    7.10.   No Postpetition Interest on Claims ................................................ 28
    7.11.   No Payment Over the Full Amount ............................................... 28

8.    CONDITIONS PRECEDENT TO EFFECTIVENESS OF THE PLAN ...........................29

    8.1.    Conditions Precedent to the Effective Date ..................................... 29
    8.2.    Waiver of Conditions ................................................................. 29
    8.3.    Simultaneous Transactions .......................................................... 29
    8.4.    Effect of Non-Occurrence of the Effective Date ................................ 29

9.    SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS ...............31

    9.1.    Compromise and Settlement ......................................................... 31
    9.2.    Subordinated Claims .................................................................. 31
    9.3.    Discharge of Claims and Termination of Equity Interests..................... 31
    9.4.    Release of Liens........................................................................ 31
    9.5.    **Debtor Release** ....................................................................... 32
    9.6.    **Voluntary Release by Holders of Claims and Equity Interests** ..................... 32
    9.7.    **Scope of Releases** ................................................................... 33
    9.8.    **Exculpation** .......................................................................... 33
    9.9.    **Injunction**.............................................................................. 34
    9.10.   **Limitations on Exculpations and Releases** ...................................... 34

10.   MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN ...................35

    10.1.   Modification of Plan .................................................................. 35
    10.2.   Effect of Confirmation on Modification ........................................... 35
    10.3.   Revocation of Plan .................................................................... 35

11.   RETENTION OF JURISDICTION ..............................................................36

    11.1.   Retention of Jurisdiction ............................................................. 36

12.   MISCELLANEOUS PROVISIONS ..............................................................39

    12.1.   Immediate Binding Effect............................................................ 39
    12.2.   Additional Documents ................................................................ 39
    12.3.   Reservation of Rights.................................................................. 39
    12.4.   Successors and Assigns................................................................ 39

SC1:4076070.8

12.5.    Term of Injunction or Stays .................................................................................. 39
12.6.    Entire Agreement ................................................................................................... 40
12.7.    Exhibits .................................................................................................................. 40
12.8.    Nonseverability of Plan Provisions Upon Confirmation ...................................... 40
12.9.    Closing of Chapter 11 Cases ................................................................................. 40
12.10.  Conflicts ................................................................................................................ 40
12.11.  Further Assurances ................................................................................................ 41
12.12.  No Stay of Confirmation Order ............................................................................ 41
12.13.  Waiver or Estoppel ............................................................................................... 41
12.14.  Post-Effective Date Service .................................................................................. 41
12.15.  Notices .................................................................................................................. 41

SC1:4076070.8

1.    **I**NTRODUCTION

Primorsk International Shipping Limited ("*Primorsk*") and its debtor affiliates, as debtors-in-possession in the above-captioned Chapter 11 Cases (each a "*Debtor Subsidiary*" and together with Primorsk, the "*Debtors*"), propose the following joint plan of liquidation (including the Plan Supplement and all other exhibits and schedules thereto, the "*Plan*") pursuant to section 1121(a) of the Bankruptcy Code.  These Chapter 11 Cases are being jointly administered pursuant to an order of the Bankruptcy Court dated January 21, 2016.  Each Debtor is a proponent of the Plan for purposes of section 1129 of the Bankruptcy Code.

2.    **DEFINITIONS AND RULES OF INTERPRETATION**

2.1.    Defined Terms

Except as otherwise provided herein, each capitalized term used in this Plan shall have the meaning set forth below.

2.1.1    "*Administrative Claim*" means a Claim arising under section 503(b) or 507(b) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Professional Claims; (c) Claims arising under section 361(1) of the Bankruptcy Code; and (d) all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code, 28 U.S.C. 1911 and 1930.

2.1.2    "*Administrative Claim Bar Date*" means the date by which Proofs of Claim in respect of Administrative Claims must be filed, as determined by an order of the Bankruptcy Court.

2.1.3    "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

2.1.4    "*Agents*" means the Secured Agent and the Swap Agent.

2.1.5    "*Allowed*" means, with respect to any Claim, that (a) such Claim has been allowed by the Plan or an order of the Bankruptcy Court; (b) such Claim has been allowed, compromised or settled in writing (i) prior to the Effective Date, by the Debtors in accordance with authority granted by an order of the Bankruptcy Court; or (ii) on or after the Effective Date, by the Liquidating Trustee; (c) such Claim is listed in the Schedules as not disputed, not contingent and not unliquidated and (i) no Proof of Claim has been filed; (ii) no objection to allowance, request for estimation, motion to deem the Schedules amended or other challenge has been filed prior to the Effective Date; and (iii) such Claim is not otherwise subject to disallowance under section 502(d) of the Bankruptcy Code; (d) such Claim is evidenced by a valid and timely filed Proof of Claim and (i) no objection to allowance, request for estimation, or other challenge has been filed prior to the Effective Date, as applicable; and (ii) such Claim is not otherwise subject to disallowance under section 502(d); or (e) in the case of an Administrative Claim, such Claim is subject to a request for payment timely filed and served in accordance with Section 3.1 herein and no objection to such Claim is timely filed and served pursuant to such Section.

2.1.6    "*APS*" means AP Services, LLC.

2.1.7    "*APS Retention Order*" means the Order Pursuant to 11 U.S.C. §§ 105(a) and 363(b) (I) Authorizing the Retention and Employment of AP Services, LLC and (II) Designating Holly Felder Etlin as Chief Restructuring Officer *Nunc Pro Tunc* to the Petition Dated, dated February 18, 2016 [Docket No. 61].

2.1.8    "*Avoidance Actions*" means any and all actual or potential claims and causes of action to avoid a transfer of property or an obligation incurred by any of the Debtors

SC1:4076070.8

pursuant to any applicable section of the Bankruptcy Code, including sections 544, 545, 547, 548, 549, 550, 551, 553(b) and 724(a) of the Bankruptcy Code, or under similar or related state or federal statutes and common law.

2.1.9    "*Ballots*" means the ballots accompanying the Disclosure Statement upon which certain Holders of Impaired Claims entitled to vote shall, among other things, indicate their acceptance or rejection of the Plan in accordance with the Plan and the procedures governing the solicitation process, and which must be actually received on or before the Voting Deadline.

2.1.10    "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*.

2.1.11    "*Bankruptcy Court*" or "*Court*" means the United States Bankruptcy Court for the Southern District of New York.

2.1.12    "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to these Chapter 11 Cases, and the general, local and chambers rules of the Bankruptcy Court.

2.1.13    "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

2.1.14    "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

2.1.15    "*Cause of Action*" means any action, claim, cause of action, controversy, demand, right, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law.  Causes of Action also include:  (a) any right of setoff, counterclaim or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity; (b) the right to object to Claims or interests; (c) any claim pursuant to section 362 of the Bankruptcy Code; (d) any Avoidance Action; (e) any claim or defense, including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; (f) any state law fraudulent transfer claim; and (g) any claim against persons or Entities that are not released under the Plan, including such Entity's directors, officers, employees, agents, Affiliates, parents, subsidiaries, predecessors, successors, heirs, executors and assigns, attorneys, financial advisors, restructuring advisors, investment bankers, accountants and other professionals or representatives when acting in any such capacities.

2.1.16    "*Certificate*" means any instrument evidencing a Claim or an Equity Interest.

SC1:4076070.8

2.1.17    "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the chapter 11 case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all Debtors, the jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

2.1.18    "*Claim*" means any claim against a Debtor as defined in section 101(5) of the Bankruptcy Code.

2.1.19    "*Claims Bar Date*" means (a) 4:00 p.m. (Eastern Time) on April 29, 2016; or (b) such other date established by order of the Bankruptcy Court by which Proofs of Claim must have been filed.

2.1.20    "*Claims Register*" means the official register of Claims maintained by the Notice and Claims Agent.

2.1.21    "*Class*" means a class of Claims or Equity Interests as set forth in Article 4 herein pursuant to section 1122(a) of the Bankruptcy Code.

2.1.22    "*Confirmation*" means the entry of the Confirmation Order on the docket of these Chapter 11 Cases.

2.1.23    "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of these Chapter 11 Cases.

2.1.24    "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

2.1.25    "*Confirmation Order*" means the order entered by the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

2.1.26    "*Consummation*" means the occurrence of the Effective Date.

2.1.27    "*Debtor Subsidiary*" has the meaning set forth in the Introduction hereto.

2.1.28    "*Debtors*" has the meaning set forth in the Introduction hereto.

2.1.29    "*Disclosure Statement*" means the Disclosure Statement for the Plan, as approved by the Bankruptcy Court pursuant to the Solicitation Procedures Order, including all exhibits and schedules thereto and references therein that relate to the Plan.

2.1.30    "*Distribution*" means a distribution of property pursuant to the Plan, to take place as provided for herein.

2.1.31    "*Distribution Agent*" means any Entity or Entities chosen by the Debtors or the Liquidating Trustee, and may include the Notice and Claims Agent.

2.1.32    "*Distribution Date*" means the Business Day that is as soon as practicable after the Effective Date when Distributions under the Plan shall commence, which date shall be no later than 20 Business Days after the Effective Date unless extended by the Bankruptcy Court for cause shown.

2.1.33    "*Distributions Record Date*" means, for the purpose of making Distributions hereunder, the Confirmation Date.

2.1.34    "*Effective Date*" means, following the Confirmation Date, 12:01 a.m. prevailing Eastern Time on a Business Day selected by the Debtors, on which all conditions to the occurrence of the Effective Date set forth in Sections 8.1 and 8.2 herein are satisfied or waived.

2.1.35    "*Encumbered Cash*" means  (i) the Vessel Sale Proceeds and (ii) the Cash in any of the Debtors' bank accounts.

2.1.36    "*Entity*" incorporates the meaning set forth in section 101(15) of the Bankruptcy Code.

2.1.37    "*Equity Interest*" means any equity security (as defined in section 101(16) of the Bankruptcy Code), including any issued or unissued share of common stock, preferred stock, or other instrument evidencing an ownership interest in a Debtor, whether or not transferable, and any option, warrant or right, contractual or otherwise, to acquire any such interest in a Debtor that existed immediately prior to the Effective Date; *provided* that Equity Interest does not include any Intercompany Interest.

2.1.38    "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

2.1.39    "*Exchange Rate*" means the closing exchange rate on January 14, 2016, as published by *The Wall Street Journal*.

2.1.40    "*Exculpated Parties*" means (a) the Debtors and the Liquidating Trustee; and (b) the current and former directors, officers (including the chief restructuring officer and interim management), employees, agents, attorneys, financial advisors, restructuring advisors, investment bankers, accountants, and other professionals or representatives of the Debtors and the Liquidating Trustee (other than Prisco (Singapore) Pte Ltd, Watson Farley & Williams LLP and Frank Dunn, Esq.), in their capacities as such; and (c) with respect to each Entity named in (a) and (b), such Entity's directors, officers, employees, agents, predecessors, successors, heirs, executors and assigns, attorneys, financial advisors, restructuring advisors, investment bankers, accountants and other Professionals or representatives when acting in any such capacities; *provided*, *however*, the current and former directors and officers of the Debtors and any persons designated by the current and former directors of the Debtors to act on behalf of or in the name of the Debtors (in each case, other than the chief restructuring officer and interim management), in their capacities as such, shall not be Exculpated Parties with respect to any act taken or omitted to be taken prior to March 23, 2016.

SC1:4076070.8

2.1.41    "*Executory Contract*" means a contract that a Debtor may assume or reject under section 365 or 1123 of the Bankruptcy Code.

2.1.42    "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to appeal, seek certiorari or move for a new trial, re-argument or rehearing has expired and no appeal, petition for certiorari or motion for a new trial, re-argument or rehearing has been timely filed, or as to which any appeal that has been taken, any petition for certiorari, or motion for a new trial, review, re-argument, or rehearing that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought; *provided* that the possibility that a motion under rule 60 of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 9024, may be filed relating to an order shall not by itself cause such order to not be a Final Order.

2.1.43    "*General Administrative Claim*" means an Administrative Claim other than a Professional Claim.

2.1.44    "*General Unsecured Claim*" means any Claim that is not an (a) Administrative Claim, (b) Other Priority Claim, (c) Other Secured Claim, (d) Senior Loan Claim, (e) Junior Loan Claim, (f) Swap Claim, (g) Equity Interest or (h) Intercompany Claim.

2.1.45    "*Holder*" means an Entity holding a Claim against or an Equity Interest in any of the Debtors.

2.1.46    "*Impaired*" means, with respect to any Claim or Equity Interest, a Claim or Equity Interest that is in a Class that is "impaired" within the meaning of section 1124 of the Bankruptcy Code.

2.1.47    "*Intercompany Claim*" means any Claim held by a Debtor against another Debtor or a Non-Debtor Subsidiary, or any Claim held by a Non-Debtor Subsidiary against a Debtor.

2.1.48    "*Intercompany Interest*" means any equity security (as defined in section 101(16) of the Bankruptcy Code), including any issued or unissued share of common stock, preferred stock, or other instrument, evidencing an ownership interest in a Debtor (other than Primorsk) or a subsidiary held by another Debtor.

2.1.49    "Intercreditor Deed" means that certain agreement dated as of June 7, 2011 (as amended and restated on December 21, 2012 and as otherwise amended, amended and restated, supplemented or otherwise modified from time to time) among Primorsk, the Secured Agent and the Swap Agent, among others.

2.1.50    "*Junior Loan Claim*" mean any Claim arising under or in connection with the junior revolving credit facility pursuant to the Senior Loan Agreement, including, without limitation, any Claim arising under section 361(1) of the Bankruptcy Code or other Administrative Claim of a Holder of a Junior Loan Claim.

- 6 -

2.1.51    "*Lien*" means a lien as defined in section 101(37) of the Bankruptcy Code.

2.1.52    "*Liquidating Trust*" means the liquidating trust that may be created pursuant to the Plan and the Liquidating Trust Agreement.

2.1.53    "*Liquidating Trust Agreement*" means the agreement establishing the Liquidating Trust that may be created pursuant to the Plan, dated as of the Effective Date and to be filed as part of the Plan Supplement to the extent created.

2.1.54    "*Liquidating Trust Distributable Cash*" means (i) any assets of the Liquidating Trust reduced to Cash, net of all expenses and costs of operating the Liquidating Trust; (ii) any Cash remaining in the Wind-Down Budget reserve after the payment in full of all items in the Wind-Down Budget; (iii) any Cash remaining in the Professional Fee Escrow Account after the payment in full of all Allowed Professional Claims; and (iv) any undeliverable or Unclaimed Distributions which may revest in the Liquidating Trust in accordance with Section 7 herein.

2.1.55    "*Liquidating Trustee*" means such Person as may be designated by the Debtors in the Plan Supplement and any successor to such Person.

2.1.56    "*Non-Debtor Subsidiary*" means Isardia Holdings Limited or Walmer Shipping Co. Limited, which holds a 50% interest in Shipworth Shipping Company Limited.

2.1.57    "*Norwegian Bond Indenture*" means the loan agreement, dated as of February 23, 2007, among Primorsk, Nordic Trustee ASA (f/k/a Norsk Tillitsmann ASA) and the bondholders party thereto, as such agreement has been and may be amended, supplemented, or otherwise modified from time to time.

2.1.58    "*Notice and Claims Agent*" means Kurtzman Carson Consultants LLC, located at 2335 Alaska Avenue, El Segundo, California 90245, retained and approved by the Bankruptcy Court as the Debtors' notice and claims agent.

2.1.59    "*Ordinary Course General Administrative Claim*" means a General Administrative Claim that is a monetary obligation for goods or services incurred by the Debtors in the ordinary course of the Debtors' business.

2.1.60    "*Other Priority Claim*" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than an Administrative Claim.

2.1.61    "*Other Secured Claim*" means any Secured Claim other than a Senior Loan Claim, a Junior Loan Claim or a Swap Claim.

2.1.62    "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

2.1.63    "*Petition Date*" means January 15, 2016.

2.1.64    "*Plan*" has the meaning set forth in the Introduction hereto.

2.1.65    "*Plan Supplement*" means the initial compilation of documents and forms of documents, schedules and exhibits to the Plan, to be filed by Primorsk and available on the Notice and Claims Agent's website, www.kccllc.net/primorsk, no later than seven days prior to the Voting Deadline or such later date as may be approved by the Bankruptcy Court, and additional documents filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement.[2]

2.1.66    "*Prepetition*" means prior to the Petition Date of January 15, 2016.

2.1.67    "*Primorsk*" has the meaning set forth in the Introduction hereto.

2.1.68    "*Pro Rata*" means, with respect to an Allowed Claim, the percentage represented by a fraction (a) the numerator of which shall be an amount equal to such Claim, and (b) the denominator of which shall be an amount equal to the aggregate amount of Allowed and estimated Claims in the same Class as such Claim, except in cases where Pro Rata is used in reference to multiple Classes, in which case Pro Rata means the proportion that such Holder's Claim in a particular Class bears to the aggregate amount of all Allowed and estimated Claims in such multiple Classes.

2.1.69    "*Professional*" means an Entity (a) employed pursuant to a Bankruptcy Court order in accordance with section 327, 363 or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date pursuant to section 327, 328, 329, 330, 331 or 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

2.1.70    "*Professional Claim*" means an Administrative Claim for the compensation of a Professional and the reimbursement of expenses incurred by such Professional through the Confirmation Date.

2.1.71    "*Professional Fee Escrow Account*" means an account maintained at Nordea Bank Norge ASA, London branch to be funded by the Debtors upon the Effective Date in an amount equal to the Professional Fee Reserve Amount.

2.1.72    "*Professional Fee Order*" means the order entered by the Bankruptcy Court on February 18, 2016 establishing procedures for interim compensation and reimbursement of expenses of certain Professionals.

2.1.73    "*Professional Fee Reserve Amount*" means the aggregate amount of unpaid Professional Claims for all Professionals through the Confirmation Date as estimated, in the Debtors' reasonable discretion, in accordance with Section 3.3.3 herein.

2.1.74    "*Proof of Claim*" means a proof of Claim filed against any of the Debtors in these Chapter 11 Cases.

---

[2]    The Plan Supplement may include, among other documents, the Liquidating Trust Agreement

2.1.75    "*Released Parties*" means (a) the Exculpated Parties; (b) Nordic Trustee ASA (but not, for the avoidance of doubt, Wealth Holdings, Inc., Nicolas Peraticos or any legal or beneficial owner of bonds issued pursuant to the Norwegian Bond Indenture or any such Entity's directors, officers, employees, agents, Affiliates, parents, subsidiaries, predecessors, successors, heirs, executors and assigns, attorneys, financial advisors, restructuring advisors, investment bankers, accountants and other professionals or representatives); (c) the Agents and lenders party to the Senior Loan Agreement and Swap Loan Agreement, each in their capacities as such; and (d) with respect to each Entity named in (c), such Entity's directors, officers, employees, agents, Affiliates, parents, subsidiaries, predecessors, successors, heirs, executors and assigns, attorneys, financial advisors, restructuring advisors, investment bankers, accountants and other professionals or representatives when acting in any such capacities; *provided*, *however* that Nordic Trustee shall not be a Released Party if it objects to confirmation of the Plan and the Swap Agent and lenders party to the Swap Loan Agreement, each in their capacities as such, shall not be Released Parties if (i) the Swap Agent or any Holder of a Swap Claim objects to the confirmation of the Plan or (ii) if Class 3C votes to reject the Plan.

2.1.76    "*Releasing Parties*" means (a) the Agents and lenders party to the Senior Loan Agreement and Swap Loan Agreement, each in their capacities as such and (b) each Holder of a Claim or an Equity Interest that was provided a Ballot and (i) affirmatively votes to accept the Plan; or (ii) either (A) abstains from voting; or (B) votes to reject the Plan; and, in case of either (A) or (B), does not opt out of the Voluntary Release by Holders of Claims in compliance with the instructions set forth in the Solicitation Materials.  For the avoidance of doubt, Holders who (i) were not provided a Ballot; and (ii) are not listed in clauses (a) – (b) above are not Releasing Parties.

2.1.77    "*Sale Order*" means the Order Authorizing (A) the Sale of the Debtors' Vessels Free and Clear of All Claims and Interests, (B) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith and (C) Wind-Down Expenditures and Distributions to Term Loan Lenders, entered by the Bankruptcy Court on July 13, 2016 [Docket No. 216]

2.1.78    "*Schedules*" means the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs filed by the Debtors in these Chapter 11 Cases as amended from time to time.

2.1.79    "*Secured Agent*" means Nordea Bank Norge ASA, as agent and security trustee to the lenders pursuant to the Senior Loan Agreement.

2.1.80    "*Secured Claim*" means a Claim (a) secured by a Lien on property in which an Estate has an interest, to the extent such Lien is valid, perfected and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code and to the extent of the value of its Holder's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed as such pursuant to the Plan.

SC1:4076070.8

2.1.81    "*Senior Loan Agreement*" means the loan agreement, dated as of January 2, 2008, among Primorsk's subsidiaries, the Secured Agent and the banks, financial institutions and other lenders party thereto, as such agreement may be amended from time to time.

2.1.82    "*Securities Act*" means the United States Securities Act of 1933, as amended.

2.1.83    "*Security*" means a security as defined in section 2(a)(1) of the Securities Act.

2.1.84    "*Senior Loan Claim*" means any Claim arising under or in connection with the senior term loan facility pursuant to the Senior Loan Agreement, including, without limitation, any Claim arising under section 361(1) of the Bankruptcy Code or other Administrative Claim of a Holder of a Senior Loan Claim.

2.1.85    "*Servicer*" means an indenture trustee, agent, servicer or other authorized representative of Holders of Claims or Equity Interests recognized by the Debtors or the Liquidating Trustee, as applicable.

2.1.86    "*Solicitation Materials*" means the solicitation package, including Ballots, authorized pursuant to the Solicitation Procedures Order.

2.1.87    "*Solicitation Procedures Order*" means the Order (I) Approving the Disclosure Statement; (II) Establishing a Voting Record Date for the Plan; (III) Approving Solicitation Packages and Procedures for the Distribution Thereof; (IV) Approving the Forms of Ballots; (V) Establishing Procedures for Voting on the Plan; and (VI) Establishing Notice and Objection Procedures for Confirmation of the Plan, entered by the Bankruptcy Court on August [__], 2016 [Docket No. __], together with any supplemental order(s) that may be entered by the Bankruptcy Court in connection therewith.

2.1.88    "*Swap Agent*" means BNP Paribas, as facility agent to the lenders pursuant to the Swap Loan Agreement.

2.1.89    "*Swap Claim*" means any Claim arising under or in connection with the Swap Loan Agreement, including, without limitation, any Claim arising under section 361(1) of the Bankruptcy Code or other Administrative Claim of a Holder of a Swap Claim.

2.1.90    "*Swap Loan Agreement*" means the secured loan agreement, dated as of June 7, 2011, among Primorsk, the Swap Agent and the banks, financial institutions and other lenders party thereto, as such agreement may be amended from time to time.

2.1.91    "*Unclaimed Distribution*" means any Distribution under the Plan on account of an Allowed Claim to a Holder that has not:  (a) accepted a particular Distribution or, in the case of a Distribution made by check, negotiated such check; (b) given written notice to the Distribution Agent of an intent to accept a particular Distribution; (c) responded in writing to the request of the Distribution Agent for information necessary to facilitate a particular Distribution; or (d) taken any other action necessary to facilitate such Distribution.

SC1:4076070.8

2.1.92    "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

2.1.93    "*Unimpaired*" means any Claim or Equity Interest that is not Impaired.

2.1.94    "*U.S. Trustee*" means the United States Trustee for Region 2.

2.1.95    "*U.S. Trustee Fees*" means fees arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

2.1.96    "*Vessel Sale Proceeds*" means the cash proceeds deriving from the sale of the Vessels, net of all expenses and costs and net of distributions made in accordance with the Sale Order.

2.1.97    "*Vessels*" means the vessels known as the (i) m/t "Zaliv Amerika", (ii) m/t "Zaliv Amurskiy", (iii) m/t "Prisco Alexandra", (iv) m/t "Prisco Ekaterina", (v) m/t "Prisco Irina", (vi) m/t "Prisco Elizaveta", (vii) m/t "Prisco Elena", (viii) m/t "Zaliv Baikal" and (ix) m/t "Zaliv Vostok" and includes any share or interest in these vessels and their engines, machinery, boats, tackle, outfit, spare gear, fuel, consumable or other stores, belongings or appurtenances, books and records whether on board or ashore and whether now owned or later acquired, which secure the obligations of the Debtors under the Senior Loan Agreement and the Swap Loan Agreement.

2.1.98    "*Voluntary Release by Holders of Claims*" means the release by Holders of Claims as set forth in Section 9.6 herein.

2.1.99    "*Voting*" means the process by which a Holder of a Claim may vote to accept or reject the Plan, pursuant to the conditions in Article 4 herein.

2.1.100    "*Voting Deadline*" means 8:00 p.m. (Eastern Time) on September 13, 2016, by which time all Ballots must be actually received by the Notice and Claims Agent.

2.1.101    "*Wind-Down Budget*" means the Debtors' wind-down budget attached as Exhibit B to the Sale Order.

2.2.    Rules of Interpretation

For the purposes of this Plan:  (a) any reference herein to the word "including" or word of similar import shall be read to mean "including without limitation"; (b) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (c) unless otherwise specified, the words "herein," "hereof" and "hereto" refer to the Plan in its entirety rather than a particular portion of the Plan; (d) captions and headings to Articles are inserted for the convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (e) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (f) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (g) all references to docket numbers of documents filed in these Chapter 11 Cases are references to the docket numbers

SC1:4076070.8

under the Bankruptcy Court's CM/ECF system; (h) all references to statutes, regulations, orders, rules of courts and the like shall mean as amended from time to time, and as applicable to these Chapter 11 Cases, unless otherwise stated; (i) any reference herein to a contract, agreement, lease, plan, policy, document or instrument being in a particular form or on particular terms and conditions means that the same shall be substantially in that form or substantially on those terms and conditions; (j) any reference herein to a contract, agreement, lease, plan, policy, document or instrument or schedule or exhibit thereto, whether or not filed, shall mean the same as amended, restated, modified or supplemented from time to time in accordance with the terms hereof or thereof; (k) any immaterial effectuating provisions may be interpreted by the Debtors and the Liquidating Trustee in such a manner that is consistent with the overall purpose and intent of the Plan, all without further Bankruptcy Court order; (l) any reference to an Entity as a Holder of a Claim or Equity Interest includes that Entity's successors and permitted assigns; (m) except as otherwise expressly provided in this Plan, where this Plan contemplates that any Debtor or the Liquidating Trustee shall take any action, incur any obligation, issue any security or adopt, assume, execute or deliver any contract, agreement, lease, plan, policy, document or instrument on or prior to the Effective Date, the same shall be duly and validly authorized by the Plan and effective against and binding upon such Debtor and/or the Liquidating Trustee, as applicable, on and after the Effective Date without further notice to, order of or other approval by the Bankruptcy Court, action under applicable law, regulation, order or rule, or the vote, consent, authorization or approval of the board of directors of any Debtor or any other Entity; and (n) except as otherwise provided in the Plan, anything required to be done by the Debtors or the Liquidating Trustee, as applicable, on the Effective Date may be done on the Effective Date or as soon as reasonably practicable thereafter.

2.3.   Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflicts of laws, shall govern the construction and implementation of the Plan and any agreement, document or instrument executed or entered into in connection with the Plan.

2.4.   Computation of Time

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

SC1:4076070.8

3.      **GENERAL ADMINISTRATIVE CLAIMS, PROFESSIONAL CLAIMS AND UNITED STATES TRUSTEE STATUTORY FEES**

In accordance with section 1123(a)(1) of the Bankruptcy Code, the Plan does not classify General Administrative Claims and Professional Claims, payment of which is provided for below.

3.1.    Administrative Claim Bar Date

Any request for payment of a General Administrative Claim must be filed and served on the Debtors or the Liquidating Trustee, as applicable, pursuant to the procedures specified in the notice of entry of the Confirmation Order and the Confirmation Order on or prior to the Administrative Claim Bar Date; *provided* that no request for payment is required to be filed and served with respect to any:

(a)      Allowed Administrative Claim as of the Administrative Claim Bar Date;

(b)      Ordinary Course General Administrative Claim;

(c)      Professional Claim; or

(d)      Claim for U.S. Trustee Fees.

Any Holder of a General Administrative Claim who is required to, but does not, file and serve a request for payment of such General Administrative Claim pursuant to the procedures specified in the Confirmation Order on or prior to the Administrative Claim Bar Date shall be forever barred, estopped and enjoined from asserting such General Administrative Claim against the Debtors or the Liquidating Trustee or their respective property, and such General Administrative Claim shall be deemed discharged as of the Effective Date.

Any objection to a request for payment of a General Administrative Claim that is required to be filed and served pursuant to this Section 3.1 must be filed and served on the Debtors or the Liquidating Trustee, as applicable, and the requesting party creditor (a) no later than 90 days after the Administrative Claim Bar Date or (b) by such later date as may be established by order of the Bankruptcy Court upon a motion by a Debtor or the Liquidating Trustee, with notice only to those parties entitled to receive notice pursuant to Bankruptcy Rule 2002.

3.2.    General Administrative Claims

Except to the extent that a Holder of an Allowed General Administrative Claim agrees to less favorable treatment, the Holder of each Allowed General Administrative Claim shall receive Cash in an amount equal to the full unpaid amount of such Allowed General Administrative Claim on the later of (a) the Effective Date or as soon as reasonably practicable thereafter, (b) the date on which such Claim is Allowed or as soon as reasonably practicable thereafter, or (c) with respect to Ordinary Course General Administrative Claims, the date such amount is due in accordance with applicable non-bankruptcy law and the terms and conditions of any applicable agreement or instrument.  If an Allowed General Administrative Claim exceeds

- 13 -

the amount budgeted for it in the Wind-Down Budget, the amount by which such Claim exceeds the budgeted amount shall be paid by the Debtors or from the Liquidating Trust, as applicable.

3.3.    Professional Claims

3.3.1    Final Fee Applications.  All final requests for payment of Professional Claims shall be filed and served no later than 60 days after the Effective Date, in the manner set forth in the Professional Fee Order, or, as it relates to APS, in the APS Retention Order.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Claims.

3.3.2    Professional Fee Escrow Amount.  The Debtors shall establish and fund on or prior to the Effective Date the Professional Fee Escrow Account from Encumbered Cash equal to the Professional Fee Reserve Amount.  The Professional Fee Escrow Account shall be maintained in trust for the Professionals.  Except as provided in the last sentence of this paragraph, such funds shall not be considered property of the Estates of the Debtors or the Liquidating Trust, as applicable.  The Debtors or the Liquidating Trustee, as applicable shall pay Professional Claims in Cash as soon as reasonably practicable after such Claims are Allowed by order of the Bankruptcy Court.  When all Allowed Professional Claims have been paid in full, amounts remaining in the Professional Fee Escrow Account, if any, shall revert to the Liquidating Trust.

3.3.3    Professional Fee Reserve Amount.  Professionals shall provide good faith estimates of their Professional Claims for purposes of the Professional Fee Escrow Account and shall deliver such estimates to the Debtors no later than 10 days prior to the Confirmation Hearing; *provided* that such estimates shall not be considered an admission or limitation with respect to the fees and expenses of such Professionals.  If a Professional does not provide such an estimate, the Debtors may estimate, in their reasonable discretion, the Professional Claims of such Professional.

3.3.4    Post-Effective Date Fees and Expenses.  Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Debtors or the Liquidating Trustee, as the case may be, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional or other fees and expenses.  Except as otherwise specifically provided in the Plan, upon the Effective Date, any requirement that Professionals comply with section 327, 328, 329, 330, 331 or 1103 of the Bankruptcy Code or the Professional Fee Order (or, as it relates to APS, the APS Retention Order) in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors and the Liquidating Trustee may employ and pay any Professional in the ordinary course of business.

3.4.    Statutory Fees Payable Pursuant to 28 U.S.C. § 1930

The Debtors or the Liquidating Trustee, as applicable, shall pay all U.S. Trustee Fees for each quarter (including any fraction thereof) until these Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

4. **CLASSIFICATION, TREATMENT AND VOTING OF CLAIMS AND EQUITY INTERESTS**

    4.1.    <u>Classification of Claims and Equity Interests</u>

        All Claims and Equity Interests, except for Administrative Claims and Professional Claims, are classified in the Classes set forth in this Article 4. A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Equity Interest qualifies within the description of such other Classes. A Claim or Equity Interest also is classified in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim or Equity Interest is Allowed as a Claim or Equity Interest in that Class and has not been paid, released or otherwise satisfied prior to the Effective Date.

        4.1.1    <u>Deemed Substantive Consolidation</u>. The Plan shall serve as a motion by the Debtors seeking entry of a Bankruptcy Court order deeming the substantive consolidation of the Debtors' Estates into a single Estate for certain limited purposes related to the Plan, including Voting, Confirmation and Distribution. As a result of the deemed substantive consolidation of the Estates, each Class of Claims and Equity Interests will be treated as against a single consolidated Estate without regard to the separate legal existence of the Debtors. The Plan will not result in the merger or otherwise affect the separate legal existence of each Debtor, other than with respect to voting and distribution rights under the Plan.

        4.1.2    <u>Summary of Classification and Treatment</u>. The classification of Claims and Equity Interests pursuant to the Plan is as follows:

| Class | Claims and Equity Interests | Status | Voting Rights |
|-------|------------------------------|--------|----------------|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3A | Senior Loan Claims | Impaired | Entitled to Vote |
| 3B | Junior Loan Claims | Impaired | Entitled to Vote |
| 3C | Swap Claims | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Impaired | Deemed to Reject |
| 5 | Equity Interests in Primorsk | Impaired | Deemed to Reject |

    4.2.    <u>Treatment of Claims and Equity Interests</u>

        4.2.1    <u>Class 1 – Other Priority Claims</u>

        (a)    *Classification*: Class 1 consists of all Other Priority Claims.

        (b)    *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed Other Priority Claim, each Holder of such Allowed

Other Priority Claim shall be paid in full in Cash on or as soon as reasonably practicable after the latest of (i) the Effective Date, (ii) the date on which such Other Priority Claim becomes Allowed, and (iii) such other date as may be ordered by the Bankruptcy Court.

(c)    *Voting*:  Class 1 is Unimpaired.  Each Holder of an Other Priority Claim is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of Other Priority Claims is entitled to vote to accept or reject the Plan.

### 4.2.2    Class 2 – Other Secured Claims

(a)    *Classification*:  Class 2 consists of Other Secured Claims.

(b)    *Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive one of the following treatments, in the sole discretion of the applicable Debtor:  (i) payment in full in Cash including the payment of any interest payable under section 506(b) of the Bankruptcy Code; (ii) delivery of the collateral securing such Allowed Other Secured Claim; or (iii) treatment of such Allowed Other Secured Claim in any other manner that renders the Claim Unimpaired.

(c)    *Voting*:  Class 2 is Unimpaired.  Each Holder of an Other Secured Claim is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of an Other Secured Claim is entitled to vote to accept or reject the Plan.

### 4.2.3    Class 3A – Senior Loan Claims

(a)    *Classification*:  Class 3 consists of all Senior Loan Claims.

(b)    *Allowance*:  The Senior Loan Claims shall be Allowed in an aggregate amount equal to (i) $194,269,474, representing principal and accrued and unpaid interest at the non-default contractual rate up to and including the Petition Date and (ii) to the extent provided for in the Senior Loan Agreement, unpaid postpetition interest at the default contractual rate until the principal and all unpaid interest are repaid in full.

(c)    *Treatment*:  Except to the extent that a Holder of an Allowed Senior Loan Claim agrees to a less favorable treatment, and in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed Senior Loan Claim, each Holder of an

- 16 -

Allowed Senior Loan Claim shall be paid in full in Cash in accordance with the Sale Order.

(d)    *Voting*:  Class 3A is Impaired and each Holder of a Senior Loan Claim is entitled to vote to accept or reject the Plan.

### 4.2.4    Class 3B – Junior Loan Claims

(a)    *Classification*:  Class 3B consists of all Junior Loan Claims.

(b)    *Allowance*:  The Junior Loan Claims shall be Allowed in an aggregate amount equal to $51,625,000, representing principal and accrued and unpaid interest at the non-default contractual rate up to and including the Petition Date.

(c)    *Treatment*:  Except to the extent that a Holder of an Allowed Junior Loan Claim agrees to a less favorable treatment, and in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed Junior Loan Claim, each Holder of an Allowed Junior Loan Claim shall receive (i) its Pro Rata share of remaining Encumbered Cash, following the provision of a reserve for line items in the Wind-Down Budget and the distributions made to the Holders of Senior Loan Claims, and (ii) its Pro Rata share of the Liquidating Trust Distributable Cash, in each of cases (i) and (ii) until such time as such Holder has received Cash distributions equal to the Allowed amount of such Allowed Junior Loan Claim.

(d)    *Voting*:  Class 3B is Impaired and each Holder of a Junior Loan Claim is entitled to vote to accept or reject the Plan.

### 4.2.5    Class 3C – Swap Claims

(a)    *Classification*:  Class 3C consists of all Swap Claims.

(b)    *Allowance*:  The Swap Claims shall be Allowed in an aggregate amount equal to $16,400,988, representing principal and accrued and unpaid interest at the non-default contractual rate up to and including the Petition Date.

(c)    *Treatment*:  Except to the extent that a Holder of an Allowed Swap Claim agrees to a less favorable treatment, and in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed Swap Claim, each Holder of an Allowed Swap Claim shall receive its Pro Rata share of the Liquidation Trust Distributable Cash, following the distributions made to the Holders of the Junior Loan Claims.

- 17 -

(d)    *Voting*:  Class 3C is Impaired and each Holder of a Swap Claim is entitled to vote to accept or reject the Plan.

4.2.6    <u>Class 4 – General Unsecured Claims</u>

(a)    *Classification*:  Class 4 consists of all General Unsecured Claims.

(b)    *Treatment*:  No Holder of a General Unsecured Claim shall receive any Distributions on account of its General Unsecured Claim.  On and after the Effective Date, all General Unsecured Claims shall be released and shall be of no further force or effect.

(c)    *Voting*:  Class 4 is Impaired and each Holder of a General Unsecured Claim is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  No Holder of a General Unsecured Claim is entitled to vote to accept or reject the Plan.

4.2.7    <u>Class 5 – Equity Interests in Primorsk</u>

(a)    *Classification*:  Class 5 consists of all Equity Interests in Primorsk.

(b)    *Treatment*:  No Holder of an Equity Interest in Primorsk shall receive any Distributions on account of its Equity Interest.  On and after the Effective Date, all Equity Interests in Primorsk shall be canceled and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

(c)    *Voting*:  Class 5 is Impaired.  Each Holder of an Equity Interest in Primorsk is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  No Holder of an Equity Interest in Primorsk is entitled to vote to accept or reject the Plan.

4.3.    <u>Intercompany Claims and Interests</u>

Notwithstanding anything herein to the contrary, on the Effective Date or as soon thereafter as is reasonably practicable all Intercompany Claims and Intercompany Interests will be canceled and discharged in full and the Holders thereof shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such portion under the Plan. In no event shall Intercompany Claims be allowed as General Unsecured Claims or entitled to any Distribution under the Plan.

4.4.    <u>Special Provision Governing Unimpaired Claims</u>

Except as otherwise provided herein, the Plan shall not affect the Debtors' or the Liquidating Trustee's rights in respect of any Unimpaired Claims, including legal and equitable defenses or setoff or recoupment rights with respect thereto.

- 18 -

4.5.    <u>Confirmation Pursuant to Sections 1129(a) and 1129(b) of the Bankruptcy Code</u>

For purposes of Confirmation, section 1129(a)(10) of the Bankruptcy Code shall be satisfied if any one of Classes 3A, 3B or 3C accepts the Plan.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class or Classes of Claims.

SC1:4076070.8

5.    **IMPLEMENTATION OF THE PLAN**

5.1.    Operations Between the Confirmation Date and Effective Date

During the period from the Confirmation Date through and until the Effective Date, the Debtors may continue to operate their businesses as debtors-in-possession, subject to all applicable orders of the Bankruptcy Court.

5.2.    Establishment of the Liquidating Trust

On or before the Effective Date, the Debtors, on their own behalf and on behalf of the beneficiaries, may execute the Liquidating Trust Agreement and may take all necessary steps to establish the Liquidating Trust. If established, the Liquidating Trust shall be established for the sole purpose of distributing the Liquidating Trust assets for the benefit of the beneficiaries of the Liquidating Trust with no objective to continue or engage in the conduct of a trade or business. If the Liquidating Trust is established, the Liquidating Trustee shall be vested with all powers and authority set forth in this Plan and the Liquidating Trust Agreement. If the Liquidating Trust is established, the Liquidating Trustee shall be deemed to have been appointed as the Debtors' Estates' representative pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.

5.3.    Vesting of Assets in the Liquidating Trust

Except as otherwise provided herein or in the Confirmation Order, as of the Effective Date, if the Liquidating Trust is established, all property of each Estate (including Causes of Action and any remaining Encumbered Cash following the provision of a reserve for line items in the Wind-Down Budget and distributions made to the Holders of Senior Loan Claims, Junior Loan Claims and Swap Claims) and any property acquired by any Debtor under the Plan shall vest in the Liquidating Trust, free and clear of all Liens, Claims, charges or other encumbrances or interests. For the avoidance of doubt, the immediately preceding sentence does not apply to any property of a non-Debtor Affiliate of the Debtors.

5.4.    Cancelation of Existing Agreements, Notes and Equity Interests

On the Effective Date, except as otherwise specifically provided for in the Plan, the Senior Loan Agreement, Swap Loan Agreement, Norwegian Bond Indenture and any other Certificate, Equity Interest, share, note, bond, indenture, purchase right, option, warrant, intercreditor agreement or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors or giving rise to any Claim or Equity Interest, shall be canceled, and the Debtors and their Affiliates shall not have any obligations thereunder and shall be released and discharged therefrom.

5.5.    Section 1146 Exemption from Certain Transfer Taxes and Recording Fees

Pursuant to, and to the fullest extent permitted by, section 1146(a) of the Bankruptcy Code, any transfers from the Debtors to the Liquidating Trust or to any other Person, pursuant to, in contemplation of, or in connection with the Plan (including any transfer pursuant to: (a) the distribution, transfer, or exchange of any debt, equity security, or other interest in the

- 20 -

Debtors or non-Debtor subsidiaries of the Debtors; or (b) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan) shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, sales and use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local government officials or agents shall, and shall be directed to, forgo the collection of any such tax, recordation fee or government assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee or government assessment.  The Bankruptcy Court shall retain specific jurisdiction with respect to these matters.

      5.6.    <u>Preservation of Causes of Action</u>

Except as otherwise provided in Article 9 or 12 herein or the other provisions of the Plan, if the Liquidating Trust is established, each Cause of Action of a Debtor shall be preserved and, along with the exclusive right to enforce such Cause of Action, shall vest exclusively in the Liquidating Trust as of the Effective Date.  Unless a Cause of Action is expressly waived, relinquished, released or compromised in the Plan or an order of the Bankruptcy Court, the Liquidating Trustee expressly reserves such Cause of Action for later adjudication and, accordingly, no doctrine of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), laches or other preclusion doctrine shall apply to such Cause of Action as a consequence of the Confirmation, the Plan, the vesting of such Cause of Action in the Liquidating Trust, any order of the Bankruptcy Court or these Chapter 11 Cases.  **No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as an indication that the Debtors or the Liquidating Trustee, as applicable, will not pursue such Cause of Action.**

      5.7.    <u>Effectuating Documents and Further Transactions</u>

The Debtors or the Liquidating Trustee, as applicable, may take all actions to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan.  The secretary and any assistant secretary of each Debtor shall be authorized to certify or attest to any of the foregoing actions.

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the shareholders, directors or members of the Debtors shall be deemed to have been so approved and shall be in effect prior to, on or after the Effective Date (as appropriate), pursuant to applicable law, and without any requirement of further action by the shareholders, directors, managers or partners of the Debtors, or the need for any approvals, authorizations, actions or consents.

5.8.    Fees and Expenses of the Secured Agent

Reasonable and documented fees and expenses incurred by the Secured Agent during the pendency of these Chapter 11 Cases, solely in its capacity as such, shall, without duplication and to the extent unpaid by the Debtors prior to the Effective Date, be Allowed Administrative Claims and paid by the Debtors without further Bankruptcy Court approval upon the submission of invoices to the Debtors and the U.S. Trustee.

## 6.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 6.1.    Rejection of Executory Contracts and Unexpired Leases

Except as otherwise provided herein, all Executory Contracts and Unexpired Leases will be rejected by the Plan on the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code, other than (a) Executory Contracts or Unexpired Leases previously assumed or rejected pursuant to an order of the Bankruptcy Court, and (b) Executory Contracts or Unexpired Leases that are the subject of a motion to assume that is pending on the Effective Date.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the rejection of such Executory Contracts and Unexpired Leases pursuant to sections 365 and 1123 of the Bankruptcy Code.

### 6.2.    Modification, Amendments, Supplements, Restatements or Other Agreements

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is rejected shall include all modifications, amendments, supplements, restatements or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests, unless any of the foregoing agreements have been previously rejected or repudiated or are rejected or repudiated under the Plan.

Modifications, amendments, supplements and restatements to Prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the Prepetition nature of such Executory Contract or Unexpired Leases or the validity, priority or amount of any Claims that may arise in connection therewith.

### 6.3.    Reservation of Rights

Nothing contained in the Plan shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease, or that any Debtor has any liability thereunder.

SC1:4076070.8

## 7.    PROVISIONS GOVERNING DISTRIBUTIONS

### 7.1.    Distributions

Beginning on the Distribution Date, the Distribution Agent shall make Distributions under the Plan on account of each Claim that is Allowed on or prior to the Effective Date.

The Secured Agent shall be deemed to be the holder of all Senior Loan Claims and all Junior Loan Claims and the Swap Agent shall be deemed to be the holder of all Swap Claims. All Distributions on account of such claims shall be made to or on behalf of the Secured Agent or the Swap Agent, as applicable. The Secured Agent or the Swap Agent, as applicable, shall hold or direct such Distributions for the benefit of the holders of such claims. As soon as practicable following compliance with the other requirements set forth in this Article 7, the Secured Agent or the Swap Agent, as applicable, shall arrange to deliver such Distributions to, or on behalf of, the holders of such claims. If the Liquidating Trust is established, any such Distributions that are Unclaimed Distributions for a period of six months shall be deemed unclaimed property and shall revest in the Liquidating Trust in accordance with Section 7.6 herein. If the Liquidating Trust is not established, any such Distributions that are Unclaimed Distributions for a period of six months shall be deemed unclaimed property and shall be returned to the Distribution Agent for distribution in accordance with Section 4 herein. The Agents shall promptly report to the Liquidating Trustee or Distribution Agent, as applicable, any Unclaimed Distributions six months after receipt of any Distribution. For the avoidance of doubt, the Agents shall only be required to act to make Distributions in accordance with the terms of the Plan. The Debtors' obligations to make Distributions to the Holders of the Senior Loan Claims, the Junior Loan Claims and the Swap Claims in accordance with Article 4 herein shall be deemed satisfied upon delivery of Distributions to the Secured Agent or the Swap Agent, as applicable, or if the consent of an Agent is given, to the Distribution Agent on behalf of that Agent, as provided for herein.

### 7.2.    Record Date and Delivery of Distributions

7.2.1    Record Date for Distributions.  On the Distributions Record Date, the Claims Register shall be closed and the Distribution Agent shall be authorized and entitled to recognize only those Holders of Claims listed on the Claims Register as of the close of business on the Distributions Record Date. If a Claim, other than one based on a publicly traded security, is transferred 20 or fewer days before the Distributions Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practical, and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

7.2.2    Delivery of Distributions in General.  Except as otherwise provided herein, the Distribution Agent, at the direction of the Debtors or the Liquidating Trustee, as applicable, shall make all Distributions required under the Plan to Holders of Allowed Claims, except that distributions to Holders of Allowed Claims governed by a separate agreement and administered by a Servicer shall be deposited with the appropriate Servicer, at which time such distributions shall be deemed complete, and the Servicer shall deliver such distributions in

- 24 -

accordance with the Plan and the terms of the governing agreement.  Except as otherwise provided herein, and notwithstanding any authority to the contrary, Distributions to Holders of Allowed Claims shall be made to Holders of record as of the Distributions Record Date by the Distribution Agent or a Servicer, as appropriate: (a) to the signatory set forth on any of the Proofs of Claim filed by such Holder or other representative identified therein (or at the last known address of such Holder if no Proof of Claim is filed or if the Debtors, the Liquidating Trustee or the Distribution Agent have been notified in writing of a change of address); (b) at the address set forth in any written notice of change of address delivered to the Notice and Claims Agent; or (c) at the address reflected in the Schedules if no Proof of Claim has been filed and the Notice and Claims Agent has not received a written notice of a change of address.  The Debtors, the Liquidating Trustee, the Distribution Agent and the Notice and Claims Agent shall not incur any liability whatsoever on account of the delivery of any Distributions under the Plan.

> 7.2.3    <u>Foreign Currency Exchange Rate</u>.  Except as otherwise provided herein, an order of the Bankruptcy Court or as agreed to by the Holder and the Debtors or the Liquidating Trustee, as applicable, any Claim asserted in a currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollars at the Exchange Rate.

7.3.    <u>Distribution Agents</u>

The Debtors and the Liquidating Trustee, as applicable,  shall have the authority, in their sole discretion, to enter into agreements with one or more Distribution Agents to facilitate the Distributions required hereunder.  To the extent the Debtors and the Liquidating Trustee, as applicable, do determine to utilize a Distribution Agent to facilitate the Distributions, such Distribution Agent would first be required to: (a) affirm its obligation to facilitate the prompt distribution of any documents; (b) affirm its obligation to facilitate the prompt distribution of any recoveries or Distributions required under the Plan; and (c) waive any right or ability to set off, deduct from or assert any Lien or other encumbrance against the Distributions required under the Plan to be distributed by such Distribution Agent.

The Debtors or the Liquidating Trustee, as applicable, shall pay to the Distribution Agents all of their reasonable and documented fees and expenses without the need for any approvals, authorizations, actions or consents of the Bankruptcy Court or otherwise.  The Distribution Agents shall submit detailed invoices to the Debtors or the Liquidating Trustee, as applicable, for all fees and expenses for which the Distribution Agents seek reimbursement, and the Debtors or the Liquidating Trustee, as applicable, shall pay those amounts that they, in their sole discretion, deem reasonable, and shall object in writing to those fees and expenses, if any, that the Debtors or the Liquidating Trustee, as applicable, deem to be unreasonable.  In the event that the Debtors or the Liquidating Trustee, as applicable, object to all or any portion of the amounts requested to be reimbursed in a Distribution Agent's invoice, the Debtors or the Liquidating Trustee, as applicable, and such Distribution Agent shall endeavor, in good faith, to reach mutual agreement on the amount of the appropriate payment of such disputed fees and/or expenses.  In the event that the Debtors or the Liquidating Trustee, as applicable, and a Distribution Agent are unable to resolve any differences regarding disputed fees or expenses, either party shall be authorized to move to have such dispute heard by the Bankruptcy Court.

SC1:4076070.8

7.4.    Fractional and De Minimis Distributions

Notwithstanding anything herein to the contrary, the Liquidating Trustee and the Distribution Agent shall not be required to make Distributions or payments of less than $50.00, which amount shall be set forth in the Plan Supplement (whether in Cash or otherwise).

7.5.    Undeliverable Distributions

In the event that any Distribution to any Holder is returned as undeliverable, or no address for such Holder is found in the Debtors' records, no further Distribution to such Holder shall be made unless and until the Liquidating Trustee or the Distribution Agent is notified in writing of the then-current address of such Holder, at which time such Distribution shall be made to such Holder not less than 30 days thereafter. Undeliverable Distributions shall remain in the possession of the Liquidating Trustee or the Distribution Agent until such time as such Distribution becomes deliverable or such Distribution reverts to the Liquidating Trust or is canceled pursuant to Section 7.10 herein, and shall not be supplemented with any interest, dividends, or other accruals of any kind.

7.6.    Reversion

If the Liquidating Trust is established, any Distribution under the Plan, including Distributions made by the Agents in accordance with Section 7.1, that is an Unclaimed Distribution for a period of six months thereafter shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code, and such Unclaimed Distribution shall revest in the Liquidating Trust. If the Liquidating Trust is not established, any Distribution under the Plan, including Distributions made by the Agents in accordance with Section 7.1, that is an Unclaimed Distribution for a period of six months thereafter shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code, and such Unclaimed Distribution shall be returned to the Distribution Agent to be distributed in accordance with Section 4. Upon such return, revesting or cancelation, the Claim of any Holder or its successors and assigns with respect to such property shall be canceled, discharged and forever barred, notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary. The provisions of the Plan regarding undeliverable Distributions and Unclaimed Distributions shall apply with equal force to Distributions that are issued by the Debtors, the Liquidating Trustee or the Distribution Agent made pursuant to any indenture or Certificate, notwithstanding any provision in such indenture or Certificate to the contrary and notwithstanding any otherwise applicable federal or state escheat, abandoned or unclaimed property law.

Nothing contained herein shall require the Debtors or the Liquidating Trustee to attempt to locate any Holder of an Allowed Claim whose Distribution is declared an undeliverable or Unclaimed Distribution.

7.7.    Surrender of Canceled Instruments or Securities

Except as otherwise provided in the Plan, on the Effective Date, or as soon as reasonably practicable thereafter, each holder of a Certificate shall be deemed to have surrendered such Certificate to the Distribution Agent or a Servicer (to the extent the relevant Claim is administered by a Servicer). Subject to the foregoing sentence, regardless of any actual

- 26 -

surrender of a Certificate, the deemed surrender shall have the same effect as if its Holder had actually surrendered such Certificate (including the discharge of such Holder's Claim or Equity Interest pursuant to the Plan), and such Holder shall be deemed to have relinquished all rights, Claims and Equity Interests with respect to such Certificate.  Notwithstanding the foregoing paragraph, this Section 7.7 shall not apply to any Claims Reinstated pursuant to the terms of the Plan.

       7.8.    <u>Compliance with Tax Requirements and Allocations to Principal and Interest</u>

       In connection with the Plan, to the extent applicable, the Debtors, the Liquidating Trustee and the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any tax law, and all Distributions pursuant hereto shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Debtors, the Liquidating Trustee and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including withholding in kind, liquidating a portion of the Distributions to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding Distributions pending receipt of information necessary to facilitate such Distributions or establishing any other mechanisms they believe are reasonable and appropriate. For purposes of the Plan, any withheld amount (or property) shall be treated as if paid to the applicable claimant.  The Debtors and the Liquidating Trustee reserve the right to allocate all Distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens and encumbrances.  Distributions in full or partial satisfaction of Allowed Claims shall be allocated first to trust fund-type taxes, then to other taxes and then to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that has accrued on such Claims.

       7.9.    <u>Setoffs</u>

       Except as otherwise provided herein, a Final Order of the Bankruptcy Court, or as agreed to by the Holder and the Debtors or the Liquidating Trustee, as applicable, each Debtor or the Liquidating Trustee, as applicable, pursuant to the Bankruptcy Code (including section 553 thereof), applicable non-bankruptcy law, or such terms as may be agreed to by the Holder and the Debtors may, without any further notice to, or action, order or approval of the Bankruptcy Court, set off against any Allowed Claim and the Distributions to be made on account of such Allowed Claim (before any Distribution is made on account of such Allowed Claim), any claims, rights and Causes of Action of any nature that such Debtor or the Liquidating Trustee, as applicable, may hold against the Holder of such Allowed Claim, to the extent such claims, rights or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided* that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Debtor or the Liquidating Trustee of any such Claims, rights, and Causes of Action that such Debtor or the Liquidating Trustee may possess against such Holder. In no event shall any Holder of a Claim be entitled to set off any Claim against any Claim, right, or Cause of Action of a Debtor or the Liquidating Trustee, as applicable, unless such Holder has filed a Proof of Claim in these Chapter 11 Cases by the applicable Claims Bar Date preserving

such setoff and a Final Order of the Bankruptcy Court has been entered, authorizing and approving such setoff.

      7.10.   <u>No Postpetition Interest on Claims</u>

      Unless otherwise specifically provided for in the Plan or the Confirmation Order, required by applicable law, or agreed to by the Debtors or the Liquidating Trustee, as applicable, no Holder of a Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date with respect to such Claim, notwithstanding any dispute or other delay with respect to any Distribution.

      7.11.   <u>No Payment Over the Full Amount</u>

      In no event shall a Holder of a Claim receive more than the full payment of such Claim.  To the extent any Holder has received payment in full with respect to a Claim, such Claim shall be disallowed and expunged without an objection to such Claim having been filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

SC1:4076070.8

8. **CONDITIONS PRECEDENT TO EFFECTIVENESS OF THE PLAN**

8.1.    Conditions Precedent to the Effective Date

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of this Article 9.

(a)    Confirmation Order.  The Confirmation Order shall have been entered in a form and substance reasonably satisfactory to the Debtors and the Secured Agent, and there shall not be a stay or injunction in effect with respect thereto.

(b)    Professional Fee Escrow Account.  The Debtors shall have established and funded the Professional Fee Escrow Account in accordance with Section 3.3.2 herein.

(c)    Wind-Down Budget Reserve.  The Debtors shall have reserved sufficient Cash to pay for the line items in the Wind-Down Budget.

(d)    Necessary Documents.  All actions, documents, certificates and agreements necessary to implement the Plan shall have been effected or executed and delivered, as applicable.

(e)    Necessary Authorizations.  All authorizations, consents, regulatory approvals, rulings or documents that are necessary to implement and effectuate the Plan as of the Effective Date shall have been received, waived or otherwise resolved.

8.2.    Waiver of Conditions

The Debtors, with the consent of the Secured Agent or order of the Bankruptcy Court, may waive conditions to the occurrence of the Effective Date set forth in this Article 8 at any time; *provided*, *however*, that the Debtors may not waive the condition set forth in Article 8.1(a).

8.3.    Simultaneous Transactions

Except as otherwise expressly set forth in the Plan, the Confirmation Order or a written agreement by Primorsk, each action to be taken on the Effective Date shall be deemed to occur simultaneously as part of a single transaction.

8.4.    Effect of Non-Occurrence of the Effective Date

If the Effective Date does not occur by the 60th day following the Confirmation Date or such later date as the Debtors determine, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtors, prejudice in any manner

the rights of the Debtors or any other Person, or constitute an admission, acknowledgment, offer
or undertaking by the Debtors or any Person.

SC1:4076070.8

9.      **SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS**

9.1.    Compromise and Settlement

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the Distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Equity Interests and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim, or any Distribution to be made on account of such Allowed Claim.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors and their Estates and is fair, equitable and reasonable.

9.2.    Subordinated Claims

The allowance, classification and treatment of all Allowed Claims and Equity Interests and the respective Distributions and treatments under the Plan take into account, conform to and satisfy the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto; however, the Debtors reserve the right to reclassify or modify the treatment of any Allowed Claim or Equity Interest in accordance with any contractual, legal or equitable subordination relating thereto, unless otherwise provided in a settlement agreement concerning such Allowed Claim or Equity Interest.

9.3.    Discharge of Claims and Termination of Equity Interests

Pursuant to and to the fullest extent permitted by the Bankruptcy Code, except as otherwise specifically provided in the Plan or the Confirmation Order, the treatment of Claims and Equity Interests under the Plan shall be in full and final satisfaction, settlement, release, discharge, and termination, as of the Effective Date, of all Claims of any nature whatsoever, whether known or unknown, against, and Equity Interests in, the Debtors, any property of the Estates, the Liquidating Trustee or any property of the Liquidating Trust, including all Claims of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a Proof of Claim or Equity Interest based upon such Claim, debt, right, or Equity Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Equity Interest based upon such Claim, liability, obligation or Equity Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim, liability, obligation or Equity Interest has accepted the Plan.  Except as otherwise provided herein, any default by the Debtors or their Affiliates with respect to any Claim that existed immediately prior to or on account of the filing of these Chapter 11 Cases shall be deemed cured on the Effective Date.

9.4.    Release of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the

- 31 -

Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released and discharged, and all of the rights, title and interest of any Holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Liquidating Trust and its successors and assigns.

9.5.    **Debtor Release**

**Except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, on and after the Effective Date, the Released Parties are hereby released and discharged by the Debtors, the Liquidating Trustee and the Estates, including any successor to the Debtors or any Estate representative, from all claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereafter arising, in law, at equity or otherwise, whether for indemnification, tort, contract, violations of federal or state securities laws or otherwise, including, those that any of the Debtors, the Liquidating Trustee or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or any other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors and their non-Debtor Subsidiaries, the Estates, the conduct of the businesses of the Debtors and their non-Debtor Subsidiaries, these Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any Security of the Debtors, the release or discharge of any mortgage, lien or security interest, the distribution of proceeds, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the restructuring of Claims and Equity Interests prior to or during these Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Disclosure Statement  or, in each case, related agreements, instruments or other documents, any action or omission with respect to Intercompany Claims, any action or omission as an officer, director, agent, representative, fiduciary, controlling person, affiliate or responsible party, or any transaction entered into or affecting, a Non-Debtor Subsidiary, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan, other than claims or liabilities arising out of or relating to any act or omission of a Released Party to the extent such act or omission is determined by a Final Order to have constituted willful misconduct, gross negligence, fraud, or a criminal act.**

9.6.    **Voluntary Release by Holders of Claims and Equity Interests**

**Except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties to facilitate the reorganization of the Debtors, the implementation of the orderly liquidation contemplated by the Plan and the release of mortgages, liens, and security interests on estate property, the distribution of proceeds, on and after the Effective Date, to the fullest extent permitted by applicable law, the Releasing Parties (regardless of whether a Releasing Party is a Released Party) shall be deemed to conclusively, absolutely, unconditionally, irrevocably and forever release, waive**

SC1:4076070.8

and discharge the Released Parties of any and all claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereafter arising, in law, at equity or otherwise, whether for indemnification, tort, contract, violations of federal or state securities laws or otherwise, including, those that any of the Debtors, the Liquidating Trustee or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or any other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors and their non-Debtor Subsidiaries, the Estates, the conduct of the businesses of the Debtors and their non-Debtor Subsidiaries, these Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the restructuring of Claims and Equity Interests prior to or during these Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Disclosure Statement or, in each case, related agreements, instruments or other documents, any action or omission with respect to Intercompany Claims, any action or omission as an officer, director, agent, representative, fiduciary, controlling person, affiliate or responsible party, or any transaction entered into or affecting, a Non-Debtor Subsidiary, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan, other than claims arising under the Intercreditor Deed including, for the avoidance of doubt, disgorgement of interest and fees paid to the Swap Agent in its capacity as such during the Chapter 11 Cases and claims or liabilities arising out of or relating to any act or omission of a Released Party to the extent such act or omission is determined by a Final Order to have constituted willful misconduct, gross negligence, fraud, or a criminal act.

9.7.    **Scope of Releases**

Each Person providing releases under the Plan, including the Debtors, the Liquidating Trustee, the Estates and the Releasing Parties, shall be deemed to have granted the releases set forth in the Plan notwithstanding that such Person may hereafter discover facts in addition to, or different from, those which it now knows or believes to be true, and without regard to the subsequent discovery or existence of such different or additional facts, and such Person expressly waives any and all rights that it may have under any statute or common law principle which would limit the effect of such releases to those claims or causes of action actually known or suspected to exist at the time of execution of such release.

9.8.    **Exculpation**

Notwithstanding anything herein to the contrary, as of the Effective Date, the Debtors and their directors, officers (including the chief restructuring officer and interim management), employees, attorneys, investment bankers, financial advisors, restructuring advisors and other professional advisors, representatives and agents will be deemed to have solicited acceptances of this Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including section 1125(e) of the Bankruptcy Code and

SC1:4076070.8

any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with the solicitation.

**Except with respect to any acts or omissions expressly set forth in and preserved by the Plan, the Plan Supplement or related documents, the Exculpated Parties shall neither have nor incur any liability to any Entity for any Prepetition or postpetition act taken or omitted to be taken in connection with, or arising from or relating in any way to, these Chapter 11 Cases, including (a) the operation of the Debtors' businesses during the pendency of these Chapter 11 Cases; (b) formulating, negotiating, preparing, disseminating, implementing, administering, confirming and/or effecting the Disclosure Statement and the Plan, the Plan Supplement, and any related contract, instrument, release or other agreement or document created or entered into in connection therewith (including the solicitation of votes for the Plan and other actions taken in furtherance of Confirmation and Consummation of the Plan); (c) the offer and issuance of any securities under or in connection with the Plan; or (d) any other Prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, other than liability resulting from any act or omission that is determined by Final Order to have constituted willful misconduct, gross negligence, fraud, or a criminal act.**

9.9.    **Injunction**

**Except as otherwise expressly provided in the Plan or Confirmation Order, the satisfaction, release and discharge pursuant to this Article 9 shall also act as a permanent injunction against any Person who has held, holds or may hold Claims or Equity Interests against commencing or continuing any action, employment of process or act to collect, enforce, offset, recoup or recover any Claim or Cause of Action satisfied, released, or discharged under the Plan or the Confirmation Order to the fullest extent authorized or provided by the Bankruptcy Code, including to the extent provided for or authorized by sections 524 and 1141 thereof.**

9.10.    **Limitations on Exculpations and Releases**

**Notwithstanding anything to the contrary herein, none of the releases or exculpations set forth herein shall operate to waive or release any obligation or Causes of Action of any Person or Entity:  (a) arising under the Intercreditor Deed, (b) arising under any contract, instrument, agreement, release or document delivered pursuant to the Plan or documents, agreements or instruments executed in connection therewith, including all post Effective Date obligations, or (c) expressly set forth in and preserved by the Plan, the Plan Supplement or related documents.**

SC1:4076070.8

10.    **MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN**

10.1.    Modification of Plan

Subject to the limitations contained in the Plan: (a) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications with respect to the treatment of Classes 3 – 5 to satisfy section 1129(b) of the Bankruptcy Code; *provided*, *however*, amendments or modifications that adversely affect the Holders of Senior and Junior Loan Claims require the prior consent of the Secured Agent; and (b) after the entry of the Confirmation Order, the Debtors or the Liquidating Trustee, as applicable, may, upon order of the Bankruptcy Court, (i) amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or (ii) remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

10.2.    Effect of Confirmation on Modification

Entry of a Confirmation Order shall mean that all modifications and amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code, and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

10.3.    Revocation of Plan

The Debtors reserve the right, with the consent of the Secured Agent, to revoke or withdraw the Plan prior to the Effective Date and to file subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if the Confirmation Order is not entered or the Effective Date does not occur, then:  (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan, assumption or rejection of executory contracts or leases affected by the Plan, and any document or agreement executed pursuant hereto shall be deemed null and void; and (c) nothing contained in the Plan shall:  (i) constitute a waiver or release of any claims by or Claims against, or any Equity Interests in, any Debtor or any other Entity; (ii) prejudice in any manner the rights of the Debtors or any other Entity; or (iii) constitute an admission of any sort by the Debtors or any other Entity.

SC1:4076070.8

## 11.    RETENTION OF JURISDICTION

### 11.1.    Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain its existing exclusive jurisdiction over all matters arising in or out of, or related to, these Chapter 11 Cases or the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

(a)    Allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured or unsecured status, or amount of any Claim or Equity Interest, including the resolution of any request for payment of any General Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Equity Interests;

(b)    Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

(c)    Resolve any matters related to: (i) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is a party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including any disputes regarding cure obligations; and (ii) any dispute regarding whether a contract or lease is, or was, executory or expired;

(d)    Ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the Plan and adjudicate any and all disputes from, or relating to Distributions under the Plan;

(e)    Adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters and Causes of Action, and grant or deny any applications, involving a Debtor that may be pending before the Bankruptcy Court on the Effective Date;

(f)    Adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(g)    Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, Plan Supplement or the Disclosure Statement;

- 36 -

(h)     Enter and enforce any order for the sale of property pursuant to
        section 363, 1123, or 1146(a) of the Bankruptcy Code;

(i)     Adjudicate, decide or resolve any and all disputes as to the ownership of
        any Claim or Equity Interest;

(j)     Issue injunctions, enter and implement other orders or take such other
        actions as may be necessary or appropriate to restrain interference by any
        Person or Entity with enforcement of the Plan;

(k)     Resolve any cases, controversies, suits, disputes or Causes of Action with
        respect to the existence, nature and scope of the releases, injunctions, and
        other provisions contained in the Plan, and enter such orders as may be
        necessary or appropriate to implement and enforce such releases,
        injunctions, and other provisions;

(l)     Enter and implement such orders as are necessary or appropriate if the
        Confirmation Order is for any reason modified, stayed, reversed, revoked
        or vacated;

(m)     Determine any other matters that may arise in connection with or relate to
        the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation
        Order, or any contract, instrument, release, indenture, or other agreement
        or document created in connection with the Plan, the Plan Supplement or
        the Disclosure Statement;

(n)     Enter an order or final decree concluding or closing these Chapter 11
        Cases;

(o)     Consider any modifications of the Plan, to cure any defect or omission, or
        to reconcile any inconsistency in any Bankruptcy Court order, including
        the Confirmation Order;

(p)     Hear and determine disputes, cases, controversies or Causes of Action
        arising in connection with the interpretation, implementation, or
        enforcement of the Plan, or the Confirmation Order, including disputes
        arising under agreements, documents or instruments executed in
        connection with the Plan;

(q)     Hear and determine all disputes involving the existence, nature, or scope
        of the Debtors' discharge, including any dispute relating to any liability
        arising out of the termination of employment or the termination of any
        employee or retirement benefit program, regardless of whether such
        termination occurred prior to or after the Effective Date;

(r)     Enforce all orders previously entered by the Bankruptcy Court;

SC1:4076070.8

(s)     Adjudicate decide or resolve any and all disputes under the Intercreditor Deed (without prejudice to the Secured Agent's right to bring such disputes in another court); and

(t)     Hear any other matter not inconsistent with the Bankruptcy Code.

## 12.    MISCELLANEOUS PROVISIONS

### 12.1.    Immediate Binding Effect

Notwithstanding Bankruptcy Rule 3020(e), 6004(g) or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Liquidating Trustee and any and all Holders of Claims and Equity Interests (irrespective of whether Holders of such Claims or Equity Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

### 12.2.    Additional Documents

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors, the Liquidating Trustee and all Holders of Claims or Equity Interests receiving Distributions pursuant to the Plan and all other parties-in-interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### 12.3.    Reservation of Rights

Except as expressly set forth herein, the Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order.  Neither the filing of the Plan, any statement or provision contained herein, nor the taking of any action by a Debtor or any other Entity with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of: (a) any Debtor with respect to the Holders of Claims or Equity Interests or other Entity; or (b) any Holder of a Claim or an Equity Interest or other Entity prior to the Effective Date.

### 12.4.    Successors and Assigns

The rights, benefits and obligations of any Entity named or referred to herein shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

### 12.5.    Term of Injunction or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in these Chapter 11 Cases pursuant to section 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

12.6.    Entire Agreement

On the Effective Date, the Plan and the Plan Supplement shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations with respect to this subject matter, all of which have become merged and integrated into the Plan.

12.7.    Exhibits

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  Copies of such exhibits and documents may be obtained upon written request to the Debtors' counsel at the address below or by downloading such exhibits and documents from the Bankruptcy Court's website at www.nysb.uscourts.gov or the website of the Debtors' notice and claims agent at www.kccllc.net/primorsk.

12.8.    Nonseverability of Plan Provisions Upon Confirmation

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing is: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors; and (c) nonseverable and mutually dependent.

12.9.    Closing of Chapter 11 Cases

The Liquidating Trustee shall, promptly after the full administration of these Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close these Chapter 11 Cases.

12.10.    Conflicts

Except as set forth in the Plan, to the extent that any provisions of the Disclosure Statement, the Plan Supplement, or any order of the Bankruptcy Court (other than the Confirmation Order) referenced in the Plan (or any exhibits, appendices, supplements, or amendments to any of the foregoing), conflicts with or is in any way inconsistent with any provision of the Plan, the Plan shall govern and control.

12.11.  <u>Further Assurances</u>

The Debtors, the Liquidating Trustee, all Holders of Claims receiving Distributions hereunder, and all other parties-in-interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

12.12.  <u>No Stay of Confirmation Order</u>

The Confirmation Order shall contain a waiver of any stay of enforcement otherwise applicable, including pursuant to Bankruptcy Rules 3020(e) and 7062.

12.13.  <u>Waiver or Estoppel</u>

Each Holder of a Claim or an Equity Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Equity Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement or papers filed with the Bankruptcy Court prior to the Confirmation Date.

12.14.  <u>Post-Effective Date Service</u>

After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities that have filed renewed requests for service.

12.15.  <u>Notices</u>

All notices, requests, pleadings and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

(a)    If to the Debtors, to:

Primorsk International Shipping Limited
c/o Prisco (Singapore) Pte Ltd
No. 8 Temasek Boulevard
#24-02 Suntec Tower Three
Singapore 038988
Attn:  Dmitry Golomovzy

with copies to:

Sullivan & Cromwell LLP
125 Broad St.
New York, NY 10004
Attn:    Andrew G. Dietderich
           Brian. D. Glueckstein

(b)    If to the Secured Agent, to:

White & Case LLP
1155 Avenue of the Americas
New York, NY 10036
Attn:    Scott Greissman

(c)    If to the Swap Agent, to:

Luskin, Stern & Eisler LLP
Eleven Times Square
New York, NY 10036
Attn:    Richard Stern

(d)    If to the U.S. Trustee, to:

Office of the United States Trustee
U.S. Department of Justice
33 Whitehall Street, 21st Floor
New York, NY 10004
Attn:    Richard Morrissey

New York, New York
Dated: August 2, 2016

PRIMORSK INTERNATIONAL SHIPPING
LIMITED, on behalf of itself and all other Debtors

By: _/s/ Holly Felder Etlin_____
       Name: Holly Felder Etlin
       Title:  Chief Restructuring Officer of the
            Debtors

**Appendix B: Solicitation Procedures Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————————— x
In re                                                 :        Chapter 11
                                                      :
                                                      :        Case No. 16-10073 (MG)
PRIMORSK INTERNATIONAL SHIPPING                       :
LIMITED, *et al.*,[1]                                 :
                                                      :        Jointly Administered
                            Debtors.                  :
                                                      :
———————————————————————— x

**ORDER (I) APPROVING THE DISCLOSURE STATEMENT; (II) ESTABLISHING A
VOTING RECORD DATE FOR THE PLAN; (III) APPROVING SOLICITATION
PACKAGES AND PROCEDURES FOR THE DISTRIBUTION THEREOF; (IV)
APPROVING THE FORMS OF BALLOTS; (V) ESTABLISHING PROCEDURES
FOR VOTING ON THE PLAN; AND (VI) ESTABLISHING NOTICE AND
OBJECTION PROCEDURES FOR THE CONFIRMATION OF THE PLAN**

Upon the Motion[2] of Primorsk International Shipping Limited, and its affiliated

debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), for

entry of an order (this "Order"), pursuant to section 1125 of the Bankruptcy Code, Bankruptcy

Rules 2002, 3017, 3018 and 3020 and Local Rules 2002-1, 3018-1 and 3020-1, (i) approving the

*Disclosure Statement for the Debtors' Joint Plan of Liquidation Under Chapter 11 of the*

*Bankruptcy Code* (as may be amended, modified or supplemented, the "Disclosure Statement");

(ii) establishing a record date for purposes of voting on the *Joint Chapter 11 Plan of Liquidation*

*of Primorsk International Shipping Limited and its Debtor Affiliates* (as may be amended,

modified or supplemented, the "Plan"); (iii) approving solicitation packages and procedures for

---

[1]    The Debtors in these chapter 11 cases and, if applicable, the last four digits of their U.S. taxpayer identification
       numbers are: Primorsk International Shipping Limited (Cyprus), Boussol Shipping Limited (Cyprus) (6402) –
       m/t "Zaliv Amerika", Malthus Navigation Limited (Cyprus) (6401) – m/t "Zaliv Amurskiy", Jixandra Shipping
       Limited (Cyprus) (6168) – m/t "Prisco Alexandra", Levaser Navigation Limited (Cyprus) (0605) – m/t "Prisco
       Ekaterina", Hermine Shipping Limited (Cyprus) (0596) – m/t "Prisco Irina", Laperouse Shipping Limited
       (Cyprus) (0603) – m/t "Prisco Elizaveta", Prylotina Shipping Limited (Cyprus) (6085) – m/t "Prisco Elena",
       Baikal Shipping Ltd (Liberia) (6592) – m/t "Zaliv Baikal" and Vostok Navigation Ltd (Liberia) (1745) – m/t
       "Zaliv Vostok".

[2]    Capitalized terms used and not defined herein shall have the meanings ascribed to them in the Motion.

the distribution thereof; (iv) approving the forms of ballots; (v) establishing procedures for

voting on the Plan; and (vi) establishing notice and objection procedures relating to the

confirmation of the Plan; this Court having jurisdiction to consider the Motion pursuant to 28

U.S.C. §§ 157 and 1334; and venue of these chapter 11 cases and the Motion in this district

being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this matter being a core proceeding

pursuant to 28 U.S.C. § 157(b); and this Court having found that proper and adequate notice of

the Motion and the relief requested therein has been provided in accordance with the Bankruptcy

Rules, the Local Rules, the *Administrative Order Establishing Case Management Procedures*

[Docket No. 71] (the "Case Management Order") and the *Order (I) Scheduling a Hearing to*

*Consider Approval of Disclosure Statement; (II) Fixing Time for Filing Objections Thereto and*

*(III) Approving the Form and Manner of Notice Related Thereto* [Docket No. __] and that,

except as otherwise ordered herein, no other or further notice is necessary; and any objections to

the Motion having been withdrawn or overruled on the merits; and a hearing having been held to

consider the relief requested in the Motion (the "Disclosure Statement Hearing"); and upon the

record of the Disclosure Statement Hearing and all of the proceedings had before this Court; and

this Court having found and determined that the relief sought in the Motion is in the best

interests of the Debtors, their estates, their creditors and all other parties-in-interest; and that the

legal and factual bases set forth in the Motion establish just cause for the relief granted herein;

and after due deliberation and sufficient cause appearing therefor;

IT IS HEREBY FOUND AND DETERMINED THAT:

1.    Disclosure Statement.  The Disclosure Statement (together with the

exhibits thereto) provides Holders of Claims entitled to vote on the Plan with adequate

information in accordance with section 1125(b) of the Bankruptcy Code and otherwise complies

with the applicable requirements of section 1125 of the Bankruptcy Code.

       2.     <u>Solicitation and Confirmation Schedule</u>.  The Debtors' proposed schedule

and procedures relating to solicitation of votes on the Plan and confirmation of the Plan, as set

forth herein, provides parties-in-interest with sufficient time to review and consider all

solicitation materials, including the Plan, the Disclosure Statement, the Plan Supplement, if any,

and other information and materials relating to confirmation of the Plan, provides Holders of

Claims with sufficient time, prior to the Confirmation Hearing, to make an informed judgment to

accept or reject the Plan, and provides all parties-in-interest in these chapter 11 cases with

sufficient time to object to confirmation of the Plan.

       3.     <u>Ballots and Voting and Tabulation Procedures</u>.  The Voting and

Tabulation Procedures set forth in the Motion, and the Ballots substantially in the forms attached

to the Motion as <u>Exhibit G</u> and accompanying instructions, in each case, adequately address the

circumstances of these chapter 11 cases and provide for a fair and equitable voting process

appropriate for Holders of Claims in Classes 3A, 3B and 3C that are entitled to vote on the Plan

(the "<u>Voting Classes</u>").  The Ballots are consistent with Official Bankruptcy Form No. 314 and

comply with Bankruptcy Rule 3018(c).  Ballots need not be provided to Holders of Claims in

Classes 1 and 2, which are classified as unimpaired under the Plan and are conclusively

presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Ballots also

need not be provided to Holders of Claims in Class 4 and Holders of Equity Interests in Class 5,

as such Holders are not receiving any distributions under the Plan and are deemed to reject the

Plan pursuant to section 1126(g) of the Bankruptcy Code.

4.     <u>Distribution Procedures and Unimpaired Creditor Notice</u>.  The proposed

Distribution Procedures set forth in the Motion, including the delivery of the Solicitation

Package to Holders of Claims in Voting Classes, the delivery of the notice substantially in the

form attached to the Motion as <u>Exhibit D</u> (the "<u>Unimpaired Creditor Notice</u>") to Holders of

Claims in Classes 1 and 2, and the delivery of the notice substantially in the form attached to the

Motion as <u>Exhibit E</u> (the "<u>Non-Voting Creditor Notice</u>") to Holders of Claims in Class 4 and

Holders of Equity Interests in Class 5 provide sufficient information relating to the relief granted

by this Order, in accordance with Bankruptcy Rule 3017(d) and other applicable provisions of

the Bankruptcy Code, Bankruptcy Rules, Local Rules and Case Management Order.

5.     <u>Confirmation Hearing Notice</u>.  Service of notice of the date, time and

location of the Confirmation Hearing, the deadline for objecting to confirmation of the Plan and

information regarding the discharge, injunction, exculpation and release provisions set forth in

Article 9 of the Plan, substantially in the form attached to the Motion as <u>Exhibit C</u> (the

"<u>Confirmation Hearing Notice</u>"), pursuant to the Distribution Procedures and as otherwise set

forth in the Motion, constitutes good and sufficient notice of the Confirmation Hearing to

Holders of Claims and in Voting Classes and other parties-in-interest in these chapter 11 cases,

in satisfaction of the requirements of due process and in accordance with Bankruptcy Rules

2002(b) and 3017(d) and other applicable provisions of the Bankruptcy Code, Bankruptcy Rules,

Local Rules and Case Management Order.

IT IS THEREFORE HEREBY ORDERED THAT:

1.     The Motion is GRANTED as set forth herein.

A.    Approval of the Disclosure Statement

2.    The Disclosure Statement is approved pursuant to section 1125(b) of the

Bankruptcy Code and Bankruptcy Rule 3017(b) and, to the extent not withdrawn, settled or

otherwise resolved, any objections to the approval of the Disclosure Statement are overruled.

B.    Establishment of Schedule for Solicitation and Confirmation

3.    The following dates and deadlines are hereby established with respect to

solicitation of votes on the Plan and confirmation of the Plan:

a.    **August 23, 2016 at 4:00 p.m. (Eastern Time)** shall be the record date for purposes of determining:  (a) the Holders of Claims entitled to receive a Solicitation Package; (b) the Holders of Claims entitled to vote on the Plan; and (c) whether Claims or Equity Interests have been properly transferred to an assignee pursuant to Bankruptcy Rule 3001(e) such that the assignee can vote as the Holder of such Claim (the "Voting Record Date");

b.    The Debtors shall distribute the Solicitation Packages, the Unimpaired Creditor Notice and Confirmation Hearing Notice to Holders of Claims on **August 26, 2016** (the "Solicitation Mailing Deadline");

c.    All Holders of Claims entitled to vote on the Plan must complete, execute and return their Ballots so that they are **actually received** by KCC pursuant to the Voting and Tabulation Procedures, on or before **September 13, 2016 at 8:00 p.m. (Eastern Time)** (the "Voting Deadline");

d.    **September 13, 2016 at 4:00 p.m. (Eastern Time)** shall be the date by which objections to the Confirmation of the Plan must be filed with this Court and served so as to be **actually received** by the Notice Parties (the "Confirmation Objection Deadline");

e.    **September 15, 2016** shall be the deadline to file the Voting Report; and

f.    This Court shall consider the confirmation of the Plan at a hearing to be held on **September 20, 2016 at 10:00 a.m. (Eastern Time)** (the "Confirmation Hearing").

5

C.    <u>Approval of Solicitation Packages, Distribution Procedures, Unimpaired Creditor
Notice and Non-Voting Creditor Notice</u>

4.    The Distribution Procedures are hereby approved as set forth herein.  On

or before the Solicitation Mailing Deadline, the Debtors shall cause KCC  to distribute a

solicitation package to each Holder of a Claim in the Voting Classes, containing the following

materials (collectively, the "<u>Solicitation Package</u>"), which are hereby approved:

a.    a cover letter, substantially in the form attached to the Motion as
<u>Exhibit B</u>: (i) describing the contents of the Solicitation Package, the
contents of the enclosed CD-ROM and instructions for obtaining hard
copies of materials provided on CD-ROM, and (ii) informing the Holders
of the Debtors' recommendation to accept the Plan;

b.    a printed copy of the Confirmation Hearing Notice;

c.    an appropriate Ballot (as defined below), together with a pre-addressed,
postage prepaid return envelope for submitting such Ballot;

d.    the Disclosure Statement (together with all exhibits thereto, including the
Plan and all exhibits to the Plan) in electronic format on a CD-ROM; and

e.    a copy of this Order (without exhibits) in electronic format on a CD-ROM.

5.    Any party that has filed duplicate proofs of claim which are classified

under the Plan in the same Class, whether against the same Debtor or multiple Debtors, shall

receive only one Solicitation Package for voting the relevant Claim with respect to such Class.

6.    No Solicitation Packages shall be distributed to any person to whom the

Debtors have mailed a notice of the Disclosure Statement Hearing, if such notice has been

returned as undeliverable, except to the extent the Debtors are provided with accurate addresses

for the applicable parties prior to the Solicitation Mailing Deadline.

7.    The Debtors shall, at their expense, provide paper copies of the Plan,

Disclosure Statement or Solicitation Procedures Order to any party submitting a request for such

paper copies:  (a) through the Debtors' restructuring website at <u>www.kccllc.net/primorsk</u> or (b) in

writing to:  Primorsk Ballot Processing, c/o Kurtzman Carson Consultants LLC, 2335 Alaska

Avenue, El Segundo, California 90245.

8.      Holders of Claims in Classes 1 and 2, which are conclusively presumed to

have accepted the Plan, shall receive the Unimpaired Creditor Notice, which is hereby approved.

9.      Holders of Claims in Class 4 and Holders of Equity Interests in Class 5,

which are conclusively presumed to have rejected the Plan, shall receive the Non-Voting

Creditor Notice, which is hereby approved.

10.     The Debtors are hereby authorized to modify the Disclosure Statement,

the Plan and the Ballots and other related documents approved pursuant to this Order, without

further order of this Court, at any time before distributing Solicitation Packages in accordance

with this Order, <u>provided</u> that such modifications are not material as determined by the Debtors

in good faith.  The Debtors shall file a notice of any such modification with this Court, together

with a marked version reflecting such modification.

      D.      <u>Approval of Forms of Ballots and Voting and Tabulation Procedures</u>

11.     The Ballots are hereby approved.

12.     The Debtors are authorized to solicit, receive and tabulate votes on the

Plan in accordance with the Voting and Tabulation Procedures, which are hereby approved as set

forth herein.

13.     The following voting procedures and standard assumptions in tabulating

Ballots are hereby approved:

        a.   <u>Votes Not Counted</u>.  The following Ballots shall not be counted or
           considered for any purpose in determining whether the Plan has been
           accepted or rejected:

           i.   any Ballot received by KCC after the Voting Deadline, unless the
              Debtors shall have granted in writing an extension of the Voting
              Deadline with respect to such Ballot;

    ii.    any Ballot that is illegible or contains insufficient information to identify the Holder of the Claim;

    iii.    any Ballot cast by a person or entity that (A) does not hold a Claim in a Class that is entitled to vote on the Plan or (B) is not otherwise entitled to vote pursuant to the procedures described herein;

    iv.    any Ballot sent to the Debtors or the Debtors' financial or legal advisors, agents or representatives (other than KCC);

    v.    any unsigned Ballot;

    vi.    any Ballot not received in its executed, original form;

    vii.    any Ballot that is received by KCC by facsimile or other means of electronic transmission; or

    viii.    any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan.

b.    <u>Multiple Ballots</u>.  If multiple Ballots are received from the same Holder with respect to the same Claim prior to the Voting Deadline, the latest dated Ballot received by the Voting Deadline shall be counted for voting purposes, subject to contrary order of the Court; <u>provided</u>, <u>however</u>, that where ambiguity exists with respect to which Ballot was the latest dated, KCC has the right to determine the appropriate tabulation of such Ballot and to contact the respective Holder to determine such Holder's intent in connection therewith.

c.    <u>No Vote Splitting</u>.  All Claims must be voted in their entirety to either accept or reject the Plan.

d.    <u>Ballots Signed by Representative</u>.  If a Ballot is signed by a trustee, executor, administrator, guardian, attorney in fact or other person acting in a fiduciary or representative capacity, such person shall be required to indicate such capacity when signing the Ballot.  The Debtors may request proper evidence of such representative's authority to sign the Ballot.

e.    <u>Defective Ballots</u>.  Subject to contrary order of this Court, the Debtors may, in their sole discretion, waive any defects or irregularities as to any particular Ballot at any time (including the timeliness of the submission of a Ballot), either before or after the Voting Deadline; <u>provided</u>, <u>however</u>, that:

    i.    any such waivers shall be documented in the voting reports completed by KCC;

8

    ii.    neither the Debtors, nor any other person or entity, will be under any duty to provide notification of such defects or irregularities other than as provided in the voting reports prepared by KCC, nor will any of them incur any liability for failure to provide such notification; and

    iii.    unless waived by the Debtors, subject to contrary order of this Court, any defects or irregularities associated with the delivery of Ballots must be cured prior to the Voting Deadline or such Ballots will <u>not</u> be counted.

    f.    <u>Lack of Good Faith Designation</u>.  In the event a designation of lack of good faith is requested by a party-in-interest under section 1126(e) of the Bankruptcy Code, this Court shall determine whether any vote to accept or reject the Plan will be counted for purposes of determining whether the Plan has been accepted or rejected by the applicable person or entity.

E.    <u>Approval of Notice and Objection Procedures for Confirmation of the Plan</u>

14.    The Confirmation Hearing Notice is hereby approved.

15.    On or before the Solicitation Mailing Deadline and simultaneously with the distribution of the Solicitation Packages, the Debtors shall serve the Confirmation Hearing Notice on:  (a) the U.S. Trustee; (b) all known creditors; (c) all equity security holders; (d) the Internal Revenue Service; (e) counsel to the agent for the Debtors' prepetition secured lenders, White & Case LLP, 1155 Avenue of the Americas, New York, New York 10036 (Attn: Scott Greissman); (f) counsel to the agent for the Debtors' prepetition swap lenders, Luskin, Stern & Eisler LLP, Eleven Times Square, New York, New York 10036 (Attn: Michael Luskin); (g) counsel to the agent for and the ad hoc group of the Debtors' prepetition bondholders, Shearman & Sterling LLP, 599 Lexington Avenue, New York, New York 10022 (Attn: Douglas Bartner); (h) the parties identified on the Debtors' consolidated list of 30 largest unsecured creditors; and (i) all parties who have filed a notice of appearance and request for service of documents pursuant to the Case Management Order, in each case only to the extent such parties have not otherwise been served with the Confirmation Hearing Notice pursuant to this Order.

SC1:4143499.8

16.    Any objection to confirmation of the Plan must: (a) be in writing,

(b) comply with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, (c) set forth

the name of the objector, the nature and amount of Claims or Equity Interests held or asserted by

the objector against the particular Debtor or Debtors, (d) state the basis and the specific grounds

therefor and (e) be filed with the Court, together with proof of service thereof, and served upon

and received by each of the following (collectively, the "Notice Parties") no later than the

Confirmation Objection Deadline of **September 13, 2016 at 4:00 p.m. (Eastern Time)**: (i) the

Chambers of the Honorable Martin Glenn, United States Bankruptcy Court for the Southern

District of New York, One Bowling Green, New York, New York 10004; (ii) the Debtors and

their counsel (Sullivan & Cromwell LLP, Attn: Andrew G. Dietderich and Brian Glueckstein,

125 Broad Street, New York, New York 10004); and (iii) the U.S. Trustee, 201 Varick Street,

Suite 1006, New York, New York 10014. A hard copy of any objection also must be delivered

via first-class mail to the U.S. Trustee by the Confirmation Objection Deadline.

F.    Approval of Notice of Filing of the Plan Supplement

17.    The Plan Supplement, if any, shall be filed by the Debtors no later than

**August 26, 2016** (the "Plan Supplement Filing Deadline"). The Plan Supplement Notice in the

form attached to the Motion as Exhibit F is hereby approved. If the Debtors file a Plan

Supplement, on or before the Plan Supplement Filing Deadline, the Debtors shall serve the Plan

Supplement Notice on: (a) the U.S. Trustee; (b) counsel to the agent for the Debtors' prepetition

secured lenders, White & Case LLP, 1155 Avenue of the Americas, New York, New York

10036 (Attn: Scott Greissman); (c) counsel to the agent for the Debtors' prepetition swap

lenders, Luskin, Stern & Eisler LLP, Eleven Times Square, New York, New York 10036 (Attn:

Michael Luskin); (d) counsel to the agent for and the ad hoc group of the Debtors' prepetition

bondholders, Shearman & Sterling LLP, 599 Lexington Avenue, New York, New York 10022

10

(Attn: Douglas Bartner); (e) the parties identified on the Debtors' consolidated list of 30 largest

unsecured creditors; (f) all parties who have filed a notice of appearance and request for service

of documents pursuant to the Case Management Order and (g) those parties receiving the

Solicitation Package.  Such service of the Plan Supplement Notice shall constitute good and

sufficient notice of the filing of the Plan Supplement.

       G.    <u>Other</u>

       18.    The Debtors and KCC are authorized and empowered to execute and

deliver such documents, and to take and perform all actions necessary to implement and

effectuate the relief granted in this Order.

       19.    Nothing in this Order shall be construed as a waiver of the right of the

Debtors or any other party-in-interest, as applicable, to object to a proof of claim after the Voting

Record Date.

       20.    Nothing in the Motion or this Order, nor as a result of any payment made

pursuant to this Order, shall be deemed or construed as an admission as to the validity or priority

of any claim against the Debtors, an approval or assumption of any agreement, contract or lease

pursuant to section 365 of the Bankruptcy Code or a waiver of the right of the Debtors, or shall

impair the ability of the Debtors, to contest the validity and amount of any payment made

pursuant to this Order.

       21.    The requirements set forth in Local Rule 9013-1(b) are satisfied.

       22.    This Order is immediately effective and enforceable, notwithstanding the

possible applicability of Bankruptcy Rule 6004(h) or otherwise.

       23.    This Court retains jurisdiction with respect to any matters, claims, rights

or disputes arising from or related to this Order.

11

Dated: _____, 2016
      New York, New York

_____

Martin Glenn
United States Bankruptcy Judge

12

**Appendix C: Debtors' Corporate Structure Chart**



**PRIMORSK INTERNATIONAL SHIPPING LIMITED**
**Structure Chart**
**(as of 1/14/2016)**

*Held directly or controlled via special purpose subsidiaries. Remainder of interest held by Isardia Holdings Limited and public shareholders.

SC1:4069504.1

**Appendix D: Liquidation Analysis**

**PRIMORSK INTERNATIONAL SHIPPING LIMITED, et al.**

**Liquidation Assumptions**

**Liquidation Analysis**

Pursuant to Section 1129(a) (7) of the Bankruptcy Code (often called the "Best Interests Test"), holders of Allowed Claims and Interests must either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Plan's assumed Effective Date, that is not less than the value such non-accepting holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code ("Chapter 7").

In determining whether the Best Interests Test has been met, the first step is to determine the dollar amount that would be generated from a hypothetical liquidation of the Debtors' assets under Chapter 7. The Debtors, with assistance of their financial advisor, have prepared this hypothetical Liquidation Analysis (the "Liquidation Analysis") in connection with the Disclosure Statement. The Liquidation Analysis reflects the estimated cash proceeds net of liquidation-related costs that would be available to the Debtors' creditors if the Debtors were to be liquidated under Chapter 7 as an alternative to an orderly wind-down under the Plan. The Liquidation Analysis is based upon the assumptions discussed herein and in the Disclosure Statement.

UNDERLYING THE LIQUIDATION ANALYSIS ARE NUMEROUS ESTIMATES AND ASSUMPTIONS

REGARDING LIQUIDATION PROCEEDS THAT, ALTHOUGH DEVELOPED AND CONSIDERED

REASONABLE BY THE DEBTORS' MANAGEMENT AND ITS ADVISORS ARE INHERENTLY SUBJECT

TO SIGNIFICANT BUSINESS, ECONOMIC, REGULATORY AND COMPETITIVE UNCERTAINTIES AND

CONTINGENCIES BEYOND THE CONTROL OF THE DEBTOR AND ITS MANAGEMENT.

ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THE

LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE DEBTORS WERE, IN FACT, LIQUIDATED,

AND ACTUAL RESULTS COULD MATERIALLY DIFFER FROM THE RESULTS SET FORTH HEREIN.

**GENERAL ASSUMPTIONS**

***Overview of the Liquidation Process***

The Debtors prepared this Liquidation Analysis in connection with its solicitation of votes to accept or reject its Plan, which contemplates a liquidation of PRIMORSK INTERNATIONAL SHIPPING LIMITED, et al. (Collectively, "Primorsk"), along with 9 of their direct subsidiaries (the "Debtor Subsidiaries"). Under the hypothetical Chapter 7 scenario in this Liquidation Analysis, Primorsk and its Debtor Subsidiaries are collectively referred to as the "Chapter 7 Debtors."

In this case, it is assumed that the Debtors would continue to operate in the normal course in order to complete the sale of their vessels. After the vessels are sold, the case would convert to a Chapter 7 liquidation and a trustee (the "Chapter 7 Trustee") would be appointed to manage the Chapter 7 Debtors' remaining affairs. The Debtors would cease substantially all operations in an orderly manner and use their cash position to pay claims in accordance with the priority scheme set forth in the Bankruptcy Code.

### *Hypothetical Liquidation Period*

The Liquidation Analysis assumes an expedited, but orderly liquidation of the Debtors' operations to maximize recovery values. The hypothetical Chapter 7 liquidation is assumed to commence following the sale of the Debtors' vessels and conversion to a Chapter 7. For the purposes of this analysis the Company's Vessels are valued at $215 million, consistent with the July 13, 2016, Court order approving the sale of the vessels.

### *Estimate of Net Proceeds*

The net proceeds estimated in the Liquidation Analysis use the wind-down budget included with the Supplemental Declaration in Support of the Sale Motion as a beginning point. The estimated cash proceeds that could be realized in liquidation are approximated by evaluating the Chapter 7 Debtors' assets. The Chapter 7 Debtors' assets primarily consist of (i) cash proceeds from the sale of their fleet of tankers, (ii) any additional operating assets such as customer receivables and other current assets, (iii) and an interest in a joint venture.

### *Estimate of Costs*

The estimated liquidation costs include fees payable to a Chapter 7 Trustee as well as those to attorneys and other professionals that the Chapter 7 Trustee may engage. The Chapter 7 trustee is assumed to be paid 3% of the proceeds available from the Chapter 7 estate for their services. Priority expenses would include any obligations and unpaid expenses the Debtors incurred both during the Chapter 11 cases and from the start and until the conclusion of the Chapter 7 case.

### *Distribution of Net Proceeds*

The proceeds available represent the sum of the disposition of the Chapter 7 Debtors' assets and cash on the balance sheet at the commencement of the hypothetical Chapter 7 liquidation.

Available proceeds from the liquidation of assets and cash would be first applied to the payment of Postpetition Administrative Claims (first claims arising from the wind-down of the Chapter 7 Debtors' business during the Chapter 7 liquidation process and thereafter to any Postpetition expenses associated with the Chapter 11 reorganization process). Following the payment of Administrative Claims, net proceeds attributable to the liquidation of the Debtors' assets would be applied to satisfaction of debt obligations secured by the Chapter 7 Debtors' various assets. Remaining liquidated proceeds, if any would be available for the satisfaction of unsecured claims "Unsecured Claims", which shall consist of General Unsecured Claims and any additional unsecured claims that arise in Chapter 7

liquidation "Additional Unsecured Claims." The holders of the Lender Claims have first priority liens or mortgages on, security interests in, and assignments, charges, or pledges on certain property, including, without limitation, (i) nine Vessels owned by the Debtor Subsidiaries, (ii) deeds of covenant assigning certain agreements related thereto, including, without limitation, charters, management agreements, earnings, and insurance, and (iii) Cash Collateral, as well as second priority liens or mortgages on, security interests in, and assignments, charges, or pledges on certain property, including, without limitation, (iv) nine Vessels owned by the  Debtor Subsidiaries, and (v) deeds of covenant assigning certain agreements related thereto, including charters, management agreements, earnings, and insurance, that will partially fund the Chapter 11 and Chapter 7 processes.

Any secured claims that are not satisfied by the liquidation of the underlying collateral securing the claims would represent an unsecured deficiency claim.

The table below summarizes the estimated proceeds that would be available for distribution to the Chapter 7 Debtors' creditors and equity interest holders in a hypothetical liquidation of the estates under Chapter 7 of the Bankruptcy Code. The estimated recoveries do not reflect any potential negative impact on the distributable value available to the Chapter 7 Debtors' creditors on account of any potential unknown and contingent liabilities. Additional assumptions with respect to the Liquidation Analysis are provided below.

**PRIMORSK INTERNATIONAL SHIPPING LIMITED, et al.**
Scenario: Consensual Liquidation Process (Ch-7)

*$ in thousands*

| | Amount | % Recovery | | Liquidation Proceeds | | See Note |
| --- | --- | --- | --- | --- | --- | --- |
| | | Low | High | Low | High | |
| **Assets Available for Distribution** | | | | | | |
| Cash & Cash Equivalents | (2,550) | 100% | 100% | $ (2,550) | $ (2,550) | 1 |
| Accounts Receivable | - | 50% | 75% | - | - | 2 |
| Inventory and Other Assets | 944 | 50% | 75% | 472 | 708 | 3 |
| Polar Crewboat JV | 500 | 100% | 100% | 500 | 500 | 4 |
| Net vessel sale proceeds (exc Clarksons costs) | 212,800 | 100% | 100% | 212,800 | 212,800 | 5 |
| **Proceeds Available for Post-Petition Administrative Claims** | $ 211,694 | | | $ 211,222 | $ 211,458 | |
| **Estimated Liquidation Expenses** | | | | | | |
| Less: Chapter 7 Trustee Fees (3% of Gross Proceeds) | | | | (6,337) | (6,344) | 6 |
| Less: Other Professional Fees | | | | (250) | (250) | 7 |
| **Estimated Proceeds Available for Allocation After Administrative Claims** | | | | $ 204,636 | $ 204,864 | |

| | Estimated Claims | | Estimated Creditor Recovery Percentage | | Hypothetical Creditor Recovery Values | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Low | High | Low | High | Low | High | |
| **Estimated Creditor Recoveries** | | | | | | | |
| Senior Maritime Claims | $ - | $ - | na | na | $ - | $ - | 8 |
| **Estimated Net Proceeds Available to Secured Creditors** | | | | | $ 204,636 | $ 204,864 | |
| | | | | | | | |
| Lender Claims | $ 262,295 | $ 262,295 | | | | | 9 |
| *530S* | $ 194,269 | $ 194,269 | 100% | 100% | $ 194,269 | $ 194,269 | |
| *530J* | $ 51,625 | $ 51,625 | 20% | 21% | $ 10,366 | $ 10,595 | |
| *Swap Loan* | $ 16,401 | $ 16,401 | 0% | 0% | $ - | $ - | |
| Bondholders Claims | $ 80,955 | $ 80,955 | 0% | 0% | $ - | $ - | 10 |
| **Estimated Net Proceeds Available to Unsecured Creditors** | | | | | $ - | $ - | |
| | | | | | | | |
| **Other Claims** | | | | | | | |
| Charterers Claim | - | - | 0% | 0% | - | - | |
| Non debtor intercompany Claim | 7,653 | 7,653 | 0% | 0% | - | - | |
| Non debtor affiliate Claim | - | - | 0% | 0% | | | |
| Unsecured Claims | - | - | 0% | 0% | - | - | |
| **Estimated Other Claims** | 7,653 | 7,653 | | | - | - | 11 |
| | | | | | | | |
| **Equity Holders** | n/a | n/a | | | - | - | |

**SPECIFIC ASSUMPTIONS**

*Note 1 – Cash and Cash Equivalents*

The Liquidation Analysis assumes that the Debtors sell the vessels consistent with the July 13, 2016 Court order approving the sale of the vessels and then the case converts to a Chapter 7 Liquidation.  The Debtors are assumed to operate under the wind-down budget previously presented as part of the Supplemental Declaration in Support of the Sale Motion through October 30, 2016.  As of that date, the debtors are in a negative cash position from operations due to the lack of charter income, operating costs, crew related severance payments, and professional fee costs. In addition, Senior Debt is assumed to be repaid in October, resulting in additional interest to be paid to the lenders.

*Note 2 – Accounts Receivable*

Based on management's estimate of collectability, it is assumed that all accounts receivable, which consists of amounts due from charters, have previously been collected or will be collected through the wind down budget period.

*Note 3 – Inventory and Other Assets*

Inventory and Other Assets include lubricants inventory and prepaid insurance. Lubricants inventory, which is used to operate Vessels, is stored on-board the Vessels at the time of purchase and, depending on the flag of the Vessel, may also be pledged to the Secured Credit Facilities lenders. Prepaid insurance includes insurance premiums paid in advance which cover a period of time which has not elapsed.

*Note 4 – Polar Crew boat Joint Venture*

Shares in the joint venture are not liquid as the joint venture partner has a right of first refusal. The project is specific and the number of potential buyers is limited. The value is estimated based on an existing offer to purchase the joint venture.

*Notes 5 – Value of Debtors' Vessels*

The Liquidation Analysis assumes that the Debtors' vessels will be sold for $215 million, consistent with the July 13, 2016 Court order approving the sale of the vessels. Proceeds net of broker fees and expenses are $212.8 million.

*Note 6 – Chapter 7 Trustee and Other Liquidator Fees*

The estate will incur Chapter 7 Trustee fees of approximately $6.3 million in aggregate, calculated as 3.0% of the gross proceeds available for distribution. The Liquidation Analysis assumes that one Chapter 7 Trustee is appointed for all Debtors. However, it is possible that if all of the Debtors were to liquidate under Chapter 7, multiple Chapter 7 Trustees could be appointed, resulting in additional costs. The Liquidation Analysis does not account for possible fees by foreign administrators or liquidators in the event of a foreign insolvency proceeding.

*Note 7 –Other Professional Fees*

It is assumed the Trustee will require $250,000 professional fees to be paid to advisors to the Trustee.

*Note 8 – Maritime Payables*

Maritime Payables arise from claims related to providing "necessaries" associated with vessel operations and include crew wages, vessel repairs and voyage supplies such as bunkers. These Maritime Payables are frequently secured by maritime liens. The Liquidation Analysis assumes that maritime liens, in the form of trade accounts payable at the individual Vessel-owning Debtor Subsidiaries, are senior to the secured loan claims at the vessel owning Debtor Subsidiaries. If any such claims exist, they are assumed to have been satisfied within the wind down budget.

*Note 9 – Lender Claims*

Balances are estimated as of September 2016 and claims are ranked in order of priority.

*Note 10 – Bondholder Claims*

Balance is estimated as of September 2016.

*Note 11 – Unsecured Claims*

Although there may be general unsecured claims from contract rejection and other sources, those claims have not been estimated.

Non Debtor intercompany claims total approximately $7.7 million.